UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | S5-4:15CR 404 HEA/NAB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL GRADY, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR RELEASE FROM CUSTODY**

COMES NOW the United States of America by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Michael A. Reilly, Assistant United States Attorney for said District, and for its response to Defendant Grady's Motion For Release From Custody ("Defendant's Motion For Release," Doc. # 2571), states as follows:

**Introduction**

This is Defendant's fourth challenge to the Court's detention order, which imposed pretrial detention because no conditions of release would assure the safety of the community and Defendant's appearance at future proceedings (Doc. # 789, 2571; 18 U.S.C. § 3142(e)). Critically, Defendant does not challenge the Court's determination that he poses both a danger to the community and a flight risk. Nor does he attack the presumption that applies in favor of detention in this case pursuant to 18 U.S.C. § 3142(e)(3)(1). Rather, Defendant advances concerns about the spread of COVID-19 outside of the jail system to justify his immediate release on bond. Defendant has not identified any valid basis for this extraordinary relief. For

1

instance, there is no evidence that any detainee at the Alton City Jail has been exposed to COVID-19, and jail administrators have implemented proactive measures to prevent the transmission of the virus. Additionally, given that Defendant's concerns about COVID-19 could be invoked by many other detainees with health concerns, granting release here would cause a flood of similar requests at a time when the justice system is already inundated with challenges related to coronavirus outbreak. Accordingly, the Court should reject Defendant's efforts to unsettle its determination that pretrial detention is necessary in this case.

## Procedural History And Detention

On December 1, 2016, the Grand Jury returned the Fourth Superseding Indictment, which among other things charged the following offenses:  (1) Derrick Terry (Terry), Grady, and Oscar Dillon (Dillon) were charged in counts three and four, conspiracy to distribute cocaine and heroin, respectively, in violation of Title 21, United States Code, §§ 841(a)(1) and 846; (2) Terry, Grady, Dillon, and Charda Davis (Davis) were charged with obstruction of justice, acting together, in count twenty-eight, in violation of Title 18, U.S.C., §§ 2 and 1512(c)(2); (3) Terry, Grady, Dillon, and Davis were charged with unlawful flight to avoid prosecution, acting together, in count twenty-nine, in violation of Title 18, U.S.C., §§ 2 and 1073; and (4) Terry, Grady, Dillon, and Stanford Williams (Williams) were charged with conspiracy to commit money laundering in count fifty-one, in violation of Title 18, U.S.C., § 1956.  Terry was also charged with drug distribution related homicides in counts five and fifty-six, for violations of Title 18, U.S.C., §§ 2, 924(c), and 924(j).

On December 20, 2018, the grand jury returned the Fifth Superseding Indictment in this matter that charged Defendant Grady with similar but renumbered Counts in Counts 31-34, and added a charge of witness tampering in Count 35 in relation to these proceedings.

As to Count 31, the drug conspiracy, the offense carries a statutory maximum sentence of more than ten years (life as to cocaine, and a maximum of twenty years as to heroin) as prescribed in the Controlled Substances Act set forth in 21 U.S.C. 801 *et seq.*  A finding of probable cause that Grady committed such offenses subjects Grady to a statutory presumption in favor of detention that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e) and (f).

The United States opposes Defendant's Motion For Release for the same reasons set forth in its responses to Defendant's previous related motions.  On December 23, 2016, the Magistrate Judge entered the detailed Order of Detention Pending Trial (Doc. # 789).[1]  On January 11 and 18, 2017, Defendant, by and through previous counsel, filed his Motion to Revoke or Amend Order of Detention and Memorandum of Law in Support of Motion for Revocation or Amendment of Order of Pre-Trial Detention (Docs. # 821, 833).  On January 18, 2017, the United States filed its Response to Defendant's Motion For Revocation or Amendment of Order of Pre-Trial Detention ("Government's Response," Doc. # 834, incorporated herein by reference).  On January 19, 2017, after a lengthy hearing and argument, the District Court overruled Defendant's Motion for Revocation (Doc. # 838).

