UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S5-4:15CR00404 HEA |
| | ) | |
| MICHAEL GRADY, and | ) | |
| OSCAR DILLON, III, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S NOTICE OF EXPERTS' NAMES, QUALIFICATIONS, AND
SUBJECTS OF TESTIMONY**

COMES NOW the United States of America, by and through Sayler A Fleming, United

States Attorney for the Eastern District of Missouri, and Donald Boyce and Michael A. Reilly,

Assistant United States Attorneys for said District, and pursuant to Federal Rule of Evidence

16(a)(1)(G) hereby provides Defense Counsel with the Government's Notice of Experts' Names,

Qualifications and Subjects of Testimony in relation to the following expert witnesses the

Government intends to call at trial:

**1. Forensic Chemists**

**Ann Miller**, is a Forensic Chemist, Department of Homeland Security, U.S. Customs and

Border Protection Laboratories and Scientific Services, Chicago Laboratory.  Ms. Miller's

testimony may include the following:  (1) her background and experience; (2) the results of the

controlled substance analyses she conducted in this case, including but not limited the results and

conclusions disclosed in the laboratory report (JAV 002631) pertaining to substances seized in

HSI operations between February 3-6, 2014; (3) the testing methods that she used to determine

1

that the substance contained cocaine hydrochloride, a Schedule II controlled substance; (4) the substance also contained levamisole, a common cutting agent; (5) weight and other characteristics of the chemical substances; and (6) the Homeland Security laboratory is ASCLAD accredited and that she conducts regular proficiency testing.   The results of her conclusions and testing are set forth in the materials previously provided to counsel for Defendants.   Ms. Miller's curriculum vitae has been previously disclosed to counsel.

**Christina Hayes**, is a Criminalist with the St. Louis Metropolitan Police Department (SLMPD) Crime Laboratory.   Ms. Hayes' testimony may include the following:   (1) her background and experience; (2) the results of the controlled substance analyses she conducted in this case, including but not limited the results and conclusions disclosed in the laboratory reports (JAV 0006020-21; JAV 0012435-45) pertaining to controlled substances seized on November 10, 2014 and January 29, 2016; (3) that she conducted scientific testing of the substances, and her findings based upon said testing, including that the substance contained cocaine and cocaine base (crack), Schedule II controlled substances; heroin, a Schedule I controlled substance; (4) she determined some of the substances to be marijuana, a Schedule I controlled substance; (5) weight and other characteristics of the chemical substances; and (6) the SLMPD laboratory is ASCLAD accredited and that she conducts regular proficiency testing.   The results of her conclusions and testing are set forth in the materials previously provided to counsel for Defendants, and her curriculum vitae has been previously disclosed to counsel.

**Erica Saldivar**, is a Forensic Scientist, Texas Department of Public Safety, Crime Laboratory, Westlaco, Texas.   Ms. Saldivar's testimony may include the following:   (1) her background and experience; (2) the results of the controlled substance analyses she conducted in

this case, including but not limited the results and conclusions disclosed in the laboratory report (JAV 0022870-71) pertaining to controlled substances seized on or about February 3, 2015 in or near Palm View, TX; (3) that she conducted scientific testing of the substance, and her findings based upon said testing, including that the substance contained cocaine, a Schedule II controlled substance; (4) weight and other characteristics of the chemical substances; and (5) the Texas Department of Public Safety Crime Laboratory is ASCLAD accredited and that she conducts regular proficiency testing.   The results of her conclusions and testing are set forth in the materials previously provided to counsel for Defendants.   Ms. Saldivar's curriculum vitae has been previously disclosed to counsel.

**SA Qiji Wang** was previously employed as a forensic chemist by the DEA and presently employed as a special agent by the DEA. He is an expert in the areas of chemical analysis and identification of controlled substances.   He tested items seized on September 7, 2016, from 3748 Delor, St. Louis, Missouri.   His testimony may include, among other things: (1) background and experience; (2) methods of chemical analysis and identification of controlled substances; (3) analysis of the chemical substances seized in this case; (4) weight and other characteristics of the chemical substances; (5) identification of the chemical substances; (6) packaging of the chemical substances; and (7) the contents of the Laboratory Report, which was previously disclosed, regarding analysis of the chemical substances.   Mr. Wang's curriculum vitae has been previously disclosed to counsel.

