**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA,**    )
                                             )
     **Plaintiff,**          )
                                             )
     **v.**                   ) **No. 4:15-CR-00404 HEA**
                                           )
                                           )
**MICHAEL GRADY AND OSCAR**     )
**DILLON, III,**              )
                                           )
     **Defendants.**        )

**JURY TRIAL**

**Volume 5B**

**BEFORE THE HONORABLE HENRY E. AUTREY**
**UNITED STATES DISTRICT JUDGE**

**MARCH 26, 2021**

APPEARANCES:

For Plaintiff:         Michael A. Reilly, Esq.
                      Donald S. Boyce, Esq.
                      OFFICE OF U.S. ATTORNEY
                      111 South Tenth Street, 20th Floor
                      St. Louis, MO  63102

(APPEARANCES CONTINUED ON PAGE 2)

Reported By:      CARLA M. KLAUSTERMEIER, RMR, CRR, CSR, CCR
                      Official Court Reporter
                      United States District Court
                      111 South 10th Street
                      St. Louis, MO 63102 | (314)244-7984

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED

For Defendant Grady:      Quinn A. Michaelis, Esq.
                          QUINN A. MICHAELIS, ATTORNEY AT LAW
                          73 West Monroe, Suite 106
                          Chicago, IL  60603


For Defendant Dillon:     Vadim Alex Glozman, Esq.
                          Matthew Paul Kralovec, Esq.
                          LAW OFFICES OF VADIM A. GLOZMAN
                          53 W. Jackson Blvd., Suite 1410
                          Chicago, IL  60604

                          Blaire C. Dalton, Esq. (by telephone)
                          DALTON LAW, LLC
                          53 W. Jackson Blvd., Suite 1550
                          Chicago, IL  60604

INDEX

WITNESSES:                                              Page

STANFORD WILLIAMS
     Cross-Examination Continued By Ms. Michaelis        4
     Cross-Examination By Mr. Glozman                    30
     Redirect Examination By Mr. Reilly                  88
     Recross Examination By Ms. Michaelis               110
     Recross Examination By Mr. Glozman                 118
     Further Redirect Examination By Mr. Reilly         119

JAMES CHURCH
     Direct Examination By Mr. Boyce                    120
     Cross-Examination By Ms. Michaelis                 130
     Cross-Examination By Mr. Glozman                   132

ZACKERY AMPLEMAN
     Direct Examination By Mr. Boyce                    133
     Cross-Examination By Mr. Glozman                   147

4

1    **(PROCEEDINGS RESUMED AFTER A LUNCH RECESS AT 1:34 P.M.)**

2    **(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH**

3    **THE DEFENDANTS PRESENT, AND WITHIN THE HEARING AND PRESENCE OF**

4    **THE JURY:)**

5              THE COURT:  Proceed.

6              MS. MICHAELIS:  Thank you, Your Honor.

7                    CROSS-EXAMINATION CONTINUED

8    BY MS. MICHAELIS:

9    Q.    I want to back up just for a second and ask you some more

10   questions about these clips.  And perhaps we can watch 79M

11   again.  And this is the clip where you take your affidavit --

12   I'm sorry -- after you've taken your affidavit up to Jerome

13   Lewis.  He then takes it over to the door.  If we can see that

14   one.

15                    **(A video clip was played.)**

16   Q.    (By Ms. Michaelis) And if you see at the bottom here,

17   this is at 7:59 p.m. on December 4, 2016; correct?

18   A.    Yes.

19   Q.    Okay.  So Jerome Lewis is putting the affidavit through

20   the door there; is that correct?

21   A.    Yes.

22   Q.    Okay.  And then in the next clip, which would be 79N --

23              MS. MICHAELIS:  If you could play that one.

24                    **(A video clip was played.)**

25   Q.    (By Ms. Michaelis) This is later in the same evening at

5

```
 1   10:17 p.m.; right?
 2   A.    Yes.
 3   Q.    And do you give some paperwork to Jerome Lewis in this
 4   clip; is that right?
 5   A.    I gave him the copies.
 6   Q.    Those are copies.  Copies of the affidavit?
 7   A.    Yes.
 8   Q.    Okay.  All right.  So you gave them to Jerome Lewis for
 9   the purpose of what then?
10   A.    Giving them to Grady.
11   Q.    Okay.  So that was not Grady that Lewis gave the
12   affidavit to in the previous clip; is that correct?
13   A.    When he slid it through the door?
14   Q.    Yes.
15   A.    My understanding, it was Grady he gave it to.
16   Q.    Here in this --
17   A.    I don't -- I don't -- I can't see on the other side of
18   the door, but it was going to Grady.
19   Q.    Well, you have copies of this affidavit now in this
20   second clip; correct?
21   A.    Right.
22   Q.    How did you get those copies?
23   A.    The guards Xeroxed them for me.
24   Q.    Okay.  All right.  And then you give those copies to
25   Jerome Lewis in order to give them to Michael Grady?  Is that
```

1    what you're saying happened in the next clip?

2    A.   Yes.

3    Q.   Okay.  And so, when did you ask the guards to make the

4    copies for you?

5    A.   That same day.

6    Q.   That same day.  Was it in between the time of the

7    previous clip and this -- this clip right now, 10:18?

8                       **(A video clip was played.)**

9    A.   I just knew I asked him.  I don't know what time it was.

10   Q.   (By Ms. Michaelis) Well, was it before or after you --

11   that previous video where Jerome Lewis slipped the affidavit

12   through the door?

13   A.   It had to be before -- before he --

14   Q.   Before he put the affidavit through the door?

15   A.   Yeah.  They had to -- they had to copy it.

16   Q.   Okay.  You asked someone to make copies of that affidavit

17   for you?

18   A.   (No audible response.)

19   Q.   Okay.  Thank you.

20        Now, those videos, they take place over the course

21   of three days; is that right?  We're on the --

22   A.   I think so.

23   Q.   December 4th.  This is the last set of videos here;

24   correct?

25   A.   Yes.

1   Q.   And the first set started on December 2nd; correct?

2   A.   Yes.

3   Q.   Okay.  So during that time period, you didn't ever once

4   reach out to your attorney; correct?  You didn't once tell

5   your attorney that you were concerned about your safety;

6   correct?  During that period of time?

7   A.   Yeah.  I called and let them know that they was there and

8   I was tripping off of it.  I got moved to the hole.

9   Q.   You called your attorney and told them that Michael Grady

10  was there?

11  A.   Yes.  I called and told him that they were there.

12  Q.   Okay.  Was that during this time period, this

13  December 2nd through the December 4th time period?

14  A.   Yeah.  It was while they were there.

15  Q.   It was while they were in Lincoln County Jail?

16  A.   Yes.

17  Q.   Do you know when Mr. Grady left Lincoln County Jail?

18  A.   No.

19  Q.   Okay.  So it could have been after December 4th?

20  A.   It was while he was in the jail.  Me and him both were in

21  the hole together.

22  Q.   Okay.  You were both in the hole in -- at Lincoln County

23  together?

24  A.   Yeah.

25  Q.   Tell us what the hole is.

1   A.   It's where they put you in segregation.

2   Q.   So you're in segregation, but you're in the same room

3   with Michael Grady?

4   A.   Nah.  In the same pod, but not in the same room.

5   Q.   Okay.  I see.  So people in the jail put you two together

6   a second time; is that correct?

7              MR. REILLY:  Well, Judge, I'm going to object to

8   that.  That actually mischaracterizes what the witness has

9   testified to.

10             THE COURT:  Restate -- or rephrase your question

11  rather.

12  Q.   (By Ms. Michaelis) So after Michael Grady asked to be

13  moved from D-Pod, you were -- he joined you -- or let's -- let

14  me put it this way.  You went to the hole on a date after the

15  4th; is that correct?

16  A.   Yes.

17  Q.   Okay.  And at some point, Michael Grady was also put into

18  the hole; is that right?

19  A.   Yes.

20  Q.   Okay.  So after he had asked to be moved away from D-Pod,

21  he was put into the hole where you were also at; is that

22  correct?

23  A.   Yes.

24  Q.   Okay.  I want to show you this affidavit.

25             MS. MICHAELIS:  If you can pull up the affidavit.

```
1   Sorry.  I keep forgetting to write it down.  I believe it
2   is --
3              MS. KREKE:  The one that's filed or the original?
4              MS. MICHAELIS:  We can do the original.  Yeah.
5   Thank you.
6   Q.   (By Ms. Michaelis) I want to go through this affidavit
7   with you.
8              MS. MICHAELIS:  And actually, if you just leave it
9   the way that it is and I'll just highlight it.  Thank you.
10  Q.   (By Ms. Michaelis) So you're -- you're not denying that
11  this affidavit is in your own handwriting; correct?
12  A.   Correct.
13  Q.   Okay.  This first full paragraph where it states
14  underneath the part with your name, that says -- that starts
15  with, "In the case" -- or "That in the case,
16  U.S. v. Williams," and then it gives the case number, that
17  first full paragraph, "that I have agreed to cooperate with
18  the Government in exchange for a reduced sentence."  You said
19  that you wrote that in your own words; is that correct?
20  A.   No.
21  Q.   That is copied from the affidavit?
22  A.   Yes.
23  Q.   Okay.  But that's a true statement; is that right?  That
24  you were -- you agreed to cooperate with the Government?
25  A.   Right.
```

1    Q.    Okay.  And it's also true that you agreed to cooperate

2    with them in exchange for a reduced sentence; correct?

3    A.    Hoping for a reduced sentence.

4    Q.    Okay.  So that is a true statement; correct?

5    A.    Yes.

6    Q.    Okay.  And then the next part says, "My cooperation

7    involved the day-to-day operation of the Derrick Terry drug

8    trafficking scheme;" correct?

9    A.    Right.

10   Q.    That is also a true statement; is that right?

11   A.    Right.

12   Q.    Okay.  And we've gone over the extent of that cooperation

13   a little bit; correct?

14   A.    Correct.

15   Q.    All right.  Let's go to the next paragraph here.  It

16   says, "However, in Count 51 of this indictment, it states that

17   beginning around August, 2015, and continuing thereafter until

18   the date of this indictment, that I knowingly conducted and

19   attempted to conduct financial transactions affecting

20   interstate or foreign commerce."  Do you see that part of the

21   affidavit?

22   A.    Yes.

23   Q.    Okay.  And in the fourth superceding indictment, you were

24   charged, in fact, in Count 51; is that correct?

25   A.    Yes.

```
 1    Q.   So that part is true; right?

 2    A.   Right.

 3    Q.   And the language that's here, that's the language from

 4    the indictment; is that right?

 5    A.   Right.

 6    Q.   Okay.  So that's -- that's a true statement; correct?

 7    A.   Right.

 8    Q.   And, in fact, this is the Government's words that you're

 9    copying here; is that right?

10    A.   It was --

11    Q.   It's from the indictment; right?

12    A.   Yeah.

13    Q.   Okay.  The next sentence states, "I want to state that I

14    have been very truthful in all of my debriefings."  Do you see

15    that there?

16    A.   Yes.

17    Q.   I assume that you'll tell me that that is correct?

18    A.   It is.

19    Q.   That's a true statement; yes?

20    A.   Yes.

21    Q.   And then underneath that -- or the next sentence is,

22    "That I met Mr. Grady and Mr. Dillon for the first time in my

23    life in January of 2016."  Is that correct?

24    A.   Yes.

25    Q.   And that is a true statement as well; is that right?
```

1    A.    Yes.

2    Q.    And then it says, "I want to state again that at no time

3    did I have any kind of illegal financial dealings with these

4    men;" correct?

5    A.    Correct.

6               MR. REILLY:   May we approach the bench?

7               THE COURT:   All right.

8    **(A Bench Conference Was Held on the Record and Outside of the**

9                **Hearing of the Jury as Follows:)**

10              THE COURT:   Yes, sir.

11              MR. REILLY:   The next sentence -- if Counsel asks

12   him to verify the next sentence, I believe it's directly

13   contrary to Mr. Williams' grand jury testimony about

14   Mr. Dillon.

15              THE COURT:   Speak a little louder, Mr. Reilly.

16              MR. REILLY:   I believe if Counsel goes through the

17   next sentence the way she has gone through these statements

18   and ask if that's a true statement, in the grand jury, in

19   April of 2016, Mr. Williams testified that, with regard to

20   "Big Chest Ant," that "I didn't know him as a paralegal.  He's

21   a major drug dealer as far as I know.

22              "To your knowledge, was this guy a drug dealer?

23              "Yes.  He was a drug dealer for BMF and he has a

24   reputation for that as a major drug dealer."

25              So, now, if Counsel asks the next question that I

1   think she's going to ask, she's potentially going to open the

2   door to his grand jury -- his grand jury testimony.  So I'm

3   just bringing that up for the record, and so both counsel know

4   that and we can go on with our eyes wide open.

5            MS. MICHAELIS:  And I'll let Mr. Glozman speak to

6   this, too, because it's -- I think it's impacting his client

7   more.  But if I remember that grand jury statement correctly,

8   he -- Mr. Williams is trying to tell you that he knew them

9   as that at one time, but that he now knows them as paralegals.

10           MR. REILLY:  I would --

11           MS. MICHAELIS:  Well, I will -- I will move on to

12  the next part of the affidavit then.

13           MR. REILLY:  It would help us avoid some issues.

14           MS. MICHAELIS:  Okay.

15           MR. GLOZMAN:  If she skips that question or that

16  line and goes --

17           MR. REILLY:  Yeah.

18           MR. GLOZMAN:  -- to the financial transaction --

19           MR. REILLY:  That's fine.  That's fine.  Yeah.  Then

20  we're not highlighting --

21           MR. GLOZMAN:  Okay.

22           MS. MICHAELIS:  Okay.  That's fine.

23           THE COURT:  So we're straight?  We're clear?

24           MS. MICHAELIS:  Yes.  Yes.

25           THE COURT:  Okay.

1    **(The Following Proceedings Were Held Within the Hearing and**

2    **Presence of the Jury:)**

3    THE COURT:  Proceed.

4    MS. MICHAELIS:  Thank you.

5    Q.   (By Ms. Michaelis) I'm going to go to this part of the

6    letter at the very bottom here.  "Mr. Grady and Mr. Dillon

7    have never been involved in my criminal activity."  Do you see

8    that sentence there?

9    A.   Yes.

10   Q.   That is also a true statement; correct?

11   A.   Correct.

12   Q.   And then it goes on to say, "and had no knowledge of how

13   I obtained my money."  Correct?

14   A.   Correct.

15   Q.   And that is also a true statement as well; is that

16   correct?

17   A.   Correct.

18   Q.   And that's what you told the ladies and gentlemen of the

19   jury on direct; right?  That you wrote that part in our own

20   words yourself; correct?

21   A.   Correct.

22   Q.   Okay.

23   MS. MICHAELIS:  Is there a second page to this

24   affidavit?

25   Q.   (By Ms. Michaelis) The next sentence is -- I'm sorry.

1    "And I have not been threatened or promised anything in

2    exchange for this statement."  No one threatened you,

3    correct --

4    A.    Correct.

5    Q.    -- during this period of time?

6    A.    Correct.

7    Q.    Okay.  And no one promised you anything for this

8    statement; correct?

9    A.    Correct.

10   Q.    Okay.  And then you say, "Moreover, I agree to be fully

11   cooperative and tell the whole truth in this investigation as

12   I know it."  Correct?

13   A.    Correct.

14   Q.    Okay.  And that's a true statement as well; right?

15   A.    Yes.

16   Q.    I want to ask you about this question at the top of the

17   affidavit here, that you have not been threatened.  You

18   prepared -- or you sat through a presentence investigation

19   with a probation officer; is that right?  Do you recall that?

20   A.    Yeah.  I -- I know I did that.

21   Q.    Okay.  And you told them certain information about

22   yourself; correct?

23   A.    Correct.

24   Q.    And then they repaired -- prepared a report to submit to

25   the judge to help with your sentencing; is that right?

```
 1   A.    Right.

 2   Q.    Okay.  And the information in that report, you were given

 3   a copy of that report; is that correct?

 4   A.    Yes.

 5   Q.    Okay.  And you were able to review that report with your

 6   attorney?

 7   A.    Yes.

 8   Q.    And then you were allowed to make changes to that report

 9   if there was anything inaccurate in that report; correct?

10   A.    We never got to that point.

11   Q.    You haven't gotten to that point?

12   A.    No.  We never -- we had never made the changes yet.

13   Q.    Okay.

14         MS. MICHAELIS:  May I approach, Your Honor?

15         THE COURT:  You may.

16   Q.    (By Ms. Michaelis) Okay.  I'm going to show you a copy of

17   this report.  Okay?

18         MR. REILLY:  Which page?

19         MS. MICHAELIS:  Just the front.

20         MR. REILLY:  Okay.

21   Q.    (By Ms. Michaelis) Is that a copy of your presentence

22   investigation report?

23   A.    Yeah.  Except for I don't know about this sentencing

24   date.

25   Q.    All right.  Did you see also at the top of this report
```

1    where it said "Final"?

2    A.    Yes.

3    Q.    Okay.  And I know you said that the sentencing date is

4    incorrect because it's obviously past now.  Your sentencing

5    date here is September 29, 2020; correct?

6    A.    Right.

7    Q.    Okay.  But is it your understanding that this is the

8    final version of this presentence report?

9    A.    According to that.  I didn't know.

10   Q.    Okay.  And this report contains information about your

11   criminal history; correct?

12   A.    Correct.

13   Q.    It lists the charges that you have previously pled guilty

14   to?

15   A.    Yes.

16   Q.    Okay.  And one of those charges involved an ex-girlfriend

17   that you had; is that right?

18   A.    Yes.

19   Q.    Okay.  And in 2010, you were convicted of stalking her;

20   right?

21   A.    Yes.

22   Q.    Okay.  And you were convicted of that offense because you

23   called her up on the phone and threatened to murder her; is

24   that right?

25   A.    No.

1    Q.    No?

2    A.    No.  I never threatened --

3    Q.    Did you make threats to her over the phone?

4          MR. REILLY:  Your Honor, I think we're outside the

5    scope of proper impeachment.  He's admitted the fact of the

6    conviction and we're quickly moving beyond the scope of what's

7    proper.

8          THE COURT:  Revise, Ms. Michaelis.

9          MS. MICHAELIS:  The affidavit here is talking about

10   threats.  There's threats involved in this particular

11   conviction.  One of the counts here is that Mr. Grady

12   involved -- or was involved with witness tampering with

13   respect to this particular witness.

14         THE COURT:  Okay.  And so?

15         MS. MICHAELIS:  So if the -- if some of the elements

16   of the witness tampering involve whether threats had been made

17   or anything like that, I think that this particular conviction

18   is relevant to that particular count.

19         MR. REILLY:  Relevance of his prior conviction is

20   relevant for impeachment purposes under law, but where she's

21   attempting to go, there's no logical connection or relevance,

22   Your Honor, and it's beyond the scope of both.

23         THE COURT:  Yeah.  The objection is sustained.

24   Q.    (By Ms. Michaelis) So you were convicted of stalking in

25   that case; correct?

```
 1    A.    Yes.

 2    Q.    And then you were also convicted of breaking into her

 3    house or burglary in that case as well; right?

 4    A.    I didn't break in.  I just walked in behind and they

 5    constitute that as a burglary.

 6    Q.    Well, you pled guilty to burglary in that -- in that

 7    case; correct?

 8    A.    Right.

 9    Q.    Okay.  And that was your ex-girlfriend's house; correct?

10    A.    Yes.

11    Q.    Okay.  I'm going to show you another document here which

12    I'm marking as Grady B.

13            MS. MICHAELIS:  Is that the correct -- you want us

14    to use letters; is that right, Your Honor?

15            Okay.  I'm going the mark this as Grady B.

16            MS. KREKE:  B, as in "boy"?

17            MS. MICHAELIS:  B, as in "boy."  Correct.

18            May I approach, Your Honor?

19            THE COURT:  You may.

20    Q.    (By Ms. Michaelis) Can you take a look at that letter for

21    me, please?

22    A.    Yeah.  I know that.

23    Q.    Do you recognize this letter?

24    A.    Yes.

25    Q.    And this document is in your handwriting; correct?
```

1    A.    Yes.

2    Q.    What do you recognize this letter to be?  Is it a letter

3    that you've written yourself; correct?

