1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

1

2

3

4  UNITED STATES OF AMERICA,    )
                                )
5        Plaintiff,             )
                                )
6        v.                     )No. 4:15-CR-00404 HEA
                                )
7  MICHAEL GRADY and OSCAR      )
   DILLON, III,                 )
8                               )
         Defendants.            )
9

10

11                         JURY TRIAL

12                         **Volume 12**

13            BEFORE THE HONORABLE HENRY E. AUTREY
                 UNITED STATES DISTRICT JUDGE
14
                        APRIL 6, 2021
15

16  APPEARANCES:

17  For Plaintiff:       Michael A. Reilly, Esq.
                         Donald S. Boyce, Esq.
18                       OFFICE OF U.S. ATTORNEY
                         111 South Tenth Street, 20th Floor
19                       St. Louis, MO  63102

20                       **(APPEARANCES CONTINUED ON PAGE 2)**

21

22  REPORTED BY:         ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                         Official Court Reporter
23                       United States District Court
                         111 South Tenth Street, Third Floor
24                       St. Louis, MO  63102
                         (314) 244-7978
25

        PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED

For Deft. Grady:      Quinn A. Michaelis, Esq.
                      QUINN A. MICHAELIS, ATTORNEY AT LAW
                      73 West Monroe, Suite 106
                      Chicago, IL  60603

For Deft. Dillon:     Vadim Alex Glozman, Esq.
                      Matthew Paul Kralovec, Esq.
                      LAW OFFICES OF VADIM A. GLOZMAN
                      53 W. Jackson Blvd., Suite 1410
                      Chicago, IL  60604

BY TELEPHONE:         Blaire C. Dalton, Esq.
                      DALTON LAW, LLC
                      53 W. Jackson Blvd., Suite 1550
                      Chicago, IL  60604

**(WHEREIN THE COURT'S INSTRUCTIONS TO THE JURY WERE REPORTED**

**BUT OF WHICH ARE NOT CONTAINED HEREIN)**

**(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT, WITH THE**

**DEFENDANTS PRESENT, WITHIN THE HEARING AND PRESENCE OF THE**

**JURY.)**

THE COURT:  Mr. Reilly, are you ready to proceed?

MR. REILLY:  Yes, Your Honor.

THE COURT:  I've provided copies of the instructions to each counsel.  If you wish to use the Court's instructions, I will have them available for you from the clerk, okay?

MR. REILLY:  Thank you, Judge.  May it please the Court, Counsel, prosecution team.  Ladies and gentlemen of the jury, first of all, we thank you.  This has been a long trial during COVID.  You've been an attentive jury.  That's been clear to everyone.  There are aspects of this process that may have tested your patience.  We understand that.  Having said that, please don't let it keep you from doing what justice requires in this case.  One of the instructions Judge Autrey read to you, which is a great overall guide for your deliberations and the process you are about to embark on, is that "the law demands of you a just verdict unaffected by anything but the evidence, your common sense, and the law as I give it to you."  Judge Autrey has now given you the law.  So it's the evidence, your common sense, and the law that Judge Autrey has instructed you upon.

4

1    Now, in this case, to be blunt with you, the United

2    States has presented overwhelming evidence.  We have presented

3    credible eyewitnesses, including cooperating witnesses with

4    insider information, about the highest levels of organized

5    crime in this town.  That's Mr. Terry and Mr. Williams.  And

6    you have had the chance to evaluate their demeanor, and we'll

7    talk about some of the evidence that will help you assess what

8    they have told you and evidence that corroborates them, things

9    that demonstrate the reasonableness of their testimony in

10   light of all the evidence in the case.  We will walk through

11   that.

12        In terms of your measure of these witnesses, as

13   Mr. Boyce suggested to you in the opening statement, we'll ask

14   you to be critical of these witnesses.  There is no question.

15   We told you at jury selection they have criminal histories.

16   They are large-scale drug dealers, and they want something.

17   They are looking for a reduction in their sentences.  Under

18   all those circumstances, you should be critical of their

19   testimony.  That's your job as a juror.  And Judge Autrey has

20   now given you the credibility instruction.  Having said that,

21   we also ask you to be fair to them, all right?  When you look

22   at all the circumstances and as we walk through the evidence

23   here -- and you have heard a great deal of evidence in this

24   case, it's been a dense case in terms of the presentation of

25   evidence -- there is many things along the way that should

1  make you comfortable with an assessment of information that

2  you are being given, and we are about to embark on a journey

3  through the evidence in this case.

4       Now, the other thing to remember, these two

5  witnesses, all the witnesses in the case, but Williams and

6  Mr. Terry in particular, granted they had lengthy direct

7  examinations, but they had extensive cross examinations, and

8  there was no material change to any of their testimony.  What

9  they told you on direct examination stood and in some cases

10  even got stronger during cross examination, very lengthy cross

11  examinations I might add.

12       Judge Autrey has talked to you about the elements of

13  the offenses, and we will get through those, but I want to

14  emphasize the conspiracy instruction.  A person joins an

15  agreement -- in terms of conspiracy overall, when we walk

16  through the verdict director, it's clear that Terry and

17  Williams and Company already had an ongoing drug distribution

18  conspiracy.  We are not saying the defendants were involved in

19  the conspiracy at the outset of it.  Terry and Williams had

20  been dealing narcotics since 2012 controlling that Marcus area

21  in North St. Louis that they told you about, and they

22  continued to rise in their stature and scope of their kilogram

23  level cocaine and heroin dealings.  At times, they worked with

24  other dealers including Lemons and Jordan.  They had mutually

25  beneficial relationships, which is one of the reasons

6

1   cooperators are so dangerous to organized criminals.  They are

2   a powerful tool for law enforcement, but they are a

3   significant liability for drug dealers, particularly these

4   large-scale drug dealers that you are hearing from in this

5   case.  So in terms of an existing conspiracy, from the

6   evidence you have heard, there was a massive drug conspiracy

7   in this case including the Terry organization.  They were

8   interrelated to some extent, but view the Grady/Dillon

9   relationship, it's not with Lemons, it's not necessarily with

10  Jordan, maybe it might have touched on Jordan, but it's with

11  the Terry organization.  So the fact that a conspiracy existed

12  is clear-cut.

13           The second element is did the defendants knowingly

14  and intentionally join the conspiracy.  One of the points upon

15  which Judge Autrey just instructed you was that a person joins

16  an agreement to distribute a controlled substance by

17  voluntarily and intentionally participating in the unlawful

18  plan with the intent to further the crime of distribution of a

19  controlled substance.  That's a person joins an agreement to

20  distribute a controlled substance by voluntarily and

21  intentionally participating in the unlawful plan with the

22  intent to further the crime of distribution of a controlled

23  substance.  Some things to keep in mind here.  This is a

24  different case in terms of the level at which these defendants

25  engaged Terry initially, and we are not saying the initial

1   contact about the supervised release violation was necessarily

2   to further the goal of distribution of a controlled substance,

3   but it transitioned into something else, and that was

4   providing information about the cooperators.  But if you look

5   at and assess how they initially contacted Terry, Mr. Dillon

6   over here approached Mr. Terry.  They approached a top-level

7   drug dealer in the St. Louis area in 2014, and Mr. Dillon

8   talked to him about the supervised release issues he was

9   having.  Mr. Dillon represented that he beat a federal case.

10  So in terms of the unique posture of their relationship with

11  Terry, they didn't contact him initially to work on his real

12  estate.  They didn't contact him to replace his roof.  They

13  contacted him in relation to a federal drug distribution case

14  for which he was on supervised release.  That's in the

15  backdrop of their knowledge and their intent in this case.

16  That is a significant fact.

17        And from the beginning, we also told you, ladies and

18  gentlemen, we have never said -- and we talked about this in

19  jury selection and opening statement, we have not represented

20  that either of these defendants were hands-on in this case

21  with narcotics.  As Terry told you, he already had people that

22  handled drugs, distributed drugs.  No, they actually did

23  something that was more sophisticated.  And having said that,

24  we have to prove all those elements of the conspiracy beyond a

25  reasonable doubt.  But these defendants provided a more

1  sophisticated service to Derrick Terry and his organization,

2  and that was the invaluable information to help assess who was

3  cooperating, who might be a liability for the organization,

4  who can you and can't you deal with, and there were other ways

5  in which Terry told you he could leverage that information.

6         As we go through the evidence, the Court has also

7  given you an important instruction.  You are tasked with

8  deciding what somebody's mental state is, and the Court has

9  given you an important instruction in relation to the third

10  point of the conspiracy, and that is whether the defendants

11  knew the purpose of the agreement when they joined it.  And

12  one of the things Judge Autrey just read to you, it is seldom

13  if ever possible to determine directly what was in a

14  defendant's mind.  It's seldom if ever possible to determine

15  directly what was in the defendant's mind.  Thus, the

16  defendant's knowledge of the agreement and its purpose can be

17  proved like anything else, from reasonable conclusions drawn

18  from the evidence.  That's from reasonable conclusions drawn

19  from the evidence.  And you have heard a lot of evidence that

20  should help you decide what their mental state was.

21         There is another instruction contained in this packet

22  that talks about intent and knowledge.  It's at the end of the

23  packet, and you can consider it as to all the offenses that we

24  are going to walk through here.  Intent or knowledge -- this

25  is instruction 45.  "Intent or knowledge may be proved like

1  anything else.  You may consider any statements made and acts

2  done by the defendant and all the facts and circumstances in

3  evidence which may aid in the determination of the defendant's

4  knowledge or intent.  You may but are not required to infer

5  that a person intends the natural and probable consequences of

6  acts knowingly done or knowingly omitted."  So it's making

7  decisions from the facts and circumstances of the case.  That

8  may also sound obvious, but it's all contained in the

9  instructions.  And it was a lengthy packet of instructions.

10  They are all equally important.  I don't mean to single any of

11  them out, but those are things that may help you make

12  assessments as we go through.

13        The evidence and the reasonable inferences to be

14  drawn from the evidence establish the conspiratorial

15  relationships between Terry and Dillon and Grady.  And let's

16  step back for a moment and look.  We are going to do a

17  high-level overview and then we will start walking through the

18  verdict directors and what the Government must prove beyond a

19  reasonable doubt.  In this case, we are going to ask you as

20  the investigators did to follow the evidence.  You had a

21  specialized organized crime investigative unit and group,

22  members of the DEA, the Drug Enforcement Administration, the

23  FBI, and the St. Louis Police Department Intelligence

24  Division, specialized investigators were doing their duty.

25  They were conducting an investigation of a large-scale drug

1  trafficking organization and other elements associated with it

2  that were violent.  So they are investigating, they are doing

3  what they are obligated to do.  They are doing their duty

4  investigating a large-scale drug trafficking organization, the

5  Lemons organization, and investigating Jordan, and they start

6  to develop links during the investigation.  They follow the

7  evidence.  Eventually, this led them to the Terry organization

8  and Terry's association with Jordan.

9       As you heard on January 13th, the investigators did a

10  large-scale round-up directed to not only Terry but Lemons and

11  other members of that organization.  Jordan had already been

12  taken into custody.  But look at how we get to the defendants.

13  As has been established by the evidence, they were never part

14  of this case or on the radar before January 29th.  But Terry

15  disappeared, his organization to the trained investigators

16  continued to distribute drugs, so the investigators after

17  massive operations on the 13th turned around and continued to

18  investigate the Terry organization up in that Marcus area.

19  And as they did that, they executed another round of search

20  warrants and enforcement actions on January 29th.  You will

21  recall they contacted Mr. Williams.  They contacted the other

22  defendant, Richard Scott.  They seized narcotics, cocaine and

23  heroin.  Again, that's consistent with the operation of the

24  conspiracy.  The conspiracy was ongoing.

25       Now, let's look at some of the things that developed

1    as the investigators were following the evidence.  Task Force

2    Officer Gaddy here was speaking with Mr. Somogye and

3    Mr. Williams back at the Drug Enforcement Administration when

4    Mr. Williams began to talk about the Terry operation and his

5    relationship with Derrick Terry.  As they progressed through

6    the interview, he raised the fact that Terry had fled the

7    jurisdiction, and things eventually led to the identification

8    of the defendants, Dillon and Michael Grady.  And then think

9    about what happens during the course of the interview.  And

10    there are certain things in this case that are obvious and

11    they are right in front of you.  Don't minimize the

12    significance of some things that may appear so basic.  Oh, he

13    called Stanford Williams.  Michael Grady called Stanford

14    Williams at 11:37 on January 29th while Williams was being

15    investigated -- or being talked to by the Drug Enforcement

16    Administration.  The mere fact of that phone call, the mere

17    fact of that phone call, and the mere fact that Grady has

18    Stanford Williams's phone number is evidence of conspiratorial

19    associations in this case.

20          What's the common link between Stanford Williams and

21    Michael Grady?  It's Derrick Terry.  Michael Grady is working

22    with Derrick Terry, and the mere fact that he is contacting

23    the Terry's conspirators is so significant in terms of the

24    associations of this case.  The timing of that is also

25    significant.  It's after an enforcement action.  It's after an

12

1    enforcement action.  It's fair for you to infer that Mr. Grady

2    is checking on Mr. Williams, all right?  And there is other

3    contacts.  You will recall he contacted him first.  Williams

4    called Grady on the 15th.  He used his family phone for that,

5    but then the contact then switched to Williams's dope phone.

6         And let's talk about what else happened on that day.

7    On January 29th -- and we only know this now because of the

8    outstanding efforts of law enforcement in this case to track

9    down Derrick Terry.  The only reason we have the text message

10   on the 29th and the only reason we know about that is because

11   law enforcement actually tracked Terry down some approximately

12   six months later down in Dallas and recovered the broken

13   phone, which fortunately a forensic search was able to recover

14   the content of this text message:  "They arrested Stan today

15   down on Cottage."  That's to Charda Davis on a

16   compartmentalized phone, on the 217 number.  It wasn't her 314

17   number.  That was the phone that she was using to communicate

18   with Michael Grady.  So the significance of that, again why is

19   Grady contacting Charda Davis and Stanford Williams?  Why

20   contact Terry's associates?  Well, again the common

21   denominator there is Derrick Terry.  Grady is not working for

22   Stanford Williams.  He is not working for Charda Davis at that

23   time.  And so that contact is significant.

24        That contact, why do you have it?  Well, they know

25   Terry is gone and/or they are not having direct communications

1  with him.  And when I say Grady contacted him, we'll walk

2  through some of the communications later, but don't dismiss

3  for a minute what's really happening with this communication.

4  There are several instances in which Defendant Dillon is in

5  very close contact with Grady when he is reaching out to

6  Williams -- when I say he, I mean Grady -- Grady is having

7  contact with Williams and Davis.  That is compartmentalized

8  communications.  And we will get to September 7th and

9  compartmentalized communications in a moment here.  So why are

10  they contacting Terry's associates?  Why is that happening?

11  Well, it's because they know Terry is gone.  And how do they

12  know Terry is gone?  Why do you transition to his associates

13  instead of dealing with the boss, the organized crime boss?

14  Because you know he's gone.  And how do you know he's gone?

15  Because you told him to leave, okay, at Applebee's.

16        We have the seizure of documents at Kennerly on the

17  29th.  On February 12th, can we pull that photograph up.

18  Here's another thing that may seem obvious, may seem obvious

19  or, oh, this is just it's Oscar Dillon talking to Stanford

20  Williams's attorney.  Let's talk about what that really means

21  for a minute.  Oscar Dillon doesn't work for Stanford

22  Williams.  Again, what's the common denominator here?  It's

23  Derrick Terry.  He is here checking on the proceeding.  And

24  you must assume he's got some type of interest in this case,

25  perhaps a financial interest.  There is some reason he is in

1  court, he is at Stanford Williams's court.  He is motivated by

2  something.  We know all these drug dealers are motivated by

3  money, and we know these guys have been paid money based on

4  the information by Terry, so he shows up at Stanford

5  Williams's court proceeding.  And think about the significance

6  of this.  You know, he is collecting -- and you will recall

7  the testimony of Task Force Officer Gaddy.  He saw Dillon

8  approach Joseph Hogan, the attorney for Williams.  It wasn't

9  vice versa.  He is going up to find out information.  And Mr.

10  Glozman was right about one thing, he is not wearing a ski

11  mask.  He is absolutely not.  He is also -- he is doing two

12  things.  He is trying to collect information for Terry, but

13  he's also sending the most basic kind of message that someone

14  can send.

15       You'll recall, this was a sensitive part of this

16  organized crime investigation.  High-level organized crime

17  leaders and you are at a very sensitive point because the

18  investigators are attempting to get the cooperation of

19  Stanford Williams to give them this so significant information

20  about Terry's drug operations, Terry's location, and so

21  basically you have got Grady making the phone call right after

22  he is arrested, there is a flurry of phone activity between

23  Grady and Dillon over the course of the day on the 29h, and

24  then we have Mr. Dillon here on the 12th of February, and that

25  is to send a clear message.  He is not wearing a ski mask, and

1   the message is we are watching you.  That's why he is at

2   Stanford Williams's court date aside from trying to collect

3   information.  And you may say, well, why would he do that?

4   Well, some people are bold.  That's how these groups work.

5   Part of it is by intimidation, and that's exactly what this

6   is.  Don't let them for a minute try to convince you this is

7   anything else other than trying to collect information and

8   sending a message to Stanford Williams and his attorney we're

9   watching you.

