UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S5-4:15CR00404 HEA |
| | ) | |
| MICHAEL GRADY, and | ) | |
| OSCAR DILLON, III, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S RESPONSE TO MOTION FOR JUDGMENT OF ACQUITTAL, OR
ALTERNATIVELY FOR A NEW TRIAL**

COMES NOW the United States of America, by and through Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Michael A. Reilly, Assistant United States Attorney for said District, and for its response to Motion for Judgment of Acquittal, or Alternatively for a New Trial, states as follows:

**I.    Introduction**

On May 22, 2021, Defendants filed their joint 38 page Motion for Judgment of Acquittal, or Alternatively for a New Trial (DCD3320 or "Defendants' Motion").   The jury found Defendants guilty of the following offenses:   (1) conspiracy to distribute cocaine and heroin, respectively, in violation of 21 U.S.C. § 841(a)(1) and 846; (2) obstruction of justice, acting together, in violation of 18 U.S.C. §§ 2 and 1512(c)(2); and (3) conspiracy to commit money laundering, in violation of

1

18 U.S.C. § 1956.   The jury found Defendant Grady not guilty of attempted witness tampering in violation of 18 U.S.C. § 1512(b)(1).

Defendants advance the following arguments:   (1) They are entitled to a judgment of acquittal because the witnesses were not credible and there was insufficient evidence to support each charge for which they were convicted; (2) Alternatively, they are entitled to a new trial based upon: (i) Evidence of the September 7, 2016 cocaine delivery was improperly admitted, and evidence of Dillon's acquittal improperly excluded; (ii) Evidence of Grady's 2000 conviction for conspiracy to distribute heroin was improperly admitted; (iii) There were Brady and Giglio violations because the Government withheld notes of Terry's meetings with the prosecution team; (iv) There were Brady, Giglio and Jencks violations because the Government withheld recorded statements of Terry; (v) The indictment should have been dismissed for violating the Speedy Trial Act; (vi) The indictment should have been dismissed for prosecutorial misconduct; (vii) The Court erred by giving certain jury instructions; and (viii) these cumulative errors warrant reversal.

There is no factual or legal basis to support Defendants' arguments.   The Court should reject the Defendants' attempts to mischaracterize the overwhelming strength of the evidence, established by credible witness testimony and corroborating evidence.   The United States does not concede the accuracy of Defendants' specific characterizations of the record which lack citation to the record, much less their overall assessments of witness credibility.   The jury chose to credit the witnesses, who were subject to extensive cross-examination.   To the extent Defendants' invite this Court to set aside the verdict and evaluate the credibility of witnesses in relation to the Rule 33 claims, the Court may overwhelmingly conclude that the prosecution

witnesses were credible.   DCD3320 at 17.   The Court did not err in its rulings before or during trial.   As the trial unfolded, the evidence only strengthened the basis for the Court's previous rulings regarding the admission of evidence of aspects of the events of September 7, 2016, and the highly incriminating evidence contained in Dillon's phones.   The same can be said for the admission of Grady's previous conviction for drug conspiracy pursuant to Rule 404(b).   The United States produced more than thirty installments of discovery in this complex case.   This included the early production of substantial witness statements and grand jury testimony. Thereafter, the United States produced additional information which Defendants used to impeach trial witnesses.   There is no *Brady*, *Giglio* or *Jencks* violation.   Defendants' remaining claims, including those related to violations of the Speedy Trial Act and prosecutorial misconduct, are refuted by the existing record.

## II.   Factual Background

Credible witness testimony corroborated by significant evidence established the conspiratorial associations between Grady, Dillon, Terry, Williams and Davis.   The evidence included Grady's phone records, in which he had contact with Dillon, Williams and Davis.   To the extent text messages were recovered from Dillon's cell phones and Davis' cell phone, they are consistent with and corroborative of the existence of the conspiracy and the charged offenses. Dillon's extensive web browser searches of court cases pertaining to Washington and Jordan, and related court documents downloaded on his phone further corroborate the credible witness testimony, as do the documents seized from Grady's residence on December 2, 2016.   This evidence is consistent with Terry's testimony and documents seized from his Kennerly drug house.

Dillon's presence at Williams' court hearing on February 12, 2016, is strongly corroborative of the conspiratorial associations in this case, and Grady and Dillon's intent to influence, obstruct and impede this proceeding.

Williams, Terry and Davis corroborate each other.   The circumstances of Williams' arrest, cooperation, and testimony firmly establish his credibility.   Grady's phone call to Williams on January 29, 2016, confirmed the conspiratorial relationship.   Thereafter, Williams identified Davis, which eventually led investigators to Terry's hidden location in Dallas.   Williams' testimony that Grady and Dillon told him that Terry should be gone for a year to two years is credible and firmly corroborates Terry's credible testimony.   Williams and Terry, both high-level criminals, were subject to extensive cross-examination, which only confirmed their credibility. The cumulative weight of this evidence is overwhelming.

### A.   The Conspiracy

Codefendant Derrick "D-Boy" Terry (Terry) was a large scale drug trafficker in the St. Louis area.   In 2012, Terry had recently been released from prison and was reestablishing himself as a drug dealer.   Terry's drug trafficking organization (Terry DTO) bought and sold kilogram quantities of cocaine and heroin.   Trial Transcript (Tr.) 7B at 85-87; 8 at 6-7.   Trial evidence established that Grady and Dillon joined the conspiracy in or after May 2014.   Terry explained that his organization dealt 25-30 kilograms of controlled substances per month when he started working with Grady and Dillon.   Over a period of approximately 16-18 months, Terry's drug trafficking operations increased, in part because of intelligence from Grady and Dillon.   The quantities increased to forty and eventually up to sixty kilograms per month.   Tr. 9B at 110-11.

Stanford Williams (Williams), Terry's lieutenant, testified that while he saw multiple kilos of cocaine and heroin when he was working with Terry in 2012, the quantities increased by the time Williams was arrested in January 2016. Tr. 4B at 86, 90, 103-04.   By January 2016, Williams explained that the organization distributed 20 kilograms or more of cocaine per month, and 15 kilograms or more of heroin per month.   Tr. 4B at 104.

The Terry DTO controlled the Marcus neighborhood that included the streets Highland, Northland, Kennerly and Cottage.   Tr. 7B at 83.      Eventually, the Terry DTO distributed anything from small user quantities to kilogram quantities of cocaine and heroin in the Marcus area.   Tr. 7B at 99.      Williams explained that, "You can spend $5 on Northland or you can spend $40,000 on Northland."   Tr. 4B at 89.   The Terry DTO maintained multiple sources of supply for illegal narcotics.   Tr. 4B at 99-102.   Terry benefitted by having relationships with other kilogram quantity drug dealers because he could distribute illegal drugs directly to other large scale dealers, which allowed Terry to move large quantities of illegal narcotics without holding the narcotics for too long.   In turn, other dealers also provided Terry the opportunity to purchase large quantities from them, which provided Terry and steady source of supply of narcotics for distribution.   Tr. 7B at 88-89.

Terry developed kilogram cocaine distribution relationships with other large scale drug traffickers, including Anthony (TT) Jordan and Adrian (AD) Lemons.   This relationship included selling and buying kilogram quantities of cocaine with Jordan and Lemons.   At times, Terry would sell cocaine to Lemons through Jordan.   Other times, Terry would purchase cocaine from

Lemons through Jordan. Tr. 7B at 89-91.  By way of illustration, Terry explained that these transactions involved providing Jordan "a quarter million or a half a million and tell him put it with whatever he got and spend it with A.D., which is Adrian Lemons."  Tr. 7B at 91.  In order to minimize risks, Terry and Jordan used an intermediary, Kenneth Keys (Keys), to transport money and illegal drugs.  Tr. 7B at 92-93.  Williams was skilled at tracking issues related to money and ran the organization when Terry was on house arrest.   Tr. 7B at 100; 4B at 85-86, 89-91.   Williams corroborated the scope of the Terry DTO's dealings with Jordan and Lemons, when Williams delivered $500,000 of Terry DTO currency Keys to pool money with Jordan for a cocaine purchase from Lemons.   Tr. 4B at 93-94.

The conspiratorial relationships and scope of the drug transactions between Terry, Jordan, and Lemons are corroborated by evidence of enforcement actions presented at trial.   On August 25, 2014, investigators were conducting a long-term investigation of the Lemons DTO when they attempted to conduct a traffic stop of Rainey.   Investigators later recovered a drug trafficking note from Rainey's vehicle that referenced the recipients of a multiple kilogram cocaine load that included Lemons (AD) and Jordan (TT).   Tr. 3A at 73-86; exhibits 5D-1, 5F.   In February 2015, investigators seized 20 kilograms of cocaine in southern Texas near the Mexican border, after which they arranged a controlled delivery of 20 kilograms of imitation controlled substance to 6327 Theodosia, believed to be used by the Lemons DTO.   On February 6, 2015, investigators successfully conducted the controlled delivery, executed a search warrant at 6327 Theodosia and arrested co-conspirators Clarence Miller (Miller), Juan Garza (Garza), and Luis Cantu (Cantu). Investigators recovered $570,000 at Theodosia, an auto salvage yard that Miller operated, and

6

$300,000 at a stash house at 7118 Idlewild.   Garza and Cantu were facilitators for Velazquez and maintained the stash house at 7118 Idlewild.   Title III intercepts implicated Lemons and Jose Alfredo Velazquez, the source of supply.   Tr. 3B at 10-37.   On January 13, 2016, investigators conducted a "round-up" in this case and executed multiple search warrants, including at the primary residence of Lemons at 11553 Poggemoeller.   Investigators recovered drug notes linked to Terry ("225 D-Boy") and Jordan ("108 TT"), a firearm, and $245,000 in currency.   Tr. 3B at 45-55; exhibits 21C and 21D.

### B.   The Introduction of Dillon and Grady to the Conspiracy

In May 2014, Defendant Dillon approached Terry, and eventually introduced Terry to Defendant Grady.   The Terry DTO had already adopted significant countermeasures to avoid law enforcement.   7B at 93-97; 101-02; 4B at 95-99.   At the time Dillon approached Terry, Terry was a large-scale cocaine and heroin dealer, his status in the drug trafficking community was "big," and not just anyone could approach Terry.   Tr. 7B at 102-03; 110; 8 at 4-5.   Terry knew enough about Dillon's background that he was willing to meet with Dillon.   Dillon represented to Terry that Dillon had "beat the feds."   Tr. 7B at 102-03; 110.   Dillon vouched for Grady, representing Grady as "a brother of his."   Tr. 7B at 104.   Grady and Dillon functioned as a partnership, a unit, and a team.   Tr. 7B at 109, 127; 9A at 109.   The assertions of Terry and Williams, *infra*, that Grady and Dillon functioned as and referred to each other as "partners," was corroborated by their significant phone contacts (Tr. 6B at 74-83; Exhibits 81A, 81A-1, 81C, 81F and 83), text messages

(Tr. 6B at 38; Exhibit 56B-3; 43-48; Exhibit 81H-1),[1] and a contract signed by Grady and Dillon, on behalf of Seals & Bailey Legal Services, with a third party.   On December 2, 2016, investigators executed a search warrant at Grady's residence, and seized evidence including the contract, that established that Grady and Dillon would share profits.   Thus supporting the conclusion that Grady and Dillon, are in fact, partners.   Tr. 9B at 119-22; Exhibit 76A.

Grady and Dillon prepared a Motion for Early Termination of Supervised Release for Terry to file in cause number 4:99CR 291 CEJ.   Terry was on supervised release for possession with intent to distribute cocaine base.   Terry paid Dillon and Grady $2,500 in drug proceeds to file the motions.   After the motion was denied, they eventually prepared a Motion to Reconsider, which was also denied.   Tr.  7B at 105-15; exhibits 1H1-4; 8 at 148-49.   Investigators also seized paperwork from Grady's residence corroborating Terry's assertion that Grady and Dillon prepared the motions on his behalf, which Terry filed under his name.   The documents seized at Grady's residence were identical to the documents Terry filed in court, supporting his assertion that Grady and Dillon prepared the motions for him.   Tr. 9B at 77-95; Exhibits 71A-G; 1H1-4.    Terry stated that Grady and Dillon felt like they did not do their job when his motion to terminate supervised release was denied.   They discussed why the motion was denied, including that people were making statements about Terry.   Tr. 8 at 8-10.