---

[1] The Judge concluded that, "Given the nature of the charges and the potential sentence as well as Defendant's history of serious convictions, arrests, and failures to appear, the Court concludes by both clear and convincing evidence, as well as a preponderance of the evidence, that no condition or combination of conditions would assure Defendant's appearance or the safety of the public." (Doc. # 789, p. 4).  The Court found that Defendant had not introduced sufficient evidence to rebut the presumption of detention (Doc. # 789, p. 2).  The Court's analysis included the following reasons for detention:  (1) Subject to lengthy period of incarceration if convicted; (2) Prior criminal history; (3) History of violence or use of weapons; and (4) Prior failure to appear in court as ordered (Doc. # 789, pp. 2-3).  The Court also noted specific concerns related to Defendant's significant criminal history (Doc. # 789, p. 3).

On July 11, 2017, Defendant Grady filed a Second Motion for Revocation or Amendment of Order of Pre-Trial Detention ("Defendant's Second Motion to Revoke," Doc. # 1066), and Memorandum In Support of the Motion for Revocation or Amendment of Order of Pre-Trial Detention ("Memorandum in Support," Doc. # 1067), to which the United States responded (Doc. # 1080, incorporated herein by reference).  On July 27, 2017, the District Court denied Defendant's Second Motion to Revoke (Doc. # 1107).

On February 20, 2019, Defendant Grady filed his Motion for Reconsideration of Bond (Doc. # 2087), which the District Court denied on May 6, 2019 (Doc. # 2240).  The District Court agreed that by clear and convincing evidence the release of the Defendant on bond would pose a danger to the community.  The District Court also found by a preponderance of the evidence "that there is a considerable flight risk in releasing the defendant on bond."  (Doc. # 2240, p. 4).  The District Court noted that, "The history and characteristics of the charges and evidence is that defendant provided counsel to a highly tiered drug trafficker in Counts 32 and 33.  The highly tiered drug trafficker is alleged to have used a firearm resulting in death."

The same analysis that supported the detention orders in December 2016, January 2017, and May 2019, applies today, and the United States refers to the record, including its original responses, and relevant court orders (Docs. # 789, 834, 838, 1080, 1107, 2110 and 2240).  For purposes of judicial economy, the United States will not restate all of its arguments, but the arguments remain meritorious.

Moreover, Defendant now faces the additional charge of tampering with a witness in this case, as charged in Count 35 of the Fifth Superseding Indictment.  Thus, in addition to the factors previously detailed in the existing detention orders, the case for detention is even stronger now.

The additional charge provides further evidence of the "a serious risk that [Grady] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."  *See* 18 U.S.C. § 3142(f)(2)(B).   In a nutshell, Defendant Grady tampered with a witness while being detained on corresponding charges in Counts 32 and 33 that he counseled a high level drug trafficker, also charged with use of a firearm resulting in death, to abscond this jurisdiction in an effort to influence this judicial proceeding.  Detention, regardless of COVID-19's existence, is for this exact type of defendant.

### Facts

### I.      COVID-19 procedures at the Bureau of Prisons

The Bureau of Prisons ("BOP") has been preparing for a potential COVID-19 outbreak since January 2020 by developing best practices to mitigate transmission. *See* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/ news/20200313_covid-19.jsp. Effective March 13, 2020, BOP required all of its facilities to implement a set of measures "to mitigate the spread of the COVID-19" and "to ensure the continued effective operation of the federal prison system." *Id.* These measures include: (1) prohibiting all social and volunteer visits; (2) restricting legal visits (with case-by-case exceptions); (3) suspending inmate facility transfers (with exceptions for medical treatment and other compelling reasons); (4) requiring staff health screening, including temperature checks; (5) implementing a variety of coronavirus-specific protocols for inmates, such as screening new inmates, quarantining asymptomatic inmates, and isolating and testing inmates with exposure risk factors (in addition to its routine infectious disease management program); and (6) modifying operations to maximize social distancing and to limit group gatherings. *Id.*

In the Southern District of Illinois, where Defendant is detained, as well as in the Eastern

District of Missouri, the U.S. Marshals Service has recommended that all pretrial detention facilities follow the BOP's COVID-19 mitigation measures. Area detention facilities have already implemented a number of the recommended measures, including limiting visitors and taking prisoners' temperature prior to court appearances. Additionally, each detention facility has a protocol for responding to the medical issues, including transporting detainees to area hospitals in the usual event they cannot provide in-facility care.