## 2.  Latent Fingerprint Analyst

**Anastasia V. Petruncio**, Senior Fingerprint Specialist for the DEA.   Ms. Petruncio's testimony may include the following: (1) her background and experience; (2) the general scientific

principles underlying latent fingerprint detection, analysis, and comparison; (3) factors affecting the presence and detection of latent fingerprints, including but not limited to surfaces, secretors/nonsecretors, moisture and other factors affecting the presence and viability of fingerprints; (4) factors contributing to whether or not fingerprints can be recovered from plastic bags, including but not limited to the surface, the presence of dirt, the manner in which it is carried, handled or touched, environmental factors such as weather and moisture, individual factors such as sweating and wiping objects, the condition of the bag, and how it is stored; and (5) the testing, procedures, and results of fingerprint analysis performed in this case as set forth in Ms. Petruncio's report, which was previously disclosed to defense counsel and relates to evidence seized on September 7, 2016.   Ms. Petruncio's curriculum vitae has been previously disclosed to counsel.

## 3.  Digital Forensic Examiners

**Bobby Baine** an expert in forensic data acquisition and analysis of digital devices, now retired from the SLMPD Cyber Crimes Section.   The Government expects that Mr. Baine may testify about the forensic examination of cellular telephones seized from Charda Davis and Derrick Terry in Dallas, TX, on or about July 26, 2016. These cellular telephones have been described in police reports, evidence receipts and forensic acquisitions provided to the defense. Mr. Baine's testimony may include, among other things: (1) his background, training, certifications, and experience; (2) general methods of forensic data acquisition and analysis of digital devices, included methods used in this case; and (3) an explanation of the findings from the cell phone, which include the standard methods of examination used by SLMPD Cyber Crimes Section; and (4) an identification of where items were found on the cellular telephone, including relevant photographs, text messages, emails, ledgers and/or videos as documented in previously disclosed

4

reports.   A statement as to Mr. Baine's curriculum vitae shall be disclosed forthwith.

**Jeremy Harrell** is an expert in forensic data acquisition and analysis of digital devices, now retired from the SLMPD Cyber Crimes Section.   The Government expects that Mr. Harrell will testify about (1) the forensic examination of a cellular telephone seized from Charda Davis in Dallas, TX on or about July 27, 2016; and (2) the forensic examinations of cellular telephones seized from Oscar Dillon on September 7, 2016, in the area of 3748 Delor, St. Louis Missouri. These cellular telephones have been described in police reports, evidence receipts and forensic acquisitions provided to the defense. Mr. Harrell's testimony may include, among other things: (1) his background, training, certifications, and experience; (2) general methods of forensic data acquisition and analysis of digital devices, included methods used in this case; and (3) an explanation of the findings from the cell phone, which include the standard methods of examination used by SLMPD Cyber Crimes Section; and (4) an identification of where items were found on the cellular telephone, including relevant photographs, text messages, emails, ledgers and/or videos as documented in previously disclosed reports.   Mr. Harrell's curriculum vitae has been previously disclosed to counsel.

**Liea Toedte** is an expert in forensic data acquisition and analysis of digital devices, now retired from the SLMPD Cyber Crimes Section.   The Government expects that Ms. Toedte may testify about the forensic examination and forensic acquisitions of the cellular telephones and electronic devices seized from Michael Grady on or about December 2, 2016 in St. Louis, Missouri. These devices have been described in agent reports, evidence receipts and forensic reports provided to the defense. Ms. Toedte's testimony may include, among other things: (1) her background, training, certifications, and experience; (2) general methods of forensic data

acquisition and analysis of digital devices, included methods used in this case; and (3) an explanation of the findings from the cell phone, which include the standard methods of examination used by SLMPD Cyber Crimes Section; and (4) an identification of where items were found on the cellular telephone, including relevant photographs, text messages, emails, ledgers and/or videos as documented in previously disclosed reports.

Ms. Toedte was previously a police officer with the St. Louis Metropolitan Police Department (SLMPD). After several years of patrol experience, she was assigned to the Intelligence Section of the SLMPD, where she was a member of the Technical Assistance Group (TAG). Ms. Toedte received specialized training related to forensic acquisitions of electronic devices and was a certified Cellebrite Examiner. Ms. Toedte also attended training sponsored by the United States Secret Service at the National Computer Forensic Institute, where she received additional training in Cellebrite acquisitions and in other forensic acquisition techniques. Ms. Toedte has an undergraduate bachelor of science degree and a master's degree in Business Administration.