4    A.    Yes.

5    Q.    Okay.  And is it a handwritten letter that you sent to

6    your girlfriend?

7    A.    Yes.

8    Q.    Okay.

9              MS. MICHAELIS:  May I publish, Your Honor?

10             MR. REILLY:  Judge, I object to the admission of the

11   document, Your Honor.  It's hearsay.  He's already discussed

12   the letter and he hasn't denied the contents of it.

13             MS. MICHAELIS:  I have other -- I have other ways I

14   can get it in.  We don't have to --

15             THE COURT:  You have what?

16             MS. MICHAELIS:  -- do it through this witness.  I

17   have other ways that I can get it in.  If I can just talk

18   about the contents, that's fine with me for right now.

19             THE COURT:  Please proceed.

20   Q.    (By Ms. Michaelis) So this was a letter that you sent to

21   Toya; correct?

22   A.    Yes.

23   Q.    That's your girlfriend from the time around the round-up;

24   is that right?

25   A.    Yes.

1   Q.   Okay.  And this letter that you sent her, you're asking

2   to have D to get his paralegal up to see you; correct?

3   A.   Right.

4   Q.   And D refers to Derrick Terry; right?

5   A.   Yes.

6   Q.   And the paralegal that you're referring to here, that's

7   Michael Grady; is that right?

8   A.   Yes.

9   Q.   Okay.  And you're asking for the paralegal to come up to

10  see you so that you can be told how to go about recanting your

11  statement; correct?

12  A.   Right.

13  Q.   Okay.  And then it says, "Let D know that I could never

14  go to trial.  I got caught red-handed."  Right?

15  A.   Right.

16  Q.   Okay.  And the date on this letter is September 8, 2016;

17  right?

18  A.   I don't know.  I don't remember the date.

19  Q.   If I showed you the letter again, would you be able to

20  remember what the date was that you sent the letter on?

21  A.   Yes.

22  Q.   Okay.

23           MS. MICHAELIS:  May I approach, Your Honor?

24           THE COURT:  You may.

25  Q.   (By Ms. Michaelis) The date on this letter is

1   September 8, 2016; correct?

2   A.   Right.

3   Q.   Okay.  And that's before all of these events that

4   happened in the jail; is that right?

5   A.   Yes.

6   Q.   And you didn't ever tell the Government about this letter

7   when you were meeting with them about these events that

8   happened in the jail; correct?

9   A.   Correct.

10   Q.   The only time you talked about the Govern- -- or talked

11   to the Government about this letter was just within the last

12   couple of days; is that right?

13   A.   Correct.

14   Q.   Okay.  I want to talk to you about this PSR again.

15   There's another conviction in here where you're charged -- or

16   you're convicted with attempted trafficking in the first

17   degree.  Do you remember that charge from 1994?

18   A.   Yes.

19   Q.   And then as part of that case, you were also convicted of

20   tampering with physical evidence; correct?

21   A.   Yes.

22   Q.   Okay.  And as part of that offense, the tampering of

23   physical evidence, that was because you -- you were hiding to

24   murder victims; is that correct?  That's the --

25            MR. REILLY:  Judge, again, I'm going to object.

```
 1    He's -- we're exceeding the scope of the rule of permissible
 2    impeachment.
 3              THE COURT:  Any response, Ms. Michaelis?
 4              MS. MICHAELIS:  I mean, we're -- Your Honor, we're
 5    talking here about -- this whole case has been involved with
 6    obstruction of justice, and here, Mr. Williams is charged with
 7    obstruction of justice, essentially, for hiding evidence in a
 8    crime.  Significant evidence.
 9              MR. REILLY:  Your Honor, we stipulate he's been
10    convicted of tampering with physical evidence, a felony
11    offense, and that is entirely -- it's entirely proper
12    impeachment and we brought it out on direct examination.  We
13    stipulate to the fact of the conviction.  We do not contest
14    it, nor has the witness equivocated.
15              THE COURT:  The objection is sustained.
16    Q.   (By Ms. Michaelis) There's a section of your PSR that
17    talks about the impact of your plea agreement.  Do you recall
18    that part of your PSR?
19    A.   No.
20    Q.   Okay.  If I were to show you a copy of your PSR, would
21    that refresh your recollection as to what's contained in that
22    document?
23    A.   Yes.
24    Q.   Okay.
25              MS. MICHAELIS:  May I approach, Your Honor?
```

1          THE COURT:  You may.

2    Q.   (By Ms. Michaelis) It's the part labeled "Impact of the

3    Plea."

4    A.   Okay.  I see what you're talking about.  You're talking

5    about this, 156?

6    Q.   Let me have that for a second.  Yeah.

7    A.   (Witness reading document.)

8          Yeah.  I read that part.

9    Q.   You read it?

10   A.   Yeah.

11   Q.   Okay.  Okay.  You've had a chance to read through that

12   paragraph 156 that I was directing you to; correct?

13   A.   Yes.

14   Q.   Okay.  And that part of the PSR discusses what would have

15   happened to you if you hadn't had this plea agreement with the

16   Government; is that right?

17   A.   Right.

18   Q.   Okay.  And it indicates there if you had pled guilty to a

19   drug offense -- I'm sorry.  You have pled guilty to a drug

20   offense right now that has a mandatory minimum sentence; is

21   that correct?

22   A.   Yes.

23   Q.   And that mandatory minimum sentence is 10 years in

24   prison; right?

25   A.   Right.

1   Q.   So without the Government's assistance, the judge would

2   not be able to sentence you to under 10 years; is that

3   correct?  Is that your understanding?

4   A.   My understanding is the judge can, you know, do as he see

5   fit.

6   Q.   Well, what is your understanding of what the words

7   "mandatory minimum sentence" means?

8   A.   At that time, people had pled guilty and got sentenced on

9   my case and they were sentenced up under that, so I didn't

10  know.

11  Q.   Okay.  It's your understanding, though, that if the

12  Government files these assistance motions though, that the

13  judge will be able to give you a much lower sentence than what

14  you had anticipated before; correct?

15  A.   Correct.

16  Q.   Okay.  And one of the things that's mentioned in this

17  particular paragraph that I had you review is that the

18  Government had an ability to file what's called an 851 notice.

19  Do you -- do you remember reading that in here --

20  A.   I know what --

21  Q.   -- in the document I just showed you?

22  A.   I know what it is.

23  Q.   You know what it is?

24  A.   Yeah.

25  Q.   Is it -- is it your understanding that an 851 notice

1    essentially doubles what the mandatory sentence would be in

2    your case, the mandatory minimum sentence in your case?

3              MR. REILLY:  Well, Judge, I'll stipulate that he

4    could be subject to an 851 enhancement, but I don't know,

5    since the First Step Act, if it essentially doubles it.  We

6    wouldn't -- were an 851 enhancement filed because of his prior

7    drug convictions, he would be facing more time.  There's no

8    question about it.  The exact amount, I think that would have

9    to be determined under the First Step Act as it stands now.

10   But we stipulate he was subject to an 851 enhancement and a

11   potentially higher sentence should we have filed that because

12   of his drug convictions.

13             THE COURT:  Do you accept that stipulation,

14   Ms. Michaelis?

15             MS. MICHAELIS:  Well, actually, if the -- the PSR

16   goes on to say that there would have been a second notice that

17   could have been filed.  So would he --

18             Would you also stipulate to the fact that there

19   would have been a second conviction that would have qualified

20   him for an even higher enhancement?

21             MR. REILLY:  I believe he has at least one

22   conviction.  I'm not -- I'm not certain how many actually

23   qualified.  I'd have to look at his record.  But he has at

24   least one -- I think at least one qualifies, I believe.

25             MS. MICHAELIS:  Okay.  Well, the PSR says what it

1    says.  So do you --

2              MR. REILLY:  He may have two.

3              MS. MICHAELIS:  And if he had two, then he would

4    have had a higher sentence than the first one?

5              MR. REILLY:  Potentially.  He's looking at a lot of

6    time.  His guidelines are high, also.  We stipulate to all

7    that.

8              MS. MICHAELIS:  Okay.

9              THE COURT:  Proceed.

10             MS. MICHAELIS:  Thank you, Your Honor.

11   Q.   (By Ms. Michaelis) Are you also aware in the PSR what the

12   actual sentencing guideline calculation is?

13   A.   Yes.

14   Q.   Okay.  And is it your understanding that the range that

15   you're looking at as calculated by the probation office, I

16   believe, starts at 262 months.  Is that your understanding?

17   A.   Yes.

18   Q.   Okay.  But to your -- you believe that you're going to be

19   getting something less than 262 months in prison; right?

20   A.   At the time of my cooperation, I didn't even know nothing

21   about no 262 months.

22   Q.   Well, what about today?

23   A.   Yeah.  I know today.

24   Q.   Today, you believe you're going to get less than

25   262 months; correct?

1   A.    Correct.

2   Q.    And you think it's going to be a lot less than

3   262 months; correct?

4   A.    Hopefully.

5   Q.    Okay.  You think it's going to be zero months at the end

6   of it; right?

7               MR. REILLY:  Well, Judge, he's --

8   A.    No.  I don't know.

9               MR. REILLY:  -- he's -- that's misleading.  He's

10  testified he's been in jail.  It's unlikely that he'll get a

11  sentence of zero months, so that's misleading.  I object to

12  the form of the question.  It's also argumentative.

13              THE COURT:  Sustained.

14  Q.    (By Ms. Michaelis) I'd like to go through some of the

15  exhibits that the Government showed you yesterday.  This is

16  Exhibit 81D.  These were some phone calls that they showed you

17  yesterday.  Do you recognize this exhibit from yesterday?

18  A.    Yes.

19  Q.    Okay.  And then the Government asked you about this

20  particular last phone call here that happened on January 29,

21  2016; correct?

22  A.    Correct.

23  Q.    And the duration of that call is only 33 seconds;

24  correct?

25  A.    Correct.

1   Q.   Okay.  And then it was your testimony yesterday that this

2   is the phone call that the agents directed you not to answer;

3   correct?

4   A.   Correct.

5   Q.   Okay.  So you didn't actually talk on this -- on this

6   call?

7   A.   No.

8   Q.   Right?

9            Okay.  And the phone call right above that one,

10  which is on January 22nd, that is also a duration of

11  33 seconds; correct?

12  A.   Correct.

13  Q.   Do you have any memory of answering that phone call?

14  A.   I think it's my voicemail.

15  Q.   It went to your voicemail.  Okay.  And then it looks like

16  there's another call on line 5 from January 19, 2016, with a

17  duration of 25 seconds; correct?

18  A.   Yes.

19  Q.   Did that one go to your voicemail as well?

20  A.   I don't know.  I can't remember.

21  Q.   Well, that duration is shorter than the one where you

22  didn't answer; correct?

23  A.   Correct.

24  Q.   Okay.  And then right above it, there's another call on

25  January 18, 2016, with a duration of 37 seconds; correct?

```
 1    A.    Correct.

 2    Q.    Do you have any memory of answering that call?

 3    A.    No.

 4    Q.    So that one might have gone to your voicemail as well?

 5    A.    I don't know.

 6    Q.    Okay.  But that one's about the same duration as these

 7    other calls we've been talking about; correct?

 8    A.    If you say so.

 9    Q.    Well, it's 37 seconds.  It says it on the record; right?

10    A.    Yeah.

11    Q.    Okay.  And that's only, what, four seconds longer than

12    these other two calls that you were ins- -- the other call

13    that you were instructed not to answer; correct?

14    A.    Correct.

15    Q.    Correct?  Okay.

16               MS. MICHAELIS:  Thank you, Your Honor.

17               THE COURT:  Mr. Glozman?

18                          CROSS-EXAMINATION

19    BY MR. GLOZMAN:

20    Q.    Good afternoon, Mr. Williams.

21    A.    Good afternoon.

22    Q.    Now, I was going to cover this later, and I know

23    Ms. Michaelis did, but I have a question.  You started

24    cooperating on January 29, 2016; right?

25    A.    Yes.
```

```
1    Q.   And you -- the first person you cooperated against was

2    Derrick Terry; right?

3    A.   Yes.

4    Q.   You knew they wanted Derrick Terry; right?

5    A.   Right.

6    Q.   And you started sending him your discovery?

7    A.   Did I start what?

8    Q.   You sent him your discovery --

9    A.   Yes.

10   Q.   -- in the case?

11   A.   Yes.  I sent --

12   Q.   The person you're cooperating against; right?

13   A.   Yes.

14   Q.   With the Government; right?

15   A.   Right.

16   Q.   And you're telling the Government that you're being

17   truthful about everything; right?

18   A.   Right.

19   Q.   But you weren't being truthful about sending your

20   discovery?

21          MR. REILLY:  Judge, I'm going to object to the form

22   of the -- I'm going to object to the form of the question.

23   It's argumentative.

24          THE COURT:  Sustained to form.

25   Q.   (By Mr. Glozman) Were you being truthful about sending
```

1   discovery to the person you were cooperating against?

2   A.   I -- I never -- it never came up.  I never mentioned it

3   to him.

4   Q.   Well, you talked about Derrick Terry; right?

5   A.   I never mentioned sending my discovery to the prosecutor.

6   Q.   No, I know you didn't.  But you talked about Derrick

7   Terry; right?

8   A.   Yes.

9   Q.   And you talked about how he's on the run; right?

10  A.   Yes.

11  Q.   You talked about you saw him with four fake IDs the day

12  before he left; right?

13  A.   Right.

14  Q.   And you don't know who gave him those fake IDs; right?

15  A.   No.

16  Q.   You knew that he stayed in the hotel for a few days after

17  he left; right?

18  A.   Right.  I found that out after he left.

19  Q.   You were packing a U-Haul to take down to him before you

20  were arrested; right?

21  A.   I wasn't taking it to him.  It was getting sent to

22  somewhere.

23  Q.   Okay.  But you were packing it for him; right?

24  A.   I never got a chance to pack it.

25  Q.   You were gonna pack it for him; right?

1   A.   Correct.

2   Q.   You were telling the Government this; right?

3   A.   Yes.

4   Q.   But at the same time, you were sending him discovery from

5   your case; right?

6   A.   Yes.

7   Q.   Discovery that implicated him; right?

8   A.   Yes.

9            MR. REILLY:  Well, Judge -- Judge, now I'm -- I'm

10  going to ask to clarify the record.  We're talking about two

11  different time frames.

12           Are you -- he didn't have discovery for his case

13  before he was arrested.

14           MR. GLOZMAN:  No.  While he's cooperating.

15           MR. REILLY:  Thank you.

16           THE COURT:  All right.

17  Q.   (By Mr. Glozman) While you're cooperating, you're sending

18  discovery to Derrick Terry; right?

19  A.   Right.

20  Q.   And these were not public documents; right?

21  A.   I didn't know that.

22  Q.   You don't -- you don't know?

23  A.   I didn't know.

24  Q.   You didn't know.  But you didn't tell the Government that

25  you were doing that; right?

```
 1    A.    Right.

 2    Q.    While you were being truthful with them; right?

 3    A.    Right.

 4    Q.    Because you thought that would get you in trouble with

 5    them; right?

 6    A.    Nah.  Because they were mine.  I thought I could send

 7    them wherever I wanted to.

 8    Q.    To the guy you're cooperating against?

 9    A.    Yep.

10    Q.    That makes sense to you?

11    A.    Even though I'm cooperating against him, I still care

12    about him.

13    Q.    So by cooperating against him, you know he's going to get

14    charged, right, if you're being honest?

15    A.    I knew that he thought he was -- he was -- they were

16    looking at him about drugs.

17          MR. REILLY:  I'm going to object.  He'd already been

18    charged.  The question's confusing and it's misleading.

19          THE COURT:  Reform your question.

20    Q.    (By Mr. Glozman) You were giving incriminating

21    information about Derrick Terry; right?

22    A.    Yes.

23    Q.    And you were being honest about this information; right?

24    A.    Yes.

25    Q.    Because you wanted a lower sentence for yourself; right?
```

1   A.   Right.

2   Q.   And you knew if you gave them information that they could

3   use against Derrick Terry, that would be beneficial for you;

4   right?

5   A.   Correct.

6   Q.   But you wanted to give him a head's up about what he's

7   looking at?

8   A.   He didn't -- we thought -- me and him thought it was a

9   drug case.  When I found out it was murder, I wanted him to

10  know that he was looking at murder.

11  Q.   You wanted him to know he was looking at murder?  Okay.

12  A.   Yes.

13  Q.   Now, you previously testified that Derrick Terry told you

14  if he was looking at murder, he's going shots fired; right?

15  A.   I talked him out of that.

16  Q.   Okay.  But he did tell you that if he was looking at

17  murder, he was going to go shots fired; right?

18  A.   Right.

19  Q.   But you told him, "No.  Don't do that.  Run away

20  instead;" right?

21  A.   Yeah.

22  Q.   And then you gave him this discovery that says he's

23  looking at murder; right?

24  A.   Yes.

25  Q.   To tell him he should stay and run away; right?

Volume 5B                    36

```
 1   A.    To hide more.

 2   Q.    What?

 3   A.    To hide even more.

 4   Q.    To hide even more?

 5   A.    Yes.

 6   Q.    While you're cooperating with the Government?

 7   A.    Yes.

 8   Q.    And it was you who convinced him to leave; right?

 9   A.    I didn't convince him to leave.  I just told him he

10   should leave.  He was already told that he should leave.

11   Q.    By you; right?

12   A.    By Grady.  I mean, at that time, they had already told

13   him.

14   Q.    Well, you were never present at any meeting between Grady

15   and Terry.  You testified to that; right?

16   A.    Yeah.  But Terry told me in The Gents that they had told

17   him.

18   Q.    But you had to convince him to go?

19   A.    No.  If you read the paperwork --

20   Q.    I'm not -- I'm asking you --

21   A.    -- it simply states --

22         MR. REILLY:  Judge -- Judge, I'm going to ask that

23   he allow the witness to answer the question.

24         THE COURT:  Very well.

25   A.    If you read the paperwork, it states that I said Terry
```

1   told me that they told him to leave.

2   Q.   (By Mr. Glozman) I'm not asking what your paperwork says.

3   I'm asking what you know.  You don't know the contents of any

4   conversations that he had with anyone but you; correct?

5   A.   I just know what he told me.

6   Q.   Okay.  You were not present at any meetings that he might

7   have had with Mr. Grady or Mr. Dillon; correct?

8   A.   Correct.

9   Q.   And then a meeting you had with him, you convinced him to

10  leave; correct?

11  A.   Yeah.  I told him he should go.

12  Q.   You told him he should go.  And then you found out that

13  he's looking at murder; correct?

14  A.   Correct.

15  Q.   And you sent him paperwork showing that he's looking at

16  murder; right?

17  A.   Correct.

18  Q.   And the purpose of this was to tell him to stay away;

19  correct?

20  A.   Correct.

21  Q.   Okay.  Now you were arrested near the end of January in

22  2016; correct?

23  A.   No.  I was arrested at the beginning of January, 2016.

24  Q.   I thought you were arrested January 29, 2016?

25  A.   Yeah.  You said I was arrested at the end.  I was right

1    at the beginning.

2    Q.   The 29th is the end.

3    A.   I was arrested at the beginning of the year, 29th of

4    January.

5    Q.   No.  The end of January.

6    A.   Oh, okay.  Yeah.  I was arrested at the end of January.

7    Q.   I'm not trying to trip you up.  I'm just trying to get a

8    timeline.