10          So we move forward in the investigation, you recall

11  Terry was arrested after much investigation.  They arrested

12  Gerry Cushshon in a bar in North St. Louis in May, but Terry

13  was gone.  He was in Dallas.  And Terry gets arrested down in

14  Dallas, and that's when they find the phone with the link to

15  Davis and they eventually bring him back to the jurisdiction.

16          So if we look at September 7th, as we move forward on

17  the timeline, just big picture, high-level overview,

18  September 7th of 2016 and we are about to start getting more

19  information once Mr. Dillon's phones are seized.  The

20  investigators don't know who is going to show up on

21  September 7th.  They don't know who is going to show up at The

22  Silver Lining.  They are working a separate investigation.

23  And well who does show up?  It's Oscar Dillon.  He is in the

24  Camry checking out The Silver Lining at 10:00 a.m. consistent

25  with the text message later recovered from the phone in the

1  car, "been here since 10", and he's basically in and out all

2  day skulking around The Silver Lining.  He is driving in and

3  out.  He is walking in and out of the building.  He's got the

4  key.

5       And think about the events that occur, okay?  The

6  investigators contact him after he uses the key to open the

7  door to the bar and signs a false name accepting the package,

8  puts the keys -- keeps the keys and walks out of the bar after

9  he signed the fake name, David Russell, not his name, to

10  receive the 10-kilogram package of cocaine.  He exits the bar.

11  The investigators contact him.  They seize the Camry.  They

12  execute a search warrant, and among the items recovered in the

13  executed search warrant are the five phones recovered from the

14  vehicle.  With that, they seize the rental contract, and one

15  of the phones has the exact same phone number listed under the

16  wife as the person, Jasmine Simmons, who rented the vehicle.

17  So essentially, he's in control of the vehicle.  It's rented

18  by the person that he refers to as the wife.  He is the only

19  person in the vehicle all day.  He controls the vehicle and

20  the things in it.  That includes the phones.  And from the

21  phones, we recover significant evidence in this case.  That's

22  what starts giving you more information that corroborates

23  Terry's account of these events, including that Dillon was

24  running on July 15th Antonio Washington's federal case.  He

25  was running that on August 5th.  That was before the Jordan

1  search warrants were executed on August 6th.

2          So as the investigators continue to go through the

3  phone or eventually when they get through the phone, they

4  recover documents and text messages that are relevant to this

5  case that include the Dominic Irons, the McGhee text messages,

6  headed to Kennerly.  And with that, you can also see the level

7  of sophistication, the compartmentalized phones that were used

8  in the investigation -- or that Mr. Dillon had.  There is a

9  level of sophistication.  The 56D phone set up the 10-kilogram

10  delivery, and the 56D phone, that's an example of just using

11  that phone for that drug transaction.  There is another flip

12  phone with the transaction seized from the car, but then we

13  get into two smartphones where we seized relevant information

14  to this investigation.  So part of those events are also going

15  to be relevant to helping you get comfortable with the fact

16  that the evidence the way these folks related to -- Dillon and

17  Grady related to Williams and Davis, it was compartmentalized,

18  and that was intentional.  Grady had the direct

19  communications, but he was in close communications with

20  Terry -- or with Dillon as Grady was in touch with Williams

21  and Davis on some occasions.

22          So then we move forward after nearly a yearlong

23  investigation, which included Williams and Terry's Grand Jury

24  appearances, the Grand Jury returned indictments against the

25  defendants in early December.  They were indicted along with

1  30 other people at that point as Lanham told you, Task Force

2  Officer Lanham told you, and on December 2nd at the search of

3  Grady's Congress residence, there were various documents that

4  corroborated Terry's description of his relationship with

5  Grady and the events that occurred with Grady and Dillon.

6       Now, these are facts in the case, all right?  These

7  are the facts of the case.  These are not facts that are made

8  up by cooperators or law enforcement officers.  These are

9  facts, evidence, data, records, things seized during the

10  course of the investigation for your consideration.  Now, in

11  terms of what the law requires, Mr. Boyce told you in opening

12  statement it requires an act in a mental state, and

13  essentially at this point when you walk through the events and

14  the corroboration that we'll discuss as we move through the

15  evidence, it really comes down to what is the mental state.

16  The events occurred.  It's that simple.  You have heard

17  credible evidence that's been corroborated by electronic data

18  and other factors, documents seized.

19       Let's talk about the jury instructions for just a

20  moment.  Some people refer to the verdict directors that Judge

21  Autrey read to you as funnels.  They help narrow the issues

22  for your consideration what the Government must actually prove

23  beyond a reasonable doubt.  And there is three or four

24  elements that make up each offense in this case, and we'll

25  just touch on that.  I'm going to move into the conspiracy

1   verdict director and talk about that first.  That's Count One.

2          Reasonable doubt as Judge Autrey has defined it for

3   you in Count 26, this is our burden.  This is the burden that

4   the United States must meet.  "Reasonable doubt is a doubt

5   based upon reason and common sense and not doubt based on

6   speculation."  That's reason and common sense not doubt based

7   on speculation.  Remember that.  It's not based on

8   speculation, but it's based on the evidence that you have

9   heard.  "A reasonable doubt may arise from careful and

10  impartial consideration of all the evidence or from a lack of

11  evidence.  Proof beyond a reasonable doubt is proof of such a

12  convincing character that a reasonable person after careful

13  consideration would not hesitate to rely and act upon that in

14  life's most important decisions.  Proof beyond a reasonable

15  doubt is proof that leaves you firmly convinced" -- that's

16  firmly convinced -- "of the defendant's guilt.  Proof beyond a

17  reasonable doubt does not mean proof beyond all doubt or

18  beyond all possible doubt."  So hold us to our burden.  We

19  must firmly convince you.  Don't hold us above our burden.  If

20  I had to prove beyond all possible doubt that I was the same

21  person who spoke to you in jury selection, that might not be

22  possible to prove beyond all possible doubt, but our burden is

23  to firmly convince you.

24          As to the elements of the verdict director for

25  conspiracy, so Count One, "beginning at an exact time unknown

1  to the Grand Jury but including 2012 and continuing thereafter

2  to the date of the indictment, two or more people reached an

3  agreement to commit the crime of distribution of a controlled

4  substance." That's the Terry organization. And as we stated

5  earlier, we don't have the defendants joining until sometime

6  in 2014 or thereafter as that relationship transitioned. Some

7  of the points in this instruction that Judge Autrey gave you

8  in the supplemental instructions, the agreement does not need

9  to be formal or in writing. In other words, think about

10  something so basic as if I am in my office with three or four

11  other people and I say why don't we go across the street to

12  The Tin Roof. Nobody says a word. We are going to go over

13  and eat some lunch. Why don't we go get some lunch at The Tin

14  Roof. No one says a word, but we all get up and walk out

15  together and we start walking down to the lobby. Well, that's

16  an agreement, okay? There is no -- it's not in writing

17  obviously. Then maybe we run into another colleague in the

18  lobby of the building, say we are going to lunch, do you want

19  to join us. They may join the group, not say a word. It's

20  still an agreement. I know it's a very simple example, but

21  these agreements with drug trafficking organizations are

22  typically not in writing. They are based on understandings of

23  which you heard a significant amount of evidence.

24          The instruction that Judge Autrey read you also

25  stated that it does not matter whether the crime of

1   distribution of a controlled substance was actually committed

2   or whether the alleged participants actually succeeded in

3   accomplishing their unlawful plan.  Here, we know the members

4   of the conspiracy succeeded in distributing controlled

5   substances.  We also know that Grady and Dillon joined this

6   agreement while it was in effect and they increased the

7   capacity of the organization as Mr. Terry told you.  And we'll

8   get specific about that in a moment here.  But to the extent

9   that the defense was asking questions about, well, ultimately,

10  Mr. Terry, you got arrested, you got indicted, well, that

11  doesn't matter because for one thing, he's testified that it

12  improved the capacity of his organization, helped him delay an

13  indictment.  But success is immaterial.  It's the agreement

14  that is the crime.  It's the agreement to commit a crime.

15          The members of the agreement do not all have to join

16  at the same time, and that's clearly Grady and Dillon weren't

17  in on the ground floor with Derrick Terry and Stanford

18  Williams.  They joined this agreement as the organization was

19  growing.

20          A person may be a member of the agreement even if the

21  person does not know all the other members of the agreement or

22  the person agreed to play only a minor part in the agreement.

23  Now, here it's clear the defendants engaged this conspiracy at

24  the highest possible level with the boss, with Terry.  Some

25  things to think about for that at least in terms of the

1    conspiracy, we know the conspiracy exists.  The Terry

2    organization was linked to Lemons, Jordan, and you have the

3    testimony of Williams and Terry as to the scope of their

4    dealings.  You also heard the evidence on January 13th --

5    strike that -- on August 25th of 2015 when they are searching

6    or chasing Rainey, they eventually seize the drug notes that

7    implicate TT.  When they execute the search warrant of the

8    Lemons residence, they find the notes for D-Boy, TT, and

9    $245,000 in cash which was seized.  We also heard about the

10   large enforcement operation in February of 2015 at Theodosia.

11   So the conspiracy exists.  And while some of that evidence

12   relates to the Lemons organization, it is important because it

13   establishes the links between Lemons and D-Boy, Terry, and

14   Jordan, and it also lends credibility when Stanford Williams

15   and Derrick Terry are talking about transactions that involve

16   hundreds of thousands of dollars.  Well, that's in reach when

17   you see what was seized from Lemons and you see the notes that

18   were seized and the types of cash that was seized, $870,000 on

19   February 6th, $245,000 on January 13th of 2016 during the

20   round-up.  And notably, when Terry talks to you about his

21   concerns about money being seized, well, what did law

22   enforcement do with all that money?  They seized it, as well

23   they should have.

24        So in the turn-over meeting, the conspiracy was going

25   to continue on January 13th.  The conspiracy was ongoing.

After Stan Williams met Derrick Terry at the Gents, think about that as your own experience. That's reasonable in light of the evidence that they would meet to have a turn-over. The boss is leaving based on advice from the defendants and he is telling his top lieutenant take over the organization. They discussed the debts and that Williams was going to pay $144,000 to Shaq, one of the drug distributors in the case. It's natural when Williams thought -- strike that -- when Terry thought his organization, not necessarily Williams or the other people, have been implicated, he is going to turn the organization over. So the conspiracy continues after the 13th all the way through the 29th. And what happens on the 29th is Williams told you is we got caught, otherwise, we would have kept selling drugs, and they would have continued the conspiracy. So the conspiracy is ongoing.

The second element of the conspiracy charge involves that "the defendant voluntarily and intentionally joined in the agreement either at the time it was reached or at some later time while it was still in effect. A person joins an agreement to distribute a controlled substance by voluntarily and intentionally participating in the unlawful plan with the intent to further the crime of distribution of a controlled substance." It's not necessary for you to find that the defendant knew all the plans, all the details of the plan, not necessary for you to find that the defendant reached an

1  agreement with every person who was a participant in the

2  agreement.  And then it discusses what distribution of a

3  controlled substance, the crime, is, and again we are not

4  alleging these guys were distributing a controlled substance.

5  The evidence is that their actions were providing information

6  to Terry.  By doing so, they were voluntarily and

7  intentionally participating in the unlawful plan with the

8  intent to further the crime of distribution of a controlled

9  substance.

10          So the instruction also says the defendants don't

11  necessarily need to know the exact nature of the controlled

12  substance with which they were dealing; in other words, they

13  don't need to know the exact nature of the controlled

14  substance that the conspiracy is dealing with.  But think

15  about this.  They had met with Terry to try to get him off of

16  supervised release for a possession with intent to distribute

17  cocaine base case.  That's alluded to in the court documents.

18  They had seen the Jordan indictment, which we'll get to in

19  just a few moments here, but they had seen the Jordan

20  indictment which dealt with a cocaine conspiracy.  They have a

21  significant amount of -- there is a significant amount of

22  evidence that would let you conclude they had knowledge and

23  intent of the size and scope of this organization and they

24  fully intended to support it.

25          So the third thing that must be proved in the

1    conspiracy is "at the time the defendant joined in the

2    agreement, the defendant knew the purpose of the agreement.  A

3    person knows the purpose of the agreement if he is aware of

4    the agreement and does not participate in it through

5    ignorance, mistake, carelessness, negligence, or accident."

6    And this is the element where again "it's seldom if ever

7    possible to determine directly what was in the defendant's

8    mind.  Thus, the defendant's knowledge of the agreement and

9    its purpose can be proved like anything else, from reasonable

10   conclusions drawn from the evidence."

11          And so let's talk for a moment and put this in plain

12   terms of a legitimate business example, and I am going to talk

13   about Anheuser-Busch, and, of course, it's a legitimate

14   business because they have a legitimate purpose, which is to

15   distribute their products which are legal.  So they might have

16   numerous employees or contractors that may have relationships

17   with Anheuser-Busch.  And you think about how the organization

18   functions.  Of course, all the people don't know each other.

19   The people who work at the bottling section of the operations

20   may not know the people who drive the trucks or the people who

21   work for the distributorship or the people in marketing and

22   research, but they all are working to further the activities

23   of the enterprise.  Some of these people are not hands-on with

24   the product.  The people who work in marketing and research,

25   for instance, may not be hands-on with the product, all right?

1   So that doesn't mean they are not furthering the activities of

2   the enterprise.  Nonetheless, they all voluntarily and

3   intentionally engage in some conduct that furthers the

4   production and distribution of the product.  And that's what

5   happens here.

6           I want to talk about advancing the conspiracy at a

7   high level.  This represents the Velazquez organization as it

8   relates to Lemons and that supplied other groups.  As you will

9   recall, Derrick Terry had other sources of supply.  Let's move

10  to the next slide please.  In terms of their intent and

11  knowledge and factors that would corroborate their knowledge

12  of -- Grady and Dillon's knowledge of Terry's status as a

13  major league drug dealer, well, they approached him with

14  Dillon at some point representing that he beat a federal case

15  and they want to get him off of supervised release for a drug

16  case.  Now, think about this for a minute.  Terry says this,

17  but there is nothing about these documents that are tied into

18  Dillon and Grady.  It doesn't say their name on it.  This is

19  an instance in which he is reliable because when Grady's house

20  is searched, the original documents are recovered from Grady's

21  residence.  So this does go to their knowledge.

22          Some things to think about in terms of their

23  relationship and things that they have represented, we have

24  got this contract when Stan Williams -- when Derrick Terry

25  tells you that Dillon introduced Grady as his brother, Dillon

1   introduced Grady as his brother, we have this contract signed

2   by Oscar Dillon and Michael Grady in which they are splitting

3   profits with this Seals and Bailey Legal Services.  So the

4   business card, Dillon and Grady are associated with this same

5   business, so it's not a stretch when Derrick Terry says, well,

6   Dillon introduced Grady as a brother and said that he was

7   somebody reliable.  Well, they worked together.  That's

8   evidence that's seized after the fact that shows that.  And

9   then when we look at the Boost Mobile phone, the compartment

10  flip phone that can be compartmentalized on top of the DEA

11  Narcotics Investigators Manual, well, those are all things

12  that go to not only their association and corroborating the

13  witnesses in their case, but it goes to their knowledge and

14  intent when they joined this conspiracy.

15          So they engaged at a high level with Derrick Terry,

16  and then they were paid $2,500 and the motion failed, and as

17  Terry told you, "They kind of felt like they didn't do their

18  job which got us talking about the reasons why my motions were

19  denied.  I felt like I kept getting criminal complaints filed

20  about me.  And when the federal courts can't get enough for an

21  indictment, we believed they would not let me off for

22  probation because we moved down the line to looking into

23  people that was telling."  And as he said, he already had

24  shooters and drug dealers, he needed them for something else.

25  "This is what kept us together, a dialogue of rats, snitches,

1  and cooperators.  If they didn't share my views or have

2  knowledge to fit my narrative, there was no reason to have

3  them around."  So they advanced the conspiracy at a high level

4  by rooting out snitches, a powerful law enforcement tool, and

5  they brought with them a degree of sophistication that gave

6  the conspiracy much more of a capacity than somebody who might

7  serve as like a traditional look-out or somebody listening to

8  a police radio scanner.  These guys were operating at a whole

9  different level to advance this conspiracy.

10        And think about this.  During this whole time frame,

11  there is no case pending against Terry.  Why do you need a

12  paralegal and an investigator when you don't have a case

13  pending against you?  Because you are trying to put together

14  information to surmise who might be cooperating.  "We worked

15  in unison.  Me and Grady and Dillon would echo each other's

16  thoughts and strategies in defying the courts and law

17  enforcement to help keep me and my operation clear of them.

18  In doing that, we had to weed out snitches.  The dialogue

19  changed from the motion to snitches, who was telling, who

20  caught cases, who was under investigation, what could possibly

21  harm me and possibly stop me from making money like I was,

22  anything that could threaten my livelihood, drug dealing, who

23  was telling, why they was telling, and who they was telling

24  on."  He also detailed how having a conversation with these

25  guys was different than a conversation with a lawyer.  He

1  could just come right out and tell them what he was looking

2  for.

3        Now, let's talk about some of the things that help

4  lend credibility to what Terry has told you.  And we are not

5  going to walk through all the evidence because we don't have

6  time.  Can we go back to that for just a minute.  Go back to

7  the Jordan indictment, if you would.  All right.  After the

8  fact, once this almost yearlong investigation was completed

9  and investigators could start to assimilate information, you

10 can't make this up.  January 29th at Kennerly, that was

11 Terry's, one of his dope houses, after he left the

12 jurisdiction, investigators did a search warrant and they

13 recovered the Jordan indictment.  Where else is that

14 recovered?  In Dillon's phone seized on September 7th.  Where

15 else is it recovered?  Grady's residence at Congress seized on

16 December 2nd.  Next slide please.  The minute entry regarding

17 Scott Rosenblum, where do we get this document?  All three

18 places, all right?  Kennerly, Dillon's phone, Congress.