---

1 Jeremy Harrell (Harrell), a digital forensic examiner, explained that forensic acquisitions are never guaranteed to collect all deleted data.   Tr. 6A at 9-11.   DEA Task Force Officer Eric Lanham (TFO Lanham) testified that the data contained in Exhibit 56C ranged from June 2015 to June 2016.   Tr. 10 at 12.

After the motions were denied, Terry's relationship with Grady and Dillon transitioned to who was cooperating with law enforcement, which Terry believed was causing problems with his supervised release.   Terry explained that, "we started the dialogue of who was telling and why they was telling and who they was telling on."   Tr. 7B at 115-16; 8 at 11. Terry, Grady and Dillon talked about why Terry's motion (for early termination of supervised release) was denied, and "we moved a little bit down the line to kind of looking into people that was telling … snitches … and our relationship just developed from there"   Tr. 8 at 9.   Terry explained that, "… We worked in unison … me, Grady, and Dillon would echo each other's thoughts, ideas, and strategies in ways of defying the courts and law enforcement … to keep me clear of them .. and my operation clear of them … and in doing that, we had to weed out snitches … the dialogue changed from the motion to snitches … that was our norm."   Tr. 8 at 9-10.   Terry started reaching out to them for more information, in-depth information about other individuals that were perceived to be telling on Terry and his organization.   Tr. 7B at 116-17.   "We started a dialogue of rats, snitches, cooperators, that became the basis of our friendship … partnership, business, whatever we had." Tr. 7B at 119.   Terry made his strong views against informants known to Grady and Dillon, who never expressed any opinions to the contrary.   Tr. 9A at 98-99.

Terry did not use Grady and Dillon to distribute narcotics, but instead relied upon them to provide information about court records and arrest records of certain individuals, information that Terry could not obtain "from the average attorney's office."   Tr. 7B at 120; 8 at 9, 11-12, 19; 9A at 97-98.   Terry was paying the for "in-depth information and knowledge on things that I did not have access to through other lawyers, that I could not just walk into their office and talk to them

about … without feeling like I was under a microscope or feeling that they had a fiduciary duty …

or obligation to law enforcement to report the type of things that I would ask about which was

snitches …"  Tr. 8 at 12.   Terry explained that unlike meeting with an attorney, when he met

with Grady and Dillon, "I can just come straight out and say … I think such and such is telling …

I need you all to check into that for me."  Tr. 8 at 14.

Terry also stated that, "I am not going to ask him (an attorney) to pull up or do

research on certain individuals so I could proceed with doing some harm to them or selling them

dope or whatever that may be.  But with Grady and Dillon, it was different.  We just had a

commonality about the way we dealt with each other, and the understanding was the narrative of

whatever I asked as far as information." Tr. 9A at 105.

Terry was looking for any information that would show that anybody was cooperating with

the Government.  Not only did this allow Terry to avoid detection by law enforcement, but it

helped him maintain relationships with different drug dealers because he could obtain and share

information that other dealers could not get.  7B at 121.  This information helped Terry know,

"who's hot, and who's not," who he should deal with, and to trade information with other large-

level drug dealers, which enhanced his business relationships.  Tr. 7B at 127.  Terry explained

that Grady and Dillon's insight and knowledge "was monumental to my organization."  This

allowed Terry to "weed out snitches, give other guys information on certain people in their

organization that could have been telling or caught cases and hadn't disclosed it to them … it kept

me in good standings with certain people."  Tr. 8 at 111.  Terry further explained that the

information allowed him "… to continue to grow my organization in the way that I seen fit without

10

coming under the scope of the law." Tr. 8 at 112-13.   Although court paperwork did not say exactly who was cooperating, Grady and Dillon provided their opinions and analysis of their observations of court proceedings.   Tr. 9A at 103.

Terry discussed a number names with Grady and Dillon, including:      Jerome (NuNu) Lewis, Antonio Washington, Anthony Jordan, Anthony McDonald, Marian Mwanza, Anthony Templeton, Dominic Irons, Don McGee and BooBoo/Shit Shit.   Tr. 8 at 15; 9A at 27, 39-40; 9B at 129.   By way of illustration, Grady and Dillon provided Terry their opinion that Lewis, who was in custody, was cooperating based upon their assessment of the court proceedings.   Terry, who had prior kilogram cocaine dealings with Lewis, was concerned about Lewis's potential cooperation.   Therefore, Terry bought Lewis's child's mother a car and provided her with money. Terry's intention was to send a message to Lewis that he was there to support Lewis, or it could go the other way, that Lewis should be quiet because his family was in danger.   Tr. 7B at 122-26; 8 at 20-21; 9A at 37-39.

Terry's assertions that he communicated with Grady and Dillon regarding several of the above named individuals were corroborated by evidence seized in the case.   However, sometimes when Grady and Dillon provided Terry with information, they did not provide paperwork.   Tr. 9B at 4-5.   Terry's testimony that he discussed Lewis with Grady and Dillon is corroborated by evidence seized from Grady's residence and from one of Dillon's phones.   Grady was in possession of numerous court and law enforcement documents related to Lewis' federal drug conspiracy case and drug trafficking activities of Lewis and his associates, including one of his co-defendants, Morshay Andrews (Andrews).   Tr. 9B at 121-29; Exhibits 76D-1-8.   Defendant

Dillon also downloaded documents related to continuances of Andrews' sentencing hearing.   Tr. 6B at 57; 56C-5, 56C-21.   DEA Task Force Officer Lanham (TFO Lanham) testified that continuances of sentencing hearings may be sensitive matters because such continuances may be considered a sign of cooperation.   Tr. 9B at 127.

Terry's testimony that he discussed the circumstances of Anthony Templeton, another drug dealer, with Grady and Dillon was corroborated by the recovery of a note referencing Templeton that was seized from Grady's residence on December 2, 2016.   Tr. 8 at 21-23; Tr. 9B at 121; Exhibit 76C.

### C.   The Investigation of Anthony Jordan and Antonio Washington

The arrest of Antonio Washington (Washington) generated concerns for Terry, because Washington was a close associate of Jordan.   Terry and Jordan had conspired and acted together in large scale drug dealings and murders.   Terry was concerned about what Jordan may have told Washington about the illegal acts that Terry and Jordan had committed together.   This created the prospect that if Washington were to cooperate, he could implicate Jordan and Terry.   Terry explained that if Washington told on Jordan, "then that puts me in the predicament to either try to kill Jordan or both of them …"   Tr. 7B at 128-30; 8 at 23-39; 9A at 92.   Jordan provided Terry with information about Washington's arrest and charges.   Terry, in turn, enlisted Grady and Dillon to obtain information about whether Washington was cooperating.   During this time period, Terry and Jordan continued to engage in large scale drug dealings.   Washington was initially charged in state court, but released from on bond in that case.   Washington was later charged federally and detained.   Grady and Dillon assessed that Washington was cooperating

because they could not determine where he was being detained while his federal case was pending. Defendant Grady told Terry that "… the feds got him and he's being hidden out to start cooperating."  Tr. 8 at 29; 7B at 133.  Grady also expressed his concerns that Washington had gotten rid of his lawyer, Scott Rosenblum, whom Jordan retained for Washington.   Dillon, who was present for this assessment, did not disagree with his business partner, Grady.    Tr. 8 at 26, 31-33; 7B at 128.

In August 2015, Terry's concerns were heightened when investigators executed federal search warrants at properties controlled by Jordan.   Terry arranged a meeting that included Grady, Dillon, Jordan, and Terry.   Grady and Dillon told Jordan that Washington was "telling" and "had been riding around with … the feds pointing out TT's buildings, places that didn't have his name, but probably held things that … weren't legal …" Tr. 8 at 34-36.    Grady, Dillon and Terry advised Jordan that although he was not arrested the "feds" would be back, and he needed to "clean up."  Tr. 8 at 36.   Grady and Dillon also expressed negative opinions about Jordan's attorney, Rosenblum.   Tr. 8 at 37-39; 9A at 105-07.   Following the meeting, Jordan was indicted and arrested in late August 2015.   Terry continued to meet with Grady and Dillon, and paid them an additional $5,000 in currency that was drug proceeds to keep him abreast of what was happening in court.   Tr. 8 at 41-42-45.   Following Jordan's arrest, Terry after discussions with Grady and Dillon, Terry provided $10,000 in currency to Dillon to hire Beau Brindley, an attorney from Chicago, IL.   Tr. 8 at 42, 61-64.   Terry continued to deal cocaine and heroin on a large scale throughout 2015 and in January 2016.   Tr. 8 at 60, 70-71.

Terry continued to have meetings with Grady and Dillon with the hope that he could help "lessen the blow," upon his associate Jordan.   Grady and Dillon met with Terry and provided him information about Don McGee and Dominic Irons, who like Washington, were associated with Jordan's case.   Tr. 8 at 49-58; 9A at 102.   Terry's account of events corroborated by documents seized from his property at 4629 Kennerly on January 29, 2016, and from text messages between Grady and Dillon referencing Irons and McGee obtained from Dillon's phone following Dillon's arrest at a ten kilogram cocaine delivery on September 7, 2016, *infra*.   Terry explained that with assistance from Dillon and Grady, he concluded that Washington was cooperating, McGee was not cooperating, and that it was too early to tell if Irons was cooperating.   Tr. 8 at 67.

On January 29, 2016, investigators executed a search warrant at 4629 Kennerly, a drug house controlled by the Terry DTO.   Investigators did not locate Terry, but recovered paperwork provided to Terry by Dillon and Grady and related to Anthony Jordan, Dominic Irons, Don McGee, federal statutes for 18 U.S.C. § 924(c) and 111, and an article related to Attorney Scott Rosenblum. Tr. 4A at 51-65; Exhibits 23A-I.

Investigators further corroborated Terry's account of these events through evidence from two of Dillon's phones that were seized on September 7, 2016, and during the search of Grady's residence on December 7, 2016.   Tr. 6B at 36-67; Exhibits 56B-56C-31; Tr. 9B at 86-131; Exhibits 72-76D-9. One of Dillon's phones contained text messages between Dillon (636)675-6833 and Grady (314)766-2083 that included the following:   (1) August 29, 2015,   Dillon to Grady:   "Anthony jordan"; (2) September 4, 2015 at 1:53 pm (converted time),   Grady to Dillon: "Text me the names"; (3) September 4, 2015 at 2:01 pm (converted time),   Dillon to Grady:

14

"Dominic irons …and Don McGhee"; and (4) October 3, 2015, Grady to Dillon:  "Headed 2 Kennerly".   Tr. 6B at 43-48; Exhibit 56G-1; 81H-1.   Each of these text messages is highly corroborative of Terry's testimony.   Moreover, the vague nature of the text messages, including "Headed 2 Kennerly," is indicative of the knowledge and sophistication of Grady and Dillon.   As Williams, an experienced drug dealer explained, text messages are deliberately vague ("I'm down the way," referencing Northland).   Tr. 4B at 95-96.   There is no evidence that Grady or Dillon had a connection to Kennerly, other than Terry.   It is reasonable to infer the Kennerly text message references a known meeting place with Terry, particularly in view of the fact that case related documents were seized from the residence.