BOP's efforts have reduced the number of BOP-related COVID-19 cases to only six inmates in BOP custody and four staff members. *See* Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/index.jsp.

## II.      COVID-19 Procedures At The Alton City Jail

The Alton City Jail (ACJ) has no reported cases of COVID-19.  The ACJ has instituted procedures to screen for COVID-19 and to limit access to the facility by outsiders, with the limitations discussed below.[2]  The United States does not concede the factual representations contained in Defendant's Motion For Release.

After March 16, 2020, all social visits to the ACJ were cancelled.  Volunteers may no longer enter the facility, and tours are no longer being conducted.  Even prior to March 16, social visits and the vast majority of legal visits were conducted by phone at a visiting window that separated the detainee and visitor.  Neither the inmate nor visitor were allowed to have direct physical contact.  On March 15, 2020, following a Court security meeting, the Federal Public Defender for the Southern District of Illinois instructed that Federal Public Defenders and CJA Panel Attorneys cease detainee visits, district wide.[3]  This request was not limited to the ACJ but extended to the entire Southern District.

---

[2]  Federal detainees at ACJ are physically separated from prisoners detained on state and local charges.

[3]  Detainees continue to have access to phones.  The ACJ is currently testing a video system to facilitate court appearances and attorney communications.

6

ACJ staff has added three screening questions related to COVID-19 that are asked during the booking process for incoming prisoners. These questions are related to the prisoner's relevant travel and recent contact and their current physical condition, including symptoms such as fever, cough, and respiratory condition. ACJ staff also takes the temperature of each incoming prisoner and documents it on the booking sheet. If an inmate has a temperature over 100.4, staff have been instructed to give the inmate a mask, isolate that inmate in a holding cell, and notify a supervisor. If indicators of COVID-19 are present, ACJ staff will contact the Madison County Health Department (MCHD) to allow MCHD staff to determine whether a detainee/prisoner should be introduced to the health care system for additional diagnosis and treatment.

 High-contact areas are disinfected after the arrival of incoming prisoners.  The ACJ conducts temperature checks on prisoners before and after transportation to court.  The ACJ conducts temperature checks on transportation officers. The ACJ conducts temperature checks on its own staff, staff from other agencies, doctors, and other non-employees entering the facility.   ACJ staff does not conduct mandatory temperature screening on fire and EMS personnel who are already screened by their own agencies.  ACJ staff has also been instructed to practice social distancing.

The recreation/dining room facility is disinfected by ACJ janitors.  The cleaning supplies, including disinfectant, are available to detainees to use in said area.  Detainees are issued two bars of soap, along with other hygiene items, each week.  Additional soap is available upon request.

Defendant, with disregard for the lack of publicly available COVID-19 testing materials, contends that, "Alton City Jail is currently doing no testing for COVID-19."  This is misleading. At the present time, actual COVID-19 testing is conducted by the medical community, subject to the discretion of health care professionals and the limitations of available of testing material.

**Analysis**

Defendant primarily argues that 18 U.S.C. 3142(i) of the Bail Reform Act requires the Court to reconsider its detention order and grant him immediate release on bond.[4] (*See* Motion for Release, pp. 1-2, 7). But neither this provision nor 18 U.S.C. § 3142(f) allows for such extraordinary relief. Moreover, if the Court were to grant Defendant's release, it would open the floodgates to similar challenges from the hundreds of pretrial detainees in the Eastern District and quickly overwhelm both the Court and the Pretrial Services Office. Accordingly, the Court should deny Defendant's request for reconsideration and release.