**4. Cellular Analysis Survey Expert**

FBI Special Agent Bastian Freund is an expert in the area of cellular telephone analysis. The United States may call Agent Freund or another cellular analysis expert to testify consistently with the contents of Agent Freund's previously disclosed report. Agent Freund's report has been previously disclosed to counsel and he has previously testified in these proceedings. Agent Freund's testimony may include, among other things: (1) his background, training, and experience; (2) general background related to tower sectors, how cellular telephones work, and call detail records, (3) general methods of analysis of call detail records obtained for a cellular

telephone in this case and the locations of relevant cell site locations referenced in the call detail records and his reports; and (4) the analysis and conclusions set forth in his report.   Agent Freund's statements of qualifications has been previously disclosed.

**5**. **Drug Distribution Profile Expert**

   **Edward Clay** is a police officer with the St. Louis Metropolitan Police Department (SLMPD) and a Task Force Officer (TFO) with the Drug Enforcement Administration with special training and experience in narcotics distribution investigations.   TFO Clay's testimony will relate to general profile evidence of drug trafficking matters and terms based upon his experience and training, and may include the following:   (1) Cocaine and heroin are not commonly manufactured in Missouri; (2) Drug distribution organizations typically involve a kilogram level distributor in another source state; these persons are typically highly placed drug distributors; (3) Couriers typically move kilogram quantities of controlled substances from the source location to the destination location, and are routinely paid $1,000 per kilogram for transporting the narcotics; (4) Once the narcotics reach the destination location, they are typically received by a cell head that receives and is responsible for the narcotics; (5) Beneath the higher level distributors, there are tiers of lower level distributors, including ounce distributors; (6) There are also distributors, often at the street level, who distribute less than ounce quantities of controlled substances; (7) Kilogram quantities are typically broken down and diluted, with materials such as baking soda or dormin, upon arrival in the destination location; (8) The dilution of the controlled substances allows dealers to maximize profits; (9) Street level usage units are typically .10 grams for heroin and cocaine; (10) At the street level in a heavily urban area, such as St. Louis City, cocaine is sold in the rock form, also known as cocaine base (crack); (11) In more suburban areas, cocaine may be sold in the

powder form, in gram or half gram quantities; (12) Cocaine base (crack) is typically smoked through a pipe or improvised device, such as an antenna with mesh; (13) Heroin is typically snorted or injected; (14) Persons engaged in the illegal distribution of narcotics may utilize the following tools or possess the following items:

(a) rental vehicles;

(b) firearms;

(c) stash houses; and

(d) large amounts of United States currency;

(15) Terms commonly utilized in relation to narcotics distribution include the following:

(a) "button" is a slang term for a gelatin cap that often contains a single usage unit of heroin or another controlled substance;

(b) "boy" is a slang term for heroin;

(c) "girl" is a slang term for cocaine;

(d) "rock" is a slang term for a usage unit of cocaine base (crack); and

(e) "front" is a slang term when a distributor provides an amount of controlled substance to another person without accepting payment at the time of the delivery;

(16) The practice of "fronting" drugs typically depends upon the level of trust between a distributor and receiver; (17) If a third party facilitator helps establish a relationship in which controlled substances are "fronted" between a distributor and receiver, the facilitator, along with the receiver may be held accountable in the event of non-payment; (18) An ounce quantity of heroin is consistent with the intent to distribute narcotics; (19) The manner in which narcotics are packaged, including individual wrapping, may also be consistent with the intent to distribute narcotics; (20)

Dealers utilize both stash locations and individuals to hold narcotics for them in an attempt to insulate themselves from legal responsibility for said items; and (21) Dealers will often enlist other persons, either male or female, to "hold" or possess narcotics because they (dealers) believe it is advantageous if the narcotics are not in their physical possession or control in the event they are contacted by law enforcement.

TFO Clay will explain how narcotics are manufactured and transported from their point of origin to the point of end use.    As to distribution from Cartel to street level, TFO Clay will explain that large scale narcotics distributors and their customers, large scale distributors in consumption cities, have the goal of establishing successful and repeat distribution patterns to maximize profits. Absent law enforcement intervention successful distribution patterns entail repeated, large scale drug deliveries to the consumption cities.    Some organizations, even after law enforcement intervention, simply change personnel or methods.

TFO Clay will explain that illegal drug trafficking is largely a cash based business.    The drug trafficking product or commodity, illegal narcotics, has significant value and generates substantial sums of United States currency.    Skilled drug traffickers routinely "cut," or dilute their product, often creating even more value or United States currency associated with the product. As to the cash based nature of the business, TFO Clay will testify regarding well established packaging protocol for bulk cash.    Bulk cash is often packaged in rounded denominations. Consistent with the nature of the cash business, drug dealers routinely keep and possess written or electronic drug ledgers or notes.    TFO Clay will testify to the nature of drug notes and drug ledgers seized in this case.    Drug notes may sometimes be related to a single transaction.