9              And you were arrested for your involvement with drug

10   trafficking; correct?

11   A.   Correct.

12   Q.   And you would sell heroin; right?

13   A.   Yes.

14   Q.   And you would sell cocaine; right?

15   A.   Right.

16   Q.   And you would turn cocaine into crack; right?

17   A.   Yes.

18   Q.   You called it getting rocked or rocking?  What did you

19   call it?

20   A.   Just rocking it up.

21   Q.   Rocking it up.  And you would do this with Derrick Terry;

22   correct?

23   A.   Yes.

24   Q.   And you were his right-hand man; is that right?

25   A.   Yes.

1  Q.   And so when he ran away, after you convinced him to, you

2  took over; correct?

3  A.   Yes.

4  Q.   And so it kept going, the drug business, without him

5  around; right?

6  A.   Yes.

7  Q.   And the same thing happened when he was put on house

8  arrest a few years before that; right?

9  A.   Yes.

10 Q.   Nothing changed by him being at home.  You kept

11 everything going; right?

12 A.   Correct.

13 Q.   So by him being on house arrest, the drug trade didn't

14 slow down; right?

15 A.   Right.

16 Q.   And it stayed the same the entire time he was on house

17 arrest until he got off; right?

18 A.   (No audible response.)

19 Q.   And you started working for him back in 2012; correct?

20 A.   Correct.

21 Q.   I think you said you started two days after you got out

22 of jail?

23 A.   Yes.

24 Q.   You didn't know him very well then; right?

25 A.   Nah.

1    Q.    You didn't work with him before that?

2    A.    No.

3    Q.    But he approached you and said, "Hey, I want you to sell

4    drugs for me"?   Is that what happened?

5    A.    Nah.

6    Q.    How'd it go?

7    A.    Just asked me what I was doing.  I told him I was out

8    there trying to hustle.

9    Q.    You were trying to hustle.  But you were on parole;

10   right?

11   A.    Yeah.

12   Q.    And there are rules that come with being on parole;

13   right?

14   A.    Right.

15   Q.    And part of those rules is not breaking any laws; right?

16   A.    Right.

17   Q.    You can't hustle when you're on parole; right?

18   A.    Right.

19   Q.    And you have a parole officer that you have to check in

20   on; right?

21   A.    Right.

22   Q.    You talked talk to him frequently; right?

23   A.    Yes.

24   Q.    And he asked you if you're staying out of trouble; right?

25             MR. REILLY:  Judge, I'm going to object.  We're

1  going quite beyond the scope of what's permissible here.  I

2  object to the relevance of it.  It's hearsay, aside from

3  everything else.

4          MR. GLOZMAN:  I'm going to his ability to tell the

5  truth if he was honest with his parole officer.

6          THE COURT:  I'll give some leeway.  Let's proceed.

7          MR. GLOZMAN:  Just a little -- a couple questions.

8  Q.  (By Mr. Glozman) When your parole officer asked you if

9  you were staying out of trouble, did you tell him you were

10  hustling?

11  A.  I can't ever been -- remember being asked by my parole

12  officer was I staying out of trouble.

13  Q.  Did you tell your parole officer you were hustling?

14  A.  No.

15  Q.  You knew if you told him the truth, you'd go back to

16  jail; right?

17          MR. REILLY:  Well, Judge, I -- I'm not sure if he's

18  asking if he volunteered or if there was a direct inquiry.

19  The question -- the question is confusing.  It's vague.

20          THE COURT:  Yeah.  Can we clear that up,

21  Mr. Glozman?

22  Q.  (By Mr. Glozman) Were you ever honest with your parole

23  officer about what you were doing on parole?

24  A.  I never was asked.

25  Q.  The parole officer never checked in on you and asked what

1   you were doing?

2   A.   He asked me, did I have a job.  He asked me, you know

3   what I'm sayin', was I smoking weed?

4   Q.   And what'd you tell him?

5   A.   I told him, yeah, I was smoking weed.

6   Q.   Did you tell him you had a job?

7   A.   I told him, yeah, I had a job.

8   Q.   What'd you tell him your job was?

9   A.   I don't recall.

10  Q.   Did you tell him it was hustling?

11  A.   Come on, man.

12  Q.   What'd you say?

13  A.   I said, "Come on, man."  That sounds stupid.

14  Q.   Yeah.  It'd be stupid for you to tell him that; right?

15       MR. REILLY:  Judge, at this point, if he's going

16  down this road, I'm going to object to any further questions

17  along this line.

18       THE COURT:  Yeah.  Let's move on, Mr. Glozman.

19       MR. GLOZMAN:  Okay.

20  Q.   (By Mr. Glozman) So you've got 2 ounces of heroin, right,

21  the first time you got funded by Terry -- Derrick Terry?

22  A.   Yes.

23  Q.   And you didn't have to pay for it.  He just fronted it to

24  you; right?

25  A.   Fronted to him means you have to pay it back.

1   Q.   Yeah.  But you didn't have to pay for it upfront.  He

2   trusted you?

3   A.   Right.

4   Q.   Okay.  And that's how your relationship with Derrick

5   Terry started; correct?

6   A.   Correct.

7   Q.   And you sold drugs with him from the time you got out of

8   jail two days after until you got arrested in January of 2016;

9   right?

10  A.   Right.

11  Q.   So that was about -- that's about three and a half years,

12  correct, from July, 2012, to January, 2016?

13  A.   If you say so.

14  Q.   During those three and a half years, did Oscar Dillon

15  sell drugs with you?

16  A.   I said that he's never sold drugs.  I've never seen him

17  with drugs.

18  Q.   And not with you and not with Derrick Terry; right?

19  A.   I've never seen that man with drugs.

20  Q.   All right.  But you were selling -- you, personally, were

21  selling heroin, cocaine, and crack; right?

22  A.   Yes.

23  Q.   And you would break it down; right?

24  A.   Yes.

25  Q.   Because you could sell it to more people; right?

```
1    A.    Right.

2    Q.    And I think this is a direct quote from you.  You said,

3    "The drug trade's all about the money."  Right?  So the more

4    people you sell drugs to, the more money you could make;

5    right?

6    A.    Correct.

7    Q.    And you didn't care what those people did with the drugs.

8    You just wanted to sell to as many people as possible; right?

9    A.    Right.

10   Q.    No matter if it was heroin or cocaine or crack; right?

11   A.    Right.

12   Q.    Now, you talked about turning cocaine into crack;

13   correct?

14   A.    Correct.

15   Q.    You called it rocking it up; right?

16   A.    Right.

17   Q.    And in order to do that, what you have to do is you've

18   got to go to the store and you've got to buy some baking soda;

19   correct?

20   A.    Correct.

21   Q.    And I think Mr. Reilly called it publicly available

22   baking soda yesterday; right?  Just available to anyone who

23   wants it; right?

24   A.    Right.

25   Q.    And so, you go to -- was there a specific store you would
```

1   go to?

2   A.   Any store.

3   Q.   Was this like a neighborhood spot you would go to?

4   A.   Any store.

5   Q.   Any store.  And then you would buy baking soda there;

6   right?

7   A.   Right.

8   Q.   And you would buy sandwich bags there; right?

9   A.   Right.

10  Q.   How much baking soda would you buy at a time?

11  A.   I don't recall.

12  Q.   Like, just one box or, like, multiple boxes?

13  A.   A box.

14  Q.   Just a box.  And you would pay for it; right?

15  A.   Right.

16  Q.   With cash?

17  A.   Right.

18  Q.   Was this drug money?

19  A.   With cash, man.

20  Q.   Was it -- was it cash you made from drug selling?

21  A.   I admit all my money came from drug selling.  You keep

22  asking the same -- I admit it.

23  Q.   Okay.  When you paid for it, did you tell the clerk,

24  "Hey, this is drug money"?

25  A.   Do you tell the clerk where you bought your soda -- your

1    soda money come from?

2    Q.    Can you please just answer my question?

3    A.    Ask one that's right.

4    Q.    When you bought baking soda and you paid with cash, did

5    you tell the clerk the source of the money?

6    A.    No.

7    Q.    Okay.  And you would purchase this baking soda to help

8    further your drug trafficking; right?

9    A.    Right.

10   Q.    Because you would take the baking soda and you would mix

11   it with the cocaine; right?

12   A.    Right.

13   Q.    And this would allow you to make more money; right?

14   A.    Right.

15   Q.    And so, in this case, you pled guilty to conspiring to

16   sell cocaine and crack; right?

17   A.    Right.

18   Q.    You were part of a drug trafficking organization; right?

19   A.    Right.

20   Q.    And as part of your drug trafficking, you would buy this

21   baking soda from a clerk and put it into your cocaine; right?

22   A.    Right.

23   Q.    And you would sell that crack on the street; right?

24   A.    Right.

25   Q.    You wouldn't consider the clerk at the store a person a

1    part of your organization, would you?

2    A.    No.

3    Q.    You just had a transaction and what you did with it was

4    your issue; right?

5    A.    I didn't even hear what you said.

6    Q.    You would just purchase the baking soda from the clerk;

7    right?

8    A.    Right.

9    Q.    You didn't tell him what you were going to do with that

10   baking soda; right?

11   A.    No, I didn't.

12   Q.    And so, that clerk wasn't part of your drug trafficking

13   organization; right?

14   A.    Right.

15   Q.    You didn't make an agreement with that clerk that you

16   were having this conspiracy to traffic drugs; right?

17   A.    Right.

18   Q.    You just had this transaction and you would move on;

19   right?

20   A.    Right.

21   Q.    And the same thing with the plastic bags that helped your

22   drug trafficking; right?

23   A.    Right.

24   Q.    Now, you also testified about a series of events at the

25   jail.  You talked about that for a while, right, in December?

1    You just watched the videos on it?

2    A.    Right.

3    Q.    And that was about an affidavit you wrote; correct?

4    A.    Right.

5    Q.    And in one of the videos, you said you approached Dillon;

6    right?

7    A.    When he came into the pod, you're talking about?

8    Q.    Yeah.

9    A.    Yes.

10   Q.    You approached him; right?

11   A.    Right.

12   Q.    And that was nothing to do with this affidavit that we're

13   talking about; right?

14   A.    Correct.

15   Q.    Isn't it true that the first thing you said to him was,

16   "I don't know what you're doing here"?

17   A.    I don't remember.

18   Q.    But it's possible you said that?

19   A.    I could have.

20   Q.    That wouldn't be out of the realm of possibility that you

21   didn't know why he was there?

22   A.    Right.  I didn't.  I didn't know.

23   Q.    You didn't know.  Okay.  And then after you guys had this

24   exchange, he transferred pods; right?

25   A.    I did what?

Volume 5B                              49

1   Q.   He transferred pods after this first conversation; right?

2   A.   He did?

3   Q.   Yeah.

4   A.   Yeah.

5   Q.   Yeah.  Now in regards to this affidavit stuff, there were

6   videos about what happened; right?

7   A.   Correct.

8   Q.   And Mr. Reilly was able to walk you through the videos

9   and you were able to show what's going on and what you say

10  happened; right?

11  A.   Right.

12  Q.   But the meetings that happened earlier in January, 2016,

13  we don't have any videos of those meetings; right?

14  A.   No.

15  Q.   There's no recordings of those meetings; right?

16  A.   Not that I know of.

17  Q.   So we've just got to take your word for what happened;

18  right?

19  A.   What do you mean "take my word"?

20  Q.   Well, you're the only one who says what happened; right?

21  It was just you and, allegedly, Mr. Dillon and Mr. Grady;

22  correct?

23  A.   It shows on the video.

24  Q.   No.  Not in the jail.  In January of 2016, during the --

25  after the round-up.  There's no recordings of those meetings

1    with you guys; right?

2    A.    Oh, you talking about when we talked at my house?

3    Q.    Yeah.

4    A.    No.

5    Q.    So we've just got to take your word for what happened;

6    right?

7    A.    Correct.

8    Q.    And your deal with the Government is if you tell the

9    truth, they're going to ask for you to get less than the

10   10-year mandatory minimum; right?

11   A.    Correct.

12   Q.    And they're the ones who determine if you tell the truth;

13   right?

14   A.    Correct.

15   Q.    Okay.  So in January, 2016, you get arrested; correct?

16   A.    Correct.

17   Q.    And law enforcement show up at your house; correct?

18   A.    Correct.

19   Q.    They place you under arrest; right?

20   A.    Right.

21   Q.    And they found a bunch of drugs in your house; correct?

22   A.    They didn't find a bunch.

23   Q.    What?

24   A.    They didn't find a bunch.

25   Q.    But they found some drugs; right?

1    A.    Right.

2    Q.    There was some marijuana in there; right?

3    A.    Yes.

4    Q.    Some cocaine; right?  Some heroin?

5    A.    Yes.

6    Q.    And you knew you were in trouble; right?

7    A.    Right.

8    Q.    You got caught red-handed?

9    A.    Right.

10   Q.    And you knew you were at risk of going back to jail;

11   right?

12   A.    Right.

13   Q.    And you had a lengthy criminal history, so you knew if

14   you'd go back to jail, it would be for a long period of time

15   potentially; right?

16   A.    Right.

17   Q.    And so, after your arrest, you decided to talk to the

18   Government; correct?

19   A.    Correct.

20   Q.    You knew this would help out your situation; right?

21   A.    Right.

22   Q.    And you kind of talked twice really quickly after; right?

23   It was, like, two meetings back to back almost?

24   A.    Right.

25   Q.    There was one the day of your arrest; right?

1    A.    Right.

2    Q.    And one, like, three or four days later?

3    A.    Correct.

4    Q.    And the first day, the meeting was much shorter than the

5    second day; right?

6    A.    Right.

7    Q.    The first one was at the DEA offices; right?

8    A.    Right.

9    Q.    And the second one was here in the U.S. Attorney's

10   Office?

11   A.    Yes.

12   Q.    Okay.  And so, on the first day, this was the shorter

13   day, like I said; correct?  Right?

14   A.    Yes.

15   Q.    And you waived your *Miranda* rights; right?

16   A.    Right.

17   Q.    And you consented to them searching your phone; is that

18   right?

19   A.    Yes.

20   Q.    And you were planning on being honest with them; right?

21   A.    I wasn't planning on it.  I was honest.

22   Q.    But you wanted to be honest with them; right?

23   A.    Right.

24   Q.    And they asked you if they could record the interview of

25   you; correct?

```
 1   A.   Correct.

 2   Q.   But you said no?

 3   A.   Right.

 4   Q.   Why?

 5   A.   Because if -- you -- you gotta understand.  I seen legal

 6   work before I got locked up, so I ain't wanting my -- no legal

 7   work with my name on it.

 8   Q.   But you're looking to talk to them; right?

 9   A.   Yeah.

10   Q.   They put your name down; right?

11   A.   But if you -- that same paperwork -- the same thing you

12   talking about, I told them I didn't want my name -- I didn't

13   want nothing written.  I ain't want my -- nothing recorded or

14   none of that.

15   Q.   But you know they wrote something; right?

16   A.   Later, I found out they didn't write anything -- write

17   down right then that I seen.

18   Q.   They weren't taking notes the first time?

19   A.   I didn't pay attention.  I didn't see it.

20   Q.   All right.  That's fine.  And so you started talking to

21   them; correct?

22   A.   Right.

23   Q.   And you started telling them about your drug trafficking

24   activities?

25   A.   Right.
```

54

1   Q.   Particularly, with Derrick Terry; right?

2   A.   Right.

3   Q.   And you talked about this for about 50 minutes or an

4   hour, if you remember?

5   A.   I don't know.

6   Q.   It was a while; right?  Stressful day, but you were

7   talking mainly about Derrick Terry?

8   A.   I don't remember.

9   Q.   You don't remember?

10  A.   I don't remember how long it was.

11  Q.   What?

12  A.   I don't remember how long it was.

13  Q.   All right.  But you agree that you were talking about

14  Derrick Terry in the beginning?

15  A.   Right.

16  Q.   And at some point, you mentioned a paralegal; correct?

17  A.   Right.

18  Q.   You said one paralegal though; right?

19  A.   Yeah.

20  Q.   Okay.  And at that point, they stopped the interview,

21  didn't they?

22  A.   Yeah.  My phone rang.

23  Q.   Or your phone rang.  And it wasn't Mr. Dillon calling

24  you?

25  A.   Right.

55

1    Q.    In fact, you didn't even have Mr. Dillon's number?

2    A.    Correct.

3    Q.    You never talked to Mr. Dillon on the phone?

4    A.    Correct.

5    Q.    You don't really know what he does; right?

6    A.    Correct.

7    Q.    All right.  But at some point, they stop the interview

8    and they called in two more people; right?

9    A.    I don't remember.

10   Q.    You don't remember?

11   A.    Nah.

12   Q.    You don't remember Mr. Reilly and Llewellyn coming in

13   later?

14   A.    Oh.  I thought it was the next time I met them.  I don't

15   remember.

16   Q.    You don't really -- you don't remember what was going on?

17   A.    I just don't remember all that.  Like, it was so

18   stressful, I don't remember all that --

19   Q.    Okay.

20   A.    -- of who came in that meeting.  I just -- to me, I was

21   just in there with the police.  I don't remember who was what.

22   Q.    But you -- okay.  That's fine.

23         And during this meeting, you didn't have a lawyer

24   with you; right?

25   A.    Right.

1    Q.    You had -- you hadn't gone to court yet; right?

2    A.    Right.

3    Q.    But the next time, the second meeting, the longer

4    meeting, you had an attorney for that one; right?

5    A.    Yes.

6    Q.    And there were more agents at that one; right?

7    A.    I don't know.  I can't remember if -- if there was more

8    agents there.

9    Q.    The prosecutors were at that second one; right?

10   A.    The prosecutors was there.

11   Q.    And did you get a chance -- without telling me what you

12   guys talked about, did you get a chance to talk to your

13   attorney before that meeting?

14   A.    For a little bit.

15   Q.    For A little bit?  And do you know if your attorney

16   talked to Mr. Reilly or anyone else at the prosecutor's office

17   before that meeting?

18   A.    I don't know.

19   Q.    You don't know.  But you had an attorney and you talked

20   to him?

21   A.    Right.

22   Q.    Without telling me what you guys talked about.

23         And so, in the second meeting, you decided to go

24   into detail about Mr. Grady and Mr. Dillon; right?

25   A.    Right.

1    Q.    Because in the first one, you didn't?

2    A.    Well, they was ending the -- ended the meeting.

3    Q.    They ended the meeting right when you mentioned one

4    paralegal; right?

5    A.    (No audible response.)

6    Q.    And in the second meeting, after you had a chance to talk

7    to your lawyer, you discussed three series of events involving

8    Mr. Dillon and Mr. Grady; right?

9    A.    Right.

10   Q.    And if any -- at any point, by the way, during my

11   questions, if you need to refresh your recollection, just let

12   me know and I'll show you the same document Mr. Reilly was

13   showing you.

14   A.    Okay.

15   Q.    During this first series of events, you said happened on

16   January 10th or 11th; correct?

17   A.    Correct.

18   Q.    And you were told -- or you told them that Toya, your

19   girlfriend, said Mr. Dillon was looking for you; right?

20   A.    Right.

21   Q.    So you didn't talk to him at that point; right?

22   A.    I didn't what?

23   Q.    You didn't talk to him right then, that day?

24   A.    No.

25   Q.    You never met him before that day; right?

58

1    A.    Right.

2    Q.    And later that day, you said you came home and Mr. Dillon

3    was waiting for you outside; correct?

4    A.    Correct.

5    Q.    And he said, "My partner's coming"?

6    A.    Right.

7    Q.    And that was Mr. Grady; right?

8    A.    Right.

9    Q.    And that was the first time you met both of them;

10   correct?