19 Discovery letter, same thing, all three places.

20        Next slide please.  The Rosenblum article, okay, this

21 is something that Terry tells you about.  You can't make this

22 up.  How do you -- he tells about this meeting with Jordan in

23 which Grady and Dillon have these derogatory opinions about

24 Scott Rosenblum, and then what do we find at Kennerly?  Well,

25 we find the newspaper article.  What do we find at Congress?

1  The original.  What do we find on Dillon's phone?  Well, he is

2  querying the document the same day he is running one of the

3  cases.  He is querying the document on October 6th.  Again,

4  you can't make this up.

5         Next slide please.  And then we have these text

6  messages, the text messages from Dillon's phone seized on

7  September 7th in which the names, "text me the names", Dominic

8  Irons and Don McGhee.  That's on September 4th.  That's after

9  Anthony Jordan on the 29th.  A single word.  You know, the use

10 of a single word with no more, that is an element of

11 sophistication, and then they know where it goes from there.

12 And then "headed to Kennerly", "headed to Kennerly"

13 October 3rd of 2015, long before Terry ever has a case, all

14 right?  And what is Kennerly?  That's where we recover all the

15 documents.

16        Next documents please.  So then we have the Irons and

17 McGhee documents that were discussed.  Let's keep moving if

18 you would.  You can go through these.  This is the Lemons

19 conspiracy with some of the notes that were seized, the money,

20 the notes.  And just keep advancing.  I will tell you when to

21 stop.  There is our note, D-Boy and TT with money that was

22 seized.  Again, it corroborates the witnesses, the scope of

23 the drug dealing in this case.  That is why you are hearing

24 it.

25        Let's move to the 13th.  This is when we have the

1 attempted obstruction of justice, okay?  And the elements for

2 this offense as set forth in the obstruction -- or in the

3 instructions, it is premised on something called aiding and

4 abetting.  Whoever commits -- this is instruction 33, "Whoever

5 commits an offense against the United States or aids, abets,

6 counsels, commands, induces, or procures its commission is

7 punishable as a principal."  The defendant -- these elements

8 are that the defendant attempted to obstruct, influence, or

9 impede an official proceeding, the defendant acted corruptly,

10 and the defendant voluntarily and intentionally carried out

11 some act that was a substantial step toward corruptly

12 obstructing, influencing, or impeding the official proceeding.

13 A person may be found guilty of attempt to obstruct,

14 influence, or impede an official proceeding even if he didn't

15 do every act that constituted the offense charged.  Derrick

16 Terry's the one who fled.  They counseled him to do it.  That

17 is why they are liable for encouraging him to flee.

18         So, in other words, as you move through this, for

19 accomplice liability under this Section 2, the person must

20 have acted in some way for the purpose of causing,

21 encouraging, or aiding the commission of attempted obstruction

22 of justice and have intended to corruptly obstruct, influence,

23 or impede an official proceeding.  So they must have acted in

24 some way for the purpose of causing, encouraging, or aiding

25 the commission of attempted obstruction of justice.  So that's

1  encouraging when they have the meeting and we have these

2  conversations at Applebee's that we present the indictment,

3  which was later seized from Grady's house.  Terry goes into

4  this meeting with -- you have already heard from Stanford that

5  D was going to go on the run, he should go for at least a year

6  to a year and a half to two years.  He took that to mean leave

7  town.  And Dillon tells Stanford Williams when he came back --

8  if D left, when he came back, he could turn himself in and

9  fight the case better alone than with everybody else.  How

10 does Stanford Williams know that unless that conversation

11 occurred?  And that's corroborated by the fact that they are

12 contacting him on the phone and we are getting these cell

13 tower hits at Cottage in that general area.

14        Then at the Applebee's, they meet Grady.  You have

15 this -- he meets Dillon at the Golden Pancake House, and

16 again, the Golden Pancake House is in Dillon's phone Contacts

17 that were seized on September 7th, and there are calls from

18 the Golden Pancake House with that same number to Grady's

19 phone and then Dillon calls on his personal phone.

20        Next slide please.  We have the gap in communication.

21 This is 81A-1 where we have this gap in the afternoon hours

22 consistent with the meeting at Applebee's and the cell tower

23 hit where Grady and Dillon aren't talking to each other

24 roughly between 3:07 and something like 5:30.  There is almost

25 a two and a half hour gap in communication.

1    Next slide please.  Then we have, you know, Dillon is

2  running this on his phone.  He is running this 404 case, this

3  case on his web browser basically from sometime after 11 until

4  sometime shortly after noon.  And then we move forward and

5  look at this gap.  We have a gap between roughly 12:51 to

6  about 5:20 on his web browser.  That's all consistent with an

7  in-person meeting.  You have the gap in the phone

8  communication, you have the gap on the web browser.  The

9  meeting happened, okay?

10    And as Terry told you, Grady said we can fight this,

11  get lost, go into hiding, go somewhere far out of the

12  metropolitan area is the way Terry took it, throw away your

13  phones.  They are allowing the conspiracy to continue.  They

14  are part of it.  "I agreed, Grady and Dillon was like I need

15  to stay away for 18 months to two years and let the courts do

16  their things, let this boil down, let people enter into

17  agreements and there would be fewer witnesses against him."

18  That is an effort to obstruct or impede the proceeding.  It's

19  done for no other reason than to obstruct or impede this case.

20  The scope of this case which you have heard about, that's why

21  they are doing it, to gain an unfair advantage and raise the

22  specter of him being out there that may discourage

23  cooperation.  That is corruption to its core, and they

24  encouraged him to do it.

25    He told them -- during the discussion, they said they

1  would be both -- he would get them another 15 or 20 or

2  $30,000.  They were both present for this.  He told them to

3  stay in touch with Stan who would be running his operation.

4  He did not believe Stan had been compromised.  And as he said

5  later, "I made the choice on my own, but once they had spoken,

6  it was etched into my brain where I could go and get some

7  sunlight."  So he made the choice, but it was their

8  counseling.  It was, "I had some reserves, but knowing that

9  was best for me to get away and come back in two years, that

10  was what was decided," and that was how he decided he got some

11  sunlight.  It was based on their counsel.  The only reason

12  they are in a position to have this conversation with him in

13  the first place is because of that existing conspiratorial

14  relationship.

15        There were also documents -- in terms of that

16  relationship, he says they discussed Jerome Lewis.  There are

17  documents on Jerome Lewis in Grady's house and Morshay

18  Andrews, a co-defendant, on Dillon's phone.  Significantly,

19  Dillon on that web browser had been running Washington before

20  those search warrants were executed.  It's all consistent with

21  them looking for Washington and not being able to find him as

22  Terry outlined that to you.

23        Moving quickly through the next couple elements and

24  the offenses, money laundering.  Money laundering in this

25  case, there was activity in November of 2015.  They are

1  exchanging drug money with Dillon for this lawyer in Chicago.

2  They are an intermediary, a courier.  If these transactions

3  are designed in part to conceal the source or location, that

4  is money laundering.  The exchange of currency to go to

5  another state through an intermediary, that's a financial

6  transaction.  As we moved on, he is indicted.  He knows the

7  police are looking for him, he is on the run, and he makes

8  more payments.  He is not concealing it from Grady and Dillon

9  nor is he concealing it from Beau Brindley, but he is

10 concealing it from the law enforcement, trying to hide the

11 cash, get it to Brindley before it gets seized by law

12 enforcement.  That's reasonable in light of all the evidence.

13 You have seen the seizures that happened with large-scale drug

14 dealers.

15         In terms of the witness tampering with Grady, there

16 is not much to say here on this last count.  Williams is

17 represented by counsel.  Grady is trained in the law.  He has

18 a copy of the indictment and said he was indicted for money

19 laundering.  What does he do?  First thing he does, he goes

20 right up to Williams, who is represented by counsel.  And this

21 is the person who is trained in the law goes right to

22 Williams.  And then he says somebody has gone to the Grand

23 Jury.  Well, Williams did go to the Grand Jury.  As Williams

24 explained, I am like the cat's out of the bag, they are going

25 to know about this.  So to smooth things over, he went -- when

1   he was contacted by Lewis, he went to the Muslim service, and

2   that's where Grady presented him with the affidavit and tried

3   to get him to say certain things, like I was not willing to --

4   and as Williams said, I wasn't willing to say that I didn't

5   give him cash, but I would say I didn't engage in a financial

6   transaction because we didn't buy buildings.  Remember, Grady

7   also wanted Williams to say that Grady was a paralegal for

8   Williams, and Williams would not put that in there because he

9   was not a paralegal for him.

10           Williams doesn't draft affidavits.  This is the kind

11  of thing that Grady does.  It is on videotape.  Not much to

12  say here.  It's with an effort to corruptly encourage Williams

13  -- he tried to corruptly influence the testimony of Williams.

14  That means to persuade someone with conscious of wrongdoing.

15  He is trying to get him to change his statement because he

16  knows that he's got some liability -- Grady knows he's got

17  some liability with this set of actions and Williams's

18  testimony.  It's done with the intent to influence.  That is

19  to get Williams to shade his testimony if you look at the

20  instructions.

21          Ladies and gentlemen, this was a significant law

22  enforcement investigation, all right?  Please keep in mind

23  when you evaluate the cooperators, they are not saying they

24  were hands-on with dope.  They are admitting the scope and

25  scale of their illegal conduct.  They are corroborated by the

1 evidence we have just discussed. There is no doubt the

2 defense is going to get up here and they are going to attack

3 law enforcement. They will come after the prosecution. We

4 have already seen that from the cross examination with their

5 e-mails, and they are going to come after the cooperators.

6 Keep in mind the evidence in the case. This is a ploy. What

7 it is is it's going to be an effort to distract you from the

8 actual evidence that you have heard in this case.

9        And in terms of where we're headed here with this

10 verdict form, we are going to ask you to -- can I have the

11 ELMO please. The forms are similar as to each man except that

12 there is a separate and fourth instruction as it relates to

13 Defendant Grady. But keep in mind what we're going to ask you

14 to do is return guilty verdicts on all these counts, hold them

15 fully accountable for what they have done. And if you find

16 the defendant guilty of Count One, then you have to check

17 which substances you unanimously find beyond a reasonable

18 doubt were involved in the offense, cocaine, heroin. Based on

19 the knowledge and intent, the knowledge that these defendants

20 have of narcotics dealings as you can glean from the manner of

21 their relationship with Terry, the previous conviction of

22 Grady for heroin conspiracy, and Dillon's actions on

23 September 7th, which relate to a multi-kilogram cocaine

24 transaction, you can find them guilty of knowing that this

25 conspiracy involved both. They approached the Terry

1 organization.  They fostered a relationship.

2          If you had found unanimously and beyond a reasonable

3 doubt that cocaine was involved in the offense, you must

4 determine the quantity or mixture or substance attributable to

5 Defendant Grady and the other form will be Dillon as a result

6 of his own conduct and the conduct of the other conspirators

7 reasonably foreseeable to him, and the options are 5 kilograms

8 or more, less than 5 kilograms but more than 500 grams, less

9 than 500 grams.  You have to check the quantity that you find

10 unanimously and beyond a reasonable doubt was involved in the

11 offense as it relates to cocaine.  Let's talk about that for

12 just a moment.  You have their backgrounds in terms of

13 reasonably foreseeable.  They went over the Jordan indictment

14 with Terry.  You also have Grady's conviction for heroin

15 distribution in terms of reasonably foreseeable.  They courted

16 a large-scale heroin and cocaine dealer and developed a

17 relationship with him, took his money, and they also have the

18 knowledge and trade craft that you saw in the -- Dillon has

19 the knowledge and the trade craft that you saw in the

20 10-kilogram case.  And if that's not enough, they actually sat

21 down and went over the indictment that was recovered from

22 Grady's house with Terry on January 13th, which specifically

23 detailed the scope of the organization of 5 kilograms.

24 Thereafter, they continued to support this conspiracy.

25          Based on all these circumstances, ladies and

1   gentlemen, we are going to ask you to hold them fully

2   accountable of each count.  Mr. Boyce will come back to you in

3   the second half of this argument and ask you to hold the

4   defendants fully accountable for what they have done.  Thank

5   you.

6          THE COURT:  Ms. Michaelis, do you want to proceed

7   with your closing at this time?

8          MS. MICHAELIS:  It would be my preference if we have

9   an offer for a break, that we would take that first.

10         THE COURT:  Okay.  All right.  Well here, let me do

11  this.  Hold on.  We'll take a short recess, ladies and

12  gentlemen, before the defense begin their closing arguments.

13  During the course of the recess, do not discuss the case

14  amongst yourselves or with anyone else.  Do not allow anyone

15  to discuss it within your hearing or presence.  Do not form or

16  express any opinions about the case.  And most assuredly since

17  we are at this stage of the trial, do not utilize any cell

18  phones or other web-enabled devices you might have that might

19  allow for a discussion or seeing something or hearing

20  something about the case and definitely no use of any social

21  media platforms.  Make it ten, ten minutes, Erica, and keep

22  them under your control over there.

23         **(Court Recessed from 12:25 p.m. until 12:45 p.m.)**

24         THE COURT:  Ms. Michaelis, proceed.

25         MS. MICHAELIS:  Ladies and gentlemen, when I first

1  stood up here two weeks ago, I asked you to verify what the

2  Government was presenting to you, verify whether the testimony

3  matches the physical evidence, because the Government hasn't

4  matched the testimony with the physical evidence, and because

5  they haven't done that, they have failed to meet their burden.

6      This entire investigation began on the day that

7  Stanford Williams was arrested and first mentioned the name

8  Michael Grady.  From there, he told the Government a story

9  about meeting with Michael Grady on January 10th or January

10  11th.  Whether he could remember the exact date makes no

11  difference because what he described was a series of events

12  that happened before the day of the round-up and a series of

13  events that happened on the day of the round-up.  Two separate

14  days, not one, two separate days.

15      The round-up, that was the defining moment of this

16  case.  Stanford Williams even said so himself.  From the

17  information that Stanford Williams gave the Government, that

18  he met with Michael Grady before the day of the round-up, the

19  Government thought that they had a crime.  They thought they

20  could get Michael Grady because before the round-up, the

21  indictment is under seal.  Before the round-up, if Michael

22  Grady had access to the sealed indictment, then the Government

23  had a real problem on their hands.  Every subsequent step that

24  followed was based on the uncorroborated statement of Stanford

25  Williams.  They filed search warrant after search warrant all

1   containing that January 10th or 11th date.  They requested

2   phone records, they looked through phones, computers, files,

3   and all of that was based on the uncorroborated statement of

4   Stanford Williams about the meeting that he had with Mr. Grady

5   on the 10th or the 11th.  And that is exactly what Detective

6   Gaddy told you.  He corroborated information that Stanford

7   Williams gave him about Derrick Terry, but he didn't

8   corroborate what Stanford Williams had told him about Michael

9   Grady.

10          Within a week of talking to Stanford Williams, the

11  Government requested toll records and call detail records that

12  would tell them whether Stanford Williams was telling the

13  truth, but they didn't look at those records, at least not

14  right away.  And if Detective Gaddy had tried to corroborate

15  that information, the information that Stanford Williams told

16  him about Michael Grady, he would have discovered right away

17  that Stanford Williams wasn't telling the truth about Michael

18  Grady because the very first thing Williams told them, that he

19  met with Michael Grady on January 10th or the 11th before the

20  day of the round-up, that couldn't be true because Michael

21  Grady was in Florida until January 12th, and that could have

22  been verified by looking at the very phone records that the

23  Government presented to you.

24          That Michael Grady was in Florida before the

25  round-up, that was verified months later, and you can see it

1    by looking at the CAST report that the Government presented to

2    you.  On January 12, 2016, the activity on Michael Grady's

3    phone before 10:44 a.m. put Michael Grady in Jacksonville,

4    Florida.  And because the way Stanford Williams describes

5    things with that first series of events and the second series

6    of events, if they couldn't -- if those descriptions couldn't

7    be true, Stanford Williams had to change his story.  He now

8    had to say that everything happened on the same day, that

9    Terry came over to his house in the morning, that Grady came

10   to him more than once, and then Terry came back and told

11   Williams in the afternoon that Grady advised him to run, and

12   all of this happened before the meeting at Gents that night.

13          But verify it.  The Government gave you the tools to

14   verify whether these meetings took place.  That CAST report,

15   Williams said Mr. Grady came over to the house on Cottage more

16   than once on January 13th.  The Government showed you the CAST

17   report for the 13th and the cell towers there that are

18   activated.  The map shows that there was activations showing

19   over a ten-minute period of time, but they didn't present to

20   you any additional maps showing any other meetings on

21   January 13th.  Where are the maps of these other meetings?

22   That's reasonable doubt.  Also notice in that CAST report,

23   that the second map that was included of Stanford Williams's

24   address shows a different cell tower activation.

25          What did Terry say about that day?  That he didn't

1  meet with Williams until the evening of the round-up when he

2  met Williams at Gents Bar.  Williams and Terry don't even have

3  their own facts straight.  That's reasonable doubt.