Consistent with Dillon's interest in the case on Terry's behalf, Dillon's web browser from one of Dillon's phones seized on September 7, 2016 contained ample evidence of his extensive and continuous searches of Washington's cases, before and after Jordan was charged.   The existence of these searches further corroborates Terry.   The searches included queries of Washington's case on July 15, 2015 and August 5, 2015, prior to the time search warrants were executed on Jordan's property and prior to the time Jordan was charged.   Tr. 10 at 12-15; Exhibit 56C-27.   The timing of these queries firmly corroborates Terry's assertions that he had discussed his concerns about Washington and Jordan to Grady and Dillon prior to the time search warrants were executed on Jordan's property.   Dillon also conducted numerous and continuous queries of Washington's state case, including extensive queries on January 12, 2016, the day before the "roundup" targeting Terry and others. Tr. 10 at 15-16, 18-19; Exhibits 56C-28; 56C-30.   During the same time period on January 12, 2016, in which Dillon was making extensive queries of

15

Washington's state case, he had a long phone conversation with Grady.   Tr. 10 at 19-20; Exhibits 56C-30 and 81C.   On January 13, 2016, the date of the "roundup," Dillon queried both the Jordan and Washington cases.   Tr. 10 at 20-22.   The forensic search of one of Dillon's phones also revealed that Dillon also downloaded other documents related to Washington's federal case (Exhibit 56C-6 and 56C-), Jordan's case (56C-8, 9, 11-18), and Irons' case (56C-10).   Tr. 6B at 49-55.

Terry is further corroborated by the commonality of documents seized from Terry's Kennerly residence, Dillon's phone, and Grady's residence, including the following:   (1) Jordan's indictment (Exhibits 23A, 56C-8 and 72A); (2) Jordan minute entry from September 3, 2015 (Exhibits 23D, 56C-9, and 72C); (3) Jordan discovery letter of September 23, 2015, (Exhibits 23H, 56C-12, and 72D); and (4) An article pertaining to Scott Rosenblum (23I, 56C-27, p. 6 (browser search of same article), and 72H).

### D.   January 13, 2016: the Indictment "Round Up," the Continuing Drug Distribution Conspiracy, Additional Payments, and Terry's Flight and Obstruction of Justice

On January 13, 2016, the date of the "round up," Terry met with Dillon and Grady to discuss the indictment.   During the mid-afternoon, Terry met Dillon at the Golden Pancake House Restaurant at 10216 Natural Bridge Road, and then Dillon and Terry proceeded to meet with Grady at a nearby Applebee's Restaurant at 9090 St. Charles Rock Road.[2]   Tr. 8 at 72-75; 6B at 41-44.

---

2  These two restaurants are approximately 1.8 miles apart.   Tr. 6B at 41.   Terry's account of the location is corroborated by Grady's historic cell cite activation records for (314)766-2083 that establish that Grady's device, within the general time frame of the meeting, activated at a cell

Grady and Dillon were in possession of the indictment and discussed, among other things, that Terry was charged in the cocaine distribution conspiracy involving five kilograms or more.   Tr. 8 at 74-87; Exhibit 1B; 9B at 4-6.   Corroborating Terry's account, as set forth above, Dillon accessed the court file via his web browser on January 13, 2016 at 11:51 am to 12:11 pm, and a copy of the First Superseding Indictment was recovered from Grady's residence.   Tr. 10 at 20-21, Exhibit 56C-31; Tr. 9B at 110-11, Exhibit 73B.   Dillon's web browser also contained evidence that he had been examining Washington's federal case (4:15 CR 39) during the early morning of January 13, 2016.   Tr. 10 at 20-21; Exhibit 56C-31.

Grady explained to Terry that he was only charged with conspiracy, and they could fight it.   Going into greater detail, Dillon and Grady stated words to the effect that it would be to Terry's advantage if he went somewhere far away, and was gone for 18 months to 2 years.   Tr. 8 at 71-77.   Grady explained that Terry should "stay away for 18 months to 2 years and kind of let the courts do their thing."   Tr. 8 at 77.   Grady and Dillon made similar statements to Williams, including that Terry would be better to stand trial alone.   Tr. 4B at 110-13; 5B at 64, 89.   Grady

tower sector that includes the location of the Applebee's Restaurant.   Tr. 4B at 46; Exhibit 82 p. 10.   One of Dillon's cell phone's contained contact information for the Golden Pancake House and a phone number ((314)427-0420).   Tr. 6B 40-42, 71-75; Exhibits 56C-1B, 81A, 85, 85A. During the afternoon of January 13, 2016, there was phone contact between Dillon's device (636)675-6833 and Grady's device, and (314)427-0420 )(the Golden Pancake House) and Grady's device.   Consistent with Terry's account of the events, there was also a two and a half hour gap in the extensive phone communications between Dillon and Grady from 3:07 pm to 5:37 pm, which was consistent with the time frame of their in person meeting with Terry at Applebee's. Tr. 6B at 70-75; Exhibit 81A, Tab 1, p. 23, 85A.

explained to Terry that Terry's absence for 18 months to 2 years would allow the courts to do their

thing, let people plead out, and reduce the number of potential cooperating witnesses against Terry.

Tr. 8 at 74-87; 9B at 5-8.

During the meeting, Grady also told Terry to get rid of his phones.   Tr. 8 at 78; 9B at 8.

Even though Terry decided to follow Grady and Dillon's advice to leave town and be gone, he

planned to have Williams continue Terry's drug distribution operation while he was out of town.

Terry told Grady and Dillon that Williams would be running his operation and that they could see

Williams while he (Terry) was out of town.   Tr. 8 at 87-88; 110; 9B at 9.   Terry decided to

abscond based upon the advice of Grady and Dillon.   Tr. 8 at 110; 9B at 6-8.

Before Terry left the meeting at Applebee's on January 13, 2016, he told Grady and Dillon

that he would cause another payment of $15,000 to $30,000 to be made to them to pay Beau

Brindley, the attorney from Chicago.   Tr. 8 at 87-92.   Later that same day, Terry decided to pay

$50,000 in United States currency to Grady to be delivered to Brindley.   Terry delivered $50,000

that was drug proceeds to Grady, with the intention of delivering the money for the attorney fees

before law enforcement could seized the money.   As an experienced drug dealer, Terry knew that

he was indicted, had a warrant for his arrest, and that law enforcement officers would seize his

United States currency.   The currency was not marked or identified with Terry, and Terry believed

that if law enforcement officers encountered Grady with the currency, that Grady would not

divulge the source of the currency.  Tr. 8 at 92-98; 9B at 9-13.   Interspersed with Dillon and

Grady's extensive phone contact on January 13, 2016, was Grady's phone contact with Brindley

during the evening hours, often in close proximity with Grady's contact with Dillon.   Tr. 9B at

135-39; Tr. 10 at 56-57; Exhibit 81A, pp. 23-24.   Consistent with having received payment, Brindley later entered his appearance on Terry's behalf, following Terry's arrest.   Tr. 10 at 7-9, 93-94; Exhibits 1D-1-3.

At the turnover meeting at Gent's nightclub on January 13, 2016, Williams and Terry both intended that the DTO would continue to function.   Tr. 8 at 91, 97-100; 4B at 118-21.   Terry told Williams that Grady directed him to run.   Tr. 5B at 36, 92-93.   This did not come as a surprise to Williams, based upon his earlier conversations with Grady and Dillon.   Tr. 5B at 36, 92-93. Terry turned over the DTO to Williams and ultimately fled to Dallas, TX, where he remained until law enforcement located him on July 27, 2016.   In the meantime, Williams was to collect substantial debts exceeding $300,000 that were owed to the organization and to continue to distribute narcotics.   Williams continued to distribute heroin and cocaine after Terry fled, and but for his arrest on January 29, 2016, Williams would have continued to distribute narcotics for the Terry organization.   Tr. 4B at 118-21; 145; 5B at 39, 98.

In the period between Terry's flight and Williams' arrest, Williams communicated with Terry through Charda Davis (Davis).   Tr. 5A at 95.   After Terry fled, he successfully directed Williams, through Davis, to pay an additional $10,000 in drug proceeds to Dillon and Grady in January 2016 with the intent that the currency would also be delivered to Beau Brindley.   Davis testified that Terry told her to tell Stan (Williams) to give Grady $10,000.   Williams confirmed that he delivered the money to Grady, and that Dillon was present.   Davis also explained that she met Grady through Terry and later met Dillon with Grady at a restaurant.   Tr. 10 at 101-02; Tr. 4B at 128-31; 5B at 73-77, 96-99; 9B at 40-41.

19

### E.   Investigation on January 29, 2016 and the Identification of Grady and Dillon

Following the failed arrest attempt of Terry during the January 13 "round up" operations, investigators observed that the Terry DTO continued to function.   On January 29, 2016, investigators conducted a series of search warrants targeting the Terry DTO.   Among other things, investigators arrested Williams and Richard Scott with distribution quantities of heroin and cocaine.   Williams began to cooperate.   Tr. 3B at 55-70; 4B at 131-36; 6A at 36-39; 53-65. While agents were speaking with Williams at the DEA office on January 13, 2016, Grady called one of Williams' phones at 11:37 am.   Tr. 4B at 139-40; 6A at 39, 59; 6B at 77; Exhibit 81D, Tab 4.

Williams began to provide information about Terry's drug distribution operations. Williams also told investigators that Grady and Dillon told Terry to leave following his indictment. Tr. 4B at 135-36.   Williams eventually testified that when he met with Grady and Dillon following the indictment, Grady stated words to the effect that Terry should go on the run for a year to two years, and Dillon explained that Terry would be better off fighting the case by himself.   Tr. 4B at 110-13; 5A at 104; 5B at 89, 92-93, 96.   When Grady and Dillon were with Williams, Grady was looking for Terry.   Tr. 4B at 114.   Williams had not met Dillon or Grady prior to the date of the "round up," when they were looking for Terry.   Tr. 5A at 72-74.   Williams' only association with Grady was through Terry, specifically, in relation to Grady providing information about Terry. Tr. 5B at 100-01.   As set forth above, Grady and Dillon met with Terry later in the afternoon at Applebee's.   Later that night, during the meeting at Gents, Terry told Williams to take over the

20

business because Terry was going on the run.   Williams explained that Terry told him that Grady told Terry to run.   Tr. 5B 36, 92-93.

Williams provided information that investigators were able to corroborate, including identifying Terry's Clayton Road apartment, and Terry's girlfriend, Charda Davis.   Tr. 4B at 141-45; 127-31; 6A at 41-47; 59-65.   During the execution of a search warrant of the apartment, investigators located a traffic ticket for a seatbelt violation in Terry's name.   Through further investigation, they learned that Davis was driving the vehicle at the time of the violation, thereby corroborating Williams.   Tr. 6A at 63-64.   The identification of Davis eventually led to Terry's arrest when investigators tracked her to Terry's apartment in Dallas by court authorized precision location information.   Tr. 6A at 39-47.

Williams' account of his contact with Dillon and Grady was further corroborated by Defendant Dillon's presence at Williams' court appearance on February 12, 2016, at which time Dillon approached Williams' attorney.   TFO Gaddy photographed Dillon speaking with the attorney, and explained this was a sensitive point in the proceedings due to Williams' potential cooperation.   Tr. 6B at 42-43, 65-70; Exhibits 29 B-1-2; 4B at 146-48; 5A at 7-12, 14; 5B at 84-85.   Historic cell cite records for Grady's phone also placed the phone within a cell tower sector that included Williams residence on Cottage during relevant times on January 13 and January 15, 2016 on dates consistent with those described by Williams.   Tr. 4B at 44-48; 4B at 121-25.

Williams also testified that Grady told Williams that Jordan would not sign over his discovery to Grady, which led Grady to be suspicious that Jordan "might tell."   5B at 104-05. Williams' assertion that Grady told Williams about Grady's attempts to gain access to Jordan's

discovery is corroborated.   On August 31, 2015, Grady visited Jordan while Jordan was confined. Exhibits 18 and 107.   Tr. 9B at 63.   On December 2, 2016, during the search of Grady's residence, investigators seized an unexecuted authorization clause seeking access to Jordan's discovery by "Seals and Bailey Legal Services," and Michael Grady.   Tr. 9B at 92-94; Exhibit 72J.   This evidence and the surrounding circumstances corroborate Williams, and further establish his reliability.