**I.     Defendant's concerns about COVID-19 cannot justify reopening his detention hearing under section 3142(f) because the recent outbreak does not have a "material bearing" on whether he poses a flight risk or a danger to the community.**

Defendant, without citing 18 U.S.C. § 3142(f), suggests that the Court reopen his detention hearing based on "changed circumstances" related to COVID-19.[5] (*See* Motion for Release, pp. 1-2, 7). But as this Court recently emphasized, this provision applies only when newly-discovered information has a "material bearing" on whether a defendant poses a flight risk or a danger to the community. *See United States v. Howard*, No. 4:19-cr-00148-ERW, slip op. at 1 n.1 (E.D. Mo. Mar. 24, 2020) (ECF No. 53) (rejecting a similar request to reconsider detention under section 3142(f) because "the Court does not view [the coronavirus pandemic] as sufficient to reopen the detention hearing"). Because the spread of the COVID-19 similarly has no impact

---

[4] Defendant also cites a number of cases related the due-process limitations on pretrial detention, but this precedent is inapposite because he does not attempt to justify release on constitutional grounds. Regardless, any constitutional argument would fail for similar reasons set out below. *See Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020) (denying TRO based on claim that "continued detention in the face of the COVID-19 pandemic violates [detainees'] Fifth Amendment right to reasonable safety while in custody".

[5] Defendant relies upon 18 U.S.C. § 3142(i). Irrespective of which section Defendant relies upon, neither section entitles him to reopen the hearing or for his release on bond.

on this central question here, Defendant has failed to identify a permissible basis for reopening his detention hearing.

In relevant part, section 3142(f) allows the Court to reopen a detention hearing if it "finds that information exists that was not known by the movant at the time of the hearing *and that has a material bearing on the issue* whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f) (emphasis added). As this Court previously instructed in denying a similar request for reconsideration under the Bail Reform Act, such newly discovered evidence must be "sufficient to overcome the key factors on which the initial order of detention were predicated." *United States v. Rush*, No. S1–4:14 CR 88 RWS(SPM), 2017 WL 6541436, at *3 (E.D. Mo. Dec. 1, 2017). Defendant's motion for reconsideration does not even suggest that his concerns about COVID-19 impact the Court's finding that Defendant poses both a danger to the community and a flight risk. Thus, there is no basis for reopening his detention hearing under section 3142(f). *See, e.g.*, *United States v. Jones*, No. 1:17-cr-00582-CCB-2, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (rejecting claim for release after detainee was exposed to COVID-19 at another detention facility and despite detainee's underlying health conditions including pregnancy because these considerations did not undermine need for detention based on § 3142(g) factors); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (denying appeal of detention order on similar grounds).

To be fair, the Bail Reform Act identifies a defendant's "physical and mental condition" as a potential factor in the detention analysis. *See* 18 U.S.C. § 3142(g)(3)(A). However, the Act makes clear that this consideration is relevant only to the extent it impacts the underlying "determin[ation of] whether there are conditions of release that will reasonably assure the

9

appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(g). The limited case law Defendant cites concerning section 3142(f) confirms this reading of the statute. For example, in *United States v. Cordero Caraballo*, the court made clear the defendant's "serious" and "grotesque" gunshot wounds were relevant to the question of pretrial detention because they rendered him entirely immobile, thereby mitigating the threat he otherwise posed to the community. *See* 185 F. Supp. 2d 143, 145–46 (D.P.R. 2002). Unlike the immobilized defendant in *Cordero Caraballo*, Defendant has not identified a physical or mental condition that has any bearing on the Court's prior finding that he poses a danger to the community and a flight risk. And even if the Court were to conclude that a defendant's concerns about an infectious disease might qualify as a relevant physical condition under section 3142(f) in some instances, Defendant's claims about COVID-19 are insufficient to justify release from detention for the reasons discussed in the next section.  Defendant Grady remains a threat to the community and a flight risk.  Thus, the Court should deny Defendant's request to reopen his detention hearing under section 3142(f).

## II.     Section 3142(i) permits only the "temporary release" of pretrial detainees, and Defendant has failed to show that this extraordinary relief is necessary for his health or any other compelling reason.