As to tools and methods used to secrete narcotics, traffickers use various methods to secrete bulk quantities of illegal narcotics, including the use of intricate packaging or other material designed to secrete the odor of narcotics to evade detection.   When using commercial carriers or postal shipping, experienced drug dealers will often use a real name that associates with a third party property.   Narcotics traffickers are aware that law enforcement interdiction efforts attempt to cross reference the names used on packages with the property to which the packages are being shipped.   The use of fictitious names, or names not associated with a property, raise law enforcement suspicion and increase the likelihood of law enforcement intervention regarding a shipment through commercial carrier or the postal service.   Drug traffickers may also employ hidden compartments in vehicles or other objects to transport and/or store narcotics.

TFO Clay will testify that drug trafficking organizations are secretive, and are familiar with the tactics and methodology of law enforcement.   As a result, drug traffickers employ numerous means and methodologies to avoid law enforcement detection.   Due to the size, scope, and nature of drug trafficking organizations, they may have a pyramid type structure, which allows top level drug traffickers to insulate themselves from members of the organization.   Drug traffickers may also communicate or act through intermediaries or third persons to further insulate themselves.

TFO Clay will explain that drug trafficking organizations often employ persons in various roles to advance their operations.   These persons may assist in day to day operations, or otherwise allow highly placed drug traffickers to insulate themselves from legal responsibility for illegal items, and to further limit law enforcement's ability to detect their involvement.   This may include couriers, stash location operators for narcotics and other drug distribution paraphernalia, or United States currency.   Drug traffickers may employ lookouts, enforcers, or other persons to

10

assist them in different capacities, including renting vehicles, renting property, holding or moving United States currency, or acting in other ways to conceal the true nature of drug trafficking proceeds.

TFO Clay will explain that is well-known in the drug trafficking community that law enforcement investigations often attempt to intercept electronic communications.   TFO Clay is familiar with wiretaps and phone analysis in drug distribution investigations.   Consequently, drug traffickers may use compartmentalized communications to avoid being detected.   His testimony will include that drug dealers routinely use code even when using compartmentalized devices. The code is typically known to drug traffickers and their associates.   Moreover, TFO Clay will testify to the meaning of well-established code words, such as "girl" (cocaine), "boy" (heroin).

TFO Clay will testify that some experienced drug traffickers and other persons engaged in related illegal conduct avoid any substantive conversation on phones, often opting for very limited communications and in person meetings to reduce the likelihood of law enforcement detection.

TFO Clay will testify that consistent with methods used to avoid law enforcement detection, persons engaged in drug trafficking routinely monitor their surroundings for the presence of law enforcement officers and/or competitors, who may present threats to drug traffickers.   Narcotics traffickers tend to be acutely aware of their surroundings, including the use of mobile surveillance by law enforcement.   Narcotics traffickers typically will not engage in narcotics trafficking activity until they are satisfied that the area in which they are operating does not present law enforcement presence or other threats.

TFO Clay will further explain that organized drug traffickers are aware that law enforcement officers routinely use cooperating suspects, arrestees, subjects, defendants and other individuals to

provide information about other persons or groups involved in the organized distribution of illegal narcotics. Investigators routinely attempt to recruit cooperators in federal organized crime investigations to advance investigations. Cooperators are very important to advance investigations of higher level complex drug trafficking organizations. TFO Clay will explain that developing cooperators is an important tool for law enforcement because of valuable information that cooperators may provide. However, if persons inside of a drug trafficking organization learn that someone is cooperating, their value as a cooperator is lost. TFO Clay will further testify that knowing who is cooperating is useful for illegal drug traffickers to avoid law enforcement detection. TFO Clay will explain that it is known in the drug trafficking community that there are incentives for cooperators, including the potential of judicial consideration, or time reductions from potential sentences. TFO Clay's curriculum vitae will be disclosed forthwith.

Finally, this Notice will serve as the Government's request for notice of expert testimony by the defendant, pursuant to Federal Rule of Criminal Procedure 16. Specifically, the Government requests that the defendant disclose to the Government a written summary of testimony that the defendant intends to present at trial pursuant to Federal Rules of Evidence 702, 703, and 705.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney

*s/ Michael A. Reilly*
MICHAEL A. REILLY #43908MO
DONALD BOYCE #6282562IL
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, MO 63102
(314) 539-2200

12

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2021, the foregoing was filed electronically with the Clerk of the Court to be served upon Counsel of record.

*s/Michael A. Reilly*
Michael A. Reilly, 43908MO
Assistant United States Attorney