11   A.    Correct.

12   Q.    And, allegedly, they told you that they heard that Terry

13   was indicted; right?

14   A.    Right.

15   Q.    And they showed you a copy of an indictment; right?

16   A.    Right.

17   Q.    But you didn't see Derrick Terry's name on it?

18   A.    Right.  I didn't pay that much attention to it.

19   Q.    All right.  And this was January 10th or 11th; right?

20   A.    Yeah.  I -- I just thought it was them days.  I didn't

21   know the exact date.

22   Q.    Well, you were pretty sure yesterday about the exact date

23   when you were testifying.

24   A.    I never said the exact date.  I mean, I said those dates

25   on the thing, but I just didn't know the day.

1   Q.   Well, when Mr. Reilly asked you what day you met them,

2   you said January 13th.  Do you remember that?

3   A.   I remember -- I remember the -- I just said -- I remember

4   that day because I was reminded that that was the day of the

5   kick-ins.  So now --

6   Q.   Who -- who reminded you?

7   A.   Read my paperwork.  I know that the 13th is the day of

8   the kick-ins.

9   Q.   Okay.  Well, during this first meeting, you're talking

10  about this first series of events on January 10th and 11th;

11  right?

12  A.   Right.

13  Q.   And this is when you meet Mr. Dillon and Mr. Grady;

14  right?

15  A.   Right.

16  Q.   And then they tell you about this indictment that may

17  come out about Mr. Terry; right?

18  A.   Right.

19  Q.   And then they leave; correct?

20  A.   Right.

21  Q.   They didn't tell you anything about him running away at

22  that point yet or that it's a good idea for him to do that;

23  right?

24  A.   We had -- We had two meetings that day.

25  Q.   I'm just talking about the first meeting.

1   A.   I can't recall if it was that one or the second one.

2   Q.   You don't --

3   A.   I just know it was --

4   Q.   -- remember what happened.

5   A.   -- that day.

6   Q.   Okay.  And then after they left, Mr. Terry walked into

7   your house; correct?

8   A.   After the second meeting.

9   Q.   Well, you told them it was after the first meeting.

10  A.   He walked in.

11  Q.   He had a key to your house; right?

12  A.   My back door.

13  Q.   To your house; right?

14  A.   Yeah.

15  Q.   And he can go there in case he wanted to get away from

16  something; right?

17  A.   Yeah.  Well, he stay -- he would be on the next street,

18  so if he just wanted to walk away from there, he could just

19  walk across the lot to my house.

20  Q.   Okay.  So you tell them that you see Grady and Dillon;

21  right?

22  A.   Right.

23  Q.   You don't tell them that they told you anything about

24  Terry having to run away; right?

25                MR. REILLY:  Judge, I'm going to object.  I'm going

1   to ask that he clarify at what point, so the question is

2   clearer for the witness and the sequence of events.

3           THE COURT:  More specific, please.

4   Q.   (By Mr. Glozman) When you were explaining to the

5   Government the details of the January 10th or 11th meeting,

6   the first time that you say you saw Grady and Dillon that day,

7   you told the Government that they didn't mention anything

8   about Terry having to run away; isn't that true?

9   A.   Correct.

10  Q.   Okay.  And then they left and Terry comes to your house;

11  correct?  That's what you told them?

12  A.   Yeah.  I know they left and Terry came.

13  Q.   Okay.  And so, then you had a conversation with Terry and

14  he told you to blow them off; correct?

15  A.   To what?

16  Q.   To blow them off?

17  A.   Yeah.  To listen, but --

18  Q.   To listen and blow them off.  But you couldn't have told

19  him that they said it was a good idea for him to run away

20  because they hadn't told that to you yet; right?

21  A.   When they came back and had the paperwork and I looked,

22  they told me.

23  Q.   The first time, they didn't tell you; right?  You don't

24  have to look at him.  Just look at me.

25  A.   I mean, I ain't paying attention -- I'm looking at you

```
 1   and him.  I said it --
 2           MR. REILLY:  Judge, I'm going to ask that that
 3   comment be stricken.  I didn't see him looking at me and I
 4   have no objection -- I have no objection, but I do object to
 5   him mischaracterizing what's happening in the courtroom.
 6           MR. GLOZMAN:  I'll -- I'll agree to strike that,
 7   Your Honor.
 8           THE COURT:  Thank you.
 9   Q.   (By Mr. Glozman) Do you -- if I -- do you just not
10   remember what you told him at the first meeting?
11   A.   I mean, I remember, but it's like you trying to mix it
12   up.
13   Q.   I'm not trying to mix it up.  I'm trying to remember --
14   have you say what you told the Government the first meeting
15   you had with them.
16   A.   If you want me to just tell what I told them, I could
17   just tell you that.  But it just seem like you're trying to
18   mix it up.
19   Q.   I'm not.  You first told them that you saw them before
20   you saw Terry; correct?
21   A.   Right.
22   Q.   And they didn't tell you about Terry having to run away
23   at that point; right?
24   A.   Right.
25   Q.   And then Terry came to your house; right?
```

```
 1   A.   Right.
 2   Q.   So you couldn't have told Terry that they said it was a
 3   good idea for him to run away because they haven't told that
 4   to you yet; right?
 5   A.   I know they told me and I told him.
 6   Q.   Did they tell it to you in the morning, the first time
 7   you talked to them?
 8   A.   All -- to me, all the meetings was in the morning.  None
 9   was at -- none of the meetings was at night.
10   Q.   Were some during the day?
11   A.   Yeah.
12   Q.   Okay.  So there could have been one in the morning and
13   there could have been one in the day; right?
14        MR. REILLY:  Well, Judge, that mischaracterizes
15   his -- when he said -- I'm sorry.  You mean one meeting in the
16   morning and one during the day.  I -- I withdraw.
17        THE COURT:  All right.
18   Q.   (By Mr. Glozman) Do you just not remember what you told
19   them?  All I'm trying to remember -- or to --
20   A.   I remember what I told them.
21   Q.   Okay.  You told them you talked to Grady and Dillon,
22   right, the first time?
23   A.   Right.
24   Q.   They didn't tell you that it was a good idea for Terry to
25   run away; right?
```

1   A.   They told me that it was a good idea for Terry to stay

2   gone for 12 to 18 months, 2 years, something like that.

3   Q.   But that's not what you told the Government the first

4   time you talked to them?

5   A.   I told the Government that they told me it was a good

6   idea for him to run.

7          MR. REILLY:   And -- and I have no objection if you

8   want to move to introduce the statements into evidence in

9   their entirety.

10  Q.   (By Mr. Glozman) If I show you the statements that the

11  Government showed you earlier, will that refresh your

12  recollection as to what you told them?

13  A.   I guess so.

14  Q.   You guess so?  Do you want me to show them to you?  I'm

15  just trying to figure out what you told them.  That's it.

16  A.   I just told you what I told them.

17  Q.   You told them that on January 10th or 11th, when you were

18  leaving your house, someone told you that there was a lawyer

19  looking for you; right?

20  A.   Yes.

21  Q.   But you blew them off; correct?

22  A.   Right.  But I said that I -- I didn't remember -- I don't

23  really know if it was the 11th or the -- the 10th or the 11th.

24  Q.   But it was one --

25  A.   But I know --

1   Q.   But it was one of those two days; right?

2            MR. REILLY:   Judge -- Judge, I'm going to ask that

3   he let the man finish his answer to the question instead of

4   cutting him off when he's trying to answer a question.

5            THE COURT:  Very well.

6            Finish your answer, Mr. Williams.

7   A.   I didn't know if it -- I don't remember if it was the

8   10th or the 11th.  I do remember that on the 13th -- I do --

9   once I know the kick-in and I start remembering the kick-in,

10  Mikey, and all this, I do know the 13th.

11  Q.   (By Mr. Glozman) All right.  And that was the second

12  series of events that you detailed for the Government that

13  day; correct?

14  A.   I don't know.

15  Q.   Well, the first series you detailed, you said it was

16  January 10th or 11th; right?  That's just what you said?

17  A.   Right.

18  Q.   And then the second detail -- or second series of events

19  you said were on the day of the warrants and the arrest;

20  right?

21  A.   Right.

22  Q.   And the warrants and the arrest were on January 13th;

23  right?

24  A.   Right.

25  Q.   So even if you don't remember the exact days, you will

1   agree that the first series of events had to happen before

2   January 13th; correct?

3   A.    Nah.  I'm not going to agree to that.

4   Q.    You're not going to agree to that?

5   A.    I'm gonna to agree that -- that I met them the day of

6   the -- that the day of the kick-ins, I know now, I met them.

7   I know that I drove around Grady that morning when I was going

8   to Northland.

9   Q.    I understand that's what you remember now.  I'm asking

10  what you told the Government the first time you met with them.

11  A.    I just didn't remember the dates right.

12  Q.    You'll agree with me that you described a first series of

13  event, correct, where you met Oscar and Grady; correct?

14  A.    All the same day.

15  Q.    But then you told them the second series of events was on

16  the day of the kick-ins?

17  A.    Right.  I just had the days mixed up, but it's all the

18  same day.

19  Q.    It's all the same day?

20  A.    It's all the same day.

21  Q.    So even though you told them it was different days

22  before, now you're saying it's the same day?

23  A.    I've been saying that I don't recall --

24  Q.    You don't recall.

25  A.    -- actual dates.

```
1              MR. REILLY:  At this point, I object to any further
2     questions on this line in that it's been asked and answered
3     multiple times.
4              THE COURT:  Sustained.
5     Q.   (By Mr. Glozman) Mr. Williams, you said you smoked weed
6     every day; correct?
7     A.   Correct.
8     Q.   But, in fact, when you were interviewed by the probation
9     officer, you told him you smoked eight to ten blunts a day;
10    isn't that right?
11    A.   Yeah.
12    Q.   What's a blunt?
13    A.   Weed rolled up in a cigar.
14    Q.   In a cigar?
15    A.   Yeah.
16    Q.   How much weed goes in that?
17    A.   How much you put in there.
18    Q.   Is that -- is that a large amount?  I don't know.
19    A.   It's however much you put in there -- you can get in
20    there.
21    Q.   All right.  And you smoke one of these blunts, that's a
22    marijuana cigar, eight to ten times a day?
23    A.   Yeah.
24    Q.   Okay.  And you were doing that during January, 2016;
25    correct?
```

1   A.    Yeah.

2   Q.    All right.  You also told the probation officer that

3   during January, 2016, you would drink a bottle of Patrón

4   tequila a day also.  Do you remember that?

5   A.    During the course of the whole day, yeah, me and friends.

6   Not just me personally.

7   Q.    Okay.  But you would go through a bottle of tequila;

8   correct?

9   A.    Correct.

10  Q.    While you were also smoking eight to ten blunts; correct?

11  A.    Correct.

12  Q.    And on top of that, you also told the probation officer

13  that you would take two to three ecstasy pills every other

14  day.  Do you remember that?

15  A.    Right.

16  Q.    And this was also during January, 2016; right?

17  A.    Correct.

18  Q.    So is it fair to say that on any given day in January,

19  2016, you would have had eight to ten blunts, a bottle of

20  tequila, and two to three ecstasy pills?

21        MR. REILLY:  Judge, I'm going to object to that.

22  That entirely mischaracterizes what he just said.  He said he

23  had tequila with other people.  And he's mischaracterizing

24  what the witness said.  I object.

25        THE COURT:  Do you want to modify that question at

1  all, Mr. Glozman?

2            MR. GLOZMAN:  Yes.

3  Q.   (By Mr. Glozman) You would drink a bottle of tequila a

4  day with other people; correct?

5  A.   Correct.

6  Q.   And while you were doing this, you were also smoking

7  eight to ten blunts; correct?

8  A.   Correct.

9  Q.   And you were also taking two to three ecstasy pills;

10 correct?

11 A.   Correct.

12 Q.   You would agree that that would affect your memory;

13 right?

14 A.   I remembered everybody that owed me.

15 Q.   You remembered everyone who owed you money?

16 A.   Yeah.

17 Q.   That's all you remember though; right?

18            MR. REILLY:  Judge --

19 A.   I mean, that's all I had to.

20 Q.   (By Mr. Glozman) So it's fair to say that you might not

21 remember what actually happened on January 10th or 11th or

22 13th?

23 A.   I remember what happened the day of the kick-ins.

24 Q.   Day of the kick-ins.  But you told the Government the

25 first time you met with them that on the day of the kick-ins,

1    you never saw Dillon.  Do you remember that?

2    A.   I don't know.

3    Q.   If I show you Government Exhibit 91E and the part that

4    talks about on the morning of the kick-ins, will that refresh

5    your recollection if you ever met Oscar that day or not?

6    A.   I know when I met him.

7    Q.   I'm asking what you told the Government when you met

8    them.

9    A.   I don't remember telling them that I didn't meet him on

10   the 13th, the day of the kick-ins.  I met everyone -- I met

11   both of them the day of the kick-ins.

12   Q.   If I show you the statement, will that refresh your

13   recollection if you told them or not?

14   A.   I met both on the day of the kick-ins.

15   Q.   You would agree with me that you didn't tell that to the

16   Government on the day you met with them; right?

17   A.   If you say it's not on there, it's not on there.

18   Q.   It's not on there.  But earlier, you said --

19          MR. REILLY:  I'm not going to agree to that.  I --

20   no objection if you move for --

21          MR. GLOZMAN:  I'm not asking if you agree.  I'm

22   asking the witness.

23          MR. REILLY:  -- the introduction of the statement.

24   The entire statement.

25          THE COURT:  Hey, you know what?  I had a really

```
 1   great idea.  Why don't we proceed like this.  Why don't we,

 2   one, nobody argue with the witnesses, two, ask a question and

 3   allow the witness to answer the question, three, if there's an

 4   objection, stop talking until the objection is finished and

 5   the judge rules on it.  How about that, fellas?  Sound like a

 6   good plan?

 7              MR. REILLY:  Yes, Your Honor.

 8              MR. GLOZMAN:  Yes, sir.

 9              THE COURT:  Thank you.

10   Q.   (By Mr. Glozman) You agreed earlier that Government

11   Exhibit 91E were true and accurate statements; correct?

12   A.   That's the copy of the statements from the -- yes.

13   Q.   And so, you read them; right?

14   A.   I skimmed through them.

15   Q.   You skimmed through them.  Would you like to skim through

16   them now?

17   A.   That's okay.

18              MR. GLOZMAN:  May I approach, Your Honor?

19              THE COURT:  You may.

20   A.   What part do you want me to read?

21   Q.   (By Mr. Glozman) Where it starts with the morning of the

22   kick-ins, the second series of events.

23   A.   (Witness reading document.)

24   Q.   Does that refresh your recollection if you told them

25   about Dillon on the day of the kick-in?
```

```
 1    A.    That's just me talking about Grady.

 2    Q.    Nothing about Mr. Dillon?

 3    A.    Nothing.

 4    Q.    In fact, yesterday, you testified that Mr. Dillon didn't

 5    really say much, did he?

 6    A.    He never did.

 7    Q.    He never did.  And you were talking about these meetings

 8    with Grady yesterday.  Do you remember that?

 9    A.    Yes.

10    Q.    And do you remember, at one point, you said it was only

11    Grady at the meeting, and then Mr. Reilly had to run up to you

12    and show you a piece of paper that said Dillon was there, too?

13          MR. REILLY:  I'm going to -- I'm going to object to

14    that.  Is that a question or was it an argument?

15          MR. GLOZMAN:  I'm asking if he remembers that from

16    yesterday.

17          THE COURT:  Proceed.

18          You may answer.

19    A.    Yes.

20    Q.    (By Mr. Glozman) Okay.  You also described a third series

21    of events that happened on about -- on or about January 15th

22    or 16th.  Do you remember that?

23    A.    You've got to tell me what they were.

24    Q.    It was a few days after the kick-ins.  Did you meet Grady

25    and Dillon a few days after the kick-ins?
```

1    A.    Yeah.  I met them a few times after the kick-ins.

2    Q.    Yeah.  And one of those times, they didn't have any

3    paperwork with them; right?

4    A.    After the first time, they never had paperwork with them.

5    Q.    They never.  And the first time, you didn't see Terry's

6    name on it?

7    A.    Right.

8    Q.    Okay.

9    A.    Well, then in that case, after the first day.  Because,

10   one time, I didn't, and then another time, I think I did see

11   his name.

12   Q.    Okay.  And you talked about how Derrick Terry directed

13   you to pay Grady $10,000.  Do you remember that?

14   A.    He didn't.  Charda came and told me that he said give it

15   to them.

16   Q.    Derrick Terry told you through Charda?

17   A.    Right.

18   Q.    And that was to hire a lawyer; right?

19   A.    I don't know if it was to hire a lawyer or what it was

20   just -- I know it was to give it to the paralegals to hire

21   them.  I don't know about a lawyer.

22   Q.    Well, you told the Government it was for a lawyer when

23   you talked to them.  Do you remember that?

24   A.    I said paralegals.  I don't know about lawyers.  I don't

25   know.  You know what I'm sayin'?  Sometime I refer to them as

1    lawyers instead of saying paralegals, but I hired them.

2    Q.    So you don't know the purpose of why Derrick Terry wanted

3    to give him that money; right?

4    A.    Do I know what all he wanted -- why he wanted to give it

5    to him?

6    Q.    Yeah.

7    A.    I just know he wanted me to give it to them for them to

8    be hired.

9    Q.    Okay.  And it was $10,000; right?

10   A.    Yes.

11   Q.    And you did that; right?  You paid $10,000?

12   A.    Yes.

13   Q.    But you didn't use Derrick Terry's money; correct?

14   A.    Correct.

15   Q.    You used your own money to pay him; right?

16   A.    Right.

17   Q.    And you stated that you'd just met Dillon and Grady a

18   couple days before that; right?

19   A.    Right.

20   Q.    And you never dealt drugs with them; right?

21   A.    Right.

22   Q.    And you didn't give Mr. Dillon the money; right?

23   A.    No, I didn't.

24   Q.    And this -- you testified for the Government that this

25   was drug money; correct?

1    A.    Correct.

2    Q.    But it was yours, not Terry's; correct?

3    A.    Correct.

4    Q.    And the purpose of this was to hire someone; correct?

5    A.    Correct.

6    Q.    Are you familiar with drug traffickers trying to clean

7    their money or wash their money?

8    A.    Yeah.

9    Q.    The purpose is to take drug money and make it look

10   legitimate; right?

11   A.    Right.

12   Q.    And so, they get it back in a legitimate form; correct?

13   A.    Correct.

14         MR. REILLY:  Judge, I'm going to object to certain

15   questions about legal conclusions because the Court will

16   instruct the jury on what the law is.  So if he's calling for

17   legal conclusions, I'm going to object to that.

18         THE COURT:  All right.  And the objection is

19   sustained as to any legal conclusions.  Otherwise, as to

20   factual knowledge that the witness has, you may proceed.

21   Q.    (By Mr. Glozman) Just based on your knowledge, what do

22   some drug traffickers do to clean their money?

23   A.    They buy things.  You know what I'm sayin'?  That they

24   can -- they can recoup their money later.

25   Q.    And they recoup their money later; right?  And that way,

1   the money is clean now.  It's not drug money anymore; right?

2   A.   Right.

3   Q.   Now, when you gave your money to Grady and Dillon, that

4   wasn't the purpose; right?

5   A.   Right.

6   Q.   You just wanted to give them the money; right?

7   A.   I just wanted to give them money for D.

8   Q.   You weren't trying to conceal the fact that it was drug

9   money; right?

10  A.   I mean, they never asked me was it drug money, so...

11  Q.   Yeah.  And you never told them; right?

12  A.   Right.

13  Q.   And the purpose of you giving them the money wasn't to

14  hide the fact that it was drug money; right?

15  A.   Right.

16  Q.   You just didn't care; right?

17  A.   Right.

18  Q.   And you used drug money to pay for everything; right?

19  A.   Right.

20  Q.   And that was the only time you ever gave them money on

21  behalf of Terry; right?