4         Stanford Williams's story about what happened the day

5  of the round-up, it doesn't match up with what Terry testified

6  to, but more importantly, it doesn't match up with the

7  physical evidence presented to you.  Stanford Williams

8  testified that Terry directed him to give $10,000 to Michael

9  Grady after the round-up and that he met with Michael Grady

10 and Oscar Dillon at Delmonico's on Euclid and Delmar.  Where

11 is the CAST report for that meeting?  Where is the expert

12 testimony that showed Mr. Grady's phone using a cell tower

13 near that location?  You can believe that if the Government

14 had a report that showed Mr. Grady's cell phone activating

15 near a cell tower near that Delmonico's, they would have shown

16 it to you.  The Government doesn't have it.  That is

17 reasonable doubt.

18        Where are the records that show Mr. Grady made a

19 deposit of some kind around that time period or another that

20 would show that this meeting actually took place or that money

21 exchanged hands?  All we have is Stanford Williams's testimony

22 telling us this meeting happened with nothing to verify it.

23 That is reasonable doubt.

24        When Stanford Williams began to cooperate with the

25 Government, he received a call from Michael Grady.  Williams

1   had just told them that Michael Grady advised Derrick Terry to

2   flee and that Mr. Grady and Derrick Terry had ways to talk to

3   each other.  Here's the Government's most baffling failure to

4   corroborate, to verify, the information.  Detective Gaddy was

5   looking for a fugitive, a dangerous drug dealer, Derrick

6   Terry, and he had just been told by this fugitive's right-hand

7   man that the very person who counseled this fugitive to run,

8   the very person who Williams said still had contact with this

9   fugitive, that person was calling his phone, calling the phone

10  right in front of Detective Gaddy's face, and Detective Gaddy

11  told Williams not to answer.  If what Williams said was true,

12  they could have heard in Mr. Grady's own words what he had

13  done.  In an ongoing investigation for a dangerous fugitive,

14  why wouldn't the Government want to hear what Michael Grady

15  had to say in that phone call?  Why wouldn't they record it?

16  That is reasonable doubt.

17       By the time Stanford Williams got to Lincoln County

18  Jail, Stanford Williams knew that Mr. Grady was a paralegal.

19  That's why Williams reached out to Mr. Grady three months

20  before he and Mr. Grady spoke at the Lincoln County Jail.

21  Three months before this encounter at the jail, Williams sent

22  a letter to his girlfriend stating that he wanted to see D's

23  paralegal because he wanted to know how to recant his

24  statement.  Now, Judge Autrey just instructed you on the

25  elements of attempted witness tampering, and one of the

1  elements is that the Government has the burden of proving that

2  Mr. Grady attempted to use corrupt persuasion against Stanford

3  Williams, that he attempted to corruptly persuade Stanford

4  Williams to change his testimony in some way.  There is no

5  persuasion here, corrupt or otherwise, because all the way in

6  September of 2016, Stanford Williams wanted to take back what

7  he told the Government.  Stanford Williams tried to reach out

8  to the paralegal first, and it wasn't because Mr. Grady was a

9  street person who knew how to handle these things because

10 Stanford Williams told you he didn't know Michael Grady before

11 the day of the round-up.  All he knew was that Michael Grady

12 was a paralegal, a paralegal who might be able to tell him how

13 to recant his statement.

14      Williams told you that he was worried about the news

15 getting out that he was cooperating, but he was the one

16 telling multiple people about the fact that he was

17 cooperating.  He told his girlfriend, and he wanted her to get

18 in touch with someone Derrick Terry knew and presumably that

19 person would tell Derrick Terry who hated snitches and that

20 person would tell Derrick Terry that Williams was cooperating,

21 and then he sat in the middle of D pod writing this affidavit

22 that said right at the beginning "I am a cooperator".  He sat

23 there in the middle for everyone to see what he was doing for

24 anyone who wanted to walk up to that affidavit to see that he

25 had written that he was a cooperator.  This is why I urge you

1  to watch those videos from the jail again, watch them for

2  yourself, because the first video that is in the gym when

3  Michael Grady walks in and he ignores Stanford Williams, it is

4  Williams who comes to him first.  Williams takes a couple

5  steps forward and then Michael Grady notices him coming over.

6  Williams approached first, which is what is verified by the

7  letter that Williams sent in September.  The rest of the 15 or

8  so clips that the Government showed you, you never see Michael

9  Grady and Stanford Williams together again.

10         Let's talk about this affidavit.  Firstly, Williams

11  admitted that the information in the affidavit was true.  That

12  is what he told you, that the information he put in the

13  affidavit was true.  The video the Government showed you of

14  this encounter between Stanford Williams and Michael Grady, it

15  has no sound, so all we have is Stanford Williams's

16  description of what happened, and what he told you was that

17  Michael Grady wanted to know how he ended up on the

18  indictment, that someone must have gone before the Grand Jury,

19  and then Williams responded that he wasn't the one who

20  testified before the Grand Jury.  After that, Michael Grady

21  asks to be removed from D pod along with Oscar Dillon.  He

22  removed himself and Oscar Dillon from the situation.  He

23  didn't stick around to keep an eye on Stanford Williams.  He

24  got out of there.

25         When Stanford Williams went to the gym, he told you

1  that for the parts of the video that we couldn't see, that is,

2  of course, when Michael Grady gave him some papers for

3  Williams to copy. And again, Williams tells a story, and when

4  the evidence doesn't match, he changes his story to fit with

5  the evidence. Conveniently, all of these papers that are

6  being passed back and forth in the one part of the gym is the

7  part that we can't see. That's not truth telling. That's

8  giving the Government what they want to hear. So look closely

9  at that video. Look closely at whether you can see anything

10 in Williams's hands when he leaves the gym or when he gets to

11 his bunk. He told you that he had something from Mr. Grady,

12 something in his hands, but verify it, look at the videos.

13 You can't actually see anything in his hands before he pulls

14 out his own papers from underneath the bunk.

15      It took Stanford Williams hours to write that

16 affidavit. It wasn't because he was trying to decide which

17 parts of an original he wanted to include. He was looking at

18 his own paperwork and coming up with his own affidavit without

19 anyone telling him what to write, just like he said he wanted

20 to do in September of 2016 when he asked his girlfriend to

21 send the paralegal to him to be told how to recant his

22 statement. Verify Stanford Williams's version of events

23 because Agent Lanham testified that they searched Michael

24 Grady's jail cell and they recovered documents from his cell,

25 but the Government didn't present you with this original

48

1    affidavit that Williams claimed Michael Grady gave him to copy

2    because they didn't find one.  That is reasonable doubt.

3         Most importantly, there was a third person there who

4    the Government could have called to verify this information to

5    you, and they didn't call him.  Now, I expect that you will --

6    or, I'm sorry, Judge Autrey has already instructed you that

7    the Government doesn't have to call every witness to an event,

8    but when you only have the testimony of Stanford Williams who

9    keeps changing his story, whose story doesn't match up with

10   anyone else's, most importantly doesn't match up with the

11   physical evidence, they must verify; otherwise, all we have is

12   the testimony of someone who has every incentive to make sure

13   the Government hears what they want to hear.  But, ladies and

14   gentlemen, your job is different.  It is your job to seek out

15   the truth here, and you deserved to hear from that third

16   person, Jerome Lewis, in his own words what happened in D pod

17   in December 2016.  And I expect the Government will say, well,

18   Ms. Michaelis could have called Jerome Lewis to testify.  She

19   could have used the subpoena powers of the court to present

20   Jerome Lewis's testimony, and they are right, but it is not

21   our burden to present that testimony.  It is the Government's

22   burden to prove their case beyond a reasonable doubt, and they

23   have chosen to present their case to you through someone who

24   has every incentive to hide the truth from you.  They could

25   have verified what Stanford Williams said through Jerome

1    Lewis, but they didn't.  That's reasonable doubt.

2              By the time the investigation finally caught up to

3    Derrick Terry, he knew they were coming for him, and he knew

4    they wanted him for murder.  That is why he looked for

5    something to point at the police, to hold court in the street.

6    That is what Stanford Williams described it as, the same thing

7    Williams described back on the day of the round-up, that if

8    the police were coming for Derrick Terry for murder, Derrick

9    Terry would hold court in the streets.  That's why Williams

10   told Terry to run.  He didn't want the cops to shoot his

11   friend, his brother, the man who gave him a start when he was

12   released from prison, the man who rode around on a bike

13   looking for customers for him, the man who gave him a place to

14   live.  He didn't want to see that person shoot it out with the

15   police, and that is the same reason Stanford Williams sent

16   down his discovery to Derrick Terry, to make Derrick Terry

17   hide more, to hide better, to keep running.

18             So when the police came for Derrick Terry and he knew

19   that he was going down for murder, he wanted a way out, but he

20   wasn't fast enough and they arrested him.  For months he sat

21   in a jail cell trying to think of a way out.  He had hired an

22   attorney to fight for him, but fighting was too much of a

23   gamble.  What did Derrick Terry tell you about himself?  He

24   was clever.  He was smart.  He told you exactly how he came up

25   with his way out of a life sentence.  He could read things in

1    the court documents and integrate those things with what he

2    learned on the street and then he would form opinions about

3    who was cooperating.  What Derrick Terry described about using

4    this information he supposedly was getting from Michael Grady

5    and Oscar Dillon, that's what he did to find his way out of

6    his life sentence.

7         Here's how he did it.  Anthony Jordan was arrested in

8    August of 2015.  Jordan starts getting his discovery right

9    away.  He starts getting his discovery shortly after he is

10   arrested.  He is talking to Terry for seven months while Terry

11   is out on the streets unindicted.  Terry used the same

12   protocol to talk to Jordan that they used to communicate with

13   each other while they were both out on the streets, through

14   intermediaries.  That's what Derrick Terry told you.  Tone

15   Bone and J Bird went to visit Anthony Jordan, and then Derrick

16   Terry gave money to Anthony Jordan's kids.  Anthony Jordan's

17   discovery included information about murders that Terry was a

18   part of, so he knew something was coming.  He didn't need

19   Michael Grady to tell him that.

20        Not only that, but Jordan had access to the affidavit

21   for a search warrant for his Sacramento addresses.  Agent

22   Lanham testified that this search warrant -- or these search

23   warrants included a detail about a cooperating witness who was

24   driving around with law enforcement, the same cooperating

25   witness who conducted pre-murder surveillance along with

1    Anthony Jordan before they shot Anthony Clark.  Agent Lanham

2    also testified to the detail being in the Sacramento Street

3    warrant.  Putting two and two together, anyone who knew

4    Antonio Washington who was reading that Sacramento Street

5    warrant would know right away that Antonio Washington was

6    cooperating and that he drove around with law enforcement.  It

7    didn't come from Michael Grady.  It came from the discovery.

8            Every other piece of information that Terry had about

9    Antonio Washington and his cooperation, it came from Anthony

10   Jordan or it came from Derrick Terry's own experience, his own

11   observations.  He said that when Antonio Washington was

12   arrested, he and Anthony Jordan went to talk to Antonio's

13   lawyer, Scott Rosenblum, who told them that Antonio Washington

14   was no longer his client, and then Derrick Terry and Anthony

15   Jordan went to talk to Washington's mother who said that the

16   Feds were trying to move her.  None of this came from Michael

17   Grady.

18           Terry also said that he had Michael Grady look into

19   someone named Kenny Keys.  The only thing found in Michael

20   Grady's office related to Kenny Keys was this envelope and the

21   form inside with no information filled out.  There is no

22   docket sheets, no filings, no notes about court hearings,

23   nothing else about Kenny Keys.  But Terry didn't need Michael

24   Grady to know Kenny Keys was cooperating.  He had all of the

25   information he needed about Kenny Keys's cooperation from the

1  search warrant found in Terry's possession at the Texas

2  arrest.  It was in that search warrant in the paragraph

3  describing what confidential witness number 4 was telling law

4  enforcement, and CW-4 stated that Terry would load up his

5  truck and either drop money or deliver it -- I'm sorry, would

6  either load up the truck with dope or money and deliver it to

7  Jordan.  Next to the paragraph talking about this exact

8  cooperating witness, CW-4, is a little handwritten note that

9  says Kenny.  Michael Grady didn't tell Terry that Kenny Keys

10  was cooperating; Stanford Williams did.  Derrick Terry read

11  this search warrant, the one that Stanford Williams sent down

12  to him, and knew right away that Kenny Keys was cooperating.

13         Terry said that Michael Grady and Oscar Dillon gave

14  him information on Jerome Lewis, the same Jerome Lewis who was

15  housed in D pod with Stanford Williams, Stanford Williams who

16  had already provided information about cooperators to Derrick

17  Terry.  I just went through some of it, the same Jerome Lewis

18  who Michael Grady talked to when he first got to D pod.  Look

19  at that video because it doesn't look to me like Michael Grady

20  had the kind of hatred of snitches that Derrick Terry said

21  that they shared.  The Government even showed you a file from

22  Michael Grady's office with Jerome Lewis's name on it.

23  Remember, that file came from Michael Grady's office.  It

24  wasn't found at the Kennerly house.  That file, it doesn't

25  show that Jerome Lewis was cooperating.  The last document in

1  that file about Jerome Lewis was from November 15, 2013 before

2  Terry said that he met with Michael Grady for the first time.

3  If Michael Grady had been giving Derrick Terry information

4  about Jerome Lewis, the docket sheet would have been updated

5  past the arrest of Jerome Lewis.  The docket sheet ends on

6  November 15, 2013.  We saw at the Kennerly house that there

7  were multiple docket sheets for Anthony Jordan, each one

8  updating the last, but for Jerome Lewis, the last entry we

9  have is right after he gets arrested.

10       Terry testified that Michael Grady was giving him

11  information about sealed court filings, but the only sealed

12  filing in this docket was the original complaint.  There were

13  no other sealed filings on this docket sheet.  And again, the

14  information in Jerome Lewis's file is from before Terry had

15  ever met Michael Grady.  That is reasonable doubt.

16       The information that Terry said about Boo Boo, there

17  were no documents found in Mr. Grady's office about this

18  person named Boo Boo, and Terry said that he was never shown

19  anything.  But Michael Grady didn't need to show Terry

20  anything.  Terry said that he was interested in Boo Boo

21  because he heard that this person, Boo Boo, was cooperating

22  against his friend, Donald White, Donald White who had a life

23  sentence.  As you can see from this docket report that I

24  submitted, Donald White went to trial, and when he lost, he

25  was given a life sentence.  The people cooperating against

1   Donald White would have testified at that trial.  Boo Boo

2   would have been one of those people testifying against Donald

3   White.  Terry didn't need Michael Grady to tell him that.

4   Everybody knew that Boo Boo was cooperating against Donald

5   White because he came to court to testify.

6          Derrick Terry also said that he got information about

7   Don McGhee and Dominic Irons, but he told you that he was

8   interested in these people because they all related to

9   Jordan's case and he knew that he had dealings with Jordan and

10  that Jordan could implicate him.  That's why he said he paid

11  Michael Grady in November, because he was getting worried that

12  everything was about to come to an end and he wanted to make

13  sure he had an attorney ready to go.  It wasn't for

14  information about conspirators -- or cooperators; it was to

15  get ready to fight the case.

16         The only document in Derrick Terry's possession that

17  wasn't publicly available that actually identified cooperators

18  in Terry's case, that didn't come from Michael Grady.  It came

19  from Stanford Williams, the person who was cooperating with

20  the Government at the time but never told them that he was

21  trying to tip Derrick Terry off that the Government knew about

22  the murders that he had participated in.  Williams never told

23  the Government that he had given Terry this information so

24  that Terry would keep hiding or hide better.  Williams never

25  told the Government that he had ways of contacting Terry who

1  was a fugitive at the time, and he certainly didn't tell the

2  Government that he was giving Derrick Terry information about

3  who was cooperating against him.  With the information that

4  Stanford Williams sent him and from reviewing his own

5  discovery, Terry could put together a way out.  He could see

6  who had been cooperating, and when the Government came

7  knocking, he could just feed their own information back to

8  them.  He could tell them that all the information he had read

9  in his own discovery about cooperators, that that all came

10 from Michael Grady, the paralegal who the Government asked

11 about first thing.

12         Derrick Terry said that he would have so many

13 meetings with Grady and Oscar Dillon.  They would be at his

14 drug house -- multiple drug houses and he would have them

15 almost every day.  But Derrick Terry was under investigation

16 at this time.  Those houses were under investigation, and

17 there are no reports of Michael Grady visiting any of those

18 houses.  Terry's right-hand man, Stanford Williams, never met

19 Grady or Dillon before the day of the round-up.  And even more

20 incredible, Derrick Terry can't remember specific details

21 about these almost daily meetings.  He couldn't tell you when

22 they specifically happened, where they specifically happened,

23 what they specifically talked about.  The only things he could

24 remember were what the Government wrote down for him.  That's

25 reasonable doubt.

1    On the day of the round-up, Derrick Terry told you

2  that he met with Michael Grady and Oscar Dillon at an

3  Applebee's and there was another person there, someone Derrick

4  Terry identified as Yummy, someone the Government showed a

5  picture to Derrick Terry of and he identified that person.

6  The Government knew who this person was, and they could have

7  called that person to testify to verify about what was talked

8  about at this Applebee's, but they didn't.  That's reasonable

9  doubt.