After extensive law enforcement investigation and a six month delay in the proceedings, Terry was arrested.   The evidence at trial established this was a major, long-term drug trafficking investigation of top level, cartel supplied, violent drug traffickers in the St. Louis area.   Terry was a top level violent drug trafficker.   In April 2016, Terry was charged with additional charges, including homicide.   Locating Terry was a top investigative priority in this long term, complex, and violent drug trafficking investigation.   His disappearance and flight caused law enforcement to expend substantial resources to locate him and delayed his arrest, prosecution, and sentencing. Tr. 6A at 44, 71.

The prosecution evidence is corroborated by extensive phone contact between Grady, Williams and Davis, and with significant contact between Grady and Dillon in general, and during the time periods in which Grady contacts Williams and Davis.   These contacts are highly relevant because they prove Grady and Dillon's associations with Terry's coconspirators during a key period of the conspiracy and the other charged offenses.   Tr. 6B at 69-85; Exhibits 81A-H; Tr. 5B at 100.   Exhibit 81-F, lines 116-120, is illustrative of Grady's contact with Dillon within seconds

of when Grady has contact with Williams and Davis.   In each instance on January 18, 2016, Grady called Dillon within seconds of having phone contact with Williams and Davis.   Tr. 6B at 80-81.

Further evidence of Grady's involvement in the conspiracy was his effort to update Davis, and presumably Terry, on Williams' arrest on January 29, 2016.   A search of one of Davis's cell phones seized in Dallas on July 26, 2016, revealed that during the afternoon of January 29, 2016, Grady texted Davis as follows:   "The locked up stan 2day from down on cottage, do".   Tr. 9B at 42-43; Exhibit 81B.   Grady also had extensive phone contact with Dillon throughout the day on January 29, 2016, including during the time period after Grady called Williams at 11:37 am. Tr. 6B at 83-85; Exhibit 81F.   Davis, Williams, and Terry's account of the events is further corroborated by text messages between Dillon (636)730-8834 and Grady (314)766-2083 following the arrest of Terry and Davis in Dallas in late July 2016.   On August 16, 2016, Dillon texted Grady:   (1) "Chanda Davis"; and (2) "Her name is Charda Davis.   She's going to need a good attorney too".   Tr. 6B 38-39; Exhibits 56B-3; 81G.

## III.   The Evidence Was More Than Sufficient to Sustain Convictions.

The evidence recounted above was not only sufficient to sustain the convictions, but was overwhelming.   There is no basis to grant a judgment of acquittal, and this Court should reject Defendants' misplaced arguments which are untethered to the existing record or the law. DCD3320 at 3-16.   Under Rule 29, the district court, on the defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a), *United States v. Stacks*, 821 F.3d 1038, 1043 (8th Cir. 2016).   "A district court must consider a motion for judgment of acquittal with very limited latitude and must neither

assess witnesses' credibility nor weigh evidence." *Stacks*, 821 F.3d at 1043, *quoting* United *States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007).   A guilty verdict is overturned only if, viewing the evidence most favorably to the prosecution, no rational trier of fact could have found the essential elements the crime beyond a reasonable doubt.  *Id.*, *citing United States v. Sanchez*, 789 F.3d 827, 834 (8th Cir. 2015); *United States v. Lewis*, 976 F.3d 787, 795 (8th Cir. 2020); *United States v. Bradshaw*, 955 F.3d 699, 704-05 (8th Cir. 2020).   The Eighth Circuit views "the evidence in the light most favorable to the guilty verdict, and grant[s] all reasonable inferences that are supported by the evidence." *Id.*, *citing United States v. Dean*, 810 F.3d 521, 527 (8th Cir. 2015). "If evidence consistent with guilt exists, we will not reverse simply because the facts and the circumstances may also be consistent with some innocent explanation. Even where the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." *United States v. Griffith*, 786 F.3d 1098, 1102 (8th Cir. 2015), cert. denied *442 —— U.S. ——, 137 S.Ct. 70, 196 L.Ed.2d 66 (2016) (citation and quotation omitted); *United States v. Huyck*, 849 F.3d 432, 441–42 (8th Cir. 2017).

As a preliminary matter, Defendants impermissibly ask this Court to assess witness credibility, which is beyond the scope of the Rule 29 motion for judgment of acquittal.   DCD 3320 at 5.   In rejecting similar challenges where convicted drug conspirators argued cooperating witnesses lacked credibility because they sought reductions in their sentences, the Eighth Circuit has held that it is not the court's role to weigh the evidence, or the credibility of the witnesses. *Lewis*, 976 F.3d at 794.   This court has "repeatedly upheld jury verdicts based solely on the testimony of conspirators and cooperating witnesses, noting it is within the province of the jury to

24

make credibility assessments." *Id.*, *quoting United States v. Hamilton*, 929 F.3d 943, 946 (8th Cir. 2019) (rejecting defendant's attack on witnesses' credibility even though they testified in exchange for plea deals or sentence reductions and had previously lied to government officials).

Moreover, to claim this was a case of "inferences based on conjecture and speculation" simply mischaracterizes the direct testimonial evidence, and disregards the substantial corroborating evidence in this case.   DCD3320 at 4.   Contrary to Defendants' assertions, the jury heard direct testimony establishing a basis to find each element of each charged offense.   A review of the record establishes not only evidence to support each element of each offense, but that there was overwhelming evidence.

### A.   The Evidence Supports The Conspiracy Convictions.

Defendants' argument that there was insufficient evidence to support the jury's verdict for the conspiracy count is without merit.   DCD3320 at 5-11.   Defendant's arguments asserting the "buyer-seller" doctrine are meritless for the reasons set forth below.   *Id.*, at 7.

There was a large scale cocaine and heroin distribution conspiracy, the Terry DTO.   The evidence established that Dillon and Grady, who were business partners, knew that Terry was a high level drug dealer.   As set for above, Grady and Dillon knew of Terry's background as a drug dealer because, among other things, they assisted him in attempting to get early supervised release on a federal drug distribution case.   Terry explained that after the motion failed, his relationship with Grady and Dillon transitioned to identifying informants and avoiding detection.   The facts adduced at trial, *supra*, established that Grady and Dillon voluntarily and intentionally participated in the plan with the intent of furthering Terry's drug trafficking activities by helping Terry identify

25

informants and avoid law enforcement detection.   On January 13, 2016, Grady, in Dillon's presence, also furthered the conspiracy by advising Terry to drop his phones.   Grady's advice is further evidence of Grady and Dillon's intent to further the activities of the conspiracy by helping Terry avoid detection.   Avoiding detection had the added benefit of allowing Terry to turn the conspiracy over to Williams, thus allowing the conspiracy to collect debts and to continue to distribute cocaine and heroin.   It does not matter that Grady and Dillon performed an ancillary function and did not touch the narcotics in this case, they acted with an intent to further the conspiracy, which is sufficient under the law set forth below.   The jury was properly instructed on the elements of conspiracy and there was ample evidence to support the verdict.   DCD3234 instructions 28-32 at 34-41.

To establish that a defendant conspired to distribute drugs, the government must prove: (1) that there was a conspiracy; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy. *United States v. Conway*, 754 F.3d 580, 587 (8th Cir. 2014) (citations omitted). While a defendant's mere presence, coupled with the knowledge, is insufficient to establish membership in a conspiracy, "association or acquaintance among the defendants supports an inference of conspiracy." *United States v. Jackson*, 345 F.3d 638, 648 (8th Cir. 2003) (citing *United States v. Sparks*, 949 F.2d 1023, 1027 (8th Cir. 1991)).   A defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy. *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006). A single conspiracy may exist "even if the participants and their activities change over time, and even if the participants are unaware of, or uninvolved in, some of

26

the transactions." *United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011) (citations and internal quotations omitted). So long as a person understands the unlawful nature of the plan and voluntarily and intentionally joins in, they may be convicted of a conspiracy offense. *United States v. Haren*, 743 Fed. App'x 711, 714 (8th Cir. 2018).

Here, in addition to the testimony of coconspirators, the Government introduced phone records, physical evidence, and other circumstantial evidence implicating Grady and Dillon.   The evidence unequivocally established that Grady and Dillon were business "partners."   Grady had phone contact with Williams and Davis.   Grady's contact included calling Williams while he was at the DEA office and sending a text message to Davis on January 29, 2016, in which he advised Davis of Williams' arrest.   Investigators seized corroborating physical evidence from Grady's residence, including files related to Terry, Jordan, Lewis and others.   Dillon had close phone contact with his conspirator Grady during periods in which Grady was communicating with Williams and Davis.

Dillon's phones contained physical evidence that corroborated his involvement in the charged offenses.   Dillon conducted extensive web browser searches and downloaded documents consistent with Terry's testimony, including queries and/or documents related to Washington, Jordan, and Lewis' co-defendant, Morshay Andrews.   Dillon and Grady exchanged text messages related to "Kennerly," Jordan, Irons, McGee and Davis.   Dillon queried relevant court files on and around January 13, 2016.   Dillon's otherwise unexplained presence at Williams' court appearance on February 12, 2016 further corroborates Terry's account of their relationship.   In August 2016, following Davis' arrest, Dillon texted Grady about obtaining a lawyer for Davis.

27

The documents seized from Grady's residence, and forensic examinations of Dillon's and Davis' phones constitute physical evidence.   The documents and downloads are consistent with documents seized from Terry's Kennerly drug house, and corroborate Terry's account of events. This is in addition to Grady's incriminating phone records, which tie Grady and Dillon to Williams and Davis, Terry's conspirators.   *See Lewis*, 976 F.3d at 794 (The government corroborated the testimony with physical evidence … The government introduced records of phone calls and text messages to Lewis from coconspirators); *citing United States v. Mayfield*, 909 F.3d 956, 963 (8th Cir. 2018) (holding evidence of conspiracy to distribute meth was "more than sufficient" because circumstantial evidence, including phone records and other physical evidence corroborated cooperating witnesses' testimony); *United States v. Tillman*, 765 F.3d 831, 834 (8th Cir. 2014) (holding evidence of conspiracy to distribute meth was sufficient because phone records corroborated cooperating witnesses' testimony).

The Eighth Circuit has squarely held that the defendant "need not have actually manufactured, harvested, or distributed the [drugs] to be a member of the [drug] conspiracy." *See United States v. Polk*, 715 F.3d 238, 246 (8th Cir. 2013). In *Polk*, the defendant, who procured houses for the growing of marijuana, argued that he could not be guilty of conspiracy because there was no evidence that he participated in manufacturing, harvesting, or distributing the marijuana. *Id.* The court rejected this argument, noting that "'[a] drug conspiracy may involve ancillary functions (*e.g.*, accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator.'" *Id.* (quoting *United States v. Garcia-Torres*, 280 F.3d 1, 4 (1st Cir. 2002). The *Polk* court went on

28

to explain that "'a variety of conduct, apart from selling [drugs], can constitute participation in a conspiracy sufficient to sustain a conviction.'" *Id.* (quoting *United States v. Burgos*, 94 F.3d 849, 859 (4th Cir. 1996). *See also United States v. Cervantes*, 646 F.3d 1054, 1059 (8th Cir. 2011) (upholding conspiracy conviction where defendant leased property for marijuana production and made property improvements that assisted in drug production).

Other decisions in the Eighth Circuit also support the argument that a conspiracy can be proven even where the defendant was not directly involved in the hands-on sale of narcotics. "In order to be a conspirator in a drug distribution operation, it is not necessary to physically handle drugs." *United States v. Jiminez*, 487 F.3d 1140, 1148 (8th Cir. 2007) (upholding drug conspiracy conviction of courier even where he did not handle drugs himself); *United States v. Trejo*, 831 F.3d 1090, 1094 (8th Cir. 2016) (holding that government need not prove defendant possessed drugs to prove a conspiracy to distribute drugs). The possession or distribution of drugs is not a requirement to prove participation in a drug conspiracy, as is the case for Dillon and Grady. *Trejo*, 831 F.3d at 1094.