Defendant argues that the Court can grant his release under section 3142(i). As an initial matter, the motion for reconsideration fails to acknowledge the limited nature of this provision, which provides for only the "temporary release" of pretrial detainees, not the indefinite "release on bond" that Defendant requests (Motion For Release, p. 7). *See United States v. Avanetti*, No. 8:19-cr-00061-JVS, slip op. at 2 (C.D. Cal. Mar. 21, 2020) (ECF No. 121) (emphasizing this distinction in denying motion for reconsideration of bail); *see also Howard*, slip op. at 2 (providing similar description of section 3142(i)). Moreover, Defendant does not qualify for even

10

temporary release because he has not met his burden of showing that a release from detention is necessary to protect his health or for any other compelling reason. Thus, section 3142(i) does not provide a basis for reconsidering Defendant's detention or granting even a temporary release.

Section 3142(i) provides that a "judicial officer may . . . permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."[6] 18 U.S.C. § 3142(i). "A defendant has the burden of showing that temporary release is '*necessary* . . .' under Section 3142(i)." *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011) (emphasis added); *see also United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (indicating that "temporary release under section 3142(i)" is warranted only "in extraordinary circumstances"). With respect to health conditions, "[t]his provision has been used sparingly" and only where absolutely necessary because care can no longer be managed by a detention facility. *United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted).

Although Defendant has identified specific concerns related to age, emphysema and lung capacity, he has failed to demonstrate that his release from detention is necessary for either his health or obtaining adequate treatment for his condition.[7]  In *United States v. Hamilton*, the

---

[6] Defendant does not claim that temporary release is necessary for preparation of his defense. Moreover, even if detention facilities were to restrict such in-person visits moving forward, detainees would face no prejudice as this Court already has modified its schedule in light of the coronavirus outbreak and could simply grant a continuance if a detainee were unable to communicate with defense counsel in a timely manner.  *See Avanetti*, No. 8:19-cr-00061-JVS, slip op. at 3 ("Notwithstanding any current limitations on attorney visits, there will be an adequate opportunity to prepare once conditions normalize.").

[7]  The United States assumes for purposes of this pleading the truth of Defendant's allegation regarding his health, but notes this specific information was not reported in the Pretrial Services

detainee failed to show a "compelling reason" for temporary release under § 3142(i) despite his "advanced age and medical conditions (which include dementia and a history of stroke and heart attack)." *United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *1 (E.D.N.Y. Mar. 20, 2020); *see also United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020)  (denying appeal of detention order for detainee who has "asthma, high blood pressure, and diabetes); *United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (rejecting request for modified sentence for detainee who claimed he was at a heightened risk due to "his compromised medical condition" based on his "high blood pressure, high cholesterol, asthma, and allergies").

Moreover, Defendant does not claim that there are any cases of COVID-19 at the Alton City Jail or that he has been exposed to the coronavirus. *See Hamilton*, 2020 WL 1323036, at *2 (finding that the COVID-19 pandemic did not constitute "a sufficiently compelling reason to justify release under [§ 3142(i)]" despite detainee's high risk for infection because "there have been no reported incidents of COVID-19 [at his facility] and [BOP] is taking system-wide precautions to mitigate the possibility of infection within its facilities."); *see also Dawson*, 2020 WL 1304557, at *2 (emphasizing similar absence of reported cases at detention facility). Given that there are a number of confirmed cases in the St. Louis Area, it may well be safer for Defendant to shelter-in-place in the controlled environment at the Alton City Jail—consistent with recent measures being implemented by local, state, and national authorities—than seeking release at this uncertain time.  *See United States v. Jefferson*, No. CCB-19-487, 2020 WL 1332011, at *1 n.1 (D. Md. Mar. 23, 2020) ("It is not at all clear that [releasing detainee to live with his family] would not pose a health risk to [the detainee] or the community"). And it

Report (Doc. # 702, p. 3).

certainly remains safer for the public for Defendant to remain in pretrial detention for the reasons this Court found in its detention order (Doc. # 789, 2240).