22  A.   That was the only time I ever gave them money.

23  Q.   That was the only time you ever gave them money.  And you

24  were charged with money laundering; right?

25  A.   Right.

1  Q.   In relation to that payment; correct?

2  A.   Correct.  Well, to my knowledge -- at that time, I didn't

3  know it had anything to do with that payment.

4  Q.   But you later found out it did; right?

5  A.   Right.

6  Q.   But you didn't have to plead guilty to that; right?

7  A.   I don't think -- I don't think so.

8  Q.   You only pled guilty to the two drug conspiracies; right?

9  A.   Right.

10  Q.   As part of your cooperation, the Government dismissed the

11  money laundering count; right?

12  A.   Right.

13  Q.   Now, after this first long meeting with the Government,

14  Ms. Michaelis asked you about you being escorted back to

15  lock-up; right?  You remember that?

16  A.   Right.

17  Q.   And it was -- I don't know if you know their names, but

18  it was Agent Lanham and Detective Earley or Earley.  I'm sorry

19  if I'm mispronouncing his name.  Do you know who I'm talking

20  about?

21  A.   I know the event you're talking about.

22  Q.   You know what event I'm talking about?  And this was

23  after you were done talking to the prosecutors; right?

24  A.   Right.

25  Q.   And your lawyer wasn't around; right?

1   A.   Right.

2   Q.   It was just these agents talking to you; correct?

3   A.   Correct.

4   Q.   And you told them that it was you who convinced Terry to

5   leave; correct?

6   A.   I just told them that I -- you're talking about when I

7   told him that I didn't think he should be shooting it out,

8   yeah, I want him to go.

9   Q.   Yeah.  You said -- I mean, it was in the notes.  You

10  said, "I convinced Terry to leave."  You admitted that

11  earlier?

12  A.   Yeah.  But I don't know if I said it like that.  I

13  don't -- I don't recall how I said it to him, but I know it

14  wasn't, "Yeah, I convinced him to leave."

15  Q.   All right.  And the agents told you that you would delve

16  into these topics at the next meeting; right?

17  A.   I don't recall.

18  Q.   You don't remember that?

19  A.   Nah.

20  Q.   But it's fair to say that at your later meetings with the

21  Government, you never talked about how you convinced him to go

22  again; right?

23  A.   You're trying to make it like they didn't -- like, I'm

24  not saying Dillon told him to leave.  I'm saying -- you're

25  trying to make it like Grady then advised me about the 18 --

79

1    about the 12 months to 18 months.

2    Q.    So you'll agree Dillon didn't tell him to leave?

3    A.    Nah.  He didn't.

4    Q.    Okay.

5    A.    He -- he didn't.  But he just explained to me what's the

6    benefits of you being away.  He didn't explain -- he didn't

7    say the 12 year -- 12 months to 18 or 24 months.  He -- nah.

8    He didn't never say that.

9    Q.    Okay.  And then the reason you were talking to these

10   agents about you convincing Terry to leave because he was

11   talking about pulling out his Choppers; right?  Is that what

12   you called them?

13   A.    He wasn't talk- -- he didn't -- nothing was said about

14   him pulling out no Choppas.

15   Q.    Well --

16   A.    The thing about the guns was mentioned in the hall.  It

17   never was mentioned that he said he was gonna pull out some

18   guns, you know, Choppas.  He said, "I'll go shoot it out," but

19   he didn't say, specifically, what gun.

20   Q.    Yeah.  But he -- Terry said he would shoot it out; right?

21   A.    Right.

22   Q.    And you told him, "Don't shoot it out, just run;" right?

23   A.    Right.

24   Q.    If he was charged with murder; right?

25   A.    Nah.

1    Q.    Just in general?

2    A.    Just run.

3    Q.    Okay.  Do you remember testifying in front of a

4    grand jury?

5    A.    Yes.

6    Q.    And you were under oath; right?

7    A.    Yes.

8    Q.    Kind of like you are today?

9    A.    Yes.

10   Q.    And you were being asked questions by the prosecutors;

11   correct?

12   A.    Correct.

13   Q.    And you talked about this whole blaze of glory and

14   Choppers thing about Terry; right?

15   A.    Yes.

16   Q.    There was never any follow-up that you convinced him to

17   run at the grand jury, was there?

18   A.    I don't remember.

19   Q.    If I show you the grand jury transcript, will that

20   refresh your recollection?

21   A.    Yes.

22   Q.    I'm going to show you what I think was already --

23   Government Exhibit 91F.

24            MR. GLOZMAN:  Do you know what page it's on?

25            MS. MICHAELIS:  It's at the very end.

```
 1              MR. GLOZMAN:  What?

 2              MS. MICHAELIS:  It's at the very end.

 3   Q.  (By Mr. Glozman) All right.  I want to show you what's

 4   91F.

 5              MR. GLOZMAN:  May I approach, Your Honor?

 6              THE COURT:  Of course.

 7   Q.  (By Mr. Glozman) Let me know when you've had a chance to

 8   read it.

 9   A.   The highlight?

10   Q.   Yes.  That's where he talks about the Choppers.

11              MR. REILLY:  Can you tell me what page you're on?

12              THE WITNESS:  67.

13              MR. GLOZMAN:  67.

14   A.   (Witness reading document.)

15   Q.   (By Mr. Glozman) Do you remember now talking about that?

16   A.   Yeah.

17   Q.   And you'd talked about how Terry says, "I loaded up my

18   Choppers.  I'm ready to go out with a bang;" right?

19   A.   Right.

20   Q.   He said, "I'm not going down for the rest of my life;"

21   right?

22   A.   Right.

23   Q.   And that -- that meant he was going to shoot it out with

24   the police; right?

25   A.   Right.
```

82

 1    Q.    And that's what you told the agents in the hallway;

 2    right?  That's the same conversation?

 3    A.    I don't know if it was in the hall or -- I don't remember

 4    where -- when it was.

 5    Q.    Wherever it was, you had this conversation with the

 6    agents; right?

 7    A.    I had the conversation.  I can't remember who it was

 8    with.

 9    Q.    That's fine.  But when -- you didn't say in here that

10    after you had this conversation with Terry, it was you who

11    convinced him to leave; right?

12    A.    See, I'm not going to say I convinced him to leave.

13    Q.    Terry also told you he wasn't tripping off getting 10 to

14    15 years; right?

15    A.    Right.

16    Q.    But when you found out that he was getting looked into

17    for murder, you sent him your discovery; right?

18    A.    Correct.

19    Q.    In an effort to tell him that you should stay away;

20    right?

21    A.    Right.

22    Q.    And that was you who did that; right?

23    A.    Correct.

24    Q.    Now, you're an experienced drug trafficker; right?

25    A.    Yeah.  I sold drugs.

1  Q.   And you know a lot of different drug traffickers; right?

2  A.   I know a few.

3  Q.   Just a few?

4  A.   (No audible response.)

5  Q.   Drug traffickers evading law enforcement isn't, like,

6  some kind of new idea; right?

7  A.   Right.

8  Q.   I mean, they don't talk on the phone so they don't get

9  caught; right?

10 A.   I didn't talk on the phone.  I don't know what everybody

11 else do.

12 Q.   All right.  Do you know people who would throw out their

13 phone so they can't be traced?

14 A.   Yeah.  I know a few.

15 Q.   And do you know some people who have ran away not to get

16 arrested?

17 A.   Yeah.  I know a few.

18 Q.   So this whole idea of someone running away not to get

19 arrested isn't some kind of novel idea; right?

20 A.   Right.

21 Q.   Have you ever run away not to get arrested?

22 A.   Nah.

23 Q.   Never?

24 A.   Well, I mean --

25          MR. REILLY:  Judge, I'm going to object.  I'm going

1    to object.   Improper cross-examination.

2                THE COURT:  Sustained.

3                MR. GLOZMAN:  Your Honor, can I have a sidebar?

4                THE COURT:  No.

5    Q.   (By Mr. Glozman) Mr. Williams, you testified that you had

6    court on January 29, 2016; right?

7    A.   Yes.

8    Q.   And it was kind of in a courtroom like this?

9    A.   I don't remember.

10   Q.   Well, similar.  It doesn't have to be this one.  It was

11   in this building; right?

12   A.   Yeah.  I believe so.

13   Q.   And then you had another one on February 2, 2016; right?

14   A.   Yes.

15   Q.   And then on February 12, 2016; right?

16   A.   Yes.

17   Q.   And by those three times, you had already been

18   cooperating; correct?

19   A.   Correct.

20   Q.   And you would go to court the same day that you would go

21   to meetings with the Government; right?

22   A.   Right.

23   Q.   And you testified that on one of those days, you thought

24   you saw Mr. Dillon in the courtroom; right?

25   A.   Right.

1    Q.    Now, during these court proceedings, no one ever said out

2    loud that you were cooperating, did they?

3    A.    No.

4    Q.    It was kept hush-hush; right?

5    A.    Right.

6    Q.    So Mr. Dillon wouldn't have heard anyone say, "Stanford

7    Williams is cooperating;" right?

8    A.    Correct.

9    Q.    You testified that it was Grady and Dillon that told

10   Terry that he should leave for 18 months; right?

11   A.    Right.

12   Q.    That's what you told the prosecutors at your meetings;

13   right?

14   A.    Right.

15   Q.    But you've also admitted here today that you have also

16   convinced him to run; correct?

17   A.    Yeah.  When he said he was going to shoot it out.

18   Q.    Now, you've previously been convicted of evidence

19   tampering; correct?

20   A.    Right.

21   Q.    That wasn't in your own case; right?

22   A.    What do you mean, like, it wasn't in my own case?

23   Q.    You were tampering with evidence in someone else's case;

24   right?

25   A.    Right.

1    Q.    It was someone else's murder case; right?

2    A.    Right.

3    Q.    And you were trying to tamper with evidence to prevent

4    them from going to jail; right?

5             MR. REILLY:  I'm going the object.  He's admitted

6    the impeachment.  Same thing.  We're moving -- we're moving

7    quite beyond what the rules allow.

8             THE COURT:  Sustained.

9    Q.    (By Mr. Glozman) Now, you don't want to stay in jail for

10   a long time; right?

11   A.    No.

12   Q.    You want to get out as soon as you can; correct?

13   A.    Correct.

14   Q.    And in order to do that, you have to cooperate with the

15   Government; right?

16   A.    Correct.

17   Q.    And as part of that, you have to testify here in court

18   against Mr. Dillon; right?

19   A.    Right.

20   Q.    And as you've said, you have tampered with evidence

21   already; right?

22            MR. REILLY:  Judge, and I'm going to object to the

23   form of the question if he's tying it back into the previous

24   conviction that's asked and answered, otherwise, it's vague.

25            THE COURT:  Sustained.

```
 1              MR. GLOZMAN:  Your Honor, I'm trying to build

 2   foundation for my question.  I'm not going to go deep into it.

 3   I promise.

 4              THE COURT:  All right.  Go ahead.

 5   Q.   (By Mr. Glozman) You were convicted of evidence

 6   tampering; right?

 7   A.   Right.

 8   Q.   Evidence in someone else's case; right?

 9   A.   Right.

10   Q.   And you would agree that lying is easier than tampering

11   with evidence; right?

12              MR. REILLY:  Judge, I'm going to object to the form

13   of it.  It's argumentative.

14              THE COURT:  Sustained.

15   Q.   (By Mr. Glozman) You would also agree that keeping

16   yourself out of jail is more important than keeping someone

17   else out of jail?

18              MR. REILLY:  Judge, and I'll object to that.  That's

19   also argumentative.

20              THE COURT:  I'll allow that question.

21   A.   Repeat it.

22   Q.   (By Mr. Glozman) It's more important to you to keep

23   yourself out of jail than keep someone else out of jail;

24   right?

25   A.   You mean I want to stay out of jail while somebody else
```

 1  go to jail?

 2  Q.   No.  You would do anything you can to get yourself out of

 3  jail; right?

 4  A.   I wouldn't do anything I can.

 5  Q.   You wouldn't?

 6  A.   No.

 7  Q.   What wouldn't you do?

 8  A.   I mean, I ain't going to sit here and lie on nobody.

 9  Everything I'm telling is the truth of what happened.

10        MR. GLOZMAN:  One second.

11        THE COURT:  Redirect, Mr. Reilly?

12        MR. REILLY:  Yes, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. REILLY:

15  Q.   What was the last thing you just said?

16  A.   I'm not going to sit here and lie on nobody.

17  Q.   And you've never -- have you ever once said in relation

18  to what happened in this case that you saw either one of these

19  defendants hands-on with narcotics?

20  A.   No, sir.  I've never seen them with drugs.

21  Q.   You've never said that?

22  A.   Right.

23  Q.   In any of your conversations with law enforcement or the

24  Government; is that correct?

25  A.   Correct.

1   Q.   And I want to talk to you about the sequence of events.

2   You alluded to this earlier.  Can you tell the ladies and

3   gentlemen of the jury what transpired when you had the

4   conversation with Grady and Dillon about Terry needing to be

5   gone?  Can you tell the ladies and gentlemen of the jury who

6   said what?

7   A.   Okay.  We were sitting at my table in my house.

8   Mr. Grady advised me that I should tell D he need to be gone

9   for at least 12 months, 18 months, a year, 2 years, something

10  like that.  And when he told me that, you know, Mr. Dillon

11  just told me the reason why you should do stuff like that and

12  it was so that when they brought him back or he turned hisself

13  in, he would not face charges with everybody else.  He could

14  normally go by hisself and face his own charges and you -- the

15  jury wouldn't hear everybody else charges.

16  Q.   And so we also understand there's been some discussion

17  about -- about this other conversation that you had with

18  Mr. Terry where you related to the ladies and gentlemen of the

19  jury here that there was some talk where you had mentioned

20  that he talked about shooting it out with the police and you

21  talked to him about leaving?

22  A.   Right.

23  Q.   Can you tell the ladies and gentlemen of the jury when

24  you had that conversation with Mr. Terry in relation to this

25  conversation with Dillon and Grady that you've just described?

1  A.   I had that conversation with them earlier to when I had

2  the conver- -- I had the conversation later with D about what

3  kind of case it was, if it was a drug case, if it was a murder

4  case, and what he was going to do, you know.  He was willing

5  to take his drug charges, but murder, you know, he know he

6  gonna be gone for life.

7  Q.   Do you recall where that conversation was?

8  A.   In The Gents.

9  Q.   In The Gents.  So this was -- was this the day of the

10  kick-in?

11  A.   Yeah.

12  Q.   And back to all this -- so all this talk about you talked

13  to -- talked him into leaving, had he already had that -- was

14  this -- just clear up when that was, the talk about shooting

15  it out with the police that you had with Mr. Terry, that

16  occurred at Gents?

17  A.   Yes.

18  Q.   And based on your understanding, what had happened

19  earlier in the day?  What conversation had you had earlier in

20  the day before -- with Grady and Dillon before the

21  conversation with Terry at The Gents?

22  A.   I had a conversation with them about, you know, them

23  talking about TT, them talking about D, talking about him

24  having to run.  You know, and I just -- and when we got to

25  The Gents and he was talking about if it's a murder charge,

1  what he was going to do.  I mean, I just know what come with

2  shooting it out with the police and I didn't want him to go

3  through that.

4  Q.   And so you also thought it might be better for him to run

5  than shoot it out with the police?

6  A.   Right.

7  Q.   But had he heard this idea from somebody else first?

8  A.   About running?

9  Q.   Yes.

10 A.   Yeah.  He told me that he had -- he heard it from --

11          MR. GLOZMAN:  Objection, Judge.

12          MR. REILLY:  Judge, this was part of the -- this was

13 part of the cross-examination.  He asked him questions

14 directly on point.

15 Q.   (By Mr. Reilly) When you got to Gents, had Mr. Terry told

16 you about his conversation that he'd had earlier with

17 Mr. Grady or Dillon?

18 A.   He told me about the conversation.

19          MR. GLOZMAN:  Objection.

20          MR. REILLY:  I'm sorry?

21          THE COURT:  Hold on.

22          MR. GLOZMAN:  Hearsay and it's a compound question.

23          MR. REILLY:  And I'll break it down.  May I --

24          THE COURT:  All right.

25          MR. REILLY:  May I approach the witness?

1          THE COURT:  You may.

2     Q.   (By Mr. Reilly) And I'll -- for purposes of the record,

3     I'm going to hand you 91F.  I'm also going to put a copy of

4     91E, and I'm going to put a copy of 91F in front of you.  I'm

5     going to direct your attention to page 4.

6          MR. GLOZMAN:  Judge, objection.

7          THE COURT:  Basis?

8          MR. GLOZMAN:  He never said he forgot anything.  You

9     can't just show him reports.

10    Q.   (By Mr. Reilly) Okay.  Do you recall -- you had a meeting

11    with Mr. Terry at The Gents; correct?

12    A.   Correct.

13    Q.   And did he ask you to do something with the business?

14    A.   To take over.

15    Q.   And why'd he ask you to take over the business?

16    A.   Because he was gonna run.

17    Q.   And did he tell you who told him to run?

18    A.   Told me --

19         MR. GLOZMAN:  Objection.

20    Q.   (By Mr. Reilly) Do you recall --

21         MR. REILLY:  Judge, it's a co-conspirator statement,

22    for one thing, and he went directly into this on

23    cross-examination.

24         THE COURT:  Go ahead.  Overruled.

25    A.   He told me Mr. Grady advised him to run.

1    Q.   (By Mr. Reilly) And you told investigators about that,

2    did you not?

3    A.   Yes.

4    Q.   And so as part of this conversation about what was going

5    to happen with the business, he was telling you, basically,

6    why you needed to take over the business; fair to say?

7    A.   Right.

8    Q.   And were you surprised when Mr. Terry, at The Gents, had

9    told you that Mr. Grady had told him to run?

10   A.   No.

11   Q.   Why weren't you surprised?

12   A.   Because Mr. Grady had already told me.

13   Q.   And what did Mr. Dillon voice an opinion about that once

14   Mr. Grady told you that Terry should be gone for that period

15   of time?  What, again, did Mr. Dillon say?

16   A.   He just explained to me why a person run, you know, so

17   that when you brought them in and turned hisself in, they

18   wouldn't have to go to trial with the other co-conspirators.

19   Q.   And I want to ask you some questions now.  You were asked

20   a bunch of questions about the first series of events, the

21   second series of events.  And did you, in your statements --

22   you've reviewed your statements; correct?

23   A.   Correct.

24   Q.   And in these statements, do you talk about this exchange

25   that happened between you and Mr. Dillon and Mr. Grady that

1    you've told the jury about?

2    A.    Right.

3    Q.    Is that -- and do you remember -- do you tie things to

4    exact dates?

5    A.    Nah.  Not all the time.

6    Q.    And we've talked about -- you -- you've mentioned that

7    you tie things to -- some of these things are to the kick-in;

8    is that correct?

9    A.    Right.

10   Q.    And when you talk about the kick-in, you know what date

11   that is now; is that fair to say?

12   A.    Yes.

13   Q.    And when you relate things that happened -- your language

14   in here on some of the dates was approximately the 10th or the

15   11th; is that correct?

16   A.    Right.

17   Q.    And is the reason you did not correct the word

18   "approximately the 10th or the 11th" because the 10th or the

19   11th is also close to the 13th?

20   A.    Yes.

21   Q.    Do you -- now, we've talked about the statements a lot.

22   But the events that you've detailed in relation to this

23   exchange with Grady and Dillon, have you testified similarly

24   in the grand jury to that exchange?

25   A.    Yes.

1   Q.   And to the best of your recollection, as we discuss this

2   today, what event do you tie that conversation to as far as a

3   time point or a reference?