10    Terry told you that when Michael Grady showed him the

11  document, the first thing he said -- the first thing Michael

12  Grady said to him was that we're going to fight the case.

13  Terry had already paid a lawyer to fight the case.  He knew

14  something big was coming, and Michael Grady said let's fight

15  it, let's take it to trial, fight it because it's only a drug

16  conspiracy.  This is what Michael Grady did for a living.  He

17  got cases ready to take them to trial.  He doesn't get paid if

18  there is no case to work.  He doesn't get paid if Derrick

19  Terry is on the run.  All of a sudden, we are supposed to

20  believe that Michael Grady then decided to tell him to run,

21  and Derrick Terry says he trusts this person's advice but

22  doesn't trust him enough to talk to him on the phone when he

23  is on the run.

24    Let's talk about these payments that Terry said he

25  made.  First he said he paid Michael Grady $2,500 for the work

1  he did on the motion for early termination, legal work; then

2  another 5,000 for giving him information, but he doesn't

3  remember when or where he gave Michael Grady this payment; and

4  then there was a 10,000-dollar payment for hiring an attorney;

5  and then a 50,000-dollar payment for hiring an attorney.  This

6  was on the night of the round-up at Gents Bar, the one with no

7  CAST report showing Michael Grady was back at Williams's house

8  again in the evening for I believe the fourth time that day

9  according to Stanford Williams.  With all of these payments,

10  there was no concealment, not like the other instances that

11  Terry testified to about concealing the sources of his funds

12  when he bought houses and he paid his rent.  He actively hid

13  who provided the money for those properties, but with Michael

14  Grady, he didn't testify that he concealed anything about

15  where the money was coming from.  If he actually paid any of

16  this money, it was no secret it was coming from Derrick Terry.

17  He didn't conceal it.  And the money that was going to a

18  lawyer to represent him, there was no secret about that

19  either.  That lawyer was supposed to represent Derrick Terry.

20      Derrick Terry had multiple sources of income.  Some

21  of it was illegal; some of it was legitimate.  Derrick Terry

22  never told Michael Grady which account he pulled his money

23  from, and he had taken great steps to give people the

24  appearance of having legitimate sources of income.  He owned

25  properties.  He got rent from those properties.  He owned a

1  car shop.  The lack of a receipt that the Government keeps

2  focusing on, that's not what makes or breaks the money

3  laundering count.  The Government must prove knowledge.  They

4  must prove that there was a concealment that the money came

5  from Derrick Terry.  They haven't met that burden.

6       The Government showed you Michael Grady's phone

7  records, and they tried to show you just the parts between

8  Charda Davis and Stanford Williams who never identified

9  Michael Grady in open court and who never said that she gave

10  Michael Grady any money but did provide two addresses where

11  she met a man she told the Government was Michael Grady.  And

12  again, we don't have any cell tower records, we don't have a

13  CAST report to corroborate any of that information.  They

14  could have verified what she said about those meetings, but

15  they didn't.  That's reasonable doubt.  And it wasn't just

16  phone calls between Charda Davis and Williams and Oscar

17  Dillon, it was phone calls with attorneys, other attorneys,

18  and all of these other phone numbers that they never

19  identified.

20       When I first stood up before you two weeks ago, I

21  asked you to listen to those cooperating witnesses but verify

22  what they were telling you.  Now that we have gone through the

23  Government's case, you have those tools that you need to

24  verify what the cooperating witnesses have told you.  The

25  biggest piece of physical evidence that the Government has

1   against Michael Grady is those phone records, and it shows

2   that when Michael Grady was in contact with Charda Davis and

3   Stanford Williams, he was also in contact with the very

4   attorney who Derrick Terry wanted to fight his case.  That's

5   what Michael Grady did.  He would find out that someone needed

6   an attorney and he would find an attorney for them.  Just like

7   he did with Kelvin Williams who hired Raphael Morris right

8   after Michael Grady got in touch with him and just like he did

9   with Justin Shelton who was represented by Robert Taaffe who

10  Michael Grady was also in contact with during the period of

11  those phone records.  That is what he did.  You can see it in

12  the phone calls, and you can see it in the e-mails.  Michael

13  Grady found attorneys for people and then worked the cases

14  with those attorneys.

15        Michael Grady saw that there was corruption in the

16  criminal defense bar here in St. Louis.  Michael Grady saw

17  this activity and he wanted to do something about it.  And it

18  wasn't because of Derrick Terry, it was because it was

19  happening to all criminal defendants across St. Louis, and

20  because he saw that corruption, he looked for attorneys who

21  would come in and fight, who would come in and just take their

22  client's cases, fight hard against the Government instead of

23  walking their clients into a lion's den.  This is the

24  corruption the Government is talking about when they called

25  Michael Grady a corrupt paralegal.  Michael Grady would find

1　attorneys that actually pushed back against the Government,

2　and they didn't like it.

3　　　　　Here we have an attorney who was representing a

4　defendant and a cooperator in the same case, and a judge in

5　this building said that that was not right.  This was

6　ethically troubling.  And who was that attorney?  Scott

7　Rosenblum who represented Antonio Washington and Anthony

8　Jordan.  This is the conflict that is mentioned in Anthony

9　Jordan's docket sheet, and it is the conflict that Michael

10　Grady discussed with Anthony Jordan.  Incidentally, this same

11　attorney who uncovered this ethically troubling behavior of

12　Scott Rosenblum, Bill Margulis, he also represented Jerome

13　Lewis.  We have the same ethically troubling behavior

14　happening a second time in this case.  Michael Fagras who

15　represented Adrian Lemons at the beginning of this case later

16　represented Derrick Terry, and conveniently, he was Derrick

17　Terry's attorney when Terry started to cooperate.  We have

18　three different examples of the corruption that Michael Grady

19　was trying to fight against.  The first is what is written

20　about in that Rosenblum article.  The second instance is the

21　same attorney doing the same thing in this case.  And then the

22　third instance is this same case but with a different

23　attorney, Michael Fagras, representing two defendants on the

24　same case.

25　　　　　It didn't matter to Michael Grady what Anthony Jordan

1    was accused of or what Derrick Terry was accused of.  It

2    didn't matter to him what anyone was accused of because he

3    believed that defendants have rights given to them by our own

4    founding documents, and they deserve to have someone fighting

5    on their side.  Michael Grady believed in the Bill of Rights.

6    No matter how flawed he believed -- or we believe that

7    document is, he believed that defendants are protected under

8    this founding document.  The Constitution sets up the

9    government and defines the scope of its power, but the

10   amendments to the Constitution, that's for us.  That's for the

11   people.  It is a shield that stands in the way of the

12   Government's power.  It protects us from the Government going

13   too far and it limits that power.  Within the Bill of Rights

14   is a guarantee that every person accused by the Government,

15   every person whose liberty is threatened by the Government,

16   they are entitled to an attorney.  It doesn't matter what you

17   did.  If the Government accuses you of a crime and they want

18   to deprive you of your liberty, you are entitled to have

19   someone represent you, to have someone fight for you, someone

20   who has your interest at heart and not the Government's.

21          That's what Michael Grady believed, and Michael Grady

22   knew that not everyone could afford a team of attorneys.  He

23   knew that most people he dealt with, they can't afford an

24   attorney at all.  It didn't matter to Michael Grady because

25   the Bill of Rights made no distinction and neither did he.  He

1  knew that there was a power imbalance in the criminal justice

2  system.  And just look at the Government's table, they have

3  four people sitting there; Michael Grady has one.  All he

4  wanted was to make sure that if the Government was coming for

5  someone, at least they had a chance.

6       Timothy Harris said it better than I can.  When the

7  judge in his case asked him why do you want to bring on Seals

8  and Bailey, what are they going to do for you.  He said "to

9  help prepare my defense, to strengthen my defense because I am

10 up against the Government and I can't beat the Government

11 alone, so I figured the more help to help prepare my case, to

12 look into it, because he seemed to be a little busy or he

13 seems nonchalant or last minute.  He's not prepared every time

14 we come to court.  It's been several times he asked me what

15 did we come here for, what did you want to see us for.  And I

16 know that may be getting off into our relationship, but that's

17 just what I see, so I told him maybe that would help the

18 situation and strengthen my defense.  That's all I am trying

19 to do is strengthen my defense because I'm up against a bigger

20 entity and that's the Government.  And alone I just don't feel

21 like he's got my best interest at heart."

22       That's what Michael Grady did.  He prepared cases.

23 He worked for clients so that they wouldn't be alone against

24 the Government.  Michael Grady took the experience that he had

25 gained from 66 years of living and channeled it into helping

1   criminal defendants defend themselves, and the Government

2   didn't like that. He had a legitimate business, and he did

3   legitimate work. Derrick Terry and Stanford Williams saw

4   their way out, their way out of cages that they put themselves

5   in. All they had to do was say the magic words "Michael

6   Grady" and "Oscar Dillon". The Government took 25 boxes of

7   files from Michael Grady's office, so many files of legal

8   research, investigation, work that a paralegal does, and

9   Derrick Terry was the only one who they could find in those 25

10   file boxes who would say that Michael Grady was corrupt, and

11   he didn't start saying it until he realized Michael Grady was

12   his get-out-of-a-life-sentence free card.

13       Of all the things that Stanford Williams and Derrick

14   Terry told you, all the meetings, the conversations, the

15   payments, the Government didn't show you one surveillance

16   report, one recorded conversation, one document to verify what

17   these two were telling the Government and then you. When

18   Detective Gaddy said he did nothing to corroborate what

19   Stanford Williams said, that hasn't changed. The physical

20   evidence doesn't corroborate what Stanford Williams and

21   Derrick Terry have said.

22       Ladies and gentlemen, I won't have a chance to talk

23   with you again, and when the Government addresses you again, I

24   hope that in the back of your mind you ask yourself how would

25   Ms. Michaelis respond to what the Government is arguing.

64

1  Where is the corroboration?  Where does the Government verify

2  what they are telling me?  In the end, when you have answered

3  those questions for yourself, I ask you to return the only

4  verdict consistent with the evidence, that Michael Grady is

5  not guilty on all counts.  Thank you.

6      THE COURT:  Thank you, Ms. Michaelis.  Mr. Glozman.

7  And before you begin, let me direct this to the members.

8  Ladies and gentlemen, I've been informed that your lunches are

9  available.  Do you want to continue and conclude the closing

10  argument or take a brief luncheon recess?  Forge ahead?

11      All right.  We are going to take an abbreviated

12  lunch, ladies and gentlemen.  Do you think 20 minutes will be

13  sufficient for you?  All right.  We will take a luncheon

14  recess at this time.  During the course of the recess, do not

15  discuss the case amongst yourselves or with anyone else.

16  Don't allow anyone to discuss it within your hearing or

17  presence.  Do not form or express any opinions about the case

18  until it is, in fact, given to you to decide.  Do not use any

19  cell phones or other devices that could connect to the

20  internet that might allow for such discussions or viewings,

21  and don't use any social media platforms during this recess.

22  About 20 minutes, folks, give or take.  All right.

23   **(Court Recessed for Lunch from 1:30 p.m. Until 2:05 p.m.)**

24      THE COURT:  Mr. Glozman, you may proceed with your

25  closing argument.

1   MR. GLOZMAN:  Ladies and gentlemen of the jury, you

2   have been sitting here for about two weeks now what has up

3   until now been a silent role in a somewhat unique criminal

4   trial.  For the last two weeks, you have been the passive

5   recipients of the evidence and the testimony introduced by the

6   prosecutors and ourselves.  In a short while after my final

7   argument and the rebuttal by the Government, you will finally

8   take the active role in this case, and you will be charged

9   with deciding the fate of Oscar Dillon.  When you approach

10  this task, it must be approached with a willingness to speak

11  what many people think are the hardest words in life to utter,

12  "I don't know".  When we say that, "I don't know", we are apt

13  to feel like it means something unintelligent or uneducated.

14  Those words, "I don't know", might even mean that we are

15  confessing for a second that life just doesn't make sense, but

16  you must go into that jury room gripped with the courage to

17  speak those words if you determine them to be appropriate, for

18  that is what a not guilty verdict means.  It means in plain

19  terms "we do not know", "not for sure".

20  If you say not guilty, you are saying as a group we

21  thought hard about these charges and this evidence and we do

22  not know for sure.  That might be the wrong answer back in

23  school if you are taking a test, but not in the jury room.  Do

24  not feel like you failed because you have come to that

25  conclusion.  In fact, it is your obligation to say those words

1  if they are true because you can only convict if you are

2  convinced beyond a reasonable doubt, but if doubt remains, and

3  frankly in this case it must, if you find reason to doubt,

4  then it is your duty to come back here, stand before us all,

5  and say in substance "we do not know for sure".  You have

6  together sworn an oath to render a true verdict, and if in the

7  end that is your conclusion, that you do not know for sure,

8  then the oath you have taken means you have to say the only

9  words that you can, "not guilty".

10         Now, in this case, we know the Government doesn't

11  like Oscar Dillon.  If they made anything clear, it's that.

12  They didn't like who he was hired by and they didn't like the

13  people he was trying to help because they were the people they

14  were trying to put in jail.  He was a man perceived as making

15  their job harder.  He was calling out things the Government

16  may have been doing wrong, helping investigate defendants who

17  they were trying to put in jail, the same people they are now

18  using to put him in jail.

19         And you saw Agent Burke's e-mails, they were

20  targeting Dillon.  They were hell-bent on getting Dillon.

21  It's not a coincidence that that e-mail from Burke came the

22  same day Burke got an e-mail from Mr. Reilly telling him about

23  a hearing about paralegals in the case of Timothy Harris, in a

24  case where they asked the judge permission to get the

25  discovery, not just getting it straight from the client like

1 they want you to believe.  And you heard Ms. Michaelis earlier

2 today read the transcript from that hearing, why Timothy

3 Harris wanted Seals and Bailey to help, because the

4 Court-appointed lawyer could not or would not.  Mr. Dillon

5 along with Mr. Grady were there to help people that sought

6 their help.  Sometimes those people had money; sometimes those

7 people did not have money.  But every single witness the

8 Government put on that stand said Mr. Dillon was an

9 investigator.  That's what they knew him as.  And the job of

10 an investigator regardless of who they are hired by,

11 regardless of their beliefs about the people they are hired

12 by, much like an attorney, is to do their job, to investigate.

13 And that is what Mr. Dillon did.

14        This case has made clear that all the information Mr.

15 Dillon was working with was publicly available, all of it.  We

16 went through dozens of pages of search history on his phone

17 over and over again.  You saw those PACER searches on his

18 phone.  We now know that PACER is available to anyone.  It's

19 public.  All you have to do is sign up, get a user name, put

20 your credit card in, and you can access any federal case

21 that's been filed in this country.  And on these dockets,

22 there is never information about who the cooperators are.

23 That's also made abundantly clear.  All you can see are

24 publicly available documents, like indictments or minute

25 orders.  If something has sensitive information on it, it's

68

1   sealed and no one can see it, not me, not Mr. Dillon, and that

2   is done in cases where people cooperate and it's done in cases

3   where people don't cooperate.

4   　　　And Mr. Dillon would go to public proceedings in

5   courtrooms like this where we all heard the identities of

6   cooperators are not disclosed and all people are allowed to

7   come in and watch.  If there is sensitive information in the

8   proceedings, then it is not open to the public.  Mr. Dillon

9   like everyone else would not have been allowed in.  But the

10  Government didn't like that Mr. Dillon knew how to access this

11  information, the same information that is available to each

12  and every one of you, the same information that is available

13  to Derrick Terry if he wanted to get it himself.  And as I

14  said in my opening, that's how this story of Mr. Dillon

15  sitting in that chair came to be.

16  　　　I have thought for awhile how I wanted to present Mr.

17  Dillon's closing to you, but the last thing I want to do is

18  show you a bunch of exhibits that you have been looking at for

19  two weeks and that you will have the chance to review if you

20  want to back in the jury deliberation room.  So I promise,

21  during this argument, I will only show you one piece of

22  evidence.  It is a piece of evidence I believe encompasses

23  this entire case and puts into perspective why we are all

24  here.

25  　　　This is an e-mail that was written by Detective Gaddy

1  on May 4, 2016, long before I was ever on the case, long

2  before I tried to get someone through my cross examination.

3  It's an e-mail that's withstood the test of time, and if we

4  break it up, we see exactly how Mr. Dillon ended up being

5  here.  At the time this e-mail was sent, the Government only

6  had Stanford Williams as a cooperator.  They were three months

7  away from arresting Derrick Terry, and they were six months

8  away from Terry cooperating.  So let's break this down and see

9  what the Government was thinking on May 4, 2016.

10         First, in regards to Mr. Dillon, Detective Gaddy says

11  "Terry was provided info prior to being unsealed by Paralegal

12  Michael Grady and his partner, Oscar Dillon."  This was based

13  on Williams telling them that Dillon and Grady showed him and

14  Terry the indictment on January 10th or 11th.  We know through

15  this case that the indictment wasn't unsealed until the 13th,

16  so the Government was excited.  They had proof that Mr. Dillon

17  had some inside source or a nefarious way of getting this

18  information, and we know for sure that Williams was talking

19  about the 10th or 11th because both he and Detective Gaddy

20  admitted that he talked about two separate series of events,

21  one on the 10th or the 11th and one on the 13th, the day of

22  the round-up.  The round-up was his guide post, so they

23  couldn't have been the same day.  The 13th was the round-up,

24  and the 10th or the 11th was the first series before the

25  round-up, and he said he didn't see Dillon on the 13th, and

1  the Government believed this because Detective Gaddy told the

2  magistrate judge when he was seeking a warrant that this

3  happened on January 10th or 11th.  The Government loved this.