The Eighth Circuit has upheld drug conspiracy convictions for individuals participating in a range of roles to further the conspiracy, such as courier, enforcer, and lookout. *See United States v. Chavez-Alvarez*, 594 F.3d 1062, 1066-68 (8th Cir. 2010) (upholding drug conspiracy conviction of drug couriers); *United States v. Clay*, 579 F.3d 919, 931 (8th Cir. 2009) (upholding conspiracy conviction of enforcer); *United States v. Alexander*, 408 F.3d 1003, 1009 (8th Cir. 2005) (upholding drug conspiracy conviction of lookout). The Eighth Circuit has also upheld drug conspiracy convictions for more nontraditional roles in a drug conspiracy. *See United States v.*

*Magallon*, 984 F.3d 1263, 1288-89 (8th Cir. 2021) (upholding conspiracy conviction where defendant allowed his bank account to be used to receive drug proceeds and transported drug dealer to deliver drugs); *United States v. Gelinas*, 299 F.3d 978, 979 (8th Cir. 2002) (explaining that where defendant organized conspiracy by arranging flow of drugs and issuing instructions to avoid detection, conspiracy conviction was proper).

Once the conspiracy is proved, however, "even slight evidence connecting [Nunn] to the conspiracy would be sufficient to support [her] conviction." *United States v. Nunn*, 940 F.2d 1128, 1132 (8th Cir. 1991), *quoting United Sates v. Foote*, 898 F.2d 659, 663 (8th Cir. 1990). *Nunn* held that evidence was sufficient to support a conspiracy conviction when defendant made calls to collect money from drug sales they did not personally conduct, and when defendant provided transportation to coconspirators to conduct transactions. *Id*.

Outside the Eighth Circuit, courts have been explicit that a person may be convicted of conspiracy where that person assists the conspiracy by helping it avoid detection. *See United States v. Harris*, 908 F.2d 728, 736 (11th Cir. 1990) (upholding conspiracy conviction for defendant who participated in radio surveillance of law enforcement communications to help protect conspiracy from detection); *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (holding that defendant's role as a provider of peripheral services — the provision of cell phones designed to elude law enforcement detection — did not foreclose conviction since goal of drug conspiracy can be to avoid detection). *See also United States v. Cannady*, 924 F.3d 94, 103 (4th Cir. 2019) (holding that helping conspiracy avoid detection, among other acts, constituted sufficient evidence to support conviction); *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006) (holding that evidence was

30

sufficient to uphold drug conspiracy charges where one of defendant's acts was helping conspiracy avoid detection).

This same standard also applies to corrupt law enforcement officers; courts have upheld convictions of corrupt law enforcement officials who assist the conspiracy by helping it evade detection. *United States v. Rosado-Perez*, 605 F.3d 48, 53-54 (1st Cir. 2010) (affirming drug conspiracy conviction of police officer who provided help to the conspiracy by disclosing confidential police information to help conspiracy avoid detection); *United States v. Davenport*, No. 93-1216, slip op. at 14 (5th Cir. 1994) (upholding drug conspiracy conviction of law enforcement officers who warned conspiracy of impending law enforcement raid and otherwise assisted conspiracy); *United States v. Ruiz*, 905 F.2d 499, 506 (1st Cir. 1990) (affirming conviction for drug conspiracy of police officer who warned traffickers of law enforcement agent's identities, among other acts). *See also United States v. Sedoma*, No. 99-10332-MLW, 2015 WL 1132943, at *1 (D. Mass. Mar. 11, 2015) (affirming conspiracy conviction of police officer who repeatedly obtained confidential police information and relayed it to coconspirators to help the drug conspiracy evade detection), *reversed on other grounds*, 332 F.3d 20 (1st Cir. 2003); *Moseley v. United States*, No. 93-4029, slip op. at 1 (6th Cir. 1994) (denying defendant's claim that plea lacked factual basis where defendant admitted to relaying confidential police information to other members of the charged conspiracy).

Courts have also been clear that acting as a lookout is sufficient to convict on conspiracy charges. *See United States v. Pitre*, 960 F.3d 1112, 1121-22 (2d Cir. 1992) (affirming conviction of defendant where evidence revealed that defendant was acting as a lookout); *United States v.*

31

*Dean*, 59 F.3d 1479, 1487 (5th Cir. 1995) (affirming conviction of defendant where evidence supported contention that defendant was acting as a lookout); *United States v. Rodriguez*, 702 F.2d 38, 43 (2d Cir. 1983) (affirming conviction of defendant where evidence supported contention that defendant was acting as a lookout).

By analogy, Defendants may be akin to extremely sophisticated lookouts, or other persons, including corrupt law enforcement officers, who have provided information, including the identity of informants, to the conspirators with the goal of assisting the conspirators in avoiding detection.

Defendants' advance the argument that the relationship between Terry and Grady and Dillon is a mere "buyer-seller" relationship.   DCD2230 at 7.   As a preliminary matter, the Eighth Circuit has not applied the buyer-seller exception in contexts other than sales of narcotics.   Considering the long term sophisticated relationship between Terry, Grady and Dillon, Defendants' "buyer-seller" argument is without merit.   The Eighth Circuit has narrowly construed the buyer-seller exception in conspiracy cases. The Eighth Circuit has expressly stated that the buyer-seller exception can only ever apply in a situation involving "a single transient sales agreement and small amounts of drugs consistent with personal use." *United States v. Boykin,* 794 F.3d 939, 948-49 (8th Cir. 2015). In *United States v. Davis*, the Eighth Circuit explicitly rejected adopting the holdings of some of its sister courts that a buyer-seller exception can be found when multiple transactions are involved. 867 F.3d 1021 (8th Cir. 2017). When a buyer maintains a close relationship with a seller over a significant period of time, the court should not grant a buyer-seller instruction to the jury. *United States v. Conway*, 754 F.3d 580, 592 (8th Cir. 2014).   Terry's relationship with Grady and Dillon took place over an extended period of time, and focused upon

32

Terry avoiding detection in his large scale drug trafficking activities.   There is no evidence to support the application of the buyer-seller exception in this case.

### B.   The Evidence Supports Money Laundering Convictions.

Defendants' argument that there was insufficient evidence to support the money laundering convictions is without merit.   DCD3320 at 11-13.   Unlike many of the cases cited by Defendants, here there was evidence that the purpose of the cash transfers, including $50,000 immediately following Terry's indictment, was to conceal the source and ownership of the currency from law enforcement.

In the wake of Jordan's arrest, Terry after discussions with Grady and Dillon, Terry provided $10,000 in currency to Dillon to hire Beau Brindley (Brindley), an attorney from Chicago, IL.   Tr. 8 at 42, 61-64.

On January 13, 2016, Terry found out he had been indicted and met with Grady and Dillon. Before Terry left the meeting at Applebee's on January 13, 2016, he told Grady and Dillon that he would cause another payment of $15,000 to $30,000 to be made to them to pay Beau Brindley, the attorney from Chicago.   Tr. 8 at 87-92.   Later that same day, Terry decided to pay $50,000 in United States currency to Grady to be delivered to Brindley.   Terry delivered $50,000 that was drug proceeds to Grady, with the intention of delivering the money for the attorney fees before law enforcement could seized the money.   As an experienced drug dealer, Terry knew that he was indicted, had a warrant for his arrest, and that law enforcement officers would seize his United States currency.   The currency was not marked or identified with Terry, and Terry believed that

if law enforcement officers encountered Grady with the currency, that Grady would not divulge the source of the currency.   Tr. 8 at 92-98; 9B at 9-13.

During the evening of January 13, 2016, Dillon and Grady were in communication in the same time periods in which Grady was contacting Brindley.   Tr. 9B at 135-39; Exhibit 81A, page 23.   Thereafter, Williams paid $10,000 in additional currency as directed by Davis at Terry's request. The payment was made to Grady in Dillon's presence.

18 U.S.C. § 1956(a)(1)((B)(i) prohibits engaging in a financial transaction with the proceeds of unlawful activity with the purpose, in whole or in part, of concealing or disguising the nature, source, ownership, control, or location of the funds. To prove purpose and intent, the government may rely on circumstantial evidence. *U.S. v. Bowman*, 235 F.3d 1113, 1116 (8th Cir. 2000). One such bit of circumstantial evidence is if the money transfer involved only cash. *Id.* A jury may believe that the fact that a transfer was done in cash only indicates an intent to conceal; however, the use of cash is not in and of itself sufficient evidence, especially when the transfer is done in the owner's name. *See Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995). The timing of the money transfer may also serve as circumstantial evidence of purpose to conceal. See *Bowman*, 235 F.3d at 1116. Bowman had a pattern of committing a robbery, and then shifting his money around in various safe deposit boxes. The court held that the timing between the robberies and the money transfers could support an inference of an intent to conceal.   *Id.,* at 1115-16.   Additionally, when the defendant gives some of the illicit funds to a trusted friend to hold, the jury may infer a purpose to conceal those funds. *Id.*

34

In *United States v. Dvorak*, the court explained that "Here, there was ample circumstantial evidence from which a jury could conclude that Dvorak withdrew his money with the intent of concealing the location of the funds: he withdrew the entire amount of the Medicaid checks he deposited; the withdrawals were made within one week of the deposits, usually emptying his account completely; and the cash withdrawals were large, ranging from $8,274.36 to $19,865.72. In addition, the withdrawals were in cash, which, although not dispositive, does lend greater support to the jury's finding that the withdrawals were made with the intent to conceal the location of the funds for the simple reason that cash cannot be traced. *Dvorak*, 617 F.3d 1017, 1023-24 (8th Cir. 2010) (citations omitted).   Dvorak explained that, "… the question in this case is whether the circumstances surrounding the withdrawals can support the jury verdict that the withdrawal was designed to conceal the location of the funds.  The question is one of intent, and '[i]ntent frequently cannot be proven except by circumstantial evidence.'"  *Id*., at 1023, *quoting United States v. Phythia*n, 529 F.3d 807, 812 (8th Cir. 2008).

Here, the circumstances support the jury's verdict as to the conspiracy to commit money laundering.   The evidence establishes that the parties had the intent to conceal from law enforcement the source and ownership of cash received from Terry, including the cash Terry delivered to Grady on or about January 13, 2016, in order to avoid the seizure of the funds.   The circumstances supporting the intent to conceal are the timing:   coinciding with the indictment; the nature of the property transferred: United States currency, which is untraceable; and the large amounts involved in the transactions, including $50,000.  It is also reasonable to infer that not only Terry, but Grady and Dillon, are well aware that law enforcement would seize United States

currency in the possession of Terry, a drug dealer that they knew was under indictment.   Terry's testimony along with the attendant circumstances provided a factual basis for the verdict, and the intent to conceal was argued to the jury.   Tr. 12, at 34-35.   Moreover, it was reasonable for Terry to believe that Grady would not divulge him as the source of the funds if contacted by law enforcement.   The entire nature of their relationship was premised upon avoiding law enforcement detection.   The jury was properly instructed on the law.   DCD3234 instructions 37-42 at 57-67.

### C.   The Evidence Supports the Convictions for Attempted Obstruction of Justice.

Defendants' argument that there was insufficient evidence to support the convictions for attempted obstruction of justice is without merit.   DCD3320 at 13-16.   With explicit knowledge of the indictment against Terry, Dillon and Grady stated words to the effect that it would be to Terry's advantage if he went somewhere far away, and was gone for 18 months to 2 years.   Tr. 8 at 71-77.   Grady explained that Terry should "stay away for 18 months to 2 years and kind of let the courts do their thing."   Tr. 8 at 77.   Grady and Dillon made similar statements to Williams, including that Terry would be better to stand trial alone.   Tr. 4B at 110-12.   Grady explained to Terry that Terry's absence for 18 months to 2 years would allow the courts to do their thing, let people plead out, and reduce the number of potential cooperating witnesses against Terry.   Grady and Dillon were in possession of the indictment and discussed, among other things, that Terry was charged in the cocaine distribution conspiracy involving five kilograms or more.   Tr. 8 at 74, 78-87; Exhibit 1B.   The jury was properly instructed on the elements of the offense.   DCD3234 instructions 33-36, at 42-26.