The above stated facts establish among other things that:  (1) There are no COVID-19 cases currently at the ACJ; (2) ACJ staff have introduced procedures to limit visitation to the facility; (3) The Federal detainee population is physically separated from state and local detainees; (4) ACJ staff has instituted reasonable screening procedures for incoming detainees, including temperature checks; and (5) ACJ staff has instituted reasonable screening procedures, including temperature checks, for staff and other professionals entering the facility or in contact with the detainee population.

Defendant fails to meet his burden of showing that the extraordinary remedy of release from detention is necessary, particularly considering the preventative measures detention facilities like ACJ have taken to mitigate the risks posed by the spread of COVID-19. *See Gileno*, 2020 WL 1307108, at *4 ("With regard to the COVID-19 pandemic, [inmate did] not show[] that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic . . . or that the facility is specifically unable to adequately treat [him]. . . . [T]he Court cannot assume that the Bureau of Prisons will be unable to manage the outbreak or adequately treat Mr. Gileno should it emerge at his correctional facility . . . ."); *Martin*, 2020 WL 1274857, at *4 ("[W]hile the record confirms that [detainee] suffers from asthma, high blood pressure, and diabetes, this alone is insufficient to rebut the proffer by the Government that the correctional and medical staff . . . are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus.").

While the coronavirus outbreak is new, health claims by detainees are not. Courts have observed that "it is a rare case in which health conditions present an 'exceptional reason'"

requiring release where detention is otherwise warranted. *See United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008). These cases also recognize that reasonably necessary treatments are available in prison, and often times, a prison setting will provide superior care than a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, Defendant simply has failed to show that his needs will not be met during his detention. Because Defendant has not demonstrated that his release from detention is necessary for his health or any other compelling reason, the Court must reject the motion for reconsideration or release under section 3142(i).

### III.     Releasing pretrial detainees like Defendant would unduly burden the courts, the Pretrial Services Office, and a justice system already under strain from COVID-19.

In his request for relief, Defendant claims that the Court should grant his immediate release on bond because he "will not be left to his own devices, but will be supported and monitored by Pretrial Services."  (Motion For Release, p. 9).  Beyond overlooking the fact that this Court already determined that no condition of release would be adequate to address its concerns about Defendant's danger to the community and flight risk, this argument underscores the profound consequences underlying his request for reconsideration. Releasing pretrial detainees like Defendant not only would endanger the community but would impose significant burdens on the justice system, which is already facing other challenges related to the COVID-19 outbreak. For example, detainees who are released would require some form of monitoring by Pretrial Services Office, in addition to the hundreds of defendants in the Eastern District who are already under supervision.[8] Similarly, the Court would be inundated by requests from other

---

[8] Before a Defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. New release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

detainees seeking pretrial release. Countless defendants could make the generic argument, now being raised by Defendant, that they should be released due to fears over the coronavirus outbreak and widespread concerns that "pretrial confinement create[s] the ideal environment for the transmission of contagious disease."  (Motion For Release, p. 3). Thus, to the extent the Court concludes that the Bail Reform Act allows Defendant to relitigate the issue of detention, it should be mindful of these practical consequences in determining whether to grant Defendant's request for immediate release on bond.

### Conclusion

For the foregoing reasons, the Government respectfully requests that this Court deny Defendant's Motion For Release. *See Avanetti*, No. 8:19-cr-00061-JVS, slip op. at 2; *Dawson*, 2020 WL 1304557, at *1; *Gileno*, 2020 WL 1307108, at *4; *Hamilton*, 2020 WL 1323036, at *2; *Howard*, No. 4:19-cr-00148-ERW, slip op. at 2; *Jefferson*, 2020 WL 1332011, at *2; *Jones*, 2020 WL 1323109, at *1; *Martin*, 2020 WL 1274857, at *1.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

*s/Michael A. Reilly*
MICHAEL A. REILLY, #43908MO
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, MO  63102

### CERTIFICATE OF SERVICE

I certify that on March 24, 2020, a copy of the foregoing was filed with the ECF system; and that a copy was served via e-mail upon Quinn A. Michaelis, counsel for Michael Grady.

*s/Michael A. Reilly*
MICHAEL A. REILLY, #43908MO