4   A.   To the kick-ins.

5   Q.   Okay.  And I want to take you back and talk about

6   something else.  When we talk about your ability to remember

7   things, why is it important to remember money?

8   A.   That's the most important thing in this.

9   Q.   And tell the ladies and gentlemen of the jury why it's

10  important to remember money.

11  A.   Everything based off of money.  Everything you doing in

12  the drug game is for money.

13  Q.   And so you were able to rise to the, essentially, the

14  second in command of this large drug trafficking organization

15  because you were capable of remembering, in part, because of

16  what?

17  A.   Who owed who money.

18  Q.   And would you have remembered the exact date of every

19  debt or the exact date of things that happened?

20  A.   No.  I'm not remembering no dates.

21  Q.   And you were asked a series of questions about when

22  Mr. Terry said to blow them off.  And I want you to explain

23  that answer.  When he said "blow them off," tell the jury what

24  that -- what you explained -- or what that means to you when

25  Terry said to blow them off.

1    A.    It just mean, like, to listen for a little while to what

2    they saying, but don't go into real hard details and don't

3    give no money, don't talk about giving no money.  Just listen,

4    because he thought everything they said, they wanted money for

5    it.

6    Q.    They wanted money.  So -- so when he said blow them off,

7    he also told you to listen to them though; is that correct?

8    A.    Right.

9    Q.    But he was careful to tell you that they wanted money?

10   A.    Right.

11   Q.    And the substance -- just -- just so it's clear, the

12   substance of the exchange between Dillon and Grady where

13   Dillon says -- strike that -- where Mr. Grady says that D

14   needs to be gone for 18 -- 12 to 18 months to 24 months,

15   whatever it is, the substance of that statement is contained

16   within this body of statements and your grand jury testimony;

17   is that correct?

18   A.    Yes.

19   Q.    And in terms of Mr. Dillon explaining the benefits of

20   being gone, is that contained within these statements?

21   A.    Yes.

22   Q.    Who directed you to pay the $10,000?

23   A.    Charda told me that D had told her to tell me to give it

24   to them.

25   Q.    And I want to -- I want to touch on that for just a

1  moment.  You were asked some questions.  Ms. Michaelis asked

2  you some questions about that.  And where did the money come

3  from?

4  A.    It came from me.

5  Q.    And Mr. Glozman also asked you some questions about the

6  scope and timing of the Terry -- your work with Derrick Terry

7  and drug trafficking that was from July of 2012 until

8  January 29th of 2016; is that correct?

9  A.    Yes.

10 Q.    And when you were asked questions about how could -- how

11 would you know who to deal with once Terry was gone, did you

12 know -- did you know certain people who were -- who were

13 affiliated with the organization?

14 A.    Yes.

15 Q.    And does that happen over time?

16 A.    Yes.

17 Q.    And when you have a drug trafficking organization, do

18 matters such as money, loyalty, are those -- are those factors

19 that create relationships?

20 A.    Yes.

21 Q.    And is there necessarily a written-down operational plan

22 that we're going to do A, B, and C, if one of our members has

23 to run or has to -- has to -- picks up a case?

24 A.    No.

25 Q.    Are there certain understandings?

1    A.    That if something goes wrong?

2    Q.    Well, certain understandings if something goes wrong or

3    how people are going to work together?

4    A.    Yeah.

5    Q.    And is that part of what allowed you to continue to

6    function after Mr. Terry fled?

7    A.    Yes.

8    Q.    And you continued to collect debts; is that correct?

9    A.    Yes.

10   Q.    And the largest amount of that, you detailed a payment of

11   144,000.  And who was that payment to?

12   A.    It was a payment to Shaq.

13   Q.    Was that the largest percentage of the money that went to

14   any one person?

15   A.    Yes.

16   Q.    And so that was a drug-related payment; is that correct?

17   A.    Right.

18   Q.    And based on that, was the conspiracy and the drug

19   distribution operations, in your view, was it going to

20   continue to function had you not been arrested?

21   A.    It was.

22   Q.    And that -- did that continue to generate more drug

23   proceeds?

24   A.    Yes.

25   Q.    And when you went to pay -- deliver the money that you

1   described after the kick-in, the $10,000, was that -- while it

2   might have been your money, was that money derived from the,

3   basically, the Terry Drug Trafficking Organization?

4   A.   Yes.

5   Q.   Was it derived from the agreements or the relationships

6   and the sale of narcotics that had already been in place?

7   A.   Yes, it was.

8   Q.   And whose payment did you make that -- on whose behalf

9   did you make that payment?

10  A.   Mr. Terry.

11  Q.   And you may not have known all the reasons or purposes

12  behind it; is that correct?

13  A.   Correct.

14  Q.   If Mr. Grady or Mr. Dillon had possession of that money

15  and had they been stopped by the police, would you have

16  expected them to divulge the source of the money?

17          MR. GLOZMAN:  Objection, Judge.  Calls for

18  speculation.

19          THE COURT:  Sustained.

20  Q.   (By Mr. Reilly) There was nothing -- you didn't provide

21  them any paperwork?

22  A.   No.

23  Q.   You didn't -- nor did you receive any paperwork in

24  exchange for the -- and by that, I mean receipts; is that

25  correct?

```
 1   A.    Correct.

 2   Q.    And I'm going to direct your attention --

 3              MR. REILLY:  Can I call up 81 -- 81D?

 4   Q.    (By Mr. Reilly) So you were also asked some questions

 5   about how they were -- how Mr. Grady was capable of finding

 6   you at 4633 Cottage.  Do you recall those questions?

 7   A.    Yes.

 8   Q.    And is there any dispute that he was capable of finding

 9   you?

10   A.    No.

11   Q.    And these phone calls, there's -- one of these phone

12   calls was for 182 seconds; is that correct?

13   A.    Yes.

14   Q.    And another one was for 98 seconds; is that fair to say?

15   A.    Yes.

16   Q.    And directing your attention to 81E.  And here's another

17   phone call on the 15th; correct?

18   A.    Correct.

19   Q.    And what is your only basis to know or have a

20   relationship with the Defendant Grady?

21   A.    In relations to him telling me stuff over D.

22              MS. MICHAELIS:  What -- I didn't hear that.

23              MR. REILLY:  He said --

24   Q.    (By Mr. Reilly) Will you repeat your answer, please?

25   A.    In relations to him telling me stuff about D.
```

1   Q.   So this was a relationship -- your relationship with

2   these individuals was centered around --

3            MR. GLOZMAN:  Objection.

4   Q.   (By Mr. Reilly) Who -- who was your -- what was your

5   common connection to the --

6            THE COURT:  Hold on.

7            MR. REILLY:  I'll withdraw it.  I'm going to

8   rephrase it.

9            THE COURT:  Okay.

10  Q.   (By Mr. Reilly) What was your connection to these

11  individuals?

12  A.   That they was paralegals and they came around because of

13  the case.

14  Q.   And because of who?

15  A.   D.

16  Q.   D.  So that was your connection to them?

17  A.   Right.

18  Q.   In terms of -- in terms of your cooperation, we're

19  just -- we're not going to rehash everything, but I'm going

20  to -- I'm going to ask you a couple things.  Your cooperation,

21  of course, you were engaged in full-time illegal conduct,

22  basically; is that correct?

23  A.   I was what?

24  Q.   Full-time drug trafficker?

25  A.   Yes.

1    Q.   And over the course of years, being engaged in full-time

2    drug trafficking, did you learn a lot?

3    A.   Yes.

4    Q.   And so, you've cooperated against Derrick Terry?

5    A.   Yes.

6    Q.   And you also provided information about Charda Davis; is

7    that correct?

8    A.   Yes.

9    Q.   And the defendants in this case?

10   A.   Yes.

11   Q.   And Anthony Jordan?

12   A.   Yes.

13   Q.   And you've also -- you've talked extensively over the

14   course of time about a number of people; is that fair to say?

15   A.   Yes.

16   Q.   In terms of Derrick Terry's communications, I want to ask

17   you a couple questions -- oh, and by the way.  The name

18   Kenny Keys came up.  Was Kenny --

19            MS. MICHAELIS:  Objection.  Objection.  The name did

20   not come up.  It was the name Kenny.  I didn't clarify who it

21   was.  It was just a name that was elicited by the Government.

22   It was a name in direct that just came up as Kenny.  I never

23   asked whether --

24            MR. REILLY:  Okay.

25            MS. MICHAELIS:  -- it was Kenny Keys.

1            THE COURT:  Very well.

2            MR. REILLY:  I'll -- I'll ask.

3    Q.   (By Mr. Reilly) Who's Kenny?  Who's Kenny?

4    A.   Kenny a guy who work on D and TT houses.

5    Q.   And was -- did you explain that he did something else

6    yesterday when you were talking about --

7    A.   Yeah.  He picked up money and ran it to A.D. or whoever

8    TT was dealing with.

9    Q.   And do you know his last name?

10   A.   Keys.

11   Q.   Kenny Keys.  And was -- to your knowledge, was that

12   something -- was Mr. Terry concerned about Kenny Keys?

13   A.   Yeah.  He thought Kenny could tell on him for money

14   laundering.

15   Q.   Was he concerned about that as another potential source

16   of liability for him?

17   A.   I'm not understanding.

18   Q.   Was he concerned that -- what were his specific concerns?

19   Was he concerned that if Kenny talked, Kenny could get Derrick

20   Terry in trouble?

21   A.   Yeah.

22   Q.   And in terms of Derrick Terry's communications, can you

23   tell the ladies and gentlemen of the jury how Mr. Terry

24   communicated?  Or how -- what his preferences were as far as

25   communications?

1    A.    Texting.

2    Q.    Texting?  And would the texts be of any substance?

3    A.    Just, "I'm down the way."

4    Q.    I'm sorry?

5    A.    If he was on Northland, he'd just text, "I'm down the

6    way."  He wouldn't say Northland.

7    Q.    And were there times -- were there times he had in-person

8    meetings?

9    A.    Yeah.

10   Q.    And were there times that -- can you tell the ladies and

11   gentlemen of the jury how it would work for somebody just --

12   could people come to the neighborhood and potentially find you

13   or Mr. Terry?

14   A.    Yeah.  If you pulled up on Northland and we were on there

15   and you didn't know our numbers, you could ask certain people

16   outside and they would just text us and we would come out.

17   Q.    Ms. Michaelis asked you some questions and you were

18   mentioning something -- some comments about Mr. Grady that he

19   made about a meeting with Anthony Jordan.  Do you recall --

20   can you tell the ladies and gentlemen of the jury about that?

21   A.    Yeah.  He told me that they -- he was trying to get TT to

22   sign -- I guess, to sign so he could get into TT's legal work,

23   but TT's wasn't going for that.  So they thought, you know, TT

24   was -- might tell.

25   Q.    And who told you about that?  Who told you about that

1    meeting?

2    A.    Grady.

3    Q.    Grady?  Mr. Grady?

4    A.    Yeah.

5    Q.    Now, we watched a series of -- I'm going to ask you some

6    questions about the series of videos we watched and your

7    contact with Mr. Grady around the time of December 2nd and the

8    days that followed.  Did you have a number of detailed

9    conversations with him?

10   A.    I talked to him that day that he first came in and I

11   talked to him in the gym.

12   Q.    And do you recall his exact words and everything he told

13   you today?

14   A.    No.  I don't recall exact words.

15   Q.    Do you think it would help -- did you make a statement

16   to -- Ms. Michaelis alluded to it earlier.  Did you make a

17   statement to law enforcement investigators on December 9th of

18   2016 shortly after these conversations occurred?

19   A.    Yes.

20   Q.    Do you think it would help refresh your recollection to

21   review that statement?

22   A.    If you're talking about him telling me that somebody must

23   have talked to the grand jury because he got indicted and

24   stuff like that.

25   Q.    And do you think it's possible that you made additional

1    statements closer to the time?  Would it help refresh your

2    recollection if I were to show you your statements?

3    A.   Yes.

4              MR. REILLY:  May I approach the witness, Your Honor?

5              THE COURT:  You may.

6    Q.   (By Mr. Reilly) I'll direct you to the first bullet point

7    and sub-bullet points beneath that and ask you to take a look

8    at that.

9    A.   Yeah.

10   Q.   Okay.  So earlier -- and I'm going to ask you -- I'm

11   going to ask you a series of questions now.

12             Did you agree to write down everything that

13   Mr. Grady had asked you to write down?

14   A.   I agreed to it, but I didn't write it down.

15   Q.   Okay.  Were there certain things you did -- that he tried

16   to get you to say that you did not say?

17   A.   Yes.

18   Q.   Can you tell us what some of those things were?

19   A.   Well, he wanted me to say that he never -- I never gave

20   him money.  And then he wanted me to say that he was a

21   paralegal.

22   Q.   For you?

23   A.   Yeah.

24   Q.   And was he a paralegal for you?

25   A.   No.

1   Q.   And so, did you put that in the affidavit?

2   A.   No.

3   Q.   And did you -- did you also say -- were you willing to

4   say that you never gave him money in the affidavit?

5   A.   No.

6   Q.   So you chose other language; is that correct?

7   A.   Correct.

8   Q.   And what was the language you chose?

9   A.   I just chose to say that I never done anything illegal

10  with him and he didn't know how I obtained my money.

11  Q.   And then when you asked him -- he asked you to put in --

12  you put in that you never engaged in any financial

13  transactions with him, what did you mean by that?

14  A.   I just thinking that I never bought a building or nothing

15  with him, so I never...

16  Q.   And it's fair to say you don't know all the nuances of

17  the federal money laundering statutes, do you?

18  A.   No, I don't.

19  Q.   But you were unwilling to put that you never gave him

20  money?

21  A.   Right.

22  Q.   And do you recall -- do you recall that he wanted you to

23  write that he did not know how you made your money?

24  A.   Right.

25  Q.   Did he ask you to write that?

1   A.    I think -- I'm not -- I don't want to --

2   Q.    Okay.  You're unsure?

3   A.    I'm unsure.

4   Q.    All right.  Let me ask you something.  Were you

5   represented by a lawyer at this time?

6   A.    No.

7   Q.    Were you repre- -- on December 2nd -- yeah.  There

8   wasn't -- your lawyer wasn't present with you in the jail pod;

9   is that fair to say?

10  A.    Correct.

11  Q.    And -- but you were represented by a lawyer at that time;

12  correct?

13  A.    Correct.

14  Q.    And Mr. Grady didn't arrange to do this through your

15  attorney, did he?

16  A.    No.

17  Q.    He didn't -- he didn't say that he would have someone

18  contact your attorney, did he?

19  A.    No.

20  Q.    And what were your concerns and why would you have done

21  this affidavit?

22  A.    Just to keep everything smooth in the jail, not to have

23  him spread out that I was cooperating or something like that.

24  Q.    To spread -- not to spread out that you were cooperating.

25  And when you sent this letter out on September 9th, was there

1   a reason you wanted it to go to Grady, the paralegal?

2   A.   Say it again?

3   Q.   The letter on September 9th that you sent to Toya to go

4   to Donesha?

5   A.   Right.

6   Q.   Why did you want that to go to Grady, the paralegal?

7   A.   I just felt like if I could talk to him, I could smooth

8   things over.

9   Q.   Smooth things over where?

10  A.   In the streets.

11  Q.   In the streets.  And so -- so in terms of the

12  circumstances and conditions under which you produced this

13  affidavit, were those less than ideal for you?

14  A.   Yes.

15  Q.   And why did you go to -- why did you go to Muslim Prayer?

16  A.   Because I was asked to.

17  Q.   And at the time, did you know where the cameras were

18  placed -- when you made your statements on December 9th, did

19  you know where the cameras were in the facility?

20  A.   No.

21  Q.   You've never paid $5,000 for baking soda, have you?

22  A.   No.

23          MR. REILLY:  I have no further questions,

24  Your Honor.

25          MS. MICHAELIS:  May I?

1           THE COURT:  Recross?

2           MS. MICHAELIS:  Yes, please.

3           THE COURT:  Can we break and do it when we come back

4    from the break?

5           MS. MICHAELIS:  Sure.  Absolutely.

6           THE COURT:  Ladies and gentlemen, we'll take this as

7    our mid-afternoon recess.  Do not discuss the case amongst

8    yourselves or with anyone else.  Do not allow anyone to

9    discuss it within your hearing or presence.  Do not form or

10   express any opinions about the case until it is given to you

11   to decide.  And again, do not utilize any devices to access

12   the internet or access any social media platforms that might

13   allow for a discussion of the case or viewing or hearing

14   something about it.

15          15 minute recess.

16          **(Court Recessed from 3:26 p.m. until 3:44 p.m.)**

17          THE COURT:  Proceed.

18          MS. MICHAELIS:  Thank you, Your Honor.

19                       RECROSS EXAMINATION

20   BY MS. MICHAELIS:

21   Q.   I'm going to ask you some questions about the

22   September 9th letter again.  I think you said that the reason

23   why you sent this letter in the first place was because you

24   started to have concerns; correct?

25   A.   The September 9th?

```
1    Q.    The September 9th letter, yes.

2    A.    Right.

3    Q.    That you sent to your girlfriend, Toya?

4    A.    Right.

5    Q.    You sent that because you had some concerns about --

6    A.    Safety issues.

7    Q.    -- safety.  And that was because you were afraid that

8    people were going to find out that you were cooperating; is

9    that right?

10   A.    Right.

11   Q.    Okay.  And so, you, in that letter, you stated that you

12   wanted to recant your statement; correct?

13   A.    Right.

14   Q.    So you were telling your girlfriend that you had made a

15   statement; correct?

16   A.    Correct.

17   Q.    And then you wanted her to pass this letter on to someone

18   associated with Derrick Terry; is that right?

19   A.    Right.

20   Q.    That was his girlfriend at the time; is that correct?

21   A.    Child's mother.

22   Q.    Child's mother.  So you wanted your girlfriend to pass a

23   statement about -- I'm sorry -- a letter about you making a

24   statement to this other person; correct?

25   A.    Right.
```

1    Q.   And then you wanted that person to pass that along to

2    Derrick Terry; is that right?

3    A.   Well, no.  It couldn't get to him.

4    Q.   It didn't get to him?

5    A.   No.  It didn't get to him.

6    Q.   Okay.  But your intention was to pass that message along

7    to Derrick Terry; is that right?

8    A.   And so that he could direct it how to get to Grady.

9    Q.   So you wanted to make three people aware of the fact that

10   you had a statement that you wanted to recant; is that right?

11   A.   Yes.

12   Q.   Okay.  And then I think you said that the reason why you

13   agreed to write this affidavit was because you wanted to

14   smooth things over; is that right?

15   A.   Just keep things calm.

16   Q.   Keep things calm in the jail?

17   A.   Right.

18   Q.   You didn't want people to find out that you were

19   cooperating; is that right?

20   A.   Right.

21   Q.   Okay.  But you wrote in the letter that you were

22   cooperating; is that correct?

23   A.   Correct.

24   Q.   You wrote in that affidavit?

25   A.   Right.

Volume 5B                113

1   Q.   And you sat there in the middle of D-Pod and you wrote

2   that affidavit; correct?

3   A.   Well, when you see, I turned it -- I turned the pad over

4   when somebody approaches me.

5   Q.   Okay.  But you still wrote that in the affidavit,

6   correct, that you were a cooperator?

7   A.   Right.

8   Q.   Okay.  And then you also said that there were things that

9   Mr. Grady asked you to put into the affidavit that you did not

10  put in the affidavit; is that right?

11  A.   Correct.

12  Q.   Okay.  And then you gave the affidavit back to Mr. Grady;

13  correct?

14  A.   I gave it to Jerome and Jerome passed it through to him.

15  Q.   Okay.  It went back to Mr. Grady; is that right?

16  A.   Yes.

17  Q.   And it wasn't notarized at that point; correct?

18  A.   No.

19  Q.   Okay.  So it came back to you then --

20  A.   To be notarized.

21  Q.   -- with the instruction to get it notarized; is that

22  right?