4  They knew that the indictment had not been unsealed yet, so

5  they could accuse the paralegals of getting documents in some

6  kind of improper way.

7         But as the investigation went on, they realized that

8  what Williams told them was impossible, that it was a lie.

9  They could not have shown him and Terry the indictment on the

10  10th or the 11th because Grady was in Florida and Terry was in

11  Texas.  But they didn't care to learn this until after they

12  indicted Oscar Dillon.  It didn't matter to them even though

13  they had all the cell site data available to them to prove

14  that Grady wasn't there.

15         So now because it was apparent that it was impossible

16  for the meeting to have happened before the 13th, the story

17  changed.  They no longer had evidence that Dillon was getting

18  unsealed documents, and the evidence in this case has

19  supported that.  All of the documents pulled off of his phone

20  were public records because that's all he can get just like

21  everyone else.  And even though Williams was contradicted,

22  they had him come up here and tell you all of this happened on

23  the 13th, the day of the round-up, because that was his

24  benchmark for remembering everything.  But if that was his

25  benchmark for remembering everything, why did he specifically

1 tell agents that these events with Dillon happened before the

2 benchmark and then tells you the other day that it happened on

3 the benchmark?  Read his cooperation agreement.  It will tell

4 you why he said it.

5       Detective Gaddy goes on to say in this e-mail that

6 they, Dillon and Grady, directed Terry to flee.  Well, that

7 may be what they are trying to prove to you now, but back in

8 May 2016, they just did not have that information.  Detective

9 Gaddy went in front of a magistrate judge the day after this

10 e-mail was sent and he admitted to you on the stand that when

11 he was asked to provide details about how they directed Terry

12 to flee, he couldn't.  He did not tell the judge that Dillon

13 talked to Terry directly, and he did not tell the judge that

14 Williams passed along the message to Terry about needing to

15 flee because they didn't have the evidence to support it.  And

16 you can bet if they did, they would have told the magistrate

17 judge.  There was no evidence to support that Dillon directed

18 Terry to abscond, not directly and not through Williams, and

19 no evidence to corroborate Williams.

20       What they had was a story that Stanford Williams had

21 told them.  This story goes back to January 29, 2016, the day

22 he was arrested.  As we know after he was arrested, he decided

23 to cooperate with the Government, and he started telling them

24 about Derrick Terry and the drug trafficking organization and

25 then he mentions a paralegal, just one.  He said that and

1 Detective Gaddy's notes that I showed you showed that also.

2 And that one paralegal was not Mr. Dillon, but they showed him

3 a picture of Oscar anyway even though Stanford Williams wasn't

4 talking about him.  So after Williams mentions the paralegal,

5 the meeting stops, and Mr. Reilly and Detective Llewellyn are

6 called in.  It becomes obvious that they think this subject is

7 important, and instead of continuing the meeting, they move it

8 for a few days so that Stanford Williams can get a lawyer so

9 that it can be explained how important this part of his

10 cooperation is going to be.

11          And at that point, Williams knew he had given money

12 to Grady and that the Government was looking for Terry.  Look

13 at Gaddy's notes in the evidence from that first meeting.  All

14 it mentions is Terry leaving and money from a paralegal.  So

15 then he starts telling the Government that it was Grady and

16 Dillon since he was shown a picture of both of them that told

17 Terry he should run.  That's what the Government wanted to

18 hear.  He begins to tell the Government that this meeting

19 happened with them on January 10th or 11th where they had

20 Terry's indictment and told him that Terry should run.  And as

21 the meetings go on over the years, he begins to tell them that

22 he passed along this information to Terry, but Williams never

23 told them that Grady and Dillon talked directly to Terry.  He

24 just didn't know if they did or what was said if they did.

25 But the Government didn't care.  They had their story.

1       But in all this excitement, Stanford Williams messed

2   up.  As he was being walked back to the marshal's elevator, he

3   had a conversation outside the presence of Mr. Reilly and the

4   two agents walking him and he tells them that it was him that

5   convinced Derrick Terry to run, not Dillon and Grady.  That,

6   however, did not fit the Government's story.  That's not what

7   they wanted to hear, so it was never brought up by them again,

8   not in future meetings, not at the Grand Jury, not in his

9   direct testimony.  It wasn't until our cross examination that

10  the truth finally came out.  And why would the Government want

11  you to hear that?  It's not part of their story.  And the fact

12  that Williams admitted he convinced Terry to run is a reason

13  to doubt the Government's case.

14       What's interesting is, the first day that Williams

15  talked to the Government, he said only one paralegal was

16  involved, and Gaddy's notes said the same thing, but when he

17  couldn't remember to say Oscar Dillon's name on the stand, you

18  saw Mr. Reilly run up there and hand him a piece of paper to

19  read Oscar Dillon's name off of, because that's how they get

20  Oscar Dillon involved.  And isn't it strange that

21  Mr. Williams, the man who smokes eight blunts a day while

22  drinking tequila and taking ecstasy, can remember verbatim

23  what Dillon said on a day that he was high but cannot remember

24  what he told the Government agents during their cooperation

25  meetings when he was sober.  You saw what he said when I

1   questioned him.  He just couldn't remember.  But when you

2   think about the Government preparing his testimony three or

3   four times to go along with their story, it becomes much

4   clearer why he could recollect the words that were said five

5   years ago so exactly.  The script was written for him.

6          When Derrick Terry was arrested on July 27, 2016 in

7   Dallas, he was asked if anyone advised him or directed him to

8   flee, and as we learned during this trial, Derrick Terry does

9   and says what's only good for Derrick Terry, no one else.  And

10  at that time, he was not cooperating.  He didn't have an

11  incentive to lie about other people.  You remember what he

12  told the agents, no one directed him or advised him to flee.

13  The agents even asked him specifically about paralegals, but

14  he called them crooks, that's it, because that's all he

15  thought about them at that time when he had no incentive to

16  lie.

17         We even heard testimony from Stanford Williams and

18  Charda Davis that Terry told them to blow off Dillon and Grady

19  when it came to paying them money because that's what you do

20  with people who you think are crooks.  The Government went out

21  of their way to show you that this wasn't a formal

22  conversation, that there was no lawyer involved, no

23  cooperation agreement signed, no discovery to scare Terry into

24  cooperating, no Mr. Reilly, but don't all these factors

25  actually make his July 16th statement seem more true, because

1  when you add in all those facts that he was cooperating, that

2  it was more formal, that there was a cooperation agreement,

3  that he saw the evidence against him, that the prosecutor was

4  there, that makes it more likely for Terry to cry because

5  that's when it becomes his best interest to do it.  When

6  Derrick Terry begins to cooperate, the story all of a sudden

7  matches up with the Government's, that it was Dillon and Grady

8  who advised him to run.

9          The problem is, his story didn't match up with

10  Stanford Williams's.  He tells you he met Dillon and Grady on

11  January 13th, not the 10th or the 11th.  He said he didn't

12  meet with Stanford Williams that day until they saw each other

13  at night at the Gents Bar.  But how does that make sense?

14  Williams told you that he saw Terry in the morning after

15  Dillon and Grady came to his house, then left, then Terry

16  came, then they came back, and then he saw Terry again.  But

17  instead what Terry tells you is he never saw Stanford Williams

18  that morning, and he learned from his friend who works at a

19  salon that Dillon and Grady were looking for him.  Then Terry

20  tells you that he met Dillon at The Original Pancake House,

21  that he watched him eat and then they went to Applebee's

22  together to meet with Grady.  But we know from Dillon's text

23  messages that he was already eating at Cracker Barrel earlier

24  that afternoon.  So he would have had to eat at Cracker

25  Barrel, go to the Original Pancake House and eat again, and

1    then go to Applebee's all within a couple hours.

2          The whole Original Pancake House meeting is a

3    complete fabrication because that's the only way that they

4    could put Dillon in that meeting.  They saw on his phone that

5    he had a number saved for the Original Pancake House, and they

6    saw that Grady, not Dillon, called that number earlier that

7    afternoon.  Dillon never called it.  But easy enough, let's

8    just say Dillon was eating there when he met Terry, but they

9    missed the text message that I showed you on Friday from their

10   exhibit, the one they didn't want you to see, the one that

11   said he was already eating at Cracker Barrel.  But that didn't

12   fit their story, and that's another reason to doubt their

13   case.

14         The whole notion that someone needed to tell Derrick

15   Terry to run away is complete nonsense.  This man is a career

16   criminal who has been learning how to evade law enforcement

17   his entire adult life.  He switches phones and throws away his

18   old ones every two weeks.  He told you that.  He walks around

19   the neighborhood with guns looking for cameras and undercover

20   vehicles.  He doesn't talk on the phone.  He goes through four

21   people to get the source of the drugs.  He uses drug money to

22   buy 17 properties to wash his money.  You really think he

23   needs Dillon to tell him to run away not to get arrested?  He

24   already had money ready to go.  He had four fake IDs, and he

25   had someone in Dallas where he was the day before the round-up

1  ready to get an apartment for him.  It's not like running away

2  from the police is some kind of new or novel idea like the

3  Government wants you to think.  It's the oldest way to not get

4  caught.  You run.

5      And you know he is lying because when I asked him if

6  he has ever heard or seen drug traffickers run away before, he

7  said only on TV.  And then when Ms. Michaelis asked him, he

8  admitted he already knew Gerry Cushshon had run away prior to

9  January 13th.  Now, if he is sitting in that chair trying to

10  be honest or at least try to come across as being honest, why

11  would he lie about something so stupid and insignificant.

12  It's not like he would lose credibility if he admitted he had

13  seen or heard about other people running away before.  And if

14  he is willing to lie about something so small and

15  insignificant like that, what else is he lying to all of you

16  about?

17      Terry also admitted during his testimony that Anthony

18  Jordan told him he was going to have a shoot-out with the cops

19  if they were going to try to arrest him, and that it was Terry

20  who convinced him not to do that and to stay away from his

21  family and kids because that's the first place law enforcement

22  is going to look.  Ironically, this is the same exact

23  conversation Terry says he had with Dillon and Grady about

24  having a shoot-out with the police, and he tells you it was

25  after this conversation that Dillon and Grady convinced him

1 that he should run. But if you remember what Stanford

2 Williams said, that the shoot-out conversation was actually

3 between him and Terry, that it was he who convinced Terry to

4 run instead of having a shoot-out with the police. And when

5 Terry got to Dallas, what did he do? He didn't stay with his

6 girlfriend because that's where the police would look for him

7 first, the same advice he gave to Anthony Jordan.

8 When I confronted Derrick Terry with the fact that it

9 was his idea to flee and abscond, he did not want to agree

10 with me. So I showed him a copy of the statement that he gave

11 to the Government where he told them it was his idea. And

12 when confronted with this statement, his response, his excuse,

13 his lie, "well, that's just a typo." Are you kidding me?

14 Everything else the Government shoved in his face from that

15 statement was true, but the one fact that hurts their case is

16 a typo. Come on. You're all way too smart to believe that.

17 The interesting part about all of this is, Williams

18 after he began cooperating with the Government, supposedly

19 honestly, admitted to you that he sent Terry his discovery

20 that accused Terry of murder to make sure that Terry knew to

21 stay away, to stay on the run. That's the same person who

22 admitted he convinced Terry to run in the first place, not

23 Dillon.

24 So when you take the fact that Williams admits he

25 convinced Terry to run and the fact that Terry had the same

1   conversation about shooting out with the police and staying

2   away from your family with Jordan as Williams said he had with

3   Terry and the fact that William was sending Terry paperwork to

4   make sure he knew to stay away, what does that tell you?

5   Surely not that Mr. Dillon had anything to do with telling

6   Derrick Terry to run away and avoid prosecution.

7           In order to convict Oscar Dillon of attempted

8   obstruction of justice, you will have to find that he acted

9   corruptly, with a corrupt purpose, and that's what the

10   Government has to prove.  But if you look back at the evidence

11   when it came to advising people, Mr. Dillon never did so

12   corruptly.  When Mr. Dillon supposedly met with Anthony Jordan

13   after his house was raided by the feds, after he knew he was a

14   major drug trafficker and would likely be indicted, he never

15   told him to run.  He never told him to obstruct justice in any

16   way.  The meeting was set up so Jordan could take the

17   situation seriously, as he should have.  And Dillon and Grady

18   suggested to Terry well ahead of his indictment that he should

19   get a lawyer back in November 2015 when Terry told you he had

20   this eerie feeling about what was going on.  They didn't tell

21   him to run.  They told him to retain an attorney, a good one.

22   That is the opposite of a corrupt purpose.  That's what a

23   person is supposed to do when they are facing criminal

24   investigation.  You hire an attorney.  You prepare to defend

25   yourself.  You fight for yourself, you fight the case.  And

1   the Government wants you to believe that the same person who

2   is telling someone to get an attorney is later telling him to

3   run away and avoid prosecution. Now, that's a reason to doubt

4   their case because it doesn't add up. It defies common sense,

5   and the stories don't line up.

6         And look at the text message Mr. Dillon sent Grady

7   after Charda Davis got indicted. The Government showed it to

8   you not today but earlier they did and it said "she needs a

9   good lawyer." And the same with the other text messages that

10   they showed you, he refers people to lawyers because that's

11   the right thing to do. We know if there were any text

12   messages of Dillon advising someone to do something corrupt,

13   the Government would have showed it to you a hundred times,

14   but they didn't, and that tells us that they just don't exist.

15   Between the evidence of Williams and Terry's conversations and

16   Dillon's history of advising people to hire an attorney, not

17   absconding, this case becomes a little more clearer that the

18   Government's story about directing Terry to flee simply

19   doesn't add up.

20         The last part of this e-mail I want to bring your

21   attention to is the last sentence that I have highlighted,

22   that they would pass along valuable information such as who

23   was cooperating against the drug trafficking organization.

24   And this sentence is significant because of the timing of when

25   this e-mail was sent. Detective Gaddy sat on the witness

1    stand and told you that they did not know Dillon and Grady

2    were passing along information about cooperators until Derrick

3    Terry told them when he was cooperating.  That wasn't until

4    November of 2016, and we know that to be true because if Stan

5    Williams had any kind of information about them passing along

6    about cooperators, he surely would have sat up there and told

7    you about it, but he didn't.  This is something that was made

8    up six months before Terry was cooperating, something the

9    Government wanted to be true and something Terry was willing

10   to say for them because he needed to save his life.  And

11   surely, no one else told the Government about this because if

12   they did, you would have heard them testify.  And when I

13   showed Detective Gaddy this e-mail, he had no answer.  He did

14   not know what to say because there are no explanations.  I

15   definitely don't have anything for you.  But it's an e-mail

16   that I can't cross-examine and get to say anything.

17        Now, Mr. Dillon providing information about

18   cooperators to Derrick Terry is the crux of this whole

19   conspiracy to commit drug trafficking in this case.  It's the

20   Government's theory that by providing this information to

21   Derrick Terry, Dillon became a member of a drug trafficking

22   organization -- or the drug trafficking conspiracy.  And in

23   order for this to be true, the Government would have to prove

24   beyond a reasonable doubt that there was an agreement between

25   Dillon and at least one other person, presumably Derrick

1   Terry, that by him investigating and sharing information about

2   ongoing cases was for the purpose of distributing controlled

3   substances.

4        Now, I am not going to go through all the elements of

5   conspiracy.  You've heard Judge Autrey talk about it, Mr.

6   Reilly's talked about it, but there is one section I want to

7   bring to your attention.  "A person's mere knowledge of the

8   existence of a conspiracy or mere knowledge that an objective

9   of a conspiracy was being considered or attempted or mere

10  approval of the purpose of a conspiracy is not enough to prove

11  that the person joined the conspiracy."  And what the

12  Government has to prove to you is that Mr. Dillon joined an

13  agreement to distribute a controlled substance with the intent

14  to further the crime of distribution of a controlled

15  substance, and that is simply not the case here.

16       Now, just to get it out of the way, both Stanford

17  Williams and Derrick Terry told you that Mr. Dillon did not

18  distribute drugs for them, did not distribute drugs to them,

19  did not broker any of their deals, did not package the

20  narcotics or anything of that nature.  They both said they

21  never saw Dillon with drugs.  So this charge comes down to

22  whether Mr. Dillon's work as an investigator puts him in the

23  Derrick Terry drug trafficking conspiracy.  And despite the

24  fact that Derrick Terry sat up there and rattled off key words

25  like conspiracy, RICO, continuing criminal enterprise, aiding

1  and abetting, that's not proof that Dillon joined this

2  conspiracy. Those are words he learned from someone else.

3        I am not going to stand up here and tell you that Mr.

4  Dillon did not look up documents relating to Antonio

5  Washington's case or Anthony Jordan's case or that he didn't

6  download the documents on his phone. That's all true. But he

7  kept track of public records to see what was going on with

8  people's cases, the updates. That was his job. And I'm also

9  not going to tell you that he didn't know Derrick Terry was a

10  drug trafficker. I think anyone within a 10-mile range of

11  Derrick Terry knew he was a drug trafficker, but that's all

12  the evidence shows in this case, that's it. Derrick Terry sat

13  up here and tried to convince you how valuable all this

14  information was, how monumental it was, how it doubled or

15  tripled or whatever it did to his drug trafficking

16  organization, how Dillon was the offensive and defensive

17  coordinator of this football team. Come one. I would think

18  it would be a little bit more believable if he didn't

19  exaggerate so much about how helpful this information was. I

20  don't think anybody can believe what he says. It just doesn't

21  make any sense.