As a preliminary matter the Court  should reject Defendants' attempts to reargue witness credibility in relation to their Rule 29 motion.  "A district court must consider a motion for judgment of acquittal with very limited latitude and must neither assess witnesses' credibility nor weigh evidence." *Stacks*, 821 F.3d at 1043, *quoting* United *States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007).

The nexus between Defendants' conduct and the official proceeding, this case, is self-evident.  Defendants corruptly attempted to influence, obstruct and impede this significant proceeding, the product of a multi-year investigation of cartel affiliated violent organized crime, in order to gain an advantage for Terry. Defendants, who hold themselves out as experts in the area of drug trafficking law, advised Terry that he would be in a better position if he fled and delayed his prosecution, thereby reducing the number of potential witnesses against him.  The evidence establishes that Defendants were uniquely aware of the nature of the pending proceeding. Dillon routinely queried this case and downloaded case documents.  Grady possessed the indictments in his residence. There was overwhelming direct evidence upon which a reasonable jury could and did find Defendants guilty.  Terry's disappearance and flight caused law enforcement to expend substantial resources to locate him and delayed his arrest, prosecution, and sentencing. Tr. 6A at 44, 71.

Defendants' correctly acknowledge that *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) directly forecloses their arguments regarding the applicability of 18 U.S.C. § 1512(c)(2) to the present set of facts.  Defendants also disregard that 18 U.S.C. § 1503 primarily pertains to injuring or influencing a court officer or juror.   DCD3320 at 16.

37

**III.   The Interest of Justice Does Not Require Granting A New Trial.**

Defendants raise a plethora of claims for which they claim they are entitled to a new trial pursuant to Fed.R.Crim.P. 33.   DCD3320 at 16-36.   Each of these claims is without merit. Under Rule 33, the district court "may vacate any judgment and grant a new trial if the interest of justice so requires."   Fed.R.Crim.P. 33(a);   *United States v. Stacks*, 821 F.3d 1038, 1044 (8th Cir. 2016). "While the district court's discretion is quite broad—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict …, there are limits to it."   *Id.*, *quoting United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002). "An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing the factors commits a clear error of judgment."   *Id.*, *quoting United States v. Butler*, 296 F.3d 721, 723 (8th Cir. 2002).

Motions for new trials based on the weight of the evidence are generally disfavored. *Campos*, 306 F.3d at 579. "That being said, the district court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and with caution." *Id.* "Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *Id.* The remedy "is reserved for exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Knight*, 800 F.3d 491, 504 (8th Cir. 2015). *United States v. Stacks*, 821 F.3d 1038, 1044–45 (8th Cir. 2016).

As a preliminary matter, Defendants contend generally that they should be granted a new trial because the jury's verdict was contrary to the weight of the evidence.   DCD3320 at 17-18. There is no basis to grant a new trial on this ground.   The evidence was overwhelming, consisting of credible witness testimony that was firmly corroborated the evidence detailed above, including phone records, text messages, downloaded or seized documents and other incriminating circumstances, including Dillon's presence at Williams' court proceeding in February 2016.

Where Defendants within the parameters of their Rule 33 claims have invited this Court to weigh the evidence and witness credibility, it may confidently and unequivocally do so based upon the record set forth above. For the reasons stated above, there is a clear basis to conclude that Terry, Williams, and Davis are credible, and that they were overwhelmingly corroborated by physical and circumstantial evidence.   Terry and Williams were subject to extensive cross-examination, and admitted among other things their extensive criminal activities and that they sought reductions of the substantial sentences to which they were subject. Terry admitted he assisted Jordan with multiple murders.   Counsel skillfully impeached Williams by eliciting from Terry that Williams enlisted Jordan to murder a man in a wheelchair.   Tr. 8 at 124.   The jury and the Court heard all of the evidence and cross-examination, none of which diminished the credibility of the witnesses and evidence that provided a factual basis as to each necessary element to find Defendants guilty.

## A. The Court Properly Admitted Evidence of the Events of September 7, 2016.

Defendants' arguments that the Court erred by admitting evidence of the events of September 7, 2016, as intrinsic and pursuant to Rule 404(b) are without merit for the reasons set for the in the

Court's previous order in this case.   DCD3320 at 18-22, 2975, 3026, 3063.   Moreover, in the context of the trial, the probative value of the intrinsic evidence contained in Dillon's cellphones, 56-B and 56-C, was exceedingly high.   His possession of 56-C established that he was the user of the device and had extensive contact with Grady.   The device also contained highly relevant downloads, text messages and browser web searches.   While the jury heard significant evidence of these events, Defendants overstate the extent of the evidence in the context of the entire trial. DCD3320 at 20-21.   The Court properly instructed the jury with a limiting instruction.   Tr. 6A at 90-91; DCD3234, instruction 21.

### B.   The Court Properly Admitted Evidence of Grady's Conspiracy Conviction.

Defendants' argument that the Court erred by admitting evidence of Grady's 1999 conviction for conspiracy to distribute heroin pursuant to Rule 404(b) is without merit for the reasons set f or the in the Court's previous order in this case.   DCD3320 at 22-23, 3031, 3081, 3100.   The probative value of the evidence was very high in the context of the trial.   The evidence was received by stipulation and the Court properly instructed the jury with a limiting instruction.   Tr. 7B at 67-70; DCD3234, instruction 22; Exhibit 103.

### C.   There Was No *Brady*, *Giglio*, or Jencks Violation.

Defendants' arguments that there were *Brady*, *Giglio*, and Jencks violations are without merit.   DCD33202 at 23-32.   The United States produced extensive discovery materials in this case, including extensive early production of Jencks material and other information that Defendants availed themselves of in cross examining the witnesses, including Terry and Williams. Contrary to Defendants' assertions, the substance of the witnesses' statements were disclosed to

counsel, years before trial.   Thereafter, additional information that was arguably impeaching was also disclosed.

Concurrent with the filing of this motion response, the United States will move to file under seal exhibits including the following with the Clerk of the Court:

| Attachment 1 | Discovery Index | OD-MG MFNT 001-445 |
| Attachment 2 | Derrick Terry Related Documents including trial exhibits 92A-H | OD-MG MFNT 446-664 |
| Attachment 3 | Stanford Williams Related Documents | OD-MG MFNT 665-825 |
| Attachment 4 | Application, Warrant and Order 4:16MJ 7022 (925)444-5366 | OD-MG MFNT 826-873 |
| Attachment 5 | DEA 6 Re Jordan Calls with (925)444-5366 July 2021 (Jordan, Miller, Terry) | OD-MG MFNT 874 |

As the Discovery Index (Attachment 1) demonstrates, the production of discovery in this case was extensive and complex.   As a general matter, because this is part of a multi-defendant conspiracy case with thirty-four defendants, there were overall productions of discovery to all defendants in *United States v. Velazaquez, et., al*.   These general discovery materials were bates marked with "JAV" as the bates prefix, and consisted of seven productions to all defendants who had not pled guilty, including Defendants Grady and Dillon.   These productions consisted of roughly 27,000 pages in addition to extensive amounts of electronic evidence that included a large number of cellular phone search results and Title III intercepts.

In addition to discovery produced to Defendants Grady and Dillon under the general productions that were part of the overall Velazquez conspiracy case, there were also specific but voluminous productions to Defendants Grady and Dillon that were particular to their case and the

testifying witnesses.   As a general matter, these productions consisted of roughly 7,500 pages with additional electronic evidence.

In an abundance of caution, the United States also produced voluminous discovery related to the events of September 7, 2016.   This production was related to discovery materials utilized in *United States v. Burris and Dillon*; 4:17CR 95 RWS.   The materials were produced to Defendant Dillon in relation to cause number 4:17CR 95 RWS, and reproduced to counsel for Defendant Grady in this case.   See Attachment 1 OG-MD MFNT 0321-0394.   Included in these materials was data derived from the forensic searches of Dillon's phones seized on September 7, 2016.   Exhibits 56B-1 and 56C-1 and related exhibits and data, including 56C1-31, and 81H-1,

Not including sentencing materials, there were roughly thirty-eight separate discovery productions.   Included in one of those productions to counsel for Grady were twenty-four productions from *United States v. Burris and Dillon*; 4:17CR 95 RWS.

Interview notes of Williams, Terry, and Davis, along with transcribed grand jury testimony of Williams and Terry, were made available to counsel for in house inspection on February 6, 2018.   Attachment 1, OD-MG MFNT 130.   On or about March 16, 2018, the Grand Jury transcripts and other extensive interview notes, including interview reports, and other materials were produced to counsel pursuant to the protective order.   OD-MG MFNT 243-246. Discovery productions also included Agent Gaddy's hand written notes taken at the time of Williams' initial post-arrest interview, a DEA 6 documenting Terry's post-arrest statements, and a DEA-6 documenting the search of Terry's Dallas apartment.    On or about March 29, 2018, the DEA interview report of Terry from March 9, 2018, was produced.   Attachment 1, OD-MG

42

MFNT 249, referencing discovery production four specific to MG/OD bates number 460; Attachment 2 OD-MG MFNT 662.   On or about March 20, 2021, a DEA 6 report related to an interview of Terry on March 15, 2021 was disclosed to counsel with other documents related to Terry.   Attachment 1 OD-MG MFNT 442-443 (JAV 37058-59); Attachment 2 OD-MG MFNT 663-64.

One outline of Terry's statements, which documented the substance of his statements over the course of several meetings, consisted of more than 31 single spaced pages, and his grand jury testimony was 59 pages.   Attachment 2, OD-MG MFNT 568-659; Trial Exhibits 92F and G respectively.   Reports documenting Terry's statements alluded to above (OD-MG MFNT 662-664), and other reports detailing Terry's post arrest statements on July 27, 2016 were also disclosed to counsel.   One outline of Williams' statements, which documented the substance of his statements over the course of several meetings, was 25 pages single spaced, and his grand jury testimony was 45 pages.   Attachment 3, OD-MG MFNT 755-825, Trial Exhibits 91E and F, respectively.

These and other materials provided the basis for very long and probing cross-examination of Terry, Williams, and other witnesses.   Counsel cross-examined Williams for several hours, constituting 162 pages of trial transcript.   Tr. 5A at 48-116; 5B at 4-88; 110-120 (recross).   Counsel cross-examined Terry for several hours, constituting 233 pages of trial transcript.   Tr. 8 at 115-149; 9A at 4-92; 9B at 19-31 (recross).

The United States does not dispute that it met with Terry and Williams multiple times prior to trial to prepare their testimony.   However, there is no basis in the record to conclude that

43

Williams or Terry were asked to adopt the oral, unrecorded statements they made during the pretrial interviews to the extent that those oral statements would constitute Jencks material.

As to Defendants' specific assertions, the United States has been unable to find support in the record for the assertion that "at least one government agent, Agent Llewellyn, took notes during those meetings."   DCD3320 at 23; see Tr. 5-A at 48-49; 5B at 119.   When asked if anyone was taking notes, Williams stated yes.   However, Williams was not asked who was taking notes, and did not specify who was taking notes.   Tr. 5A at 49.   Williams testified that Mr. Llewellyn was present, but did not state that he was taking notes.   The record is even less clear as to Terry, *infra*.