23  A.   Notarized and be copied.

24  Q.   Notarized and make copies?

25  A.   Yeah.

1    Q.   Okay.  And when it came back with that instruction to get

2    it notarized and get it copied, there wasn't an instruction to

3    rewrite the affidavit; correct?

4    A.   Right.  It never got rewritten.

5    Q.   It never got rewritten?

6    A.   Right.

7    Q.   You weren't told to change what you had written in the

8    affidavit; correct?

9    A.   Correct.

10   Q.   Okay.  You weren't told to include these things that

11   Mr. Grady had asked you to put in the affidavit; correct?

12   A.   Correct.

13   Q.   Okay.  I know we've talked a lot about your statement

14   here.  I had previously asked you to read that paragraph about

15   what had happened on your way to the elevator.  That's in

16   the -- sorry -- back to the marshal's lock-up.  Do you

17   remember when I was asking you about that?

18   A.   (No audible response.)

19   Q.   Okay.  And then we talked a lot about what the specifics

20   of that conversation were.  Do you remember that?

21   A.   Right.

22   Q.   Okay.  And you agreed that this particular paragraph, you

23   hadn't changed that when you were -- when you reviewed this

24   document; correct?

25   A.   You talking about the guns?

1   Q.   Well, I'm talking about this conversation you had with

2   the agents when you were walking back to the lock-up, on your

3   way to the elevator.

4   A.   Is that the conversation about the guns?

5   Q.   Yeah.  There -- that was part of the conversation about

6   the guns.  Correct.

7   A.   Yeah.

8   Q.   And then you told me that you reviewed this particular

9   statement at a later date; correct?

10  A.   Correct.

11  Q.   And that you were asked to change anything that was

12  incorrect; is that right?

13  A.   Right.

14  Q.   And then you actually did make those changes; correct?

15  A.   Made some changes.

16  Q.   You made some changes.  But you didn't make any changes

17  to this particular paragraph that I asked you about; is that

18  right?

19  A.   I don't remember what paragraph you asked me about.

20  Q.   You don't remember?  Well, if I were to show you your

21  statement, would that refresh your recollection as to whether

22  you made any corrections to that particular paragraph?

23  A.   Right.

24  Q.   Okay.

25          MS. MICHAELIS:  This is page 9 I'm going to direct

1   him to.

2            MR. REILLY:  Judge, I'm not sure I asked about this

3   in redirect, Your Honor.  This may be beyond the scope.

4            MS. MICHAELIS:  The subject of this particular

5   paragraph was extensively covered in redirect.

6            THE COURT:  All right.

7   A.   Which one?

8   Q.   (By Ms. Michaelis) It's the one that starts with

9   "Detective Earley."

10  A.   (Witness reading document.)

11  Q.   You've had a chance to read this paragraph again;

12  correct?

13  A.   Correct.

14  Q.   And now you can see that you didn't make any changes to

15  that paragraph; is that right?

16  A.   Right.

17  Q.   So the information in this paragraph, you were asserting

18  was true, it was accurate; is that right?

19  A.   Right.

20  Q.   Okay.  And the information in this paragraph says that

21  this conversation that you had with Derrick Terry about going

22  down in a blaze of glory, that happened at the house on

23  Cottage; correct?

24  A.   I think it happened at The Gents.

25  Q.   Okay.  But the paragraph that I just asked you to review,

 1   that paragraph says that this conversation happened at the
 2   house on Cottage; is that right?
 3   A.   I don't -- I mean, that's what they wrote, but I --
 4   Q.   Well, you were able to review this particular paragraph?
 5   A.   But I -- like, when I -- when I was asked to review that,
 6   I was only asked to skim through certain parts, not to just
 7   read the whole thing.
 8   Q.   Well, you actually did make corrections to this document;
 9   correct?
10   A.   Yes.
11   Q.   And you changed things that you had said, on one
12   occasion, you changed them to better reflect what you
13   remembered; correct?
14   A.   Correct.
15   Q.   But you didn't make any changes to this particular
16   paragraph; is that right?
17   A.   Right.
18   Q.   And that's also true with respect to these events that
19   you talked about on approximately January 10th or the 11th; is
20   that right?
21   A.   Once again, I said I don't be knowing the dates.
22   Q.   You don't remember the dates?
23   A.   Yeah.
24   Q.   But you didn't make any changes to this particular
25   section of your statement; is that right?

1    A.    Right.

2    Q.    You didn't make any corrections; correct?

3    A.    Correct.

4    Q.    And Mr. Reilly, I think, asked you whether or not your

5    memory is tied to a specific event here; is that right?

6    A.    Right.

7    Q.    And that specific event is the kick-in, the round-up;

8    right?  And this particular statement has events that are

9    detailed that happened before the round-up and then the second

10   series of events that happens after the round-up; is that

11   correct?

12   A.    Correct.

13   Q.    Okay.

14            MS. MICHAELIS:  Thank you.  Nothing further.

15            THE COURT:  Mr. Glozman?

16            MR. GLOZMAN:  Just two questions.

17                        RECROSS EXAMINATION

18   BY MR. GLOZMAN:

19   Q.    Mr. Williams?

20   A.    Yes.

21   Q.    Since you started cooperating with the Government, you

22   met with them dozens of times; is that true?

23   A.    I don't know if it's dozens of times.

24   Q.    How many times have you met with them?

25   A.    I can't remember, but I wouldn't think it's dozens.

1    Q.    Ten times?

2    A.    Probably.

3    Q.    And isn't it true that the last three or four meetings

4    were to prepare for your testimony here today?

5    A.    Yes.

6          MR. GLOZMAN:  No more questions, Judge.

7          THE COURT:  Anything else, Mr. Reilly?

8          MR. REILLY:  Briefly.

9          THE COURT:  All right.

10         MR. REILLY:  This is it, Judge.

11         THE COURT:  Okay.

12                   FURTHER REDIRECT EXAMINATION

13   BY MR. REILLY:

14   Q.    The conversation about Terry shooting it out with the

15   police and you talking to him about leaving, did that occur

16   before or after you'd had the conversation with Grady and

17   Dillon --

18   A.    After.

19   Q.    -- about Terry -- I'm sorry?

20   A.    It happened after.

21   Q.    Is there any confusion in your mind about that?

22   A.    No.

23         MR. REILLY:  I have no further questions, Judge.

24         THE COURT:  Is this witness free to go?

25         MR. REILLY:  Yes, Your Honor.

1          MR. GLOZMAN:  We're done.

2          THE COURT:  Thank you.

3          Call your next witness.

4          MR. BOYCE:  The United States called James Church.

5          THE COURT:  Step up right here, Mr. Church, and be

6   sworn in by the clerk.

7                        **JAMES CHURCH,**

8   **Having Been First Duly Sworn, Was Examined and Testified As**

9   **Follows:**

10         THE DEPUTY CLERK:  Would you please state and spell

11  your name for the record.

12         THE WITNESS:  Dale James Church.  D-A-L-E J-A-M-E-S

13  C-H-U-R-C-H.

14         THE DEPUTY CLERK:  Thank you.  You may take the

15  stand to your left.

16                   DIRECT EXAMINATION

17  BY MR. BOYCE:

18  Q.   All right.  Good afternoon, Mr. Church.

19  A.   Good afternoon.

20  Q.   I know you've been waiting all day, so thanks for your

21  patience?

22  A.   No problem.

23  Q.   Will you tell us how you're employed?

24  A.   I work for Pepsi.

25  Q.   And you can take your mask off if you're comfortable,

1   Mr. Church, or leave it on if you're not.  Okay.

2   A.    I work for Pepsi.

3   Q.    Pepsi?  What do you do for Pepsi?

4   A.    I'm a merchandiser.

5   Q.    All right.  And how were you employed back in December of

6   2016?

7   A.    I worked for the Lincoln County Sheriff's Office.  I was

8   a corrections officer at the time.

9   Q.    Where were you a corrections officer?

10  A.    In the jail.

11  Q.    The jail?  Okay.

12  A.    Uh-huh.

13  Q.    What were your duties as a corrections officer?

14  A.    Safety security of the jail.  Basically, just kept track

15  of inmates and just did our basic tasks of checking their

16  well-being, if they had any questions, we could answer the

17  questions that they had, and that's about it.

18  Q.    Okay.  How long were you a corrections officer?

19  A.    About -- I'd say approximately three years there.

20  Q.    Okay.  And was December of 2016, where was that within

21  the three years?

22  A.    I -- I just started there.

23  Q.    Okay.  So you were a fairly new corrections officer at

24  that time?

25  A.    Yes.

1   Q.   All right.  Do you remember an inmate named Stanford

2   Williams?

3   A.   Yes.

4   Q.   And was he an inmate there at the Lincoln County Jail

5   back in December of 2016?

6   A.   Yes.

7   Q.   And had he been there for a while already?

8   A.   I believe so.

9   Q.   Okay.  At some point, do you remember whether or not

10  Michael Grady arrived at the jail?

11  A.   I believe -- I believe he was already there at the time.

12  I'm not for sure.

13  Q.   You don't remember exactly when Michael Grady arrived at

14  the jail?

15  A.   No.

16  Q.   Okay.  That's fine.

17           Just as a general matter, are inmates who are

18  charged together in the same conduct, are they typically

19  housed together?

20  A.   Not typically, no.

21  Q.   And why not?

22  A.   Basically, for the safety and security of themselves.

23  They could, basically, threaten each other or tamper with the

24  case and they could come up with different statements.  And,

25  basically, have, like, the same alibi and --

1              MS. MICHAELIS:  Objection, Your Honor.  I think he

2     said that there was quite a bunch of reasons why people would

3     do that.  I think that calls for speculation.

4              THE COURT:  Rephrase your question.

5     Q.   (By Mr. Boyce) Well, what are the reasons why the jail

6     doesn't typically have inmates in the same case charged

7     together, housed together?

8     A.   It's policy.

9     Q.   Okay.  Do you remember which pod the federal inmates were

10    kept in for the most part in the Lincoln County Jail back in

11    December of 2016?

12    A.   You want me to name all the pods, specifically?

13    Q.   Do you remember which letter the federal inmates were

14    typically kept in?

15    A.   B, D, and C.

16    Q.   Okay.  I want to show you just a little part of what's

17    already been admitted as Government's Exhibit 79M.  It'll come

18    up on your screen there.

19                    **(A video clip was played.)**

20    Q.   (By Mr. Boyce) Do you recognize what that is?

21    A.   Yes.  That's --

22    Q.   What is that?

23    A.   That's D-Pod.

24    Q.   And can you tell that by the D?

25    A.   Yes.  And --

```
 1   Q.    Okay.
 2   A.    -- it's an open bay and there was only two open-bay
 3   pods --
 4   Q.    Okay.
 5   A.    -- in the Lincoln County Jail.
 6   Q.    All right.  So it's an open bay.  What is up near the top
 7   of the steps there on the left?
 8   A.    Top left, that is another door and that is actually a
 9   fire -- fire emergency exit door.
10   Q.    And what does it lead to?
11   A.    That leads directly to C-Pod.  C, "Charles".
12   Q.    Okay.  And were you aware as a corrections officer
13   whether or not inmates used that door for any purpose other
14   than exiting?
15   A.    They use it to talk to one another.
16   Q.    Okay.  And --
17   A.    And/or, you know, in the jail terms, a kite, which is a
18   personalized message on a piece of paper that you could either
19   slide underneath or slide in between, like, on the sides of
20   it.
21   Q.    Okay.  And if you see what's going on on the video right
22   now, what does it look like is going on?
23   A.    It looks like that's an actual -- that's Mr. Lewis,
24   Jerome Lewis.
25   Q.    Uh-huh.
```

```
 1    A.   He's actually talking to somebody else through the door

 2    is what it appears to be.

 3    Q.   Okay.  And is that fairly typical behavior from your

 4    experience?

 5    A.   Oh, yeah.

 6    Q.   Okay.  Now, directing your attention --

 7             MR. BOYCE:  We can end that one, Nikki.

 8    Q.   (By Mr. Boyce) Directing your attention to the events of

 9    December 7th of 2016, did inmates have access to their own

10    legal documents?

11    A.   Yes.

12    Q.   All right.  And were they allowed to make copies of

13    documents if they needed to?

14    A.   Yes.

15    Q.   Did they make them themselves or how did that work?

16    A.   They would actually come up to us and ask if --

17    Q.   Okay.

18    A.   -- we could make a copy for them.

19    Q.   All right.  Same thing for mail?

20    A.   Mail, we would actually -- it would come in and then we

21    would sort it and then we would hand it out.

22    Q.   Okay.  Are inmates allowed to have other inmates'

23    documents?

24    A.   No.

25    Q.   Why not?
```

1  A.    It's their personal use only.

2  Q.    Okay.  So do you remember if somebody asked you to make

3  some copies on December 7th of 2016 or around that time?

4  A.    That's a daily basis.

5  Q.    Okay.

6  A.    And so, yeah.  Typically, yes.

7  Q.    Okay.  And do you remember, in particular, Inmate Grady

8  asking you to make some copies?

9  A.    I can't say for, like, off the top of my head.  That is a

10  long time ago.

11  Q.    Okay.  Well, I'll show you Exhibits -- what's already

12  been admitted as 78, and see if you recognize that.

13         MR. BOYCE:  Might I approach the witness,

14  Your Honor?

15         THE COURT:  Go right ahead.

16         MS. KREKE:  78?

17         MR. BOYCE:  78.

18  Q.    (By Mr. Boyce) Do you remember seeing something like that

19  before?

20  A.    Yes.  This is typically what we would get, like, for

21  legal documentation.  This is actually pieces of paper that

22  looks to be off of, like, the notepads that they are able to

23  buy off of commissary.

24  Q.    Okay.  So when somebody -- an inmate hands you something

25  to make a copy of, are you supposed to read it?

1  A.    No.

2  Q.    What do you do?

3  A.    But you can scan it.

4  Q.    You scan it.  And what are you looking for?

5  A.    You look for the signature and seeing if it's that inmate

6  that's giving you that paperwork.

7  Q.    Okay.  Do you remember Inmate Grady asking you to make

8  some copies of an affidavit?

9  A.    I don't remember off the top of my head, like,

10  personally, about it.  No.  But we get asked a bunch of times

11  for legal work.  So I can't say for five years ago if a

12  specific person came up to me and asked for a copy.  I can't

13  say.

14  Q.    Okay.  Would reading your prior statement help refresh

15  your recollection?

16  A.    Yeah.

17  Q.    Okay.

18        MR. BOYCE:  If I could approach again, Your Honor?

19        THE COURT:  Uh-huh.

20  Q.    (By Mr. Boyce) Do you remember being interviewed around

21  the time of February of -- around December of 2016 by a

22  Detective Llewellyn?

23  A.    A little bit, but not -- it's very vague.

24  Q.    Well, if you would, just review your statement to

25  Detective Llewellyn.  It starts here (indicating) and goes on

1   to the next page.

2   A.   Go ahead and read it out loud?

3   Q.   No.  Just read it to yourself.

4   A.   Okay.  (Witness reading document.)

5   Q.   Does that help you remember what happened?

6   A.   Not really.  Not off the top of my head.  I can't -- we

7   get asked so many times a day if we can make paperwork --

8   like, make copies of paperwork.

9   Q.   Okay.  Well, what happens if somebody gives you paperwork

10  without their name -- with someone -- another inmate's name on

11  it?

12  A.   I, obviously, will take it straight to my sergeant.

13  Q.   Okay.

14  A.   And give it to him and let him know exactly what

15  happened.  And then that's when I was told that I had to make

16  a report for it, so I wrote the report.  And that's -- that's

17  it.

18  Q.   Okay.  And do you recall that happening with

19  Inmate Grady?

20  A.   If -- if I wrote the report, then yes, it did happen.

21  Q.   Okay.  So your testimony is that around December of 2016,

22  Inmate Grady asked you to make some copies?

23  A.   Yes.

24           MS. MICHAELIS:  Objection, Your Honor.  I think his

25  testimony is that he doesn't remember, but that if he -- if

1   the incident did happen, it would have been in a report.  Not

2   specifically this report, but a report.

3              THE COURT:  Uh-huh.  Restate your question,

4   Mr. Boyce.

5   Q.   (By Mr. Boyce) So you would have written a report about

6   it?

7   A.   Yes.

8   Q.   Okay.  And if the report said that that's what happened,

9   that's what happened?

10  A.   Yes.

11  Q.   Okay.

12             MR. BOYCE:  Just a moment.

13             **(Attorneys conferred.)**

14  Q.   (By Mr. Boyce) After you -- typically, if you took the

15  paperwork and gave it to the sergeant, what would the sergeant

16  do with it?

17  A.   The sergeant would then help me, at the time, because I

18  didn't know much at the time, would help me get it into

19  evidence.  Basically, for -- for us writing the report, just

20  in case something would happen to it.

21  Q.   Okay.  And might the paperwork be returned to the inmate

22  who it belonged to?

23  A.   Do what?

24  Q.   Might the paperwork be returned to the inmate who it

25  belonged to?

1   A.   It could be, yes, depending on the sergeant.

2   Q.   Okay.

3          MR. BOYCE:  That's all I have, Judge.

4          THE COURT:  Ms. Michaelis?

5          MS. MICHAELIS:  I just have a quick couple of

6   questions.

7                    CROSS-EXAMINATION

8   BY MS. MICHAELIS:

9   Q.   I think you just mentioned that if something like this

10  happens, you get it in evidence.  Can you explain what that

11  means?

12  A.   Like you put it into evidence.  It's basically a

13  procedure that you do.  So from the time that it was given --

14  like, it was given to me, I would give it to the sergeant, he

15  helped me out of, like, doing the procedures.  So when you're

16  writing out the report, you have -- obviously, you have to

17  get, like, an evidence log sheet, then you would actually

18  secure it into what we would say a plastic bag of some sort

19  if -- if any, and then you would actually date it and time it

20  and write your signature on it with evidence tape so that way

21  nobody -- so it'd be, basically, sealed, so if the tape is

22  broke, then you know that it's been tampered with.

23  Q.   Okay.

24  A.   And then it gets locked away into a locker until a

25  detective or officer of, on the road side, would then take

1    over from there, like, the evidence custodian.

2    Q.    And you say an officer on the road side, do you mean

3    someone who's not in the jail?

4    A.    Yes.

5    Q.    Okay.  So the normal procedure would be to document the

6    fact that someone --

7    A.    Yes.

8    Q.    -- that an inmate was trying to photocopy another

9    inmate's paperwork; correct?

10   A.    Yes.

11   Q.    And that's to document whether there was some sort of

12   influence between these inmates; is that right?

13   A.    I -- I don't know on that question.

14   Q.    Okay.  But it would be documented?  There would be a

15   report generated?

16   A.    There would be a report done.

17   Q.    Okay.  And then the evidence -- the document would not go

18   back to the inmate; is that right?

19   A.    Do what?

20   Q.    The document would not then go back to the inmate; is

21   that right?

22   A.    In most cases, no.  I -- no.  Unless they're, like --

23   unless -- unless somebody of -- above me says it can go back.

24   Q.    Okay.  But the report would be generated first; is that

25   right?

Volume 5B                                          132

```
 1   A.    The report would be generated first.  Yes.
 2   Q.    Okay.  So if there was documentation of a -- of this
 3   particular event that the Government was just asking you
 4   about, it would be documented within the jail system in some
 5   way; is that right?
 6   A.    Yes.
 7   Q.    Okay.
 8             MS. MICHAELIS:  Thank you, Your Honor.
 9             Thank you, sir.
10             THE COURT:  Mr. Glozman?
11                      CROSS-EXAMINATION
12   BY MR. GLOZMAN:
13   Q.    Good afternoon.
14   A.    Good afternoon.
15   Q.    It's the jail's decision what pod to put the inmates in;
16   right?
17   A.    Yes.  The booking area, whenever they do it, it's part of
18   the step.
19             MR. GLOZMAN:  Thank you.
20             MR. BOYCE:  No redirect, Your Honor.
21             THE COURT:  All right.  Hold on a second.
22             (Brief Pause in Proceedings.)
23             THE COURT:  Call your next witness.
24             MR. BOYCE:  The United States called Zack Ampleman.
25             MR. GLOZMAN:  Can we have a quick sidebar for a
```

1    second?