22        First of all, Terry knew that Anthony Jordan's door

23  was kicked in by the feds before Dillon ever told him

24  anything. He went to go see Scott Rosenblum first before they

25  ever told Dillon anything about what was happening. He also

1  admitted that he knew Antonio Washington's case went from

2  state court to federal court and that he went missing after it

3  went to federal court and then he said the whole neighborhood

4  knew he must be cooperating because of this, not something Mr.

5  Dillon told him.  And then Derrick Terry also admitted to you

6  that Anthony Jordan had an inside source at the St. Louis

7  Metropolitan Police Department who would give them information

8  about cooperators, firsthand knowledge.  That's not some

9  public documents Mr. Dillon pulls off on his phone at the

10  Cracker Barrel.

11        When someone gets indicted by the federal government,

12  no one in their right mind would continue to do business with

13  them, drug or any other kind of illegal business, certainly

14  not an experienced drug dealer like Derrick Terry.  And if

15  they are incarcerated, they definitely can't deal drugs with

16  them, and the Government knew you were too smart to think

17  that, so they went a different route with their theory.  They

18  knew Terry was a violent and murderous man, so he wanted to

19  put the fear in you that Dillon was providing information to

20  Terry because they all hated snitches and they all wanted them

21  dead.  Derrick Terry said that to you.  This is what the

22  Government wants you to believe about Mr. Dillon, but Mr.

23  Dillon had absolutely no stake in Derrick Terry's drug

24  trafficking business.  If Terry made more money selling drugs,

25  Dillon wouldn't make more money selling drugs.  It's not like

1  they pooled their money together like Derrick Terry and

2  Anthony Jordan did.  If Terry got to sell more drugs or buy

3  more drugs, that didn't mean that Dillon would get to sell

4  more drugs or buy more drugs.  Terry never saw him with any

5  drugs.  And if those people snitched, it's not like they would

6  snitch on Dillon.  They worked with Terry.  Dillon didn't work

7  with Terry.  That whole concept that Dillon didn't like him

8  just doesn't make any sense.

9          And the Government did not have any evidence that

10  Dillon is some sort of violent man that hurt people or killed

11  people.  You know they would have used it if they had even the

12  slightest bit of it.  No evidence he ever used a gun or owned

13  a gun, no weapon of any kind.  No evidence he was ever

14  involved in any kind of killing or violence.  That's because

15  there isn't any of it.  Terry certainly has that in his

16  background.  He helped Jordan kill three people.  He tried to

17  kill a cooperator back in 2008 to help his friend.  But as he

18  admitted to you, all of his violence and all of his murders

19  occurred before he ever met Dillon.  Not a single act of

20  violence or murder after he met him and definitely not based

21  on any information that he may have gotten from Mr. Dillon or

22  Mr. Grady.

23          The truth is, Derrick Terry got absolutely no value

24  from the work that Oscar Dillon did.  Think about it.  He says

25  he paid him $2,500 in mid 2014 for a motion to terminate early

1  supervised release -- or for early termination of supervised

2  release, and that got denied.  Then he supposedly paid $5,000

3  for information to avoid getting indicted, but he got indicted

4  six months later after having been able to survive without

5  Dillon for years as a drug dealer.  Then he said he paid

6  $20,000 or $70,000, whatever number you want to believe, he

7  said he paid that for a lawyer that they recommended, and he

8  still got indicted and still got arrested.  They did nothing

9  for him besides print out some documents that said Jordan and

10  Washington were charged with crimes, the information Derrick

11  Terry already knew from the streets.  And if I was Derrick

12  Terry, I'd probably call them crooks, too.  I'd say they were

13  just after my money, just like he told the agents July 27,

14  2016 before he started cooperating to save himself from a life

15  sentence.

16       Think about it.  If this information was so valuable,

17  so significant, don't you think that a person who wears a

18  50,000-dollar watch, a 20,000-dollar chain, has multiple cars,

19  and owns over 17 houses would have paid more than $5,000 for

20  this information, this information that is exponentially

21  growing his business two or three times keeping him out of

22  jail?  $5,000?  That alone is a reason to doubt the

23  Government's case.  Compared to how much he was spending on

24  everything else, this $5,000 represents what he thought of the

25  information that he was getting.  Not much.  And it's true, he

1  got no inside information, no inside source, no actionable

2  information.  All he got was a handful of print-outs from

3  PACER and then he got indicted six months later.  Where is the

4  value in that?

5       What's even more telling about what Terry thought

6  about their information was what he did after he ran away to

7  Dallas.  Shortly after he left, his right-hand man, Lieutenant

8  Stanford Williams, got arrested.  But instead of asking

9  Mr. Dillon who was providing all this valuable and significant

10 information that was monumental to drug trafficking activities

11 to find out what was going on with his friend, his lieutenant,

12 his second-in-command, he didn't ask Mr. Dillon or Mr. Grady

13 to do it.  He admitted that he asked his friend, Deshawn

14 Jones, to look into it, the same one who gave him fake IDs.

15 And then Stan Williams himself was feeding him information

16 while he was on the lam, the same guy who convinced him to

17 leave, not Dillon.  He never talked to Dillon after he left or

18 even told him where he was going.

19       Now, I kind of understand Charda Davis not knowing

20 Oscar Dillon even though she dated Terry during the time he

21 allegedly met with Oscar Dillon every single day, but how in

22 the world can Stan Williams not know or meet him until January

23 2016?  If he is Terry's right-hand man, an integral part of

24 his drug trafficking organization, don't you think he would

25 know who Dillon is, this supposed hot-shot corrupt

1  investigator?  And wouldn't Terry want Williams to get

2  information from them, too, to stay out of trouble, to help

3  the organization keep going?  He didn't though, and that just

4  doesn't make any sense.

5      The Government has spent a lot of time talking about

6  how important it is for them to keep the status of cooperators

7  secret, how important it is for their investigations, but

8  let's look at the two main cooperators that they presented to

9  you during the course of this trial.  Stanford Williams was

10  sending Derrick Terry his discovery while cooperating to let

11  him know that the Government was looking at him for murder and

12  as a way to give him a sign that he should stay far away, that

13  he should stay on the run.  The Government didn't seem to

14  care.  They still put him up there and presented him to you.

15      And the same is true about Derrick Terry.  He

16  admitted that he was telling people on the streets that he was

17  cooperating without telling the Government, and when I

18  questioned him about it, the Government jumped up and tried to

19  protect him.  That had nothing to do with being honest with

20  them or completely or truthfully, whatever the words were.  So

21  if the Government does not care that Stanford Williams was

22  sending his discovery to Derrick Terry while he was a fugitive

23  and they do not care that Derrick Terry has been telling

24  people that he is a cooperator, what are we really doing here?

25  Does the Government really even care or they just want to make

1 sure that the story adds up to this e-mail that was sent six

2 months before Derrick Terry was cooperating.

3      I want to spend just a couple minutes talking about

4 this money that they were allegedly paid, these payments for

5 information and for the attorney that are the basis for the

6 conspiracy to commit money laundering charge.  Like last time,

7 I'm not going to go through all the elements, but there is

8 just one that I want to show you.  "Four, the defendant

9 conducted the financial transaction knowing that the

10 transaction was designed in whole or in part to conceal or

11 disguise the nature, location, source, ownership, or control

12 of the proceeds of the unlawful distribution of cocaine and/or

13 heroin."  I asked Derrick Terry about this directly.  I wasn't

14 trying to get him, just simple questions, and this is what he

15 said:

16      "QUESTION:  Now, when you paid this money to Mr.

17 Dillon and Mr. Grady, the purpose was first to get a motion

18 filed; right?

19      "ANSWER:  Yes.

20      "QUESTION:  Then the purpose was to get information;

21 right?

22      "ANSWER:  Yes.

23      "QUESTION:  And then the purpose was to try to get

24 you a lawyer; right?

25      "ANSWER:  Correct.

1      "QUESTION:  And it was a transaction just like that;

2  right?

3      "ANSWER:  Yes.

4      "QUESTION:  Like going to the store and buying

5  something; right?

6      "ANSWER:  Yes.

7      "QUESTION:  You weren't trying to conceal the fact

8  that this was drug money; right?

9      "ANSWER:  No.

10     "QUESTION:  You weren't hiding the fact that this was

11 drug money?

12     "ANSWER:  No.

13     "QUESTION:  You just paid them because that's the

14 money you were using; right?

15     "ANSWER:  Yes."

16     He said it unequivocally, that no purpose, not in

17 whole or in part, of paying the money was to conceal or hide

18 the fact that it was drug money.  It was like any other

19 transaction, like buying rubber bands or sandwich bags or

20 baking soda.  And it doesn't matter that there was no receipt.

21 It doesn't matter that he wasn't wearing a service uniform or

22 a suit when he paid this money.  What matters is his intent

23 with paying the money, and the intent behind paying the money

24 in whole or in part was for the services he thought he was

25 getting:  A motion, information, a lawyer.  When Derrick Terry

1   wanted to conceal or hide his money, he did that through real

2   estate, not through Mr. Dillon.  And if Derrick Terry had some

3   kind of other motive or intent, the Government hasn't provided

4   any evidence to it.  But even if you think that he did, there

5   is no evidence that he had any kind of conversation with Oscar

6   Dillon or Michael Grady about the purpose of this intent aside

7   from getting this information.  And without some kind of

8   agreement, there is no conspiracy.  They thought they were

9   getting the money for a motion, for a lawyer, for whatever

10  else, and he told you the purpose of the payment was not to

11  conceal and not to hide what kind of money it was.  I wasn't

12  trying to get him.  That was just the truth.

13          You know, it was actually kind of amusing listening

14  to the way Derrick Terry described his interactions with

15  Dillon and Grady.  It was like they were the same person.  He

16  told you that they finished each other's sentences, that they

17  talked almost in unison, that they were everywhere together

18  and said almost all the same things.  But if you look at the

19  rest of the testimony in evidence, that is far from the truth.

20  When Stanford Williams testified about his conversations with

21  Grady and Dillon, he said Dillon didn't say much.  When Charda

22  Davis described her interaction with Grady and Dillon, she

23  said Dillon didn't say anything.  That doesn't sound like they

24  are finishing each other's sentences and talking in uniform.

25  Dillon didn't have any contact information for Stanford

1  Williams or Derrick Terry or Charda Davis.  He did not have

2  any calls with them or text messages or e-mails.  None of them

3  had his contact information, no recorded conversations between

4  them, nothing.  And we also have no recorded conversations

5  between Dillon and Grady, no text messages between them

6  talking about Terry or him running away or giving him

7  information about cooperators, no text messages between them

8  talking about Stanford Williams or Derrick Terry's money or

9  laundering it.  You know they would have showed it to you a

10 bunch if there was.  No evidence to corroborate anything

11 Derrick Terry or Stanford Williams said about Dillon, not even

12 each other.  Their stories contradicted one another.

13         So what are we left with to prove guilt beyond a

14 reasonable doubt?  Before this jury trial began, all the

15 lawyers here were tasked with selecting a jury that will be

16 fair and reasonable to both sides, and we certainly

17 accomplished that here.  And when we were tasked with picking

18 you all as jurors, I came up here and I asked you all whether

19 you believed somebody could be guilty by association, and none

20 of you said that.  And as the evidence has come out in this

21 case, you are now tasked with taking that belief into the jury

22 deliberation room because one of the things you are called

23 upon to decide now is if you think you can find Defendant

24 Oscar Dillon guilty by association, and the way the Government

25 has presented their case, they have surely put you in that

1  position.

2          If the evidence in this case has been consistent

3  about anything, it's that Mr. Dillon didn't do much or say

4  much.  In fact, Stanford Williams acknowledged that when he

5  saw Mr. Dillon in jail, he said he didn't know what he was

6  doing there.  And it's appropriate that this thought came to

7  Mr. Williams at the Lincoln County Jail, because the one count

8  of this indictment that has to do with the jail kind of puts

9  into perspective what Mr. Dillon did or didn't do.  The

10 Lincoln County Jail count is the one that charges Mr. Grady

11 with the Stanford Williams affidavit.  Mr. Dillon is not

12 charged in that count even though he was at the jail with him.

13 And this count was the only one that had some sort of

14 corroborating evidence that the Government could use, the

15 surveillance video.  And even though Mr. Dillon was there with

16 Grady, it's the one count with the video that they didn't

17 charge him in.

18         So we must ask ourselves, if the Government

19 acknowledges that Mr. Dillon's presence near Grady at the jail

20 does not make him guilty because the video is undeniable,

21 would the Government also think he is not guilty if there were

22 videos of other interactions between Derrick Terry and

23 Stanford Williams, because without the videos, we are left

24 with the Government's theory of guilt by association and the

25 words of two murderers and drug traffickers who will do

1　anything and say anything that is in their best interest and

2　to stay out of jail.  And to convict Oscar Dillon, you have to

3　believe them because that's what the Government's story about

4　Mr. Dillon is based on.  That's what they want you to believe.

5　They want you to believe Stanford Williams and Derrick Terry

6　because that's all they have against Mr. Dillon.  And we know

7　that if Stanford Williams's word was enough to convict

8　Mr. Dillon, the Government would have indicted him much

9　sooner.  They had the Stanford Williams story on February

10　2, 2016.  They knew where Seals and Bailey was located.  They

11　knew Mr. Dillon was at the courthouse on February 12th out in

12　the open, even Detective Gaddy snapped a picture of him.  But

13　that wasn't enough.  Stanford Williams's word is not enough.

14　The Government needed something or someone to corroborate what

15　Williams told them about Mr. Dillon.

16　　　　　On September 7, 2016, they seized five cell phones

17　they believed belonged to Mr. Dillon, but those didn't help

18　them either.  There were no calls or text messages between

19　Dillon and Derrick Terry or Stanford Williams or anyone

20　associated with a drug trafficking organization.  No location

21　data to put him at any of these meetings.  No sealed documents

22　and nefarious sources to make him seem corrupt, nothing.  So

23　the Government got desperate.  In November 2016, they

24　convinced Derrick Terry to cooperate.  We already went through

25　what I think of him and what the evidence shows about the

1  reliability of his testimony.  No one can possibly believe

2  anything that Derrick Terry said, certainly not beyond a

3  reasonable doubt.  If the Government could convict someone on

4  the word of Derrick Terry where the standard of proof is proof

5  beyond a reasonable doubt, I can't think of a single case

6  where a reasonable doubt would exist.  He is a murderer, a

7  drug trafficker, and most importantly for our purposes he is a

8  liar that will do and say anything as he has his entire life

9  to get what is best for him.

10       You know, I have tried to think of an appropriate

11  word that I can use to describe his testimony while also being

12  respectful to this Court, and the best that I could do is

13  baloney.  That's what it is.  And the Government could put as

14  much frosting on his testimony as they want and call it a

15  birthday cake, but at the end, it is what it is, baloney, and

16  you can't convict someone on that, particularly not Mr.

17  Dillon, and the Government knows that.

18       So what they did was they started showing you

19  evidence of other bad things they think Mr. Dillon did.  I

20  think we spent two days talking about the package that was

21  delivered to the bar on Delor on September 7, 2016, but as

22  Detective Gaddy kept telling you over and over again,

23  Mr. Dillon is not charged with that conduct, that Derrick

24  Terry has nothing to do with those drugs, Stanford Williams

25  has nothing to do with those drugs, no one in their drug

1  trafficking organization has anything to do with those drugs,

2  and those drugs have nothing to do with this case.  But we can

3  take what Williams and Terry told us about drug trafficking to

4  analyze what happened.  Both Williams and Terry unequivocally

5  said that the drug trafficking business is all about one

6  thing, money.  That's all it's about.  But after two days of

7  listening to testimony about Dillon receiving this package,

8  absolutely no evidence of him expecting to get paid to receive

9  that package, no text, no anything, no discussion what he was

10  supposed to do with the package, not selling it, not giving it

11  to someone, not doing anything after he signed the name of the

12  bar owner whose number he had in his phone.

13          Now, we can all agree that 10 kilograms of cocaine is

14  a lot, both in its value and in the risk of getting caught

15  with it.  Absolutely no one in their right mind would do this

16  for free, but that's what the evidence in this case shows

17  about Oscar Dillon.  Both Terry and Williams also told you

18  about the importance of countersurveillance, that Terry would

19  wake up, grab his guns, walk around the neighborhood looking

20  for cameras on lamp posts, look for cars with too much tinted

21  windows or weird plates to see if law enforcement was around

22  so they wouldn't get caught.  And Detective Somogye said the

23  same thing, that this is important for drug dealers.  But

24  Detective Somogye also testified that their pole camera was up

25  for a month before the delivery date, and absolutely no one

1  came by to do any kind of countersurveillance to see if it was

2  safe to receive this 10 kilograms of cocaine.

3        And what did Mr. Dillon do after he drove behind

4  Detective Somogye and then looked directly at him?  He doesn't

5  send a warning text to Glasses.  He doesn't disappear or

6  refuse to be there when the package shows up.  He goes right

7  back to the same place, the same place where eight to ten

8  undercover vehicles would surround him.  Now, someone who is

9  expecting 10 kilograms of cocaine just does not act that way.

10  And the Government has talked about how this package was being

11  shipped to an abandoned bar, but Glasses you saw in the text

12  message was given two choices, the bar and an Imo's Pizza that

13  was still in operation, and that Glasses was the one that

14  chose the bar without any input.  Now, what would the

15  Government's theory be if he had chosen the Imo's that was

16  still in operation?  I don't know.