The United States previously disclosed the substance of Williams' extensive statements, and thereafter disclosed other potentially impeaching information to Defendants.   There is no evidence that Williams' statements in pretrial meetings were recorded, transcribed, or otherwise adopted by Williams making them subject to production under the Jencks Act.   Similarly, the United States has been unable to find support in the record that Terry adopted his unrecorded, pretrial interviews, other than those previously disclosed to the defense in his extensive witness outline and grand jury testimony.[3]   Tr. 8 at 115-18; 226-26.   There is no factual basis to support

_____

[3]   The United States has searched the trial transcript and has been unable to find support in the record for the proposition that agents were taking notes during trial preparation meetings with Terry, particularly of a nature that would constitute *Jencks* material.   Moreover, there is no evidence that this was similar to the facts of *Goldberg v United States*, 425 U.S. 93, 100 (1976) where with witness was asked to adopt statements.   DCD3320 at 27.   The oral, unadopted statements of Terry and Williams do not constitute "statements" within the meaning of the Jencks Act.   While Terry and Williams adopted their prior extensive witness statements and grand jury testimony that were disclosed to counsel, they did not adopt their oral unrecorded statements in

Defendants' assertions that the government "apparently had only disclosed the notes or the contents of roughly half of the meetings it had with the two most critical witnesses." DCD3320 at 25. The United States made early production of the extensive statements of Terry and Williams, which formed the nucleus of their testimony.

The United States fully acknowledges its discovery obligations. Under the Due Process Clause of the Fifth Amendment to the United States Constitution, the government must disclose to the accused favorable evidence that is material to guilt, punishment, or the credibility of a witness. *United States v. Chappell*, 990 F.3d 673, 678-679 (8th Cir. 2021), *citing United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019) (*citing Brady*, 373 U.S. at 87 (guilt and punishment evidence)), and *Giglio*, 405 U.S. at 154 (witness credibility)). "To establish a due process violation, a defendant must show that the evidence in question is favorable to him, that the government suppressed the evidence, and that the evidence was material." *Id*., at citing *Dones-Vargas*, 936 F.3d at 722.

Generally, "[e]vidence is material when there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id*., *citing Donnes-Vargas*, *quoting Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). A "'reasonable probability' of a different result" exists when "the nondisclosure 'undermines

_____

the meetings immediately preceding trial. *See infra United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir. 1996) (Holding that because oral, untranscribed, nonadopted assertions are not "statements," within the meaning of the *Jencks* Act, the non-disclosure of the [witness] declaration did not violate the *Jencks* Act).

confidence in the outcome of the trial.'"  *Id.*, *citing United States v. Bagley*, 473 U.S. 667, 678 (1985).  To decide if impeachment evidence is "material," we examine the record as a whole because "[t]he relative strengths of the prosecution's case and the impeachment value of the undisclosed evidence bear on whether disclosure in time for use at trial would have made a difference."  *Id*.

The Jencks Act, 18 U.S.C. 3500, provides in relevant part as follows:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States… shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement…which relates to the subject matter as to which the witness has testified.

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

"A witness's statements include all statements written or signed, or otherwise adopted or approved by the witness; verbatim transcriptions of the witness's oral statements; and the witness's grand jury testimony."  *United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir. 1996) (Holding that because oral, untranscribed, nonadopted assertions are not "statements," within the meaning

of the *Jencks* Act, the non-disclosure of the [witness] declaration did not violate the *Jencks* Act); *United States v. Lewis*, 04-403 (JNE/SRN) 2006 WL 8439442 at *4 (D. Minn. March 24, 2006).

A district court may vacate a conviction based on newly discovered evidence. Fed.R.Crim.P. 33(b)(1); *United States v. Chappell*, 673 F.3d 673, 677 (8th Cir. 2021). To receive a new trial, the moving party must show that: (1) the evidence was actually newly discovered since trial; (2) the moving party acted diligently; (3) the newly discovered evidence is neither merely cumulative or impeaching; (4) the newly discovered evidence is material to the issues involved; and (5) it is probable that the newly discovered evidence would produce an acquittal. *Chappel*, 673 F.3d at 677, *citing United States v. Shumaker*, 866 F.3d 956, 961 (8th Cir. 2017).

### 1. The shooting of the informant.

Defendants' claims that the United States failed to disclose information about Terry's uncharged unadjudicated 2008 attempted murder of an informant in an entirely separate conspiracy is entirely baseless. DCD3320 at 26. The information, arguably irrelevant and immaterial, was disclosed and defense counsel cross-examined Terry, who admitted shooting an informant.

On March 23, 2021, the United States sent counsel a letter that included among other things the following disclosure:

> As I discussed with you yesterday, Derrick Terry has admitted shooting a St. Louis man who was a law enforcement informant. The shooting occurred on October 11, 2008. Terry shot the informant multiple times and believed he killed him because Terry thought the man was giving information to law enforcement about large scale cocaine dealings. The man survived but sustained significant injuries. DCD3176 (Sealed)

47

Terry's attempted murder of an informant, approximately six years before he met Grady and Dillon, is irrelevant.   However, for purposes of judicial economy and as a matter of trial strategy, the United States did not object to the introduction of this evidence before the jury.   Counsel, without objection, cross-examined Terry on the information.   Terry readily admitted to Dillon's counsel that he shot the informant six years before he met Grady and Dillon, so the man would not inform on someone Terry knew.   Tr. 8 at 184-85.   Upon further cross-examination by Grady's counsel, Terry admitted that he shot a witness in a federal criminal case and that he was not punished for the shooting.   Tr. 9A at 85-86.   On redirect, Terry explained that he tried to kill the informant, and believed that he did kill him.   Tr. 9A at 93, 97-98.

The evidence of Terry's animus against informants did not impeach his direct testimony, but was entirely consistent with it, and tended to prove the Government's theory of the case.   This was not exculpatory material where Defendants provided information to Terry about informants while knowing and sharing his animus against informants. Tr. 9A at 98-100.   Further, Terry did not mitigate his own criminal conduct.   He admitted the scope of his illegal activities including murders, large scale drug dealing, money laundering, and that he was a "full-fledged criminal." Tr. 9B at 18; 9A at 63.     Assuming arguendo that there was any exculpatory value to the evidence, it was disclosed and presented without objection to the jury.   Moreover, additional details about Terry's association with the Sills DTO, including threats upon witnesses, were set forth in the discovery materials provided to counsel, including in the search warrant materials (at JAV 013375) recovered from Terry's Dallas residence, *infra*.   Even where the prosecution delays the disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated.

48

*Gonzales*, 90 F.3d at 1368 (citations omitted).   There is also a basis to conclude counsel had independent knowledge of the shooting when Grady's counsel cross-examined Williams, not Terry, about his knowledge of the shooting, mentioning the informant by name.   Tr. 5A at 57. The government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants.   *Id.*

### 2.   Search warrant materials recovered at the time of Terry's arrest.

Discovery material, specifically a search warrant for 4801 Northland (16MJ 5045) issued on January 28, 2016, was discovered in Terry's apartment during his fugitive arrest in Dallas in July 2016.   This search warrant, along with other materials seized from Terry's residence, was provided to counsel years before trial.   See Attachment 1 MD-MG-MNFT 105 JAV 13297-13404, which contains the search warrant seized from Terry's residence, bates marked JAV 13342-398. A DEA 6 report documenting that search warrant materials were recovered from the residence was also disclosed to Defendants well in advance of trial.   The Government confirmed that Williams, perhaps without direct knowledge of how the documents were actually delivered to Terry's apartment, knew and intended that the documents would be provided to Terry.   The United States notified counsel of this fact. DCD3176 (Sealed, included the language that, "A copy of discovery materials provided to Williams in this case (JAV 13342-JAV 13398) were recovered from Terry's apartment in Dallas on July 27, 2016.").

Williams, during his direct examination, unequivocally testified that he intended that the discovery material be provided to Terry to notify Terry that he was being looked at for a murder. Tr. 5A at 12-13.   Defendants cross-examined Williams extensively on this point, and he readily

admitted that he intended that his discovery materials be made available to Terry so that Terry knew he was wanted for a murder, that he could continue "to hide more," and that Williams did not volunteer this information to the United States.   Tr. 5A at 96-99; 5B at 31-37, 82.   Counsel subsequently cross-examined Terry on this point, and he also admitted he received and reviewed the search warrant affidavit and that it came from Williams.   Tr. 8 at 248-49; 9A at 1-11; 34-35; 88.   The United States does not concede that this constitutes exculpatory evidence as to Defendants.   Nonetheless, even where the prosecution delays the disclosure of evidence, but the evidence is disclosed during trial, *Brady* is not violated.   *Gonzales*, 90 F.3d at 1368.

### 3.   Terry's alleged flight from law enforcement in 2011 or 12.

Defendants assert that the United States failed to disclose impeachment evidence that Terry fled from law enforcement in 2011 or 2012.   DCD3320 at 25-16.   Defendants advance the argument that, "Mr. Dillon has discovered that around 2011 or 2012, Terry was involved in a high-speed chase from police with an individual named Michael French while trafficking drugs and Terry eventually hide from police in French's mother's residence.   French was charged in both St. Louis City Circuit Court and the Eastern District of Missouri regarding the incident, but Terry was never captured or charged in that offense."   DCD3320 at 26-26.

Defendants' proffered evidence fails all five requirements to mandate a new trial pursuant to Rule 33 as set forth in above *Chappel*, 673 F.3d at 677.   As a preliminary matter, there is no factual basis to suggest the United States was aware of this evidence.   While not conceding the factual veracity of the allegation, the evidence is offered for the purpose of impeachment of Terry's testimony.   The questions asked of Terry were vague and the purported evidence would not even

impeach Terry where Counsel asked, "Have you seen or heard about other drug traffickers running away from law enforcement?" Tr. 8 at 183.   Counsel did not ask Terry directly, at this point in the proceeding, about an incident in which he personally fled from law enforcement.   Terry answered that he may have seen people run on "TV" and conceded to counsel that people did these things to stay out of jail.   Tr. 8 at 183.

The United States disclosed Terry's known criminal history to counsel.   In addition to disclosing Terry's criminal history that was documented in search warrants and other judicial process, the United States sought and obtained permission from the District Court to disclose the Presentence Investigation Report (PSR) DCD2710 to counsel.   ¶¶ 145-164 of the PSR documented Terry's criminal history, including   ¶ 162 documenting an offense of failure to obey an officer that alluded to Terry driving away from police during a drug transaction.   While the relevance of this incident was marginal at best, Counsel questioned Terry about this incident.   Tr. 9A at 49-51.   This incident was also detailed in court documents related to Terry's supervised releasee violations in cause number 4:99CR 291 CEJ that were seized from Grady's residence and introduced in trial.   Exhibit 71A.

Federal Rule of Evidence 608(b) provides that except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness.   The rule further provides that specific instances of witness untruthfulness may be inquired into on cross-examination in the discretion of the court.   But such cross examination is subject to exclusion if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

51

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *United States v. Beck*, 557 F.3d 619, 620, 621 (8th Cir. 2009), *citing United States v. Beal*, 430 F.3d 950, 956 (8th Cir. 2005) (*quoting* Fed. R. Evid. 403). "Trial judges retain 'wide latitude' to impose 'reasonable limits' on cross-examination," particularly where the subjects inquired into might confuse the jury or be "repetitive or only marginally relevant." *Beck*, 557 F.3d, at 621, quoting *United States v. Drapeau*, 414 U.S. F.3d 869, 875 (8th Cir. 2005), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

The incident is irrelevant, and at best, is offered to impeach Terry.   Moreover, under Rule 608(b), extrinsic evidence of the event would be inadmissible, and cross-examination limited. Further, in view of the overall strength of the evidence, and the significant cross-examination of Terry, including his desire to obtain less than a life sentence, his extensive illegal conduct that included murders, his efforts to avoid detection for his crimes, and other significant impeaching evidence, it is not probable that evidence of Terry's flight in another case, even if true, would produce an acquittal at trial.