2                MR. BOYCE:  Sure.

3         **(A Bench Conference was Held Off the Record and Outside the**

4                      **Hearing of the Jury.)**

5                      **ZACKERY AMPLEMAN,**

6    **Having Been First Duly Sworn, Was Examined and Testified As**

7    **Follows:**

8                THE DEPUTY CLERK:  Would you please state and spell

9    your name for the record.

10               THE WITNESS:  Zackery Ampleman.  Z-A-C-K-E-R-Y

11   A-M-P-L-E-M-A-N.

12               THE DEPUTY CLERK:  Thank you.  You may take the

13   stand.

14                      DIRECT EXAMINATION

15   BY MR. BOYCE:

16   Q.   Good afternoon, Mr. Ampleman.

17   A.   Good afternoon.

18                      **(Attorneys conferred.)**

19               MR. BOYCE:  Judge, I don't know if you want to

20   instruct the jury about 404(b) before this testimony begins,

21   but it is related to that type of testimony.

22   **(A Bench Conference Was Held on the Record and Outside of the**

23                **Hearing of the Jury as Follows:)**

24               MR. GLOZMAN:  I don't know if there were conflicting

25   jury instructions on that one.  I might have switched some

1   language that you guys had, or you guys modified --

2             MR. REILLY:  I don't recall.  I know we submitted --

3             THE COURT REPORTER:  Judge, I can't hear them.

4             THE COURT:  She can't hear you guys.

5             MR. GLOZMAN:  Oh.  Judge, I don't recall if the

6   Government and myself gave you alternative versions of the

7   instruction.

8             THE COURT:  Oh, okay.  Hold on.

9             MR. BOYCE:  I'm sure there's one we can agree on for

10  now.

11            MR. GLOZMAN:  Of course.  Whatever the pattern is,

12  I'm fine with.

13            MR. BOYCE:  Yeah.  Okay.

14            MR. REILLY:  It was 208.  208 limiting, and then

15  there was one in the final packet.

16            THE COURT:  Right.  I'm looking for the packet.

17            MR. GLOZMAN:  Yeah.  I'm not trying to be difficult

18  about this.

19            THE COURT:  It might be easier if I pull it up.

20            Did you say 408?

21            MR. REILLY:  208.  I'm sorry, Judge.  208.

22            THE COURT:  Are you talking defendant's prior

23  similar acts?

24            MR. REILLY:  Yes.

25            THE COURT:  Yes.  Okay.  I got it.

Volume 5B                    135

1          MR. REILLY:  Okay.

2          MS. MICHAELIS:  Okay.

3          MR. GLOZMAN:  That's fine.

4     **(The Following Proceedings Were Held Within the Hearing and**

5                    **Presence of the Jury:)**

6          THE COURT:  Ladies and gentlemen, you are about to

7    hear evidence that the defendant engaged in certain acts.  You

8    may consider this evidence only if you find it is more likely

9    true than not true.  You decide that by considering all of the

10   evidence in deciding what evidence is more believable.  This

11   is a lower standard than proof beyond a reasonable doubt.

12          If you find this evidence has been proved, then you

13   may consider it to help you decide on other facts in relation

14   to the case.  You should give it the weight and value you

15   believe it to be entitled to.  If you find that this evidence

16   has not been proved, you must disregard it.

17          Remember, even if you find that the defendant may

18   have committed the acts in the past, this is not evidence that

19   he committed such acts in this case.  You may not convict a

20   person simply because you believe he may have committed

21   similar acts in the past.  The defendant is on trial only for

22   the crimes charged and you may consider the evidence of prior

23   acts only on the issues as stated initially.

24          Go ahead, Mr. Boyce.

25          MR. BOYCE:  Thank you, Your Honor.

1   Q.   (By Mr. Boyce) Mr. Ampleman, you can take your mask off

2   if you're comfortable.

3   A.   Okay.

4   Q.   But you can leave it on if you're not.  Okay.

5        Would you tell the jury how you're employed, sir.

6   A.   I'm an on-road supervisor at UPS.

7   Q.   Okay.  What do you do in that job?

8   A.   I train drivers, you know, new drivers, and then perform

9   safety evaluations and sometimes I have to deliver packages.

10  Q.   Okay.  Which UPS location do you work at?

11  A.   Currently, I'm in Union, Missouri.

12  Q.   Okay.  How long have you worked for UPS?

13  A.   16 years.

14  Q.   And where were you working back in 2016?

15  A.   On Jefferson Avenue, 520 South Jefferson.

16  Q.   Here in the City of St. Louis?

17  A.   Correct.

18  Q.   Okay.  And were you working on September 7th of 2016?

19  A.   Yes.

20  Q.   And what were your duties back on that day?

21  A.   Again, I was a driver supervisor.

22  Q.   Okay.  On September 7th of 2016, did you get some

23  information to be on the lookout for a particular package?

24  A.   Yes, I did.

25  Q.   And who did that come from?

1    A.    Our security personnel.

2    Q.    All right.  And what did you know about the package that

3    UPS was supposed to be looking for?

4    A.    Just the address and the tracking number.

5    Q.    Okay.  Was the address 3748 Delor?

6    A.    Yes.

7    Q.    And is that in St. Louis?

8    A.    It is.

9    Q.    Okay.  At some point, did the package come through and

10   did you find it?

11   A.    Yes, I did.

12   Q.    Okay.  About what time of day was that on September 7th?

13   A.    Early afternoon.

14   Q.    Early afternoon?  Okay.  I'm going to show you a couple

15   pictures and ask you if you recognize these.

16          MR. BOYCE:  Erica, it might be easier for me just to

17   use the ELMO on this, if I could use just the witness-only

18   ELMO first.

19          THE DEPUTY CLERK:  Hold on one second.

20          MR. GLOZMAN:  No objection there.

21          MR. BOYCE:  Okay.  Well, then I'll just move to

22   admit 46A first.

23          THE COURT:  46A will be admitted.

24          MR. BOYCE:  Okay.

25   Q.    (By Mr. Boyce) Mr. Ampleman, do you recognize 46A?

1   A.   Yes.

2   Q.   All right.  What does that show the jury?

3   A.   That's the package I was asked to find.

4   Q.   Okay.

5          MR. BOYCE:  And then I'll move for admission of 46C.

6          THE COURT:  Any objection to 46C?

7          MR. GLOZMAN:  No objection on either of these.

8          THE COURT:  Admitted.

9   Q.   (By Mr. Boyce) And does 46C -- is that -- what does that

10  show us?

11  A.   That's the original address up top and then it's shipping

12  to the ship to address.  That's our UPS label.

13  Q.   Okay.  So is that the address you were supposed to be on

14  the lookout for?

15  A.   That is correct.

16  Q.   3748 Delor?

17  A.   Yes.

18  Q.   And who's the name that it's shipped to?

19  A.   David Russell.

20  Q.   All right.  So after you identified that package, what

21  did they do?

22  A.   I called our security.

23  Q.   And what did they do?

24  A.   They notified the police.

25  Q.   All right.  And did the police come out to UPS?

1   A.   Yes, they did.

2   Q.   And what, if anything, did the police ask you to do?

3   A.   They asked if I could have one of my drivers deliver the

4   package.  I told them no.  I did not want to put a driver in

5   that situation --

6   Q.   Okay.

7   A.   -- that I would do it.

8   Q.   And what time of day was it by now?

9   A.   It was a little bit later.  Probably around 4:00-ish.

10  Q.   Okay.

11  A.   4:00 or 5:00-ish.

12  Q.   So what did you decide to do?

13  A.   Deliver the package.

14  Q.   All right.  How did that go?

15  A.   What --

16  Q.   Did you load it onto the truck?

17  A.   Yeah.  Load it on the truck and --

18  Q.   Okay.

19  A.   -- drove it there and...

20  Q.   What kind of truck did you take?

21  A.   Your standard UPS truck.

22  Q.   The big brown one?

23  A.   Yes.

24  Q.   Okay.  And were you in the regular UPS uniform?

25  A.   Yes.

1    Q.    And I think we're all familiar with that, but what color

2    is it?

3    A.    Brown.

4    Q.    All right.  And where did you -- where did you start and

5    where did you go?

6    A.    I went from 520 South Jefferson, the UPS facility, to

7    3748 Delor.

8    Q.    Okay.  And was this a regular delivery route or was this

9    a special delivery for the police?

10   A.    Special delivery.

11   Q.    All right.  Did you stop anywhere along the way or

12   anything like that?

13   A.    No.

14   Q.    Okay.  And do you recognize --

15          MR. BOYCE:  I'll move for admission of 44A,

16   Your Honor.

17          MR. GLOZMAN:  No objection.

18          THE COURT:  Admitted.

19   Q.    (By Mr. Boyce) Do you recognize -- I'm going to zoom out

20   a little bit here.  Do you recognize that?

21   A.    Yes.  That's the address I delivered to.

22   Q.    Okay.  And did it have that awning that said

23   "The Silver Lining?"

24   A.    That, I can't remember.

25   Q.    Okay.  Do you remember if the place where you were taking

1   the box, was it open to the public?

2   A.   No.

3   Q.   Okay.  It was closed?

4   A.   Yes.

5   Q.   All right.  So it wasn't a bar, like, with people in it

6   and a bartender and that sort of thing?

7   A.   No.

8   Q.   All right.  When you got there, what'd you do?

9   A.   I pulled over, got the package -- or got out of the truck

10  because the package was in the rear.  That's when he

11  approached me and asked if I had the package.  Told him,

12  "Yes," and --

13  Q.   Someone approached you while you were out on the street?

14  A.   Yes.

15  Q.   Okay.  Where did that person come from?

16  A.   I guess, it was behind me.  From behind me.

17  Q.   Came up from behind you?  Is that --

18  A.   Behind the truck.

19  Q.   From behind the truck?  Okay.

20  A.   Correct.

21  Q.   Said, "Do you have a package?"

22  A.   Yes.

23  Q.   You said, "Yes."  Okay.  What did you take that -- take

24  from that?

25  A.   I just go, "It's my last delivery of the day."

1   Q.    Okay.

2   A.    And so I load it up on the two-wheeler.  He went across

3   the street, unlocked the door, asked me if I could bring it

4   inside.

5   Q.    Okay.  Who unlocked the door?  Was it the same person who

6   asked you if you had a package?

7   A.    Yeah.

8   Q.    Okay.  All right.  So the door had been locked prior to

9   that?

10                    **(Court reporter clarification.)**

11          THE WITNESS:  Yes.  It was the same person that

12   approached me that unlocked it and asked about the package.

13   Q.    (By Mr. Boyce) All right.  And that was the person who

14   unlocked the door?

15   A.    Correct.

16   Q.    All right.  Then what happened --

17          Here.  Let me show you 46C-2 first.

18          MR. BOYCE:  I'll move for its admission.

19          MR. GLOZMAN:  No objection.

20          THE COURT:  Admitted.

21   Q.    (By Mr. Boyce) Can you see right about here (indicating)

22   on the picture?

23   A.    Yes.

24   Q.    What's -- what is that a picture of?

25   A.    Me with the package on a two-wheeler.

1   Q.    Okay.  And you're wheeling it towards that door?

2   A.    Yes.

3   Q.    All right.  So what happened after the door was unlocked?

4   A.    He asked me to bring it inside for him, so I did.

5          THE COURT:  Mr. Boyce, we need to clarify the

6   record.  In your question, you referenced 46C.  But --

7          MR. BOYCE:  Oh, I'm sorry.  46C-2.

8          THE COURT:  Well, but it was noted as 42C-2, I

9   think.

10          MR. BOYCE:  Oh, you're right.  42C-2.  I apologize,

11  Your Honor.  I'll put it back up there.  It's 42C-2.  I'm

12  still getting used to this numbering system.

13  Q.    (By Mr. Boyce) All right.  So you said you -- I'm sorry.

14  What happened after you -- after the door was unlocked?

15  A.    He asked me to bring the package into the building.

16  Q.    Did you do that?

17  A.    Yes, I did.

18  Q.    And then what?

19  A.    I scanned the package and asked for a signature.

20  Q.    All right.  I'm going to show you 48C.

21          MR. BOYCE:  I'll move for its admission.

22          MR. GLOZMAN:  No objection.

23          THE COURT:  Admitted.

24  Q.    (By Mr. Boyce) You see 48C?  Do you --

25  A.    Yes.

1    Q.    -- see 48C?

2    A.    Yes.

3    Q.    What does that show?

4    A.    The package inside the place.

5    Q.    Is that where you left it?

6    A.    Yes.

7    Q.    Okay.  And then what did you do next?

8    A.    I scanned it and got the signature and then went back to

9    my truck and took off.

10   Q.    Okay.  Now, you say you scanned it and got the signature.

11   Does UPS use paper to keep track of that anymore?

12   A.    No, not anymore.

13   Q.    All right.  You --

14   A.    It's through our DIAD system.

15   Q.    Your --

16   A.    Our DIAD boards.

17   Q.    Okay.  So the person has to actually sign the board;

18   right?

19   A.    Correct.

20   Q.    All right.  And then that keeps an electronic record that

21   could be produced later; right?

22   A.    Yes.

23   Q.    All right.  I'm going to show you --

24         MR. BOYCE:  I'll move for the admission of 53B and

25   show that to you.

Volume 5B                                    145

1              MR. GLOZMAN:  No objection.

2              THE COURT:  Admitted.

3    Q.   (By Mr. Boyce) Do you recognize 53B?

4    A.   Yes.  That's a copy of our system ETT, or electronic

5    tracking and tracing.

6    Q.   Okay.  And is this the record related to the box that

7    we're talking about that was delivered on September 7, 2016,

8    to 3748 Delor?

9    A.   Yes, it is.

10   Q.   And does it reflect the ship to name of David Russell?

11   A.   Yes.

12   Q.   Okay.  And then later on in this same exhibit, is there

13   an electronic version of the signature?

14   A.   Yes.

15   Q.   All right.  And then do we have a larger version of that

16   back here at the end?  Is that also the electronic signature?

17   A.   Yes.

18   Q.   All right.  And that's saved on your DIAD board; is that

19   correct?

20   A.   That is correct.

21   Q.   Okay.  I know he's wearing a mask, but do you see the

22   person that you delivered the box to here in court today?

23   A.   Yes.

24   Q.   Okay.  Could you identify where he's sitting and describe

25   something that he is wearing?

Volume 5B                                          146

```
 1   A.   The gentleman, I believe it's a gray mask, white shirt,
 2   all the way to the right.
 3   Q.   Okay.  What color is his tie, if you can see it?
 4   A.   I can't see it.
 5   Q.   Oh, you can't see it?  Okay.  Is it the person who's
 6   holding up his tie?
 7   A.   Yes.
 8   Q.   All right.
 9   A.   It's the person holding up the tie.
10   Q.   That's the person you delivered the box to?
11   A.   Yes.
12   Q.   All right.
13            MR. BOYCE:  Your Honor, if the record would reflect
14   the identification of the defendant.
15            THE COURT:  Very well.
16   Q.   (By Mr. Boyce) Did --
17            MS. MICHAELIS:  I'm sorry.  Can we just clarify
18   which defendant?
19            MR. BOYCE:  I'm sorry.  Defendant Dillon.
20            THE COURT:  Defendant Dillon, yes.
21            MS. MICHAELIS:  Thank you.
22            THE COURT:  Thank you, Ms. Michaelis.
23   Q.   (By Mr. Boyce) Did the person who received the package
24   say anything else to you while you were there?
25   A.   No.  I said -- we kind of joked about the 120 pounds.
```

1    Q.    Okay.

2    A.    And we just kind of laughed about that, but that was

3    about it.

4    Q.    Did he say anything about conducting an investigation of

5    any kind?

6    A.    No.

7    Q.    All right.

8              MR. BOYCE:  I have no other questions, Judge.

9              THE COURT:  Cross?

10                        CROSS-EXAMINATION

11   BY MR. GLOZMAN:

12   Q.    Good afternoon, Mr. Ampleman.

13   A.    Good afternoon.

14   Q.    You personally delivered this package on September 7,

15   2016; right?

16   A.    Yes.

17   Q.    And when you brought the package to 3748 Delor, it was

18   unopened; is that correct?

19   A.    That is correct.

20   Q.    It was in a big cardboard box?

21   A.    Yes.

22   Q.    It looked like this one right here?

23   A.    Yes.

24   Q.    And just by looking at this box, can you tell what's

25   inside of it?

```
 1   A.    No.
 2   Q.    And you were the one who took this off of your truck;
 3   right?
 4   A.    Yes.
 5   Q.    And you put it on a dolly?
 6   A.    Yes.
 7   Q.    And you took that dolly across the street to the door?
 8   A.    Yes.
 9   Q.    And you personally put the package into the bar; right?
10   A.    Yes.
11   Q.    And this is how you left Government Exhibit 48C; right?
12   A.    Yes.
13   Q.    And you said it was 120 pounds?
14   A.    Yes.
15   Q.    Now, even by knowing how heavy it is and by handling it,
16   you didn't know what was inside of it; right?
17   A.    No.
18              MR. GLOZMAN:  No more questions.
19              MR. BOYCE:  No redirect, Your Honor.
20              THE COURT:  Thank you, sir.  You may step down.
21              THE WITNESS:  Thank you.
22              MR. BOYCE:  Thanks for being here.
23              THE COURT:  Call your next witness.
24              MR. REILLY:  Judge, that's our last witness for the
25   day.  With our understanding what the Court's schedule was, we
```

1   called it at this.

2           THE COURT:  Okay.  All right.  9:30 Monday, Counsel?

3   Is that good?

4           MR. REILLY:  Yes, Your Honor.

5           MS. MICHAELIS:  Yes.

6           THE COURT:  All right.  Ladies and gentlemen, that

7   concludes the testimony and evidence for today.  We will

8   reconvene Monday morning at 9:30.

9           During the course of the recess over this weekend,

10  especially be cognizant of not read, viewing, or listening to

11  any media accounts regarding the trial, not utilizing the

12  internet that might allow for an accidental reading, viewing,

13  or hearing something about the trial.  And definitely do not

14  utilize any social media platforms that would allow for the

15  possibility of reading, viewing, or hearing something about

16  the trial, or engaging in some type of discussion or seeing a

17  post or something in that nature relating to the trial.

18          As I said, we will reconvene Monday morning at 9:30.

19  And as always, ladies and gentlemen, if you could be here at

20  9:00 so that things can be situated and get you prepared to

21  come in.

22          Should they come directly -- just come to our jury

23  room, Erica, or do you want them to go downstairs?

24          THE DEPUTY CLERK:  Yeah.  They kind of know the

25  routine.

1              THE COURT:  Just --

2              THE DEPUTY CLERK:  Jury assembly first for the

3      parking validation, then to your jury room.

4              THE COURT:  All right.  Yep.  So, yeah, report first

5      to the jury assembly room Monday morning when you get here for

6      all the things that they need to do for you, and then

7      matriculate back here and we'll see you Monday.

8              Have a good weekend.  I think it's supposed to rain

9      some time, which makes me very sad, but I'll get over it.

10             See you all Monday morning.  Thank you.

11             **(PROCEEDINGS CONCLUDED AT 4:30 P.M.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Carla M. Klaustermeier, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 150 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 27th day of March, 2021.


/s/ Carla M. Klaustermeier
Carla M. Klaustermeier, RMR, CCR, CSR, CRR
Official Court Reporter