17        And both Williams and Terry told you that Oscar

18  Dillon was the one that told Terry to run away after he was

19  indicted for guns, but the day after Mr. Dillon was arrested

20  for the 10-kilogram package after he saw dozens of federal

21  agents swarm him at the bar, after he was accused of knowing

22  about the cocaine, what did he do?  He went back to the

23  location where he was arrested the day after.  You would think

24  he would want to lay low or run away like he supposedly told

25  Derrick Terry to do.  And a week later, he walked himself into

1  the DEA office to grab his belongings that didn't really mean

2  much, like a wallet he could have gotten and a business card.

3  It's the DEA office.  That's not the actions of a person who

4  advises people to run away when they are faced with the

5  prospect of federal drug charges.

6          This evidence was presented to you simply to distract

7  you from their otherwise weak case, to try to make you hate

8  Mr. Dillon and convict him for something he is not on trial

9  for, for something that another jury should decide.  The jury

10  trial is the bedrock of our criminal justice system.  Sure,

11  both sides want to win, but at its core, it's a search for the

12  truth.  And even though the Government wants to win just as

13  much as I do, it's their role to make sure that in those cases

14  where there is proof of guilt beyond a reasonable doubt that a

15  person committed the charged crime, that they get convicted.

16  But stunts and misdirection have no place in what the

17  Government's job is, and that's the search for the truth.

18  There is a reason all of you have been chosen to sit on this

19  jury.  Everyone believed that you represented the fair and

20  reasonable jury of Mr. Dillon's peers to scrutinize the

21  Government's evidence or the lack thereof.  You are all too

22  smart to let this uncharged conduct and all the other

23  confusing and tedious evidence affect your ability to remain

24  true to your oath, to render a fair and just verdict.

25          In this case, if you hold the Government to their

1    burden of proof, proof beyond a reasonable doubt, and you

2    acknowledge that they have not overcome Mr. Dillon's

3    presumption of innocence, you must find Mr. Dillon not guilty.

4    In finding Mr. Dillon not guilty, you are not saying that you

5    agree with who he is or what he does.  You are not saying that

6    you approve of who he works with or who he works for.  You are

7    simply doing what you took an oath to do, an oath I know you

8    took seriously.  And you took it upon yourselves to discuss

9    and go through every single element of every single charge to

10   make sure that the Government was able to prove each and every

11   one of them beyond a reasonable doubt.  In this case, the

12   reasons to hesitate and the reasons to say I don't know, they

13   are clear and undeniable.  They exist.  So there is only one

14   verdict that's appropriate, but whether you are willing to

15   reasonably and honestly follow the instructions about proof

16   beyond a reasonable doubt and reach the verdict that is

17   required by the law, that is the question that both me and

18   Oscar Dillon ultimately leave up to each and every one of you.

19        THE COURT:  Thank you, Mr. Glozman.  You have 15

20   minutes, Mr. Boyce.

21        MR. BOYCE:  Okay.  Thanks, Judge.  Good afternoon,

22   everybody.  I understand I have 14 minutes, so I will get

23   right to it.  It's the Government's burden, so we get the last

24   word.  This is my opportunity to respond to some of the

25   arguments that the two defense counsel have made.  In 14

1  minutes I can't do all of it, so I will hit the high points.

2  You are going to be instructed that you have to render your

3  verdict based on the evidence, your common seasons, and the

4  law.  Common sense is a theme throughout this, so is evidence

5  because about 75 percent of what both counsel just told you

6  was not evidence.  It was speculation, it was innuendo, it was

7  out-of-court statements that are not in evidence.  Evidence is

8  defined in your instructions.  It is the testimony from the

9  stand and the exhibits that are admitted.  That is what you

10 have to limit your inquiry to, okay, evidence and your common

11 sense.  The law is the instructions that Judge Autrey has

12 given you.

13         Couple quick points starting with Count Four from Ms.

14 Michaelis.  She stood up here and told you -- this is the

15 affidavit in Lincoln County Jail.  She stood up here and

16 actually told you that Stan Williams wrote that thing himself.

17 Seriously?  You saw the video.  You heard Stan talk.  The

18 affidavit is in evidence.  This isn't going to take you long

19 to realize that is not true.  He didn't write that himself.

20 She also told you it wasn't done for corrupt persuasion.

21 Well, let's go back.  That happened in December by Michael

22 Grady, the same guy who spent most of 2015 with Derrick Terry

23 trying to ferret out who his snitch is, the same guy who the

24 day Stan was arrested said "Stan got locked up down on Cottage

25 today," the same guy who while Stan was trying to talk to the

1  police called him, the same guy whose partner showed up at

2  Stan's first court hearing, the same guy whose job it is to

3  find out who is snitching.  That guy is then charged in an

4  indictment with Stan Williams, ends up in the same pod through

5  a mistake, goes straight to him and says, hey, I hear somebody

6  went to the Grand Jury.  Seriously?  You think that that is

7  not with a corrupt motive?  You think he is just trying to get

8  the truth out there?  No way.

9         She also told you that Stan said everything in the

10  affidavit is true.  Not the case.  You were all here with me.

11  Stan was up on the stand.  They went through a few lines,

12  there was a break, skipped down, skipped a few lines, and went

13  on.  Stan didn't affirm the things that were skipped over, nor

14  would he.  Stan told you Grady told him to put things in there

15  that weren't true.  The instruction on this count says that

16  the influence has to only shade or color the testimony.

17  Obviously, when you come up to somebody in jail, your job is

18  to root out who our snitch is, you give him an affidavit to

19  copy, and then you file it in your own case, obviously that is

20  done corruptly to shade or color someone's testimony.

21         Ms. Michaelis talked about some other avenues of

22  information that Terry could have gotten stuff.  Start with

23  the Haverwood documents, Government's 31.  Just do it

24  yourself.  Don't take my word for it.  She suggested that this

25  search warrant affidavit that Terry got from Stan somehow was

1  the basis for Terry to make up this whole story. I am begging

2  you, don't take my word for it. Read it yourselves. Read it

3  and see if there is anything in there about Grady or Dillon or

4  selling information or any of this stuff, if there is any

5  basis from which Terry could have done that. There isn't. If

6  you read it, if you take the time -- it's pretty long, I read

7  it last night -- if you do that, you will know she has

8  completely mischaracterized that evidence.

9         And this is a quick point for me to say something. I

10  am not going to be kind to counsel here, but it's not

11  personal. They are doing their jobs. Their jobs are

12  essentially to divert you from the evidence, to misdirect you,

13  to mislead you, to put up a smoke screen because they know

14  that if you focus on the evidence and you apply the law and

15  you use your common sense, you will convict their clients. So

16  it's not personal. We still got to call them out when they do

17  it.

18         Let's see, Ms. Michaelis also said that Terry made

19  his story up based off of information he got from Jordan.

20  Where is the evidence of that? There is not a shred of

21  evidence of that. That is rank speculation unsupported by

22  anything. How did he make up all this stuff based on

23  information he got from Jordan? Not a shred of evidence of

24  that. You can only make your decision based on the evidence,

25  not based off of speculation, not based off of innuendo.

1     Ms. Michaelis also spent about half of her argument

2 talking about high-minded ideals like the Constitution and the

3 Bill of Rights. That's great as an attorney, but what

4 evidence was there of that? What evidence do you have about

5 Michael Grady's opinion one way or another of the Constitution

6 or the Bill of Rights? There is no evidence of any of that,

7 nor was there any evidence that any of the other work he did

8 was legitimate or illegitimate. You have a picture of boxes.

9 That's evidence. What's in those boxes, what was he doing

10 with it? We don't know. Maybe it was all legitimate, maybe

11 it was all illegitimate, maybe it was somewhere in between.

12 We don't know because there is no evidence. You have to make

13 your decision based on the evidence. The defense is under no

14 burden to produce evidence, but they also can't ask you to

15 make decisions that are not based on evidence. They don't get

16 it both ways. Maybe some of the work was legitimate, maybe

17 some of it wasn't, but it doesn't matter because we know that

18 the work in this case was not legitimate. You can ignore

19 three-quarters of what she said.

20     Let's talk about a couple things from Mr. Glozman's

21 statement, starting with the general notion that this is all a

22 giant Government conspiracy. Okay. Where is the evidence of

23 that? He showed you an e-mail. He left it up there, but what

24 did the Government do? The Government got the information

25 from Stan that Grady and Dillon had encouraged Terry to flee.

1   They conducted a nearly yearlong investigation.  They gathered

2   evidence.  It included encountering Dillon in September of

3   that same year after he just signed for a box full of cocaine.

4   They let him leave.  Then once there was enough evidence, the

5   Government charged these two.  The fact that these two were

6   charged is not evidence of a conspiracy against them.  There

7   is no evidence at all that the Government made up this theory.

8   The defense has pointed to no place where the witnesses could

9   have gotten these ideas other than their own experiences

10  because that's where the witnesses got these ideas.  Again,

11  this is innuendo, this is speculation.  It's something that's

12  specious, something that looks good maybe for a minute, but

13  when you dig in a little bit, you realize, oh, no, no, that is

14  not evidence.

15         Mr. Glozman also talked about those events of

16  September 7th, and the reason I wrote it down was he said,

17  well, the Government has it in for Dillon because the

18  Government didn't like that he was able to download documents.

19  Well, the Government didn't know he was downloading documents

20  until he received a box full of cocaine and we got his phones

21  out of a car he was driving and looked at the phones.  We

22  didn't have that information until September.  We couldn't

23  have not liked it before we knew about it.  And the Government

24  let him go.  He walked out the door.

25         Now, to this notion that he didn't know what was in

1  the box, he did come back the next day.  That is not evidence

2  of innocence.  That is evidence of guilt.  You heard it

3  explained that when you receive a big load of cocaine from the

4  cartel, from this guy Roque, that you are responsible for

5  $300,000 worth of cartel dope and it gets taken, you have got

6  to prove it.  He had to send the receipt back that ended up on

7  Roque's phone and get the search warrant from the bar, send it

8  back.  So it is somewhat inconsistent to say he didn't know

9  what was in the box, but he sure knew the protocol for when

10  your cartel drugs gets seized.  That all goes to his

11  knowledge, intent, lack of mistake in the charged offenses,

12  but that is pretty clear.

13      What else did Mr. Glozman talk about?  You know, both

14  counsel talked a lot about the 10th and the 11th and all these

15  out-of-court statements.  Those are not evidence.  I know it

16  might not seem that way because they were used so much through

17  this case.  The evidence is the testimony.  You can consider

18  an out-of-court statement to the extent it might affect the

19  testimony, but waving around a stack of papers and saying

20  didn't you say this before, that's not evidence.  The evidence

21  is the testimony.  Stan Williams and Derrick Terry both

22  testified.  That's the evidence.

23      As a quick analogy, I would say I would view the

24  whole defense team, everybody at that table, is lined up

25  pulling a rope all together like a giant tug-of-war team, they

1   drug and tugged and dragged at those two trying to get them to

2   change their story, trying to get something out of them, but

3   neither of them budged, and that's the evidence.  The

4   testimony, that's what you have to base your decision on.

5          So here's the biggest thing -- there are other things

6   I could say, but I only have five minutes, so I am going to

7   get to it.  This all comes down to Terry.  If you don't

8   believe Terry, the defendants are not guilty, we agree.  If

9   you do believe Terry, they are guilty, okay?  So ask yourself,

10  this whole story, this whole thing about buying information,

11  the way it helped his organization, being told to flee, all of

12  that, why would anybody make that up?  That's the first

13  question.  Well, these guys aren't his enemies.  They were

14  still his friends until August of '16 when he signed that

15  release.  He was still being represented by their preferred

16  lawyer, so it's not because he doesn't like them.  Why would

17  you make up this story?  Seems like a confusing story to make

18  up.  Like if you wanted to just frame these guys for some

19  reason, wouldn't you just say you bought or sold them drugs?

20  Like you wouldn't make up this story, so you wouldn't make

21  that up.

22         The Government is framing them?  Well, again, there

23  is no evidence of that, and there is no evidence that Terry

24  knew the Government was supposed to be framing them.  So

25  that's not a reason to lie.  The reason that somebody might

1    not tell you the truth is clear, it's because they want to

2    curry favor with the Government for a reduced sentence.

3    Here's the biggest thing you have got to take away from that

4    line of argument.  Why would he do it?  Well, he does want a

5    sentence reduction.  In order to get the sentence reduction,

6    he had to sign the proffer letter in November of '16.  It's in

7    evidence, read it.  It says he has to tell the truth about

8    everything, not just what we knew.  You heard from the stand a

9    couple little nuggets.  He told us about shooting the

10   informant as part of his cooperation, and he admitted the

11   double murder as part of his cooperation.  He told us two

12   heinous acts that we didn't already know about.

13        So to believe the defense theory that this is all a

14   big lie, you have to accept that Terry was caught, he agreed

15   to cooperate, he put all these drugs on himself, admitted to

16   all these bad acts, and told the Government about two things

17   they didn't already know, and then in the next breath he made

18   up the story, this sordid tale, of Grady and Dillon.  Does

19   that make any sense to anybody in this room?  It doesn't even

20   make sense to them, but they can't admit it because it's their

21   job.  It does not make sense.  That is not what happened.

22   Derrick Terry did not subject himself to the death penalty,

23   plead guilty to life in prison just so he can frame Michael

24   Grady and Oscar Dillon.  Why would he do it?  He didn't.  How

25   could he do it?  How do you make up a lie about the meeting

1 that happened?  He told us what happened.  He didn't know that

2 Dillon had the Pancake House in his phone.  He didn't know

3 about the call between the Pancake House and Grady.  He didn't

4 know that Grady's cell phone hit at the tower next to

5 Applebee's.  He didn't know about the gap in the phone records

6 between Grady and Dillon during the time of the meeting.  He

7 didn't know about the gap in the browser history.  How did he

8 make that up?  He couldn't make that up.  The meeting

9 happened.

10      How did he make up the content of the meeting?  Grady

11 told me I had to be gone for 18 months to two years.  Dillon

12 told me the reasons why it would be good to stand alone, let

13 the case filter out.  How did he make that up when Stan

14 Williams told you the same thing?  The two of them hadn't seen

15 each other since January of 2016.  They hadn't spoken since

16 January of 2016.  They don't get to read each other's

17 statements.  They don't get each other's Grand Jury.  Sit here

18 now and think where you were in January of 2016.  Think of

19 somebody you were with.  Could the two of you even tell the

20 same story from that time something five years ago, and more

21 importantly, could you tell the same lie about what happened

22 five years ago here in court if you had no opportunity to hear

23 from one another, if you had no opportunity to review each

24 other's statements?  Terry wouldn't lie about this.  He has no

25 reason to.  It doesn't make any sense.

1    And he couldn't lie about this.  He doesn't know what

2 we have.  He doesn't know what was on their phones.  He told

3 us about Washington.  Washington gets to Jordan gets to Terry.

4 Terry doesn't know that's all over Dillon's phone.  How could

5 he make up a story that they were looking for Washington who

6 can't be found and it's all over the phone?  He can't possibly

7 know that.  He can only tell you what he knows.  We don't tell

8 him the whole big picture.  You all get the big picture.  You

9 all get to see it, and because you have the big picture, you

10 know Terry was telling you the truth.

11    There is a lot more I would love to say, but I'm

12 almost out of time so I will leave you with this.  Downstairs

13 in the rotunda, there is a quote from Georgia Washington up in

14 the top.  Maybe you noticed it, maybe you didn't.  It says,

15 "Justice is the firmest pillar of good government."  Look at

16 it on the way out after you convict these two.  Thank you.

17    THE COURT:  Will one of the CSOs get the CSO from

18 outside so the clerk can swear you all in.  Will you swear in

19 the CSOs, madam clerk.

20    (CSOs sworn)

21    THE COURT:  Ladies and gentlemen of the jury, will

22 you go with Erica and the CSOs to your deliberation room.

23 Will the alternates, the three alternates, remain seated where

24 you are in the back there for a moment.

25    **(JURY OUT AT 3:15 P.M.)**

1      THE COURT:  Ladies and gentlemen who are the

2  alternates in this matter and who were selected as same, your

3  work is not yet finished.  When Erica comes back, I will have

4  you report back to the Jury Assembly Room on the first floor.

5  It is important that I need you to stay there for a little bit

6  as things progress.  Erica and/or one of the persons from the

7  Jury Assembly Office will report to you as things progress

8  along as to what your status is, okay?  And again, during the

9  remainder of the trial and especially now, do not discuss the

10  case amongst yourselves or with anyone else.  Do not allow

11  anyone to discuss this case in your hearing or presence.

12  Don't use any cell phones or other web-enabled devices to

13  access the internet, and especially do not access the internet

14  for the purpose of using any social media platforms that might

15  allow for a discussion of the case or seeing something about

16  the case or hearing something about the case.  The general

17  admonition boils down to don't talk about it, don't do any

18  research about it, don't derive any conclusions about it

19  because your services may be needed.  You were selected as my

20  insurance and backup folks.  I still need you for that for a

21  little while, okay?  So if you just stay seated where you are

22  right now until Erica gets back in, that will be great.

23      We will be in temporary recess.

24          **(Court Recessed at 3:18 p.m.)**

25

CERTIFICATE

I, Angela K. Daley, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 110 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 9th day of April, 2021.


_____
/S/Angela K. Daley
Angela K. Daley, CSR, RMR, FCRR, CRR
Official Court Reporter