### 4. The recorded statements of Terry in a jail call with Jordan.

Defendants assert that the United States provided voluminous discovery, which included a search warrant referencing a cell phone used by Terry, that Terry had recorded jail calls with Jordan, and that these calls should have been disclosed to counsel.   Defendants further state that on cross-examination, Terry denied speaking with Jordan while Jordan was in custody. Defendants, contend that the non-disclosure of the recorded jail calls constitutes a *Brady*, *Giglio*,

and Jencks violation warranting a new trial.   DCD3320 at 28-32.   Defendants' arguments are without merit.

Counsel, during cross-examination, asked Terry if he spoke to Jordan while he was in custody.   Terry said that he did not.   Counsel then asked, "Not even through a third party?"   To which Terry responded, "I just – I think maybe J Bird (Jerry Brown) or Tone Bone (Anthony Miller) went to see him.   But I gave Tone Bone 3- or 4,000 for his kids for Christmas and told him to just hold – just hold strong …"   Terry then recounted further details about "J Bird," and explained that he gave Miller money to give to Jordan's girlfriend for Jordan's kids for Christmas. Tr. 8 at 245-47.

Defendants correctly assert that the United States disclosed the application for a precision location warrant to them in pretrial discovery.   The warrant, order, and application including the affidavit (4:16 MJ 7022) were disclosed in discovery production Batch 5, on March 14, 2017 (JAV 0016295-342). See Attachment 1, OD-MG MFNT-0112, 115.   The warrant, order, and application including the affidavit are attached hereto.   See Attachment  4, including at OD-MG MFNT 854-55.   Investigators applied for and received state and federal orders for the precision location warrant believing that Terry used the phone ((925)444-5366). The corresponding state application was produced twice in discovery production Batch 6 as items 01 (JAV 00202471-477) and 20A (JAV 0020666-672).       See Attachment 1, OD-MG MFNT-0299.

Investigation reveals that the phone was used by Anthony "Tone Bone" Miller.   See Attachment 5, DEA 6 report of July 2, 2021.   At or near the time of the round up on January 13, 2016, investigators tracked the phone in an attempt to arrest Terry, but discovered that Miller, not

Terry, was in possession of the phone.   In this respect, the United States had no reason to suspect a cache of phone calls between Jordan and Terry where Miller was found in possession of the phone.

On or about June 29, 2021, DEA Task Force Officer Lanham (TFO Lanham) and the undersigned contacted Terry.   Terry listened to the jail calls and identified the voices of Miller and Jordan in the majority of calls   Terry identified a single phone call that occurred on December 4, 2015, in which Miller facilitated a conversation between Jordan and Terry, at Jordan's request. See Attachment 4, at OD-MG MFNT 854-55.   The United States will provide this phone call to the Court for *in camera* inspection, but contends that it does not impeach Terry, nor is it otherwise material.

The single phone conversation between Jordan and Terry does not constitute Jencks material as to Terry because the recording was not related to the subject matter to which he testified on direct examination.   *United States v. Jewell*, 614 F.3d 911, 925 (8th Cir. 2010) (Because Elliot's testimony focused on selected aspects of his investigation, the government was only obligated to provide any "statement" made by Elliott which "relate[d] to the subject matter" to which he testified).   The United States by no means concedes noncompliance with the Jencks Act, but where there is no indication of bad faith on the part of the government, we will not reverse unless there is a showing of prejudice to the defendant.   *United States v. New*, 491 F.3d 369, 376 (8*th* Cir. 2007).   There is no Jencks violation, nor is there bad faith on the part of the government, nor is there prejudice to Defendants.   The circumstances indicate that the United States expended considerable resources in efforts to comply with its disclosure obligations in this case.

54

Nor is there a *Brady* or *Giglio* violation.  "To establish a due process violation, a defendant must show that the evidence in question is favorable to him, that the government suppressed the evidence, and that the evidence was material."  *Chappel*, 990 F.3d at 679, *citing Dones-Vargas*, 936 F.3d at 722. Defendants cannot meet any of these factors.  For the reasons set forth below, the evidence is not favorable to Defendants.

The government did not suppress the evidence.  Its existence was disclosed in the warrant, application, and affidavit set forth above, which alluded to phone communications between Jordan and Terry.  The discovery in this case was complex, and the United States, to comply with its obligations, rightly devoted more time and resources to producing discovery than preparing for trial.  Counsel's questions alluded to above, including specific inquiry regarding Terry's communications with Jordan while he was confined and potential communications through third persons, provide a reasonable basis to conclude counsel was aware of the communications, but made no specific request to the Government for production of the recordings, perhaps to preserve this issue.[4]

The single jail call between Terry and Jordan in not material.  Based upon the strength of the evidence and the cumulative nature of the communication in the jail call (that Jordan and Terry discussed cooperators) there is no reasonable probability that the result of the proceeding would have been different.  This is particularly true in view of the strength of the corroborating physical

---

4 The jail recordings alluded to herein were produced to Counsel for Defendant Jordan.  The extent of Defense Counsel's knowledge of the call remains an open question.

and circumstantial evidence detailed above.   Moreover, the jury was made fully aware that Terry, convicted of murder in this case, was attempting to obtain a reduced sentence from life.   Terry was also impeached with numerous inconsistent statements.   The record was already replete with Terry's numerous admissions that he received information from other sources, including Jordan.   Finally, no aspect of the jail call diminishes the physical and circumstantial evidence tying Defendants to Terry, Williams, and Davis and the charged offenses.

Defendants, without citation to the record, mischaracterize the evidence by the assertion that, "The government repeatedly elicited testimony from Terry on direct examination that he received information about cooperators *exclusively* from Mr. Grady and Mr. Dillon."   DCD3320 at 30 (emphasis added).   Undoubtedly, there was ample evidence that Terry received information from Grady and Dillon, including the physical evidence and phone records detailed above.   But it mischaracterizes Terry's testimony, the evidence, and the Government's theory of the case to suggest that Terry's testimony was that he received information "exclusively" from Grady and Dillon.

For example, on direct examination Terry testified that he received information from Jordan, particularly in relation to Washington.   Terry was close to Jordan, having dealt large-scale drugs and committed murders with him.   Tr. 7B at 128-30.   Terry recounted in detail his conversations with Jordan in which Jordan related details about Washington's arrest and potential legal liability. Jordan told Terry that he paid for attorney Scott Rosenblum (Rosenblum) to represent Washington. Terry also stated that he and Jordan went to see Rosenblum after they could not find Washington. Tr. 8 at 23-26; 154-55; 220-21.   It was reasonable that Terry and Jordan, as coconspirators, would

have these types of conversations.   Terry explained that he was concerned about what Jordan may have told Washington about the illegal acts that Terry and Jordan had committed together.   This created the prospect that if Washington were to cooperate, he could implicate Jordan and Terry. Terry explained that if Washington told on Jordan, "then that puts me in the predicament to either try to kill Jordan or both of them …"   Tr. 7B at 128-30; 8 at 23-39; 9A at 92.   Moreover, Terry never claimed that he only knew about Don McGee or Dominic Irons through Grady and Dillon, nor did the prosecution imply this at trial.   Tr. 9A at 102.

The entire tenor of the evidence was that Terry derived information from others, including Jordan, Grady, and Dillon.   That Terry admitted receiving information from other sources, including Jordan and Williams, does not limit Grady and Dillon's criminal liability.   Nor is it inconsistent with the evidence that Terry would turn to Grady and Dillon, who held themselves out as experts in this area, to obtain additional information, or discern the meaning of the information and whether an individual was cooperating with law enforcement.

Defendants further mischaracterize the evidence by advancing the argument that Terry's testimony regarding Washington was the "only testimony relating to a cooperator that Terry remembered with any specificity."   DCD3320 at 30.   While Washington was a central figure because of his association with Jordan and the manner in which the present conspiracy figured into Terry's potential liability, Terry testified about other cooperators or potential cooperators that he discussed with Grady and Dillon, *supra*.   Terry testified about others, including Jerome Lewis (Tr. 7B at 122-26; 8 at 20-21; 9A at 37-39); Anthony Templeton (Tr. 8 at 21-23); Dominic Irons and Don McGee (Tr. 8 at 48-58, 67; 9A at 102), see Facts, *supra*.

At best, the proffered evidence would consist of a phone call between Terry and Jordan. There is no impeaching value to the phone call where Terry testified to his close relationship with Jordan, their prolific, and often jointly undertaken criminal activity, and to the fact that he received information from Jordan.   Defendants effort to miscast the evidence belies that there is little or no impeaching value to this evidence.   Moreover, based upon known facts, the phone records would be that of Miller as the user of the device, not Terry, with the exception of the single phone call of December 4, 2015.

To the extent Grady asserts that his trial strategy was to show that the information Terry received came Jordan and Williams, not Dillon and Grady (DCD3320 at 30-31), there was undisputed evidence that Terry had obtained information from Jordan and Williams.   As set forth above, both Williams and Terry admitted that Williams provided an affidavit that ended up in Terry's hands in Texas.   Terry also admitted that he asked Deshawn Jones to look into Williams case.   Tr. 8 at 134; 9A at 81.

Terry freely admitted he discussed Washington's situation with Jordan.   The United States did not dispute this fact; aspects of this dynamic are set forth above.   On cross-examination, Terry readily admitted that he received information from Jordan and others, including information about Washington. Tr. 8 at 220-21 (Jordan and Terry contacted Rosenblum in relation to Washington); Tr. 8 at 232-33; 9A at 12-22 (Jordan provided Terry details about murders and violence); Tr. 8 at 234-37 (Jordan and Terry obtained information about Washington from Washington's mother and father);   Tr. 9A at 25-27 (Jordan provided information about Anthony McDonald); Tr. 9A at 28-31 (Jordan had a source of information in the police department who provided information to

58

Jordan, who in turn shared information with Terry); and Tr. 9A at 31-32 (Jordan had someone inside the jail who was providing Jordan with information about DD Head (Dominic Irons).

For the reasons stated herein, Defendants' claim regarding Terry's jail communication with Jordan is without merit.   As to the totality of Defendants' *Brady*, *Giglio*, and Jencks claims, they are without merit.   Moreover, based upon the strength of the evidence an d the totality of the existing record, none of Defendants' claims, individually or collectively create a reasonable probability that they would change the outcome of the proceeding.

**D.    The Court Did Not Err When it Denied Defendants' Motion to Dismiss for Violation of the Speedy Trial Act.**

Defendants assert violations of the Speedy Trial Act, which the Court properly denied based upon the existing record.   DCD 3320 at 32; 2453, 2464, 2586, 2616, 2618, 2620, and 2646.

**E.    The Court Did Not Err When it Denied Defendants' Motions to Dismiss for Prosecutorial Misconduct.**

Defendants assert that allegations of prosecutorial misconduct should have mandated dismissal of the indictment, which the Court properly denied based upon the existing record. DCD 3320 at 33-35; 1352, 1368, 1430, 1651, 1654, 1661, 1669, 1690, 2167, 2246, 2586, 2616, 2620, and 2646.   Moreover, Defendants' allegations of prosecutorial misconduct pertained in large part to historic cell cite records, and related call detail information, which proved to be highly incriminating at trial.   The defense also placed before the jury emails from which they argued their prosecution was improper.   The jury rejected these arguments.   The evidentiary basis for Defendants' guilt has been previously set forth, *supra*.

**F.   There Were No Errors Pertaining to Jury Instructions, Nor Was There Cumulative Error.**

Defendants' non-specific claims of error as to the jury instructions are refuted by the existing record and the Court's instruction conference.   DCD3320 at 35; 3222-24; 3233-35.   Defendants' claims of cumulative error are without merit for the reasons stated herein.     DCD3320 at 35-36.

WHEREFORE, the United States requests that Defendant's Motion be denied for the reasons set forth herein.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney

*s/ Michael A. Reilly*
MICHAEL A. REILLY #43908MO
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, MO 63102
(314) 539-2200

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2021, the foregoing was filed electronically with the Clerk of the Court to be served upon Counsel of record.

*s/Michael A. Reilly*
Michael A. Reilly, 43908MO
Assistant United States